U.S. COURT OF APPEALS
RECEIVED
CLERK

AUG 28 2019

ATLANTA, GA

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

OLUWAMUYIWA AWODIYA,

*Plaintiff-Appellant,*

-v-

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF
VETERINARY MEDICINE
LIMITED,

*Defendant-Appellee.*

)
)
)
)
)
)
)
)
)
)
)
)

Appeal No.  19-12832-DD

On Appeal from the United States
District Court for the Southern
District of Florida
Case No. 0:18-cv-60482-RKA

## APPENDIX VOLUME II: DOCKET NOS. 210–218

*Pro se* plaintiff-appellant Oluwamuyiwa Awodiya ("Plaintiff") hereby files

Volume II of his Appendix.

OLUWAMUYIWA  AWODIYA
15005 DAHLIA DR
BOWIE, MD 20721
PRO-SE

## INDEX

| Vol. | Tab | Description |
|------|-----|-------------|
| I | Dkt. | Civil Docket for Case #: 0:18-cv-60482-RKA |
| I | 47 | Plaintiff's Third Amended Complaint |
| I | 58 | Defendant's Answer and Affirmative Defenses to Plaintiff's Third Amended Complaint |
| I | 59 | Medical Assessment Report |
| I | 61 | Plaintiff's First Motion for Summary Judgment |
| I | 102 | Plaintiff's Second Motion for Summary Judgment |
| I | 102-1 | Declaration of Oluwamuyiwa Awodiya |
| I | 113 | Deposition Transcript of William Owen |
| I | 119-20 | RUSM Student Handbook |
| I | 119-22 | RUSM Academic Catalog |
| I | 119-28 | Dismissal Letter |
| I | 120 | Defendant's Motion for Summary Judgment |
| I | 138 | Deposition Transcript of Matthew Stewart-Fulton; and Deposition Transcript of Bryan Hayse |
| I | 154 | Omnibus Order on Motions for Summary Judgment |
| I | 176 | Order of Reassignment |
| I | 191 | Order |
| I | 195 | Defendant's Reponses to Plaintiff's Requests for Admission; and "Exhibit 10" to Plaintiff's Requests for Admission No. 18 |

| II | 210 | Order Closing Case |
|----|-----|--------------------|
| II | 211 | Final Judgment |
| II | 212 | Plaintiff's Motion for Amended and Additional Findings |
| II | 213 | Exhibits to Declaration of Oluwamuyiwa Awodiya |
| II | 217 | Order |
| II | 218 | Notice of Appeal |

# <u>210</u>

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-60482-CIV-ALTMAN/Hunt

**OLUWAMUYIWA AWODIYA,**

Plaintiff,

v.

**ROSS UNIVERSITY SCHOOL OF MEDICINE,**

Defendant.

_____/

### ORDER

**THIS MATTER** came before the Court upon the parties' responses [ECF Nos. 192 & 193] to the Court's May 15, 2019 Omnibus Order ("Omnibus Order") [ECF No. 191]. The Omnibus Order required the parties, pursuant to Federal Rule of Civil Procedure 56(f), to brief the following questions: (1) whether Title III of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA") apply extraterritorially; and (2) what impact, if any, the answer to this question has on the Plaintiff's remaining claims.

On March 2, 2019, this Court entered partial summary judgment against the Plaintiff [ECF No. 154] and, as a result, only four of the Plaintiff's claims against the Defendant, Ross University School of Medicine ("RUSM"), have survived: Count I (failure to accommodate under the RA); Count II (failure to accommodate under the ADA); Count VIII (fraudulent inducement); and Count IX (negligent misrepresentation). At the motions hearing on June 11, 2019, the Plaintiff moved in open court to voluntarily dismiss Count IX (negligent misrepresentation) with prejudice under Federal Rule of Civil Procedure 41(a)(2), and the Court granted that motion. Accordingly, as of this Order, only Counts I, II, and VIII remain.

1

As the Omnibus Order made clear, neither party had raised—and so the Court did not consider—the question of the ADA's and the RA's extraterritorial application. With the benefit of the parties' supplemental briefing and oral argument, the Court does so now.

## THE FACTS

The facts of this case are thoroughly detailed in the Court's March 2, 2019 Order on the parties' motions for summary judgment.[1] As relevant here, the Plaintiff is a former medical student at RUSM, a private medical school in Dominica. Pl.'s 56.1 ¶¶ 1, 9. The Plaintiff applied to RUSM in 2013. Def.'s 56.1 ¶ 4. On its website, RUSM represented that "[i]t is the policy and practice of [RUSM] to comply with the Americans with Disabilities Act as applicable and practical in Dominica." *Id.* RUSM requires its students to take the National Board of Medical Examiners' Comprehensive Basic Science Exam ("COMP Exam") at the end of their fifth semester. Def.'s 56.1 ¶ 36. The Plaintiff took and failed the COMP Exam five times. Def.'s 56.1 ¶¶ 39-50. As a result, on June 29, 2017, RUSM dismissed him from the university. *See* Dismissal Letter [ECF No. 119-28 at 2].

The Plaintiff's remaining contentions are that: (1) RUSM failed to honor his alleged requests for an accommodation under the ADA and the RA for extra test-taking time; and (2) RUSM's statement that it complies with the ADA "as applicable and practical in Dominica" constitutes fraudulent inducement because RUSM never had any intention of complying with either federal statute.

---

[1] The Court will adopt the same citation convention it used in the March 2, 2019 Order. That is, the facts taken from the Plaintiff's Statement of Undisputed Facts will be referred to as "Pl.'s 56.1" [ECF No. 101]; the Defendant's Response in Opposition as "Def.'s Resp. 56.1" [ECF No. 107-1]; the Plaintiff's Reply as "Pl.'s Reply 56.1" [ECF No. 115]; the Defendant's Statement of Undisputed Facts as "Def.'s 56.1" [ECF No. 119]; the Plaintiff's Response in Opposition as "Pl.'s Resp. 56.1" [ECF No. 139]; and the Defendant's Reply as "Def.'s Reply 56.1" [ECF No. 143].

## THE STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See e.g., Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence that a genuine issue of material fact precludes summary judgment. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); FED. R. CIV. P. 56(e). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). Notably, assessments of credibility—no less than the weighing of evidence—are jury questions not susceptible of

3

disposition at summary judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). The Court must analyze the record as a whole—and not just the evidence the parties have singled out for consideration. *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987). If there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)).

## ANALYSIS

### I.    Counts I and II (Failure to Accommodate under the RA and the ADA)

Two federal courts have already held, in the precise circumstances presented here—a lawsuit by an RUSM student against RUSM for violations of the ADA and the RA—that the ADA and the RA do not apply extraterritorially. *See Archut v. Ross Univ. Sch. of Veterinary Med.*, 580 F. App'x 90 (3d Cir. 2014) and *Galligan v. Adtalem Glob. Educ. Inc.*, No. 17 C 6310, 2019 WL 423356 (N.D. Ill. Feb. 4, 2019).

The Plaintiff's Response ("Pl. Resp.") [ECF No. 192] to the Court's Omnibus Order raises three principal arguments: (1) that the Supreme Court "overruled" *Archut* in *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016); (2) that the express language of both the ADA and the RA indicates that Congress intended the statutes to apply extraterritorially; and (3) that "most of" the acts in this case occurred in the United States—thus obviating any need to determine whether the ADA applies extraterritorially.

In its Response ("Def. Resp.") [ECF No. 193], RUSM says (1) that all of the conduct pertaining to the Plaintiff's alleged requests for an accommodation occurred in Dominica; and (2) that neither the ADA nor the RA contains any express indication of congressional intent with

4

respect to the statutes' extraterritorial application—as a result of which, RUSM contends, the statutes do not apply abroad. *See Morrison v. Nat'l Austl. Bank, Ltd.*, 561 U.S. 247, 255 (2010).

It is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Id.* at 255 (citations and quotations omitted). Because Congress "ordinarily legislates with respect to domestic, not foreign, matters," a statute does not apply extraterritorially unless Congress makes plain its "affirmative intention" that the statute should govern abroad. *Id.* Indeed, given the "obvious" incompatibility between American and foreign laws that might arise if U.S. statutes were routinely given extraterritorial effect, the Supreme Court has admonished courts to presume that, if "Congress intended . . . foreign application, it would have addressed the subject" within the text of the statute. *Id.* at 269. Unfortunately for the Plaintiff, neither Title III of the ADA nor Section 504 of the RA evince any "affirmative intention" to apply the provisions of those statutes extraterritorially.

Title III of the ADA provides that "[n]o individual shall be discriminated on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Title III governs accommodations provided by private entities, which may include "postgraduate private school[s] or other place[s] of education,"[2] and prohibits a private entity's failure to make reasonable modifications in policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of its services. *See* 42 U.S.C. § 12182(b)(2)(A)(iii).

---

[2] *See* 42 U.S.C. § 12187(7)(J).

5

Analyzing the precise question at issue here—whether Title III of the ADA applies extraterritorially—the district court in *Archut* explained as follows:

> Following the analysis set forth in *Morrison,* we observe that [Title III of the ADA] contains no clear expression of extraterritorial application of the anti-discrimination standards to foreign institutions. The text of the statute provides no indication Congress intended to provide extraterritorial application of these standards to foreign institutions offering public accommodations or public transportation. Moreover, in this piece of legislation, Congress sought to reduce physical or other barriers to sites where disabled individuals need access. This focus is presumed to be domestic, as no indication exists in the text of the statute to suggest otherwise. This statute is narrowly addressed to the domestic issue of providing access for disabled United States citizens. It would be contrary to the rationale of the presumption against extraterritoriality to interpret the text so as to require foreign institutions to adhere to United States standards for barrier removal and reasonable accommodations.

*Archut v. Ross Univ. Sch. of Veterinary Med.*, No. CIV.A. 10-1681 MLC, 2012 WL 5867148, at *11 (D.N.J. Nov. 19, 2012), *aff'd,* 580 F. App'x 90 (3d Cir. 2014). Notably, the "Definitions" section of Title III does not include *foreign* educational institutions as "entities [] considered public accommodations" under the ADA. Nor does Title III contain, in any other section, any suggestion that its terms apply in foreign lands. *See generally* 42 U.S.C. § 12181.

No less significantly, Title I of the ADA—which, unlike Title III, prohibits *employment* discrimination—expressly applies extraterritorially. *See* 42 U.S.C. § 12111(4) ("The term 'employee' means an individual employed by an employer. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States."). Under the doctrine of *expressio unius est exclusio alterius*, we must assume that, by including an extraterritorial provision in Title I—and by excluding any similar provision from Title III— Congress acted purposefully. *See* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107-11 (2012). As the *Morrison* Court noted, "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that

6

provision to its terms." *Morrison*, 561 U.S. at 265.[3] Put simply, Title III of the ADA does not apply to RUSM's actions in Dominica.

The analysis under the RA is even more straightforward. By its own terms, that statute explicitly limits its own scope to "individual[s] with a disability *in the United States*." 29 U.S.C. § 794(a) (emphasis added). Based in part on this circumscription, the *Galligan* Court addressed and dismissed the very same argument the Plaintiff makes here—that, because RUSM receives federal financial assistance, it must be subject to the RA:

> The [RA] by its own terms limits relief to those "in the United States," language which supports rather than rebuts the presumption against extraterritoriality. Galligan argues that by applying to "any program," the Rehab Act demonstrates its intent to apply extraterritorially. But broad statutory language does not indicate worldwide scope. In *Morrison*, the Court held that section 10(b) of the Securities Exchange Act "contains nothing to suggest it applies abroad," even though it prohibits "*any* person" from using "*any* manipulative or deceptive device" "in connection with the purchase or sale of *any* security."

*Galligan*, 2019 WL 423356 at *3. Broad phrases such as "any program or activity receiving federal financial assistance" do not overcome the presumption against extraterritoriality. *Archut*, 2012 WL 5867148 at *5 (citing *Morrison*, 561 U.S. at 265).

There is, moreover, nothing in the text of the RA (or the ADA) to support the Plaintiff's view that an institution's decision to accept American financial assistance carries with it an implicit requirement to abide by the proscriptions of either statute. *Accord id.* at *10 (rejecting the "follow the money" theory the Plaintiff espouses here). To the contrary, it is a "basic premise of our legal

---

[3] The historical context here is even more damaging to the Plaintiff's position. In 1991, Congress saw fit to amend Title I of the ADA to ensure its extraterritorial application, but specifically chose *not to* include any similar amendments in Title III—the only Title at issue here. *See* Civil Rights Act of 1991, Pub. L. 102-166 § 109(a) (1991) (codified at 42 U.S.C. § 12111(4)). As the Supreme Court has said in an unrelated case, this may be the "most obvious textual clue" that Title III of the ADA does not apply abroad. *RJR Nabisco, Inc.*, 136 S. Ct. at 2101.

system" that our laws apply only domestically. *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007) (admonishing courts not to treat our laws as if they "rule[d] the world").

The Plaintiff's contention that the RA prohibits discriminatory conduct at "institutions of higher education" that receive federal grants, 29 U.S.C. § 705(23)—which includes "institutions outside the United States," *see id.* (incorporating by reference "institutions outside the United States," 20 U.S.C. § 1002(a)(2))—is misplaced. Pl. Resp. 5. The non-discrimination provision of the RA at issue here, § 794, refers to programs or activities at "college[s], universit[ies], or other postsecondary institution[s], or a public system of higher education." 29 U.S.C. § 794(a). But it notably includes no reference either to "institutions of higher education" or to "graduate medical schools located outside the United States." In other words, the definition of "institutions of higher education" on which the Plaintiff relies appears to refer to other, non-relevant provisions of the RA. Indeed, far from supporting the Plaintiff's position, Congress' decision to include a reference to "institutions outside the United States" in the definition of "institutions of higher education," 29 U.S.C. § 705(23), lends further support to RUSM's view that § 794—which never mentions either "institutions of higher education" or "institutions outside the United States"—does not apply abroad.

Finally, the Supreme Court's holding in *RJR Nabisco* did not, as the Plaintiff suggests, "overrule" *Archut*. Pl. Resp. 2. In fact, *RJR Nabisco* did not so much as cite to—let alone address—*Archut*. Instead, *RJR Nabisco* resolved the wholly unrelated question of whether the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961–1968, applies extraterritorially. Because of the very particular language of that statute—language that is noticeably absent from either the ADA or the RA—the Supreme Court concluded that the plaintiffs had successfully rebutted the presumption against a finding of extraterritoriality. Specifically,

8

given that certain RICO predicates unquestionably apply extraterritorially,[4] the Court found that Congress had unmistakably expressed its intention that RICO govern abroad. *See RJR Nabisco, Inc.* 136 S. Ct. at 2102. But there are no analogous "predicates" in either Title III of the ADA or in Section 504 of the RA that similarly apply outside of the United States. Accordingly, *RJR Nabisco* does not help the Plaintiff here.

Having concluded that neither the ADA nor the RA apply extraterritorially, the Court must now determine whether the Plaintiff's claims arise in the United States. To succeed on a failure to accommodate claim, including both a Title III ADA claim and a claim under the Rehabilitation Act, a plaintiff must demonstrate that he: (1) has a disability; (2) is an otherwise qualified individual; and (3) was discriminated against because of his disability. *See Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017) (laying out the *prima facie* test under the RA); *see also Hetherington v. Wal-Mart, Inc.*, 511 F. App'x 909, 912 (11th Cir. 2013) (describing the *prima facie* test under the ADA). For either statute to apply, it is not sufficient for a defendant's allegedly discriminatory conduct to bear only "some connection" to the United States. *Galligan*, 2019 WL 423356 at *3.

As in *Galligan*,[5] there is no genuine dispute as to *where* the allegedly discriminatory conduct that forms the gravamen of the Plaintiff's complaint took place. Indeed, according to the Plaintiff's own Statement of Undisputed Material Facts: (1) RUSM, which was located in

---

[4] "These predicates include the prohibition against engaging in monetary transactions in criminally derived property, which expressly applies, when 'the defendant is a United States person,' to offenses that 'tak[e] place outside the United States.' 18 U.S.C. § 1957(d)(2). Other examples include the prohibitions against the assassination of Government officials, § 351(i) ("There is extraterritorial jurisdiction over the conduct prohibited by this section"); § 1751(k) (same) . . . ."

[5] "Since Galligan alleges that the program, exclusion, denial, and discrimination all took place in St. Kitts and Nevis, where the Rehab Act does not apply, he has not stated a claim for relief. Similarly, the alleged discrimination, lack of equal enjoyment, and public accommodations under Title III were all in St. Kitts and Nevis." *Galligan*, 2019 WL 423356 at *3.

decision upon which his ADA and RA claims are based—had already been made in Dominica. In short, the record contains no evidence to support the Plaintiff's position that the conduct he has challenged occurred anywhere but in Dominica—a place where neither the ADA nor the RA apply.[7]

Because Title III of the ADA and Section 504 of the RA do not apply extraterritorially, and because the acts that form the basis of the Plaintiff's complaint occurred in Dominica, the Court finds that summary judgment is appropriate as to Counts I and II of the Plaintiff's Third Amended Complaint. Accordingly, it is hereby **ORDERED and ADJUDGED** that Counts I and II are **DISMISSED with prejudice.**

## II.  Count VIII (Fraudulent Inducement)

Count VIII of the Plaintiff's Third Amended Complaint arises under Florida law. Pointing to a statement on RUSM's website to the effect that "[i]t is the policy and practice of the University to comply with the Americans with Disabilities Act as applicable and practical in Dominica," the Plaintiff claims that RUSM fraudulently induced him into enrolling at the school. *See* Third Am. Compl. at 20-22. To succeed on a claim of fraudulent inducement under Florida law, a plaintiff must show that (1) the defendant made a misrepresentation of material fact; (2) the defendant knew or should have known of the falsity of the statement; (3) the defendant intended for the misrepresentation to induce the plaintiff to rely and act upon the misrepresentation; and (4) the plaintiff suffered injury in justifiable reliance on the representation. *See Biscayne Inv. Grp. Ltd. v. Guarantee Mgmt. Servs., Inc.*, 903 So. 2d 251, 255 (Fla. 3d DCA 2005).

Although the Plaintiff argues that the ADA-compliance statement on RUSM's website is

---

[7] The Plaintiff's suggestion that the record evidence is "not developed" enough to determine whether the acts he has challenged occurred in Dominica is belied by the aforementioned citations to the Plaintiff's own "Statement of Undisputed Material Facts."

11

"false," he supplies no record evidence to support this contention. Pl. Resp. 10. For its part, RUSM says that, because the ADA is inapplicable in Dominica, any assurances it may have made concerning its compliance with the ADA "cannot be false as a matter of law." Def. Resp. 7. The Court is not persuaded that summary judgment as to Count VIII is appropriate on this basis. If, when it published the alleged avowal on its website, RUSM knew, as its papers here suggest, that the ADA did *not* apply in Dominica, then its promise to abide by the ADA "as practical *and* [legally] applicable" in Dominica could indeed be false. "A promise of future conduct made with the positive intent not to perform will satisfy the misrepresentation element." *Stefan v. Singer Island Condominiums Ltd.*, No. 08-80039-CIV, 2009 WL 426291, at *16 (S.D. Fla. Feb. 20, 2009) (citing *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1104 (11th Cir. 1983)). Put another way, if RUSM's statement was a promise to do something it knew it would never do—precisely because it would never have to do it—such a false assurance could theoretically constitute a fraudulent misrepresentation.

This theoretical plausibility, however, does not end the analysis. To succeed on a claim of fraud under Florida law, a plaintiff must show that the promisor had a specific intent not to fulfill his promise *at the time* the promise was made. *See Alexander/Davis Properties, Inc. v. Graham*, 397 So. 2d 699, 706 (Fla. 4th DCA 1981) (citing 14 Fla. Jur., Fraud & Deceit, Sections 15-16). And "a subsequent failure to perform a promise is not evidence that a party had no intent to perform the promise when made." *Quantum Capital, LLC v. Banco de los Trabajadores*, No. 1:14-CV-23193-UU, 2015 WL 12259226, at *10 (S.D. Fla. Dec. 22, 2015) (citing *Alexander/Davis Properties*, 397 So. 2d at 708).

The evidence in this case does not support the Plaintiff's view that, at the time it posted the statement on its website, RUSM specifically intended *not* to comply with the ADA. Dr. Sharma,

for example, an RUSM Professor of Behavior Sciences, testified that he has helped other students obtain testing accommodations at RUSM, and that he routinely sends the necessary documentation to the RUSM Accommodations Office to facilitate that process. Sharma Dep. 27:1-18 [ECF No. 102 at 102]. Dr. Sharma further testified that RUSM "does not deny student accommodations once documentation is adequate." Sharma Dep. 74:3-5. No less significantly, Mr. Stewart-Fulton, one of the accommodations coordinators at RUSM, testified that, although RUSM was not *required* to comply with the ADA, "in the interest of supporting our students, we abide[] by the spirit of the ADA and Section 504 of the Rehabilitation Act to provide appropriate accommodations within the process that was defined in the student handbook." Stewart-Fulton Dep. 32:1-10 [ECF No. 102 at 122]. Finally, Dr. Bryan Hayse testified that RUSM "uses [the] ADA as a guideline, but [RUSM is] not necessarily beholden to [it]." Hayse Dep. 10:14-17 [ECF No. 102 at 114]. This testimony was corroborated by the fact that RUSM maintains an Accommodations Office (and pays accommodations coordinators) for the sole purpose of determining whether a student is eligible for the kind of accommodation the Plaintiff sought here. *See generally* Sharma Dep. 28-29.

The Plaintiff has introduced no evidence to rebut this testimony. Specifically, he has adduced no evidence to support his assertions that RUSM summarily denies requests for accommodations, or that, at the time it posted the compliance statement on its website, RUSM never intended to comply with the ADA. Instead, the Plaintiff says only that RUSM failed to conform to the ADA in his case. But this bald assertion, without more, is simply insufficient to withstand summary judgment. *See Prieto v. Smook, Inc.*, 97 So. 3d 916, 918 (Fla. 4th DCA 2012) (where plaintiff's only evidence of a positive intention not to perform is the defendant's lack of performance, that evidence is insufficient to form the predicate for actionable fraud); *accord Biscayne Inv. Grp., Ltd. v. Guarantee Mgmt. Servs., Inc.*, 903 So. 2d 251 (Fla. 3d DCA 2005).

13

Because the Plaintiff has introduced no evidence to support his averment that, at the time it posted the compliance statement on its website, RUSM made "[a] promise of future conduct *with the positive intent not to perform*," *Singer*, 2009 WL 426291 at *16 (emphasis added), the Defendant is entitled to summary judgment on Count VIII.

Accordingly, the Court hereby

**ORDERS and ADJUDGES** as follows:

1. Counts I, II, VIII, and IX of the Plaintiff's Third Amended Complaint [ECF No. 47] are **DISMISSED with prejudice**.

2. All pending motions are **DENIED as moot**. An order of final judgment shall be entered separately. The Clerk of Court is instructed to **CLOSE** this case.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 17th day of June 2019.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record
        Awodiya Oluwamuyiwa, *pro se*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-60482-CIV-ALTMAN/Hunt

OLUWAMUYIWA AWODIYA,

     Plaintiff,

v.

ROSS UNIVERSITY SCHOOL
OF MEDICINE,

     Defendant.

_____/

## FINAL JUDGMENT

**THIS CAUSE** came before the Court on the June 17, 2019 Order granting summary judgment in favor of the Defendant, Ross University School of Medicine ("Order") [ECF No. 210].

Pursuant to Federal Rule of Civil Procedure 58, the Court hereby

**ORDERS** and **ADJUDGES** that judgment is entered in favor of the Defendant and against the Plaintiff, Oluwamuyiwa Awodiya, on all counts of the Plaintiff's Amended Complaint [ECF No. 47]. The Plaintiff shall take nothing from the Defendant, and this action is **DISMISSED** on the merits. The Clerk is directed to **CLOSE** this case, all pending hearings and deadlines are **CANCELLED**, and any pending motions are **DENIED** as moot.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 19th day of June 2019.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

# 212

FILED BY _CM_ D.C.

JUN 26 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| OLUWAMUYIWA AWODIYA, <br> *Plaintiff,* <br><br> -v- <br><br> ROSS UNIVERSITY SCHOOL OF <br> MEDICINE, SCHOOL OF <br> VETERINARY MEDICINE LIMITED, <br> *Defendant.* | Case No. 0:18-cv-60482-RKA <br><br> Hon. Judge: Roy K. Altman <br> Magistrate Judge: Patrick M. Hunt |

## PLAINTIFF'S MOTION FOR AMENDED AND
## ADDITIONAL FINDINGS IN THE COURT'S ORDER CLOSING CASE

*Pro se* plaintiff Oluwamuyiwa Awodiya ("Plaintiff"), pursuant to Rule 52(b) of the Federal

Rules of Civil Procedure, hereby files his motion for amended and additional findings in the

Court's June 18, 2019 Order Closing Case [ECF No. 210].

Plaintiff respectfully moves the Court to amend or make additional factual findings under

Rule 52(b), whether or not granting the motion would alter the judgment.

## I.      INTRODUCTION

Not only did *pro se* Plaintiff not have notice to come forward with all of his evidence,

Plaintiff was not given notice that the Court would decide the domestic applications of this case.

The Court did not request for a briefing on the domestic application of the ADA and the RA in this

case. Moreover, defendant Ross University School of Medicine, School of Veterinary Medicine

Limited ("RUSM") filed its response to the Court's Order Closing Case, one week after Plaintiff

filed his response. In doing so, RUSM raised several conclusory and unsupported arguments,

which Plaintiff did not have a chance to defend since he already submitted his response a week

prior to RUSM's submission.

## II.  AMENDED AND ADDITIONAL FACTS

1.   RUSM has a campus in Miramar, Florida that includes "[f]ive classrooms ranging in capacity from 32 to 150 seats." *See* Academic Catalog at 54 [ECF No. 119-22].

2.   RUSM's administrative offices are also located in Miramar, Florida. *Id.* at page ii.

3.   The RUSM administrative offices located in Miramar, Florida includes the "Office of the Registrar … and the Exam Administration Department." *See* email from RUSM Office of Student Services dated April 6, 2016, attached as **Exhibit A** to the Declaration of Oluwamuyiwa Awodiya ("Awodiya Decl.") filed concurrently herewith this motion.

4.   RUSM's "[s]tudents complete the foundational basic science courses in Dominica through the Foundations of Medicine curriculum…. Students then continue their clinical education at one of more than 29 teaching hospitals in the US that are affiliated with RUSM." *See* Academic Catalog, at page iv–v [ECF No. 119-22].

5.   "All Foundations of Medicine coursework must be satisfactorily completed at the RUSM campus in Dominica." *Id.* at 1. The "[c]linical Science curriculum [is] in the United States." *Id.* at 2.

6.   In March 2016, the RUSM Director of Student Affairs sent an email to students outlining the process for NBME CBSE (aka COMP Exam) retakes at "Prometric sites." *See* email attached as **Exhibit B** to the Awodiya Decl. Therein the email, the Director of Student Affairs stated: "At the class meeting I promised I would get back with you regarding some information for transitioning to Clinical Semesters." *Id.* at 1.

7.   For NBME CBSE (aka COMP Exam) retakes, the RUSM "Office of Exam Administration will register [students] for the next retake testing window if [they] were to fail [their] first attempt. [The student's] testing permit will then be sent to [their] RUSM email by NBME to be used for schedule [their] sitting date for the exam." *Id.* at 1. Students were also

2

advised to schedule their "COMP retake as early as possible as Prometric sites fill-up quickly." *Id.*
at 1–2. However, "[i]f [students] decided to stay in Dominica to take [their] retake exam" they
were directed to "advise the Office of Exam Administration." *Id.* at 2.

8. From Miramar, Florida, the RUSM "Office of the Registrar - Exam
Administration" sent an email to Plaintiff stating: "We regret to inform you that you did not pass
the [NBME CBSE].… You will take the next CBSE as a web-based exam at a Prometric Testing
Center.… Details for scheduling your next web-based exam at a Prometric Testing Center will be
provided by the Office of Exam Administration within the week." *See* attached as **Exhibit C** to
the Awodiya Decl.

9. RUSM Rule 36-admits that Plaintiff's second through fifth attempts of the NBME
CBSE "occurred at Prometric Test Centers in the United States of America." *See* [Exhibit A to
ECF No. 195] at Plaintiff's Requests for Admission No. 71. RUSM Rule 36-admits "that RUSM,
not the NBME, is the entity that determines whether its students require accommodations to a
disability when taking the NBME CBSE and that this is referenced at Page 2 of Exhibit 10." *Id.* at
Plaintiff's Requests for Admission No. 18; *see also* page 1 of "Exhibit 10" referenced in Plaintiff's
Requests for Admission No. 18, therein [Exhibit B to ECF No. 195] ("This document provides
basic information on ordering, fees, and related information to request administration of an NBME
subject examination to your students at Prometric Test Centers.").

10. Page 2 of "Exhibit 10" referenced in Plaintiff's Requests for Admission No. 18,
states: "[T]he decision to provide an accommodation is still [RUSM's], as it is with locally-
delivered NBME web-based examinations." [Exhibit B to ECF No. 195]. It is RUSM's decision
to provide its "students who need extra testing time" with "1.25x, 1.5x, or 2x" the amount of time
for extended testing time on the NBME CBSE at Prometric Test Centers in the United States. *Id.*

3

11. Dr. Davendranand Sharma was a campus administrator at RUSM. *See* Academic Catalog at 59–60 (see in the "Foundations of Medicine Campus Administration" section) [ECF No. 119-22]. Dr. Sharma was also a professor at RUSM. *Id.* at 61.

12. Dr. Sharma testified that he has helped other students obtain testing accommodations at RUSM, and that he routinely sends the necessary documentation to the RUSM accommodations office to facilitate that process. Sharma Dep. 27:1–18 [ECF No. 102 at 102]. Dr. Sharma also testified: "The accommodations office ... could override my request, because I'm the one -- or the doctors make the request for accommodation, which is time-and-a-half. You get extra time. We actually put it we want the student to get the accommodation[.]" Sharma Dep. 37:15–21.

13. Dr. Sharma testified that Plaintiff had adequate documentation of his ADHD to get test accommodations. Sharma Dep. 37:9–12. Dr. Sharma also testified that he was informed that Plaintiff was running out of time on his exams and that his symptoms, ADHD, and running out of time, were "all connected." Sharma Dep. 23:7–23.

14. Dr. Sharma also created a note indicating that Plaintiff was preparing to take the NBME CBSE in the United States. *See* attached as **Exhibit D** to the Awodiya Decl.

15. It is RUSM's policy that: "Disclosure can be made without consent to RUSM officials with legitimate educational interests who need to review a record in order to fulfill their professional responsibilities. A RUSM official is a person employed by RUSM in an administrative, supervisory, academic or research, or support staff position (including law enforcement unit personnel and health staff)." *See* Student Handbook at 97 [ECF No. 119-20].

16. RUSM Rule 36-admits that Plaintiff took the NBME CBSE exam five times without any accommodations for his disability. *See* [Exhibit A to ECF No. 195] at Plaintiff's Requests for Admission Nos. 16, 53–57.

4

17.     Dr. Neils Larsen was a campus administrator at RUSM. *See* Academic Catalog at 59 (see in the "Foundations of Medicine Campus Administration" section) [ECF No. 119-22].

18.     From Miramar, Florida on June 1, 2017, Dr. Neils Larsen sent Plaintiff a letter that states: "If additional information has become available or if you believe university procedure wasn't followed, you may appeal this decision by submitting an appeal to the Dean…. The Dean or his designee will make a final decision …." *See* attached as **Exhibit E** to the Awodiya Decl.

19.     On June 2, 2017, Plaintiff sent an email to Dr. Neils Larsen where he states: "I would also want to ask if it is possible for Ross to set up a proctored NBME exam of any fashion. I have been working diligently on addressing my recent diagnosis and have made remarkable progress…. It would be great if I could take the next unofficial NBME in an environment that Ross considers adequate enough so that there is no doubt that I can now pass these exams." *See* email chain attached as **Exhibit F** to the Awodiya Decl.

20.     William Owen is the Dean of RUSM. Owen Dep. 7:20–25 [ECF No. 113 at 6]. The Dean's office is located in Miramar, Florida. *Id.*

21.     On June 12, 2017, Plaintiff's psychiatrist and psychotherapist informed the Dean of RUSM that Plaintiff has ADHD and OCD. *See* email/letter attached as **Exhibit G** to the Awodiya Decl. Plaintiff's psychiatrist and psychotherapist further informed the Dean of RUSM that "[Plaintiff] has had symptoms of the latter for the past 4-6 years but did not understand the nature of the diagnosis until recently. We believe that the anxiety and checking rituals inherent to this condition have been adversely affecting his academic performance in medical school." *Id.*

22.     On June 13, 2017, Plaintiff submitted his appeal letter to the Dean of RUSM. *See* Plaintiff's Appeal Letter to the Dean of RUSM attached as **Exhibit H** to the Awodiya Decl. In the Appeal Letter to the Dean of RUSM, Plaintiff stated that "the purpose of this letter is to seek one

more chance to take the NBME comp exam.... [M]y objective is to keep this letter relevant to how OCD has influenced my academic performance." *Id*. On the same page of the Appeal Letter, Plaintiff stated, "I'm the student who never finished an exam on time." *Id*.

23.     The Dean of RUSM testified that he saw and recalled Plaintiff's Appeal letter and the letter from Plaintiff's psychiatrist and psychotherapist that was sent to him. Owen Dep. 20:21–21:7 [ECF No. 113 at 9].

24.     From Miramar, Florida on June 29, 2017, RUSM dismissed Plaintiff from the university. *See* Dismissal Letter [ECF No. 119-28 at 2].

## III.     LEGAL STANDARD

"On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly." Fed. R. Civ. P. 52(b). "Rule 52(b) is intended to reduce the frequency of appellate remands by permitting the correction of errors in the district court." *Dev. Specialists, Inc. v. Kaplan (In re Irving Tanning Co.)*, 876 F.3d 384, 390 (1st Cir. 2017). The purpose of Rule 52(b) is to "allow the court to correct plain errors of law or fact, or, in limited situations, to allow the parties to present newly discovered evidence, but not to allow the relitigation of old issues, a rehearing on the merits, or the presentation of new theories of the case." *Perez v. Renaissance Arts & Educ., Inc.*, CASE NO.: 8:12-CV-514-T-MAP, at *2 (M.D. Fla. Feb. 3, 2014).

## IV.     ARGUMENT

### A.     Sufficiency of Notice or Miscommunication

On May 16, 2019, this Court, *sua sponte*, issued an Order (hereinafter "*Sua Sponte* Order") [ECF No. 91], stating that "the parties shall, in no more than 10 pages, brief the question of the extraterritorial application of the ADA and the RA, as well as the impact, if any, that the answer to this question might have on the Plaintiff's remaining claims .... The parties shall include

6

citations to the existing evidentiary record as needed." *Sua Sponte* Order at 5–6 (emphasis added). In response to the Court's *Sua Sponte* Order, Plaintiff filed his eleven-page brief ("Pl. Resp.") [ECF No. 192] on the question of "extraterritorial application" of the ADA and the RA.

### i.    Insufficient Notice of Questions at Issue

The Court did not request for a briefing on the domestic application of the ADA and the RA in this case. *See Sua Sponte* Order at 5. Plaintiff advised the Court that "[b]ecause the issue of **extraterritorially was irrelevant to the parties' motions for summary judgment** concerning the failure to accommodate claims, the evidence offered may have miscommunicated to the Court the location of the acts in this case .... If the Court finds that an answer to [domestic application] is warranted, **Plaintiff needs an estimated five additional pages to fully brief the depth of the mix questions of fact and law** regarding the [domestic application] … issues. At this stage, the record evidence before the Court is not developed to answer, [domestic application]." Pl. Resp. at 8–9. *See also RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016) ("If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad.").

### ii.    Insufficient Notice to Come Forward With All Evidence That Was Not on the Record

"A district court possesses the power to enter summary judgment *sua sponte* provided the losing party 'was on notice that she had to come forward with all of her evidence.'" *Burton v. City of Belle Glade*, 178 F.3d 1175, 1203 (11th Cir. 1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). "As we have long recognized, 'this notice provision is not an unimportant technicality, but a vital procedural safeguard' to a party's right to offer the best defense to any challenge." *Id.* at 1203–04 (quoting *Massey v. Congress Life Ins. Co.*, 116 F.3d 1414, 1417 (11th Cir. 1997)).

7

After Plaintiff filed his brief, the Court, without warning or notice, later determined that an answer to the domestic application of his case was warranted. *See* Order Closing Case at 10–11. Plaintiff expressly stated that the "record evidence before the Court is not developed to answer" that question—as in, there is evidence that was not on the record that is material to determine the domestic application of his case. Pl. Resp. at 9. The Court acknowledge and denied Plaintiff's request for additional pages on the grounds that "Plaintiff's suggestion that the record evidence is 'not developed' enough to determine whether the acts he has challenged occurred in Dominica is belied by the aforementioned citations to the Plaintiff's own 'Statement of Undisputed Material Facts.'" Order Closing Case at 11 n.7. To the extent that the phrase, "not developed" means something different than how used in Plaintiff's pleadings, "it is well-established that *pro se* complainants are held to less pleading standards less stringent than those applicable to lawyers." *U.S. v. Roberts*, 308 F.3d 1147, 1153 (11th Cir. 2002) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

The Court stated that "[t]he parties shall include citations to the **existing evidentiary record**." *Sua Sponte* Order at 6 (emphasis added). Plaintiff was not required to, and therefore he did not, put forth irrelevant evidence in his "Statement of Undisputed Material Facts" because that evidence (that was not on the record) was irrelevant to the parties' motions for summary judgment. As the Court noted, "neither party had raised—and so the Court did not consider—the question of the ADA's and the RA's extraterritorial application." Order Closing Case at 2. The Local Rules only requires that "[a] motion for summary judgment and the opposition thereto shall be accompanied by a statement of **material facts**." S. D. FLA. L. R. 56.1(a) (emphasis added). Thus, evidence omitted from Plaintiff's "Statement of Undisputed Material Facts" were not considered

8

6

material at that time, and consequently, was not an "existing evidentiary record," that Plaintiff could cite to.

**B.    Domestic Application and the Relevant Facts**

"If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.' If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016) (emphasis added).

    i.    How to Identify a Statute's Focus

The Supreme Court recently explained how to identify a statute's focus in *WesternGeco LLC v. Ion Geophysical Corp.*, 138 S. Ct. 2129 (2018). The Supreme Court explained that "[t]he focus of a statute is 'the object of its solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to protect' or vindicate." *Id.* at 2137 (brackets omitted) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010)). "When determining the focus of a statute, we do not analyze the provision at issue in a vacuum." *Id.* (citing *Morrison*, 561 U.S. at 267-69). Instead:

> If the statutory provision at issue works in tandem with other provisions, it must be assessed in concert with those other provisions. Otherwise, it would be impossible to accurately determine whether the application of the statute in the case is a "domestic application." And determining how the statute has actually been applied is the whole point of the focus test.

*Id.* (citation omitted) (citing *RJR Nabisco*, 136 S. Ct. at 2101).

    ii.    Plaintiff's Equal Opportunity and His Examinations Are the Statutes' Object of Solicitude in This Case

"[The] focus is not necessarily the 'bad act,' or the *actus reus*, prohibited by the statute. Rather, it is 'the object[] of the statute's solicitude,' the activities 'the statute seeks to regulate

[and] parties or prospective parties to those [activities] that the statute seeks protect.'" *European Cmty. v. RJR Nabisco, Inc.,* No. 02–CV–5771 (NGG)(VVP), 2011 WL 843957, at *4 (E.D.N.Y. March 8, 2011) (alterations in original) (quoting *Morrison v. National Australia Bank Ltd.,* 130 S. Ct. 2869, 2881 (2010)); *accord Sorota v. Sosa,* 842 F. Supp. 2d 1345, 1350 (S.D. Fla. 2012) (collecting *European* and other cases).

"42 U.S.C. § 12189, which falls within Title III of the ADA, governs … examinations." *Enyart v. National Conference,* 630 F.3d 1153, 1160 (9th Cir. 2011). "The purpose of this section is 'to assure that persons with disabilities are not foreclosed from educational, professional, or trade opportunities because an examination or course is conducted in an inaccessible site or without an accommodation.'" *Id.* (quoting H.R. Rep. No. 101-85(111), at 68-69 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 491-92). "The text of these other ADA provisions does not resolve the ambiguity in § 12189's use of term 'accessible' because an examination is not equivalent to a physical space." *Id.* at 1162. The "DOJ's regulation is not based upon an impermissible construction of § 12189, so this court affords *Chevron* deference to 28 C.F.R. § 36.309 and applies the regulation's 'best ensure' standard." *Id.* 28 CFR § 36.309(b) provides that:

> (1) Any private entity offering an examination covered by this section must assure that -
>
> (i) The examination is **selected and administered** so as to **best ensure** that, when the examination is administered to an individual with a disability that … the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills ….

*Id.* (emphasis added); *accord* 34 CFR § 104.44(c) (same under the Rehabilitation Act); *see also Jones v. Nat'l Conference of Bar Examiners,* 801 F. Supp. 2d 270, 284 (D. Vt. 2011) ("This court, like several other courts, concludes that 28 C.F.R. § 36.309(b)(1)(i) is neither arbitrary nor

capricious, nor manifestly contrary to the statute it implements. The court thus concludes that a 'best ensure' is entitled to controlling weight and governs the outcome in this case." (footnote omitted)). The *Jones* court continues:

> A "best ensure" standard not only **prevents an entity such as Defendant from directly or indirectly providing** "a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit and to reach the same level of achievement as that provided to others[,]" 28 C.F.R. § 35.130(b)(1), it also reflects the special challenges to the establishment of a level playing field in the administration of professional exams.

*Jones*, 801 F. Supp. 2d at 284 (emphasis added).

Regulating examinations, the focus of the statutes is how an examination is offered, selected, or administered. 42 U.S.C. § 12189; 28 CFR § 36.309(b)(1)(i); 34 CFR § 104.44(c). Moreover, the statutes seek to protect "persons with disabilities." *Id.* Therefore, *where* an examination is administered, is relevant to the focus of the statute. And if a person with a disability acts to take an examination within the United States, the case "involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016).

### iii. Improper Factual Inference or Application of Law

Here, the Court appears to have drawn an improper factual inference in favor of RUSM. "[A]ll factual inferences are drawn in favor of the non-moving party." Order Closing Case at 3 (citing *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)). The Court found that "the only relevant acts that took place in the United States were the Plaintiff's second, third, fourth, and fifth attempts at passing the COMP Exams—which, it is undisputed, are not administered by RUSM." Order Closing Case at 10 (footnote omitted) (citing Pl.'s 56.1 ¶ 28 [ECF No. 101]). Pl.'s 56.1 ¶ 28 cites to RUSM's Answer at ¶ 23 [ECF No. 58], which merely states that "RUSM admits

11

that Plaintiff's first attempt to pass the NBME CBSE took place in Dominica and that his second through fifth attempts took place at Prometric Test Centers in the United States of America." The Court's finding is unsupported by the referenced evidence and the Court's usage of the term "administered" is vague.

Like RUSM's argument, "NCBE argues that it is the Court of Appeals that 'offers' the MBE because the Court of Appeals administers the examination and NCBE is merely a vendor that provides testing materials." *Bonnette v. Dist. of Columbia Court of Appeals*, 796 F. Supp. 2d 164, 179 (D.D.C. 2011). The Circuit court rejected this argument and held that, "to the extent that NCBE exercises control over the manner in which the examination is given, it is subject to § 12189." *Id.* at 179–180; *see also Binno v. Am. Bar Ass'n*, 826 F.3d 338, 347 (6th Cir. 2016) ("[T]he term 'offer' nevertheless must be interpreted so that Section 309 [28 CFR § 36.309] is not meaningless. Because the statute states that an entity that 'offers' exams must do so 'in a place and manner accessible' to disabled persons or else offer alternative accommodations, the entity must have some ability to grant those accommodations in the administration of the exam."). "NCBE also suggests that § 12189 applies only to 'public accommodations' as defined in Title III of the ADA …. However, § 12189 clearly applies to 'any person' that offers examinations, not just public accommodations." *Bonnette*, 796 F. Supp. 2d at 180 n.2.

The evidence shows that RUSM selects and controls the manner in which the NBME CBSE is administered in Prometric Test Centers in the United States. *See* Amended and Additional Facts (hereinafter the "AAF") ¶¶ 6–10, *supra* Part II.

        iv. <u>A Discriminatory Decision Is Not the Focus of the ADA and the Rehabilitation Act</u>

12

The Court further stated that "by the time the Plaintiff sat down to take these examinations, the alleged discriminatory decision to deny his requested accommodation ... had already been made in Dominica." Order Closing Case at 10–11.

First, as a factual matter, RUSM judicially admitted that it is the "entity" that determines accommodations required for the NBME CBSE attempts that are administered at Prometric Test Centers in the United States. *See* AAF ¶¶ 9–10. "[F]acts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1178 (11th Cir. 2009). Moreover, Dr. Sharma, an administrator at RUSM, had the authority to institute testing accommodations for students. AAF ¶¶ 11–12, 15. Dr. Sharma also knew that Plaintiff was preparing to take his NBME CBSE exams in the United States. AAF ¶¶ 7, 13–14. Plaintiff also informed RUSM administration located in the United States that could institute a sixth NBME CBSE attempt with corrective measures for testing accommodations. AAF ¶¶ 15, 17–24.

Second, a "discriminatory decision" is not the focus of the ADA. It may very well be a "bad act" related to a focus, but it is not itself the sole focus, if any focus, of examinations under the ADA and the Rehabilitation Act. *See supra* Part IV.B.ii. A contrary reading of the statutes would lead to absurd results. *Shimek v. Weissman, Nowack, Curry Wilco*, 374 F.3d 1011, 1014 (11th Cir. 2004) ("[T]he plain meaning of the statute will be followed unless it would lead to a 'truly absurd' interpretation").

Hypothetically, if discriminatory decisions were the focus of the ADA and the Rehabilitation Act, that would mean that an entity would be liable for making a "discriminatory decision," while inside of the United States, to not provide accommodations outside of the United States. Equally, under that interpretation, an entity that makes decisions outside of the United

13

States would have no obligation to make its buildings located in the United States accessible to persons with disabilities, because the "discriminatory decision" was made in a foreign country.

The only logical interpretation of the statutes' focus is the building, examination, or activity that needs a modification. Therefore, when an extraterritorial decision controls a disabled person's equal access to a building, examination, or activity located inside of the United States, the case involves a domestic application even if other conduct occurred abroad. *See supra* Part IV.B.ii.

Third, under the Rehabilitation Act and the ADA, it is not important as to who is capable of making a "final decision" as the Court suggested. Order Closing Case at 10. "To prevail on a claim for compensatory damages under either the RA or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent." *McCullum ex rel. DF & TF v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146-47 (11th Cir. 2014). "A plaintiff may prove discriminatory intent by showing that a defendant was deliberately indifferent to his statutory rights." *Id.* at 1147 (citing *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012)).

"We have held that it is appropriate to look to Title IX case law for guidance in examining discriminatory intent under § 504." *J.S. v. Hous. Cnty. Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017) (citing *Liese*, 701 F.3d at 347). So, "[f]or an organization to be liable for Title IX purposes, [a plaintiff must show] the deliberate indifference of 'an *official* who at a minimum has *authority* to address the alleged discrimination and to institute corrective measures on the organization's behalf and who has *actual knowledge* of discrimination in the organization's programs and fails adequately to respond." *J.S. v. Hous. Cnty. Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017) (alterations in original) (citing *Liese*, 701 F.3d at 349).

14

"In the § 504 context, we conclude that an official is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 350 (11th Cir. 2012) (citing *Doe v. County*, 604 F.3d 1248, 1256-57 (11th Cir. 2010)). In *Doe*, the Eleventh Circuit found that notice to a school official met this standard because "[m]ore importantly, ... [he] could 'initiate corrective action' ... even if he could not take final adverse employment actions." *Doe*, 604 F.3d at 1255. "In *Broward County* [*Doe*, 604 F.3d 1248], we rejected the notion that 'final employment decisions such as suspending, terminating, or reassigning an offending [individual] [are] the *only* corrective measures giving an official the power to remedy' ...." *J.S. v. Hous. Cnty. Bd. of Educ.*, 877 F.3d 979, 990 (11th Cir. 2017) (quoting *Doe*, 604 F.3d at 1257). For example, the Eleventh Circuit held, "we conclude that [even] a teacher can serve as an appropriate person." *Id.* at 989.

## V.   CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order that amends or makes additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment.


DATED this 25th day of June, 2019:

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

15

## CERTIFICATE OF SERVICE

I do hereby certify that on this 25th day of June, 2019, I have caused a true and correct copy of the foregoing by mailing a copy to the Court, where the Court's CM/ECF system will send notification to the counsel of record:

By: Oluwamuyiwa Awodiya, *pro se* litigant

16


FILED BY _____ D.C.

JUN 26 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

# UNITED STATES DISTRICT COURT

for the
Southern District of Florida

|  |  |  |
|---|---|---|
| OLUWAMUYIWA AWODIYA, | ) | Case No.  0:18-cv-60482-RKA |
| *Plaintiff,* | ) | |
| | ) | |
| -v- | ) | Hon. Judge: Roy K. Altman |
| | ) | Magistrate Judge: Patrick M. Hunt |
| ROSS UNIVERSITY SCHOOL OF | ) | |
| MEDICINE, SCHOOL OF | ) | |
| VETERINARY MEDICINE LIMITED, | ) | |
| *Defendant.* | ) | |
| | ) | |

## DECLARATION OF OLUWAMUYIWA AWODIYA
## IN SUPPORT OF PLAINTIFF'S MOTION FOR AMENDED AND
## ADDITIONAL FINDINGS IN THE COURT'S ORDER CLOSING CASE

Plaintiff respectfully requests the Clerk's Office of the Court to file this document as a

docket attachment to the Plaintiff's Motion for Amended and Additional Findings in the Court's

Order Closing Case, that is being filed concurrently herewith.

1.      Pursuant to 28 U.S.C. § 1746, I, Oluwamuyiwa Awodiya, *pro se* plaintiff of the

above-captioned action, make this declaration in support of Plaintiff's Motion for Amended and

Additional Findings in the Court's Order Closing Case. I am over 18 years of age and I am

competent to testify about the matters discussed herein.

2.      A true and correct copy of an email from RUSM's Office of Student Services sent

to Plaintiff dated April 6, 2016 is attached hereto as **Exhibit A.**

3.      A true and correct copy of an email from RUSM's Director of Student Affairs sent

to Plaintiff dated March 31, 2016 is attached hereto as **Exhibit B.**

4.      A true and correct copy of an email from RUSM's Office of the Registrar - Exam

Administration sent to Plaintiff is attached hereto as **Exhibit C.**

1

5. A true and correct copy of an RUSM Counseling Note is attached hereto as **Exhibit D.**

6. A true and correct copy of a letter from RUSM to Plaintiff, is attached hereto as **Exhibit E.**

7. A true and correct copy of an email chain between RUSM and Plaintiff, is attached hereto as **Exhibit F.**

8. A true and correct copy of an email/letter from Plaintiff's psychotherapist and psychiatrist to RUSM, is attached hereto as **Exhibit G.**

9. A true and correct copy of a Plaintiff's Appeal Letter to the Dean of RUSM is attached hereto as **Exhibit H.**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

EXECUTED ON this 25th day of June, 2019:

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

2

## CERTIFICATE OF SERVICE

I do hereby certify that on this 25th day of June, 2019, I have caused a true and correct copy of the foregoing by mailing a copy to the Court, where the Court's CM/ECF system will send notification to the counsel of record.

By: Oluwamuyiwa Awodiya, *pro se* litigant

3

# Exhibit A

| | |
|---|---|
| **From:** | The Office of Student Services |
| **To:** | Awodiya, Oluwamuyiwa |
| **Subject:** | RUSM Miramar Office Availability: Thursday, April 7, 2016 |
| **Date:** | Wednesday, April 6, 2016 4:46:44 PM |



Dear Oluwamuyiwa ,

Please note that the Miramar Administrative offices will be unavailable Thursday, April 7, 2016 from 3:00 PM to 4:00 PM EST. This includes the Office of Clinical Student Affairs, the Office of Student and Professional Development, the Office of the Registrar, the Office of Student Services, the Licensing and Credentialing Department and the Exam Administration Department.

We will not be available to take phone inquiries during this time.

Please contact our associates via myRoss, or contact the Office of Student Services at StudentServices@RossU.edu with any questions or concerns.

Sincerely,

The Office of Student Services
Ross University School of Medicine

© 2016 Ross University School of Medicine. All rights reserved.

**Ross University School of Medicine @** www.RossU.edu
Tel: 754.208.4595| Fax: 732 509 4820
Address: 2300 SW 145th Avenue Suite 200, Miramar, FL 33027

AWOD003452

# Exhibit B

| | |
|---|---|
| **From:** | Jacobson, Melanie |
| **To:** | DM Semester 4x Jan 2016; DM Semester 5 Jan 2016 |
| **Cc:** | Semester 4 Class Rep DM; Semester 5 Class Rep DM |
| **Subject:** | Class Meeting Follow up |
| **Date:** | Thursday, March 31, 2016 5:20:04 PM |
| **Attachments:** | image001.png |

Good afternoon 4x and 05 students!

Wow, yesterday was the last day of Foundations of Medicine lectures for the 4x/05 spring 2016 semester. Man does time fly!!! I know everyone has a lot of studying to do, so I'll make this brief.

At the class meeting I promised I would get back with you regarding some information for transitioning to Clinical Semesters.

- Comp retake dates, STEP seating deadlines, and IMF dates – An email containing all of this information will be coming to you just after you have taken your final. The **Subject is Important Enrollment Information**. This is an IMPORTANT email please read it, as it contains all the information you need for preparing for Comp retakes, ECFMG, STEP 1, and IMF

- Passport photos for your form 186 - Radiant Photo Studios information is as follows, Contact # 225-7541, Hours of Operation - Mondays - Fridays 8:30 am - 3:45 pm. The studio is located on Bay street in Portsmouth.

- The Class meeting mediasite is in the miscellaneous folder

- Other tidbits of knowledge as you prepare for post comp:

  - Your name and registry information must be exactly the same with the National Board of Medical Examiners (NBME), Educational Commission for Foreign Medical Graduates (ECFMG) and your state issued ID.

  - COMP 1st attempt: Exam Scores will be sent to students within 5-10 business days after taking the exam

  - COMP Retakes:
    - 2nd & 3rd attempts Exam Scores will be sent to students within 5- 10 business days after the retake window closes

  - COMP retakes – The Office of Exam Administration will register you for the next retake testing window if were to fail your first attempt. Your testing permit will then be sent to yours RUSM email by NBME to be used for schedule your sitting date for the exam (via a link provided on the permit).

  - Schedule your COMP retake as early as possible as Prometric sites fill-up

AWOD000695

quickly

- ○ **Rescheduling a COMP sitting date: Must be within the prescribed testing window. If you need to reschedule the original sitting date you selected, you must go through the Prometric website at least 48hr prior to your scheduled sitting date. Changes cannot be made on the day of the scheduled exam**

- ○ **You will need a valid state issued ID to present at the Prometric site for comp retakes and STEP exams (RUSM IDs are not accepted)**

- ○ **If you decided to stay in Dominica to take your retake exam, please advise the Office of Exam Administration via askRoss so they can work with you.**

We wish you the best on your upcoming exams and some very productive studying until then.

Best regards,

**Melanie Jacobson, MSpEd**
Director of Student Affairs

**Ross University**
P.O. Box 266
Roseau,
Commonwealth of Dominica
Phone: 1 767-255-6339 (Dominica)
1 732-640-5400 x6339 (US)
Fax: 767-445-6965
Email: Mjacobson@RossU.edu

www.RossU.edu



AWOD000696

# Exhibit E

**Ross University
School of Medicine**

Office of the Registrar
2300 SW. 145ᵗʰ Ave., Suite 200
Miramar, FL. 33027
Phone 754-208-4591
Fax 732-509-4820
Registrar@RossU.edu



**ROSS UNIVERSITY**
SCHOOL OF MEDICINE

June 1, 2017

Oluwamuyiwa Awodiya
15005 Dahlia Drive
Bowie, MD 201721

Dear Oluwamuyiwa:

The Ross University School of Medicine Student Promotions Committee – Foundations of Medicine Sub-committee has reviewed your letter of appeal and academic history. After careful consideration, I regret to inform you the academic dismissal on April 13, 2017, is upheld.

If additional information has become available or if you believe university procedure wasn't followed, you may appeal this decision by submitting an appeal to the Dean. Appeal letters must state the reason for the appeal and be emailed to Dean Owen at PromotionAppeals@RossU.edu within 15 calendar days of the date on this notification letter, June 16, 2017. The Dean or his designee will make a final decision on each appeal within 15 calendar days of the Dean's receipt of the written appeal. Please refer to the RUSM Student Handbook for additional information regarding the appeals process.

Please be advised that if you are a recipient of federal student loans, RUSM must inform your lender(s) that you have not attended RUSM since the last day you attended classes. The impact of your status on your federal student loans will depend on your specific situation, applicable regulations and the terms and conditions of your loan(s). Please visit www.studentloans.gov to complete your exit interview as required by federal regulations.

Should you have questions or need additional assistance, please contact the Office of the Registrar at Registrar@RossU.edu.

Sincerely,

Niels Larsen, PhD
Professor, Department of Physiology and Biochemistry
Chair, Student Promotions Committee-Foundations of Medicine Sub-committee

cc:     Academic & Student Affairs
        Academic & Student Operations
        Student Finance
        Registrar

RUSM 000070

# Exhibit F

**From:** Larsen, Niels
**Sent:** Mon 6/12/2017 2:40:58 PM
**Subject:** RE: Appeal Letter Decision

Hello Oluwamuyiwa,

I am sorry to say that your email got stuck under some other urgent matter and I thereafter forgot about it until today. I would not have been able to help with your request anyway, no other student I have been aware of have received such a service.

Good luck
Niels Larsen

**From:** Awodiya, Oluwamuyiwa [mailto:OluwamuyiwaAwodiya@students.rossu.edu]
**Sent:** Thursday, June 08, 2017 10:06 AM
**To:** Larsen, Niels <NLarsen@RossU.edu>
**Cc:** Hall, Maureen PM. <mpmhall@RossU.edu>
**Subject:** RE: Appeal Letter Decision

Hello Dr. Larsen,

I was hoping to see if there was a possible update to the questions that I asked in my last email?

I apologize for resending this email. Its only because I have under a week left to prepare before submitting my letter to the Dean.

Best regards,
Oluwamuyiwa Awodiya

**From:** Awodiya, Oluwamuyiwa
**Sent:** Friday, June 2, 2017 12:57 PM
**To:** Larsen, Niels
**Cc:** Hall, Maureen PM.
**Subject:** RE: Appeal Letter Decision

Good morning Dr. Larsen,

Thank you very much for taking the time to respond to my email and for your advice.

I would also want to ask if it is possible for Ross to set up a proctored NBME exam of any fashion.

I have been working diligently on addressing my recent diagnosis and have made remarkable progress.

With this, for the first time ever I passed my first NBME a couple of weeks ago and plan on taking another one very soon to (next few days) to measure my growth and progress.

Because these exams are highly accurate and because of my relentless, continuous treatment I am confident that I will pass any exam as of today.

It would be great if I could take the next unofficial NBME in an environment that Ross considers adequate enough so that there is no doubt that I can now pass these exams.

So my questions are:

Is there anyway that I can have Ross unofficially or officially send an exam for me to take in a Prometric center around me? My family will take care of any cost if there is any associated with setting this up.

If not possible then do you think it is good enough to just record myself, my environment, and my screen when taking another NBME?

Also, I just wanted to confirm if all the previous submitted documents will be handed to the Dean or should I resubmit them?


Gratefully,

Oluwamuyiwa Awodiya

**From:** Larsen, Niels
**Sent:** Friday, June 2, 2017 11:41 AM
**To:** Awodiya, Oluwamuyiwa
**Cc:** Hall, Maureen PM.
**Subject:** RE: Appeal Letter Decision


Dear Oluwamuyiwa,

The committee decisions are made by secret ballot so I cannot know what swayed the different members of the committee in one direction or another. However, I may be able to give you some other advise, hope this helps.

The most important advise is that if there was something you were shy about and did not want to share, this is definitely the time to come out with it. I realize it can be difficult to share very private details, but this is the time.

Another thing is that you have a few more words to provide details in the appeal to the Dean. Use those wisely: try to avoid repetitions but use them to make sure you give a reasonably complete description of those things you do describe.

Lastly, make sure you have a clear, coherent description of what you will to differently if allowed back.

Sincerely

**Niels Larsen, PhD**
*Professor, Department of Physiology and Biochemistry*
*Chair, Student Promotions Committee*

**Ross University School of Medicine**
*Dominica Campus*:
P.O. Box 266
Roseau
Commonwealth of Dominica

*Miramar Location*:
2300 SW 145th Avenue, Suite 200
Miramar, FL 33027

Phone: **767-255-6323**
Mobile: **767-235-2431**
Email: nlarsen@rossu.edu
Web: RossU.edu

ROSS UNIVERSITY

**From:** Hall, Maureen PM.
**Sent:** Thursday, June 01, 2017 7:34 PM
**To:** Awodiya, Oluwamuyiwa <OluwamuyiwaAwodiya@students.rossu.edu>
**Cc:** Larsen, Niels <NLarsen@RossU.edu>
**Subject:** Re: Appeal Letter Decision


Dear Oluwamuyiwa:

Please be aware that I am sorry about the outcome of your appeal to the committee which was upheld. Please be aware that Dr.
Niels Larsen is now the Chair of the Committee and is best able to help you. I ave copied him for your convenience.

Respectfully,
Dr. Hall


Sent from my iPad
On Jun 1, 2017, at 7:24 PM, Awodiya, Oluwamuyiwa <OluwamuyiwaAwodiya@students.rossu.edu> wrote:

Good afternoon Dr. Hall,

I am really sorry to bother you but I just received the email about my Appeal decision which stated that it was upheld.
I plan on following the directions on getting a decision from the Dean.

I am reaching out to you because I was hoping maybe I could receive some advice about why the decision to uphold
the appeal may have occurred. So that I can possibility address those issues in my letter to the dean. Anything, no
matter how small will be appreciated.

Thank you for your time.

Sincerely,

Oluwamuyiwa Awodiya

RUSM 000772

# Exhibit G

-------------- Original Message --------------
From: [denise.h.unterman@kp.org]
Sent: 6/12/2017 1:47 PM
To: promotionappeals@rossu.edu
Subject: Oluwanuyiw Awodiya, Student I.D ███████

William F. Owen, M.D.
Dean, Ross University Medical School

Dear Dean Owen:

We are writing on behalf of Oluwanuyiw Awodiya, a student in your program.
We have been treating Mr. Awodiya for the past several months for ADHD
and Obsessive Compulsive Disorder. He has had symptoms of the latter for
the past 4-6 years but did not understand the nature of the diagnosis
until recently. We believe that the anxiety and checking rituals inherent
to this condition have been adversely affecting his academic performance
in medical school. Mr. Awodiya is currently in CBT therapy and is
acquiring strategies for managing his symptoms. He is considering
psychotropic medication, as well. He is very engaged in and committed to
treatment, dedicated to the pursuit of a career in medicine, and we hope
that his high level of motivation will be considered in the appeal
process.

Sincerely,

Denise H. Unterman, LCSW-C
Adult Psychotherapist
Earl John Mauricio, M.D.
Adult Psychiatrist

RUSM 000059

# Exhibit H

# Question Received: SubjectAppeal Dismissal Case #02149780

**Student Services <studentservices@rossu.edu>**

To: 6/13/2017 11:45 AM

To:  Awodiya, Oluwamuyiwa <OluwamuyiwaAwodiya@students.rossu.edu>;

Thank you for your inquiry.

Your question for Case #02149780 has been received.

Case Details:
 Status: New
 Subject: Appeal Dismissal
 Department: Registrar
 Department Email: PromotionAppeals@rossu.edu
 Category 1: Promotion Appeals
 Category 2: General
 Date Created: 6/13/2017
 Last Updated: 6/13/2017

---------------------------------------------------------------

Dear Dean Owen,

This email contains my appeal letter. As well as 4 screenshots of my NBMEs that I mentioned in the letter.

My psychotherapist and psychiatrist stated that they have sent a separate letter to you as well.

Sincerely,

Oluwamuyiwa Awodiya

---------------------------------------------------------------

If you have any additional questions pertaining to this case you may either reply to this email or login to myRoss and navigate to askRoss.

ref:_00D80cFjT._5008011Pi7n:ref

AWOD004990

Dear Dr. Owen,

Thank you and bless you for taking the time from your busy day to read my appeal letter. I am Oluwamuyiwa Awodiya and the purpose of this letter is to seek one more chance to take the NBME comp exam.

This year I was diagnosed with OCD. This finding for me was like a miracle. Not because I'm glad to have it, but because it explains so many parts of my life, financially, socially, and academically. There is something satisfying about knowing that I can take steps towards improving my quality of life, instead of feeling hopeless. Although OCD affects numerous aspects of my life, my objective is to keep this letter relevant to how OCD has influenced my academic performance.

I want to start by answering some questions that you may have, before I dive into my experience with my recent diagnoses. Why has the OCD started to affect me now? This has most certainly been something I have been dealing with since before I even knew what OCD really was, realistically for the last 6 years. Why have I waited so long to get help? Well if you look at my name, it may be obvious that I come from a very cultured family. Although I was born in America, my family is very Nigerian. Getting help for any emotional or behavioral imbalances would not look good for me and would likely be an embarrassment to my family. Honestly, I had rather try and deal with my "weird" feelings by myself than to risk people seeing me as crazy.

My biggest challenge with OCD is the extreme anxiety and urges that overwhelm me. I wish my anxiety was as easy as just washing my hands a million times but it's not that simple. Honestly, I don't fully understand everything about my OCD yet, but sometimes there isn't a solution to sooth my anxiety. Therefore, when I can't identify why I feel the way I do, I get hopelessly overwhelmed. Sometimes the solution is not even logical, like pulling out my eyelashes. I really do not like to explain my OCD, simply because it is one of the hardest things to convey; and even harder for many people to understand.

I'm the student who never finished an exam on time. I was compelled to back track my answers just to make sure they didn't disappear 5 seconds after I went to the next question. I had rather pick a wrong answer because of the fear that it may actually be the right answer. These are just some of the ways that OCD has influenced my academic performance.

Ever since I was diagnosed almost 2 months ago, I have been working extremely hard to improve myself now that I know what this is, what this was, and what I'm up against. I cannot tell you that I can fix this overnight, but I can tell you that progress can be made.

I have not and will not be fighting this challenge by myself. I am getting enormous help from my psychotherapist Denise H Unterman, (L.C.S.W.) and psychiatrist Earl J Mauricio, MD. I have already started CBT and will continue to do so **indefinitely**. They will also send a letter directly to you on my behalf.

AWOD004991

The progress so far has been noticeable. I took my last COMP exam on March 30th, 2017 and my score was a 60. The day before my COMP, March 29th, 2017, I took a paid NBME online (form 13) and scored a 58% (84 incorrect answers). Knowing the high validity of these exams, I knew the exam indicated that I would fail COMP again. A month after my diagnose and getting help with my OCD I took another paid NBME online (form 15) and improved quite a bit. On April 25th, 2017, I scored a 67.5% (65 incorrect answers). I did not include this into my last appeal because I did not know how the promotion committee would feel about a borderline passing score, even if I significantly improved. Four days ago, June 8th, 2017, I took another paid NBME online (form 17) and scored a 72% (56 incorrect answers). These exams were taken under standard (timed) pace. I hope that these monthly increases in my score can adequately display that I can beat my OCD and continue to improve. I just need one more chance to take COMP to prove that I can do it.

Along with this letter, I will include the screenshots of each of my NBME exams mentioned above. I recorded myself taking NBME form 15 but the video was about 5 hours long so it cannot be emailed. But it is available if needed. The letter from my psychotherapist and psychiatrist will come directly from them.

I promise Dean Owen, that I will not let you down if I am granted one more chance to take COMP. I will continue my therapy for the rest of my medical career; and I promise that I will not let my OCD handicap me now or in the future ever again.


Sincerely, thank you and God bless you,

Oluwamuyiwa Awodiya

# 217

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-60482-CIV-ALTMAN/Hunt

OLUWAMUYIWA AWODIYA,

  Plaintiff,

v.

**ROSS UNIVERSITY SCHOOL
OF MEDICINE,**

  Defendant.

_____/

### **ORDER**

  **THIS MATTER** came before the Court upon the Plaintiff's Motion for Amended and Additional Findings in the Court's Order Closing Case ("Motion to Amend") [ECF No. 212]. The Plaintiff asks the Court to "amend or make additional findings under Rule 52(b), whether or not granting the motion would alter the judgment." Motion to Amend at 1.

  As a preliminary matter, the Court notes that a motion to amend under Federal Rule of Civil Procedure 52(b) is improper where, as here, a district court has entered an order for summary judgment "because the findings of fact on a summary judgment motion are not findings in the strict sense that the trial court weighed evidence and resolved disputed factual issues." *Silva v. Potter*, No. 804CV2542T17EAJ, 2006 WL 3219232, at *2 (M.D. Fla. Nov. 6, 2006).

  What the Plaintiff actually wants is to introduce "new evidence" that might induce the Court to reconsider its June 18, 2019 Omnibus Order granting summary judgment in favor of the Defendant, RUSM ("Omnibus Order") [ECF No. 210]. As such, the Court will construe the Plaintiff's Motion to Amend as a Motion for Reconsideration under Federal Rule of Civil

Procedure 59(e). Rule 59(e) sets forth "three primary grounds that justify reconsideration[]: (1) an intervening change in the controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." *Delaware Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1383 (11th Cir. 2010) (internal quotation omitted).

In support of his motion, the Plaintiff raises two principal arguments: (1) that he was not "on notice" of the Court's intention to evaluate the domestic application of the ADA to the facts of his case;[1] and (2) that, under the "focus" test set out in *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016), the ADA's "focus" is not the elimination of discriminatory decisions, which in this case occurred in Dominica, but rather the eradication of un-accommodated exams— exams the Plaintiff admittedly took in the United States. *See generally* Motion to Amend. Both arguments are meritless.

The Plaintiff first claims that he "was not given notice that the Court would decide the domestic applications of this case," and that the "Court did not request for a briefing on the domestic application of the ADA and the RA in this case." Motion to Amend at 1. But this is simply not so. In its May 14, 2019 Order [ECF No. 191] requesting additional briefing, the Court specifically asked the parties to "brief the question of the extraterritorial application of the ADA and the RA, *as well as the impact, if any, that the answer to this question might have on the Plaintiff's remaining claims*, which include: Count I (failure to accommodate under the ADA); Count II (failure to accommodate under the RA); Count VIII (fraudulent inducement under Florida law); and Count IX (negligent misrepresentation under Florida law)." [ECF No. 191 at 6 (emphasis added)]. The Court's Order therefore put the parties on notice of its intention, not only to consider

---

[1] The Plaintiff also (and relatedly) says that the Court should have asked for additional briefing on this issue. Motion to Amend at 1.

the extraterritoriality of the ADA, but also to assess the viability of the Plaintiff's claims in the event the ADA was found not to apply abroad. The Plaintiff was therefore unmistakably on notice that the Court intended to consider the domestic application of the ADA—he says as much in his response to the Court's May 14, 2019 Order, *see* Pl. Resp. at 9 [ECF No. 192]—but, for reasons that are not clear, he specifically chose not to allocate any of his ten pages of extra briefing to this issue. *Id.*

The Court also did not need any additional briefing—that is, any briefing on top of the additional briefing the Court had already sought, *see generally* ECF No. 191—to resolve the rather straightforward question of whether the Plaintiff's ADA claims arose from actions RUSM took in the United States. Indeed, the Plaintiff's own Statement of Undisputed Material Facts[2]—upon which the Court exclusively relied for its conclusion on this issue—made plain that RUSM's alleged denial of his request for an accommodation occurred *in Dominica*. The Plaintiff's renewed arguments on this point—like the declaration he attached to his Motion—do little more than attempt to relitigate issues the Court has already addressed in the Omnibus Order. And, for whatever it is worth, the "Additional Facts" the Plaintiff cites in his motion provide *no evidence* that RUSM's allegedly discriminatory decision not to provide the Plaintiff with test-taking accommodations took place anywhere but in Dominica. As the Court explained in its Omnibus Order, RUSM's alleged decision not to grant the test-taking accommodations—and the Plaintiff's conversations with RUSM staff about his medical conditions—all occurred *in Dominica*.

The Plaintiff's second argument—that, because the ADA's "focus" is the un-accommodated exam itself, and because he took that exam in the United States, his ADA claims necessarily arose in the United States—fares little better. In *RJR Nabisco*, the Supreme Court set

---

[2] *See* Plaintiff's Statement of Material Facts in Support of Plaintiff's Second Motion for Partial Summary Judgment [ECF No. 101].

3

out a two-step framework for courts to follow in analyzing the extraterritorial application of a

plaintiff's claims:

> At the first step, we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially . . . [i[f the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's "focus." If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; *but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.*

*Id.* at 2101 (emphasis added).

The Plaintiff's decision to take the COMP Exam in the United States—a decision the

Plaintiff made only *after* RUSM had chosen not to grant him a testing accommodation—is not, as

the Plaintiff suggests, "conduct relevant to the [ADA's] focus." *Id.* To the contrary, as the text of

the ADA makes clear, the "Purpose" of the ADA is to eliminate *discrimination*—that is, decisions

that discriminate—against individuals with disabilities. *See generally* 42 U.S.C. § 12101(b).[3]

Specifically, the ADA endeavors to "provide a clear and comprehensive national mandate for the

elimination of discrimination against individuals with disabilities." *Id.* The ADA's "focus" is thus

the elimination of precisely the kind of discrimination in which RUSM allegedly engaged here—

---

[3] Section 12101(b) provides as follows:

> It is the purpose of this chapter: (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

discrimination that occurred, if at all, in Dominica. In other words, because the "conduct relevant to the focus [of the ADA] occurred in a foreign country, the case involves an impermissible extraterritorial application *regardless of any other conduct that occurred in U.S. territory.*" *RJR Nabisco*, 136 S. Ct. at 2101 (emphasis added).

In short, the decision not to provide an accommodation—even for exams that might later take place in the United States—was one RUSM made in Dominica, a foreign country in which the ADA, for better or worse, simply does not apply. Given that there has been no change in the intervening or controlling law, no new evidence, and no showing of clear error or manifest injustice, the Court hereby

**ORDERS AND ADJUDGES** that the Plaintiff's Motion to Amend [ECF No. 212] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 9th day of July 2019.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

5

# 218

# UNITED STATES DISTRICT COURT

for the
Southern District of Florida

|  |  |
|---|---|
| OLUWAMUYIWA AWODIYA, | Case No. 0:18-cv-60482-RKA |
| *Plaintiff,* | |
| -v- | |
| | Hon. Judge: Roy K. Altman |
| ROSS UNIVERSITY SCHOOL OF | Magistrate Judge: Patrick M. Hunt |
| MEDICINE, SCHOOL OF | |
| VETERINARY MEDICINE LIMITED, | |
| *Defendant.* | |

FILED BY ____ D.C.

JUL 17 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

## NOTICE OF APPEAL

Notice is hereby given that *pro se* plaintiff Oluwamuyiwa Awodiya ("Plaintiff") in the above named case hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the Order Closing Case [ECF No. 210] that granted summary judgment in favor of the defendant Ross University School of Medicine, School of Veterinary Medicine Limited, entered in this action on the 18th day of June, 2019 and the corresponding Final Judgment order [ECF No. 211] entered in this action on the 20th day of June, 2019.

Please take further notice that in this action, the District Court previously granted Plaintiff leave to proceed in forma pauperis [ECF No. 10]. Therefore, "[a] party who was permitted to proceed in forma pauperis in the district-court action … may proceed on appeal in forma pauperis without further authorization." Fed. R. App. P. 24(a)(3).

1

DATED this 15th day of July, 2019:

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

## CERTIFICATE OF SERVICE

I do hereby certify that on this 15th day of July, 2019, I have caused a true and correct copy

of the foregoing by mailing a copy to the Court, where the Court's CM/ECF system will send

notification to the counsel of record.

By: Oluwamuyiwa Awodiya, *pro se* litigant

2

## CERTIFICATE OF SERVICE

I do hereby certify that on this 26th day of August, 2019, I have caused a true

and correct copy of the foregoing by emailing a copy to the counsel of record.

By: Oluwamuyiwa Awodiya, *pro se* litigant

1