IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

---

USCA Case No. 19-12832-D
United States District Court, Southern District of Florida
Case No.:  0:18-cv-60482-RKA

---

OLUWAMUYIWA AWODIYA

Plaintiff/Appellant,

v.

ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE LIMITED

Defendant/Appellee.

---

# SUPPLEMENTAL APPENDIX TO ANSWER BRIEF OF APPELLEE ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE LIMITED

# VOLUME I OF II

---

MICHAEL C. MARSH
RYAN ROMAN
DONNIE M. KING
OCTAVIA M. GREEN
AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, Florida 33131
Tel: (305) 374-5600
Fax: (305) 374-5095

ATTORNEYS FOR APPELLEE

**INDEX TO SUPPLEMENTAL APPENDIX TO ANSWER BRIEF OF APPELLEE ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE LIMITED**

| Description | Docket / Tab |
| --- | --- |
| District Court Docket Sheet | A |
| Plaintiff's Statement of Material Facts in Support of Plaintiff's Second Motion for Partial Summary Judgment by Oluwamuyiwa Awodiya | 101 |
| Plaintiff's Second Motion for Partial Summary Judgment (including exhibits SJ-01 through SJ-23)[1] | 102 |
| Excerpts of the Transcript of the Deposition of Oluwamuyiwa Awodiya, taken December 5, 2018 | 119-2 |
| Ross University School of Medicine – Student Handbook (2015 – 2016) | 119-20 |
| National Board of Medical Examiners' Examinee Performance Profile for Awodiya Oluwamuyiwa; Test Dates: 03/30/2017, 10/22/2016, 08/26/2016, 07/02/2016, 04/22/2016 | 119-24 |
| Academic Dismissal Appeal | 119-25 |
| Plaintiff's Amended Responses and Objections to Defendant's First Set of Interrogatories | 119-26 |

---

[1] Although Appellant includes DE 102 with his appendix, certain exhibits were not included in their entirety.  For the Court's convenience, Ross University submits DE 102 in its entirety.

# TAB A

AOV,APPEAL,CLOSED,MEDIATION

## U.S. District Court
## Southern District of Florida (Ft Lauderdale)
## CIVIL DOCKET FOR CASE #: 0:18–cv–60482–RKA

Awodiya v. Ross University School of Medicine
Assigned to: Judge Roy K. Altman
Referred to: Magistrate Judge Alicia O. Valle
 Case in other court:  USCA, 19–12832–D
Cause: 42:12182 Americans with Disabilities Act

Date Filed: 03/06/2018
Date Terminated: 06/18/2019
Jury Demand: Plaintiff
Nature of Suit: 446 Civil Rights: Americans with Disabilities – Other
Jurisdiction: Diversity

**Plaintiff**

**Oluwamuyiwa Awodiya**

represented by

**Oluwamuyiwa Awodiya**
15005 Dahlia Dr.
Bowie, MD 20721
240–602–1836
Email: DRmuyiwa.a@gmail.com
PRO SE

V.

**Defendant**

**Ross University School of Medicine**
*School of Veterinary Medicine Limited*

represented by

**Christina Meddin**
Seyfarth Shaw LLP
1075 Peachtree Street NE
Suite 2500
Atlanta, GA 30309
404–888–1886
Email: cmeddin@seyfarth.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian M. Stolzenbach**
Seyfarth, Shaw, LLP
233 South Wacker Drive, Suite 8000
Chicago, IL 60601
312–460–5000
Email: bstolzenbach@seyfarth.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Donnie Marcel King**
Akerman LLP
98 SE 7th St, Suite 1100
Miami, FL 33131
3053745600
Fax: 3053745600
Email: donnie.king@akerman.com
*ATTORNEY TO BE NOTICED*

**Octavia Monique Green**
Akerman LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, FL 33131
(305) 982–5670
Email: octavia.green@akerman.com
*ATTORNEY TO BE NOTICED*

**Ryan Roman**

Akerman LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, FL 33131–1714
305–374–5600
Fax: 305–374–5095
Email: ryan.roman@akerman.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/06/2018 | 1 | COMPLAINT against Ross University School of Medicine. Filing fees $ 400.00. IFP Filed, filed by Oluwamuyiwa Awodiya. (Attachments: # 1 Civil Cover Sheet, # 2 Summon(s))(kpe) (Entered: 03/06/2018) |
| 03/06/2018 | 2 | Clerks Notice of Judge Assignment to Chief Judge K. Michael Moore. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Lurana S. Snow is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. Pro se (NON–PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON–PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (kpe) (Entered: 03/06/2018) |
| 03/06/2018 | 3 | MOTION for Leave to Proceed in forma pauperis by Oluwamuyiwa Awodiya. (kpe) (Entered: 03/06/2018) |
| 03/06/2018 | 4 | Consent by Pro Se Litigant (Non–Prisoner) Oluwamuyiwa Awodiya to receive Notices of Electronic Filing at email address: DRmuyiwa.a@gmail.com (kpe) (Entered: 03/06/2018) |
| 03/07/2018 | 5 | PAPERLESS PRETRIAL ORDER. This order has been entered upon the filing of the complaint. Plaintiff's counsel is hereby ORDERED to forward to all defendants, upon receipt of a responsive pleading, a copy of this Order. It is further ORDERED that S.D. Fla. L.R. 16.1 shall apply to this case and the parties shall hold a scheduling conference no later than twenty (20) days after the filing of the first responsive pleading by the last responding defendant, or within sixty (60) days after the filing of the complaint, whichever occurs first. However, if all defendants have not been served by the expiration of this deadline, Plaintiff shall move for an enlargement of time to hold the scheduling conference, not to exceed 90 days from the filing of the Complaint. Within ten (10) days of the scheduling conference, counsel shall file a joint scheduling report. Failure of counsel to file a joint scheduling report within the deadlines set forth above may result in dismissal, default, and the imposition of other sanctions including attorney's fees and costs. The parties should note that the time period for filing a joint scheduling report is not tolled by the filing of any other pleading, such as an amended complaint or Rule 12 motion. The scheduling conference may be held via telephone. At the conference, the parties shall comply with the following agenda that the Court adopts from S.D. Fla. L.R. 16.1: (1) Documents (S.D. Fla. L.R. 16.1.B.1 and 2) – The parties shall determine the procedure for exchanging a copy of, or a description by category and location of, all documents and other evidence that is reasonably available and that a party expects to offer or may offer if the need arises. Fed. R. Civ. P. 26(a)(1)(B). (a) Documents include computations of the nature and extent of any category of damages claimed by the disclosing party unless the computations are privileged or otherwise protected from disclosure. Fed. R. Civ. P. 26(a)(1)(C). (b) Documents include insurance agreements which may be at issue with the satisfaction of the judgment. Fed. R. Civ. P. 26(a)(1)(D). (2) List of Witnesses – The parties shall exchange the name, address and telephone number of each individual known to have knowledge of the facts supporting the material allegations of the pleading filed by the party. Fed. R. Civ. P. 26(a)(1)(A). The parties have a continuing obligation to disclose this information. (3) Discussions and Deadlines (S.D. Fla. L.R. 16.1.B.2) – The parties shall discuss the nature and basis of their claims and defenses and the possibilities for a prompt settlement or resolution of the case. Failure to comply with this Order or to exchange the information listed above may result in |

| | | |
|---|---|---|
| | | sanctions and/or the exclusion of documents or witnesses at the time of trial. S.D. Fla. L.R. 16.1.I.<br><br>Pursuant to Administrative Order 2016–70 of the Southern District of Florida and consistent with the Court of Appeals for the Eleventh Circuits Local Rules and Internal Operating Procedures, within three days of the conclusion of a trial or other proceeding, parties must file via CM/ECF electronic versions of documentary exhibits admitted into evidence, including photographs of non–documentary physical exhibits. The Parties are directed to comply with each of the requirements set forth in Administrative Order 2016–70 unless directed otherwise by the Court.<br><br>Telephonic appearances are not permitted for any purpose. Upon reaching a settlement in this matter the parties are instructed to notify the Court by telephone and to file a Notice of Settlement within twenty–four (24) hours. Signed by Chief Judge K. Michael Moore on 3/7/2018. (jm01) (Entered: 03/07/2018) |
| 03/07/2018 | 6 | PAPERLESS ORDER REFERRING PRETRIAL DISCOVERY MATTERS TO MAGISTRATE JUDGE LURANA S. SNOW. PURSUANT to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida, the above–captioned Cause is referred to United States Magistrate Judge Lurana S. Snow to take all necessary and proper action as required by law with respect to any and all pretrial discovery matters. Any motion affecting deadlines set by the Court's Scheduling Order is excluded from this referral, unless specifically referred by separate Order. It is FURTHER ORDERED that the parties shall comply with Magistrate Judge Lurana S. Snow's discovery procedures, which the parties shall be advised of by the entry of an Order. Signed by Chief Judge K. Michael Moore on 3/7/2018. (jm01) (Entered: 03/07/2018) |
| 03/07/2018 | 7 | CASE REFERRED to Magistrate Judge Lurana S. Snow per 6 Order. (asl) (Entered: 03/07/2018) |
| 03/07/2018 | 8 | PAPERLESS ORDER REFERRING Plaintiff's Motion for Leave to Proceed in forma pauperis 3 . PURSUANT to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida, the above–captioned cause is referred to Magistrate Judge Lurana S. Snow to take all necessary and proper action as required by law regarding Plaintiff's motion 3 . Signed by Chief Judge K. Michael Moore on 3/7/2018. (jm01) (Entered: 03/07/2018) |
| 03/07/2018 | 9 | GENERAL ORDER ON DISCOVERY OBJECTIONS AND PROCEDURES. Signed by Magistrate Judge Lurana S. Snow on 3/7/2018. (kpe) (Entered: 03/07/2018) |
| 03/08/2018 | 10 | ORDER granting 3 Motion for Leave to Proceed in forma pauperis. **USM Service ordered** . **Summonses provided for issuance by Clerk for USM Service** Re: 1 Complaint filed by Oluwamuyiwa Awodiya. Signed by Magistrate Judge Lurana S. Snow on 3/8/2018. (kpe) (Entered: 03/08/2018) |
| 03/08/2018 | 11 | Summons Issued as to Ross University School of Medicine. (kpe) (Entered: 03/08/2018) |
| 03/08/2018 | 12 | NOTICE of Compliance by Oluwamuyiwa Awodiya re 10 Order on Motion for Leave to Proceed in forma pauperis. Summonses and Copy of Complaint provided to US Marshal for service. (kpe) (Entered: 03/08/2018) |
| 03/21/2018 | 15 | SUMMONS (Affidavit) Returned Executed on 1 Complaint (Served Kelly Tesselar Director of Student Services) with a 21 day response/answer filing deadline Ross University School of Medicine served on 3/21/2018, answer due 4/11/2018. (ebz) (Entered: 03/29/2018) |
| 03/26/2018 | 13 | MOTION for Permission for Electronic Case Filing by Oluwamuyiwa Awodiya. (Attachments: # 1 Proposed Order)(kpe) (Entered: 03/26/2018) |
| 03/26/2018 | 14 | PAPERLESS ORDER. THIS CAUSE came before the Court upon pro se Plaintiff Oluwamuyiwa Awodiya's Motion for Permission for Electronic Case Filing. 13 . Pursuant to Section 2C of the Southern District of Florida CM/ECF Administrative Procedures, "Pro se litigants will not be permitted to register as Users at this time. Pro se litigants must tile their documents in the conventional manner." Therefore, it is ORDERED AND ADJUDGED that the Motion for Permission for Electronic Case Filing 13 is DENIED. Signed by Chief Judge K. Michael Moore on 3/26/2018. (jm01) (Entered: 03/26/2018) |

| | | |
|---|---|---|
| 04/06/2018 | 16 | SUMMONS (Affidavit) Returned Executed on 1 Complaint with a 21 day response/answer filing deadline by Oluwamuyiwa Awodiya. Ross University School of Medicine served on 3/23/2018, answer due 4/13/2018. (mee) (Entered: 04/06/2018) |
| 04/06/2018 | 17 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint by Ross University School of Medicine. Attorney Christina Meddin added to party Ross University School of Medicine(pty:dft). (Attachments: # 1 Text of Proposed Order)(Meddin, Christina) (Entered: 04/06/2018) |
| 04/06/2018 | 18 | Corporate Disclosure Statement by Ross University School of Medicine identifying Corporate Parent Adtalem Global Education Inc., Other Affiliate BlackRock, Inc. for Ross University School of Medicine (Meddin, Christina) (Entered: 04/06/2018) |
| 04/09/2018 | 19 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's Unopposed Motion for an Extension of Time to Respond to the Complaint. 17 . UPON CONSIDERATION of the Motion 17 , the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 17 is GRANTED. Defendant shall respond to the Complaint on or before April 27, 2018. Signed by Chief Judge K. Michael Moore on 4/9/2018. (jm01) (Entered: 04/09/2018) |
| 04/09/2018 | | Reset Answer Due Deadline per 19 Order: Ross University School of Medicine response due 4/27/2018. (asl) (Entered: 04/09/2018) |
| 04/09/2018 | 20 | ORDER/NOTICE OF RECUSAL signed by Magistrate Judge Lurana S. Snow on 4/9/2018. Magistrate Judge Lurana S. Snow recused. Case randomly reassigned by Clerk to Magistrate Judge Barry S. Seltzer for all further proceedings. (ane) (Entered: 04/09/2018) |
| 04/09/2018 | 21 | AMENDED COMPLAINT against Ross University School of Medicine, filed by Oluwamuyiwa Awodiya.(kpe) (Entered: 04/10/2018) |
| 04/11/2018 | 22 | ORDER Setting Discovery Procedure. Please see Order for details. Signed by Magistrate Judge Barry S. Seltzer on 4/10/2018. (pb00) (Entered: 04/11/2018) |
| 04/12/2018 | 23 | Defendant's MOTION for Extension of Time to File Response/Reply/Answer as to 21 Amended Complaint by Ross University School of Medicine. (Attachments: # 1 Text of Proposed Order)(Meddin, Christina) (Entered: 04/12/2018) |
| 04/13/2018 | 24 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's Motion for an Extension of Time to Respond to the Complaint. 23 . UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 23 is GRANTED. Defendant shall respond to the Complaint on or before May 18, 2018. Signed by Chief Judge K. Michael Moore on 4/13/2018. (jm01) (Entered: 04/13/2018) |
| 04/18/2018 | 25 | RESPONSE to 23 Defendant's Partially Unopposed MOTION for Extension of Time to Answer or Otherwise Respond to Plainitiff's Amended Complaint filed by Oluwamuyiwa Awodiya. Replies due by 4/25/2018. (kpe) (Entered: 04/18/2018) |
| 04/19/2018 | 26 | Plaintiff's Request for Judicial Notice by Oluwamuyiwa Awodiya. (Attachments: # 1 Proposed Order)(kpe) (Entered: 04/19/2018) |
| 04/19/2018 | 27 | Declaration in Support of 26 Plaintiff's Request for Judicial Notice filed by Oluwamuyiwa Awodiya. (kpe) (Main Document 27 replaced for clearer image on 4/23/2018) (yha). Modified text on 4/23/2018 (yha). (Entered: 04/19/2018) |
| 04/24/2018 | 28 | Consent MOTION to Stay *Deadlines and Referral to Mediation* by Ross University School of Medicine. Responses due by 5/8/2018 (Attachments: # 1 Supplement)(Meddin, Christina) (Entered: 04/24/2018) |
| 04/24/2018 | 29 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's Consent Motion to Stay Deadlines and Referral to Mediation. 28 . Therein, Defendant states that mediation would be particularly likely to help resolve the matter and requests that the Court stay all deadlines pending the outcome of mediation. 28 at 2. The Court shall enter a Referral to Mediation following the Parties' submission of a joint scheduling report, as required by the Court's Pretrial Order 5 . The Parties may file the joint scheduling report prior to the expiration of the deadline in which to do so. UPON CONSIDERATION of |

| | | |
|---|---|---|
| | | the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendant's Motion to Stay Deadlines and Referral to Mediation is DENIED. Signed by Chief Judge K. Michael Moore on 4/24/2018. (jm01) (Entered: 04/24/2018) |
| 05/03/2018 | 30 | RESPONSE to Motion re 26 MOTION Judicial Notice *and Defendant's Request to be Heard* filed by Ross University School of Medicine. Replies due by 5/10/2018. (Meddin, Christina) (Entered: 05/03/2018) |
| 05/07/2018 | 31 | REPLY to 30 Defendant's Request to be Heard and Response to Plaintiff's Request for Judicial Notice by Oluwamuyiwa Awodiya. (kpe) (Entered: 05/07/2018) |
| 05/08/2018 | 32 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Brian M. Stolzenbach. Filing Fee $ 75.00 Receipt # 113C–10633946 by Ross University School of Medicine. Responses due by 5/22/2018 (Attachments: # 1 Text of Proposed Order)(Meddin, Christina) (Entered: 05/08/2018) |
| 05/08/2018 | 33 | PAPERLESS ORDER. THIS CAUSE came before the Court upon a Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filings 32 . UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is ORDERED AND ADJUDGED that the Motion is GRANTED. Brian M. Stolzenbach may appear Pro Hac Vice in this matter. The Clerk of the Court shall provide electronic notification of all electronic filings to bstolzenbach@seyfarth.com. Signed by Chief Judge K. Michael Moore on 5/8/2018. (jm01) (Entered: 05/08/2018) |
| 05/09/2018 | 34 | MOTION for Leave to File Second Amended Complaint re 21 Amended Complaint by Oluwamuyiwa Awodiya. Responses due by 5/23/2018 (Attachments: # 1 Second Amended Complaint)(kpe) (Entered: 05/09/2018) |
| 05/10/2018 | 35 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's Motion for Leave to File Second Amended Complaint. 34 . Federal Rule of Civil Procedure 15(a)(2) permits a party to amend its pleadings by leave of court or by written consent of the adverse party. The decision to grant or deny a motion to amend pleadings is within the sound discretion of the trial court. Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 598 (5th Cir. 1981). The policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading. Id. Thus, unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial. Id. A substantial reason could include "undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of the amendment." Grayson v. Kmart Corp., 79 F.3d 1086, 1110 (11th Cir. 1996). The Court does not find a substantial reason to deny Plaintiff's motion for leave to amend. Accordingly, UPON CONSIDERATION of the Motion 34 , the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Plaintiff's Motion for Leave to File Second Amended Complaint is GRANTED. Plaintiff is instructed to file its Second Amended Complaint on the docket.<br><br>Clerks Notice: Filer must separately re–file the amended pleading pursuant to Local Rule 15.1, unless otherwise ordered by the Judge. Signed by Chief Judge K. Michael Moore on 5/10/2018. (jm01) (Entered: 05/10/2018) |
| 05/14/2018 | 36 | Joint SCHEDULING REPORT – **Rule 26(f)** by Ross University School of Medicine (Attachments: # 1 Exhibit)(Meddin, Christina) (Entered: 05/14/2018) |
| 05/14/2018 | 37 | PAPERLESS ORDER SCHEDULING TRIAL IN FORT LAUDERDALE. This case is now set for trial commencing the two week trial period of March 18, 2019, at 9 a.m. in the United States District Courthouse, 299 East Broward Boulevard, Fort Lauderdale, Florida. The assigned courtroom will be announced at the calendar call. All parties are directed to report to the calendar call on March 14, 2019, at 2 p.m., at which time all matters relating to the scheduled trial date may be brought to the attention of the Court. A final pretrial conference as provided for by Rule 16, Fed. R. Civ. P., and Rule 16.1(C), S.D. Fla. L.R., is scheduled for March 5, 2019, at 11 a.m. The calendar call and the final pretrial conference will take place in Courtroom 13–1 (thirteenth floor), United States |

District Courthouse, 400 North Miami Avenue, Miami, Florida. A bilateral pretrial stipulation and all other pretrial preparations shall be completed NO LATER THAN FIVE DAYS PRIOR TO THE PRETRIAL CONFERENCE. All motions to amend the pleadings or to join additional parties must be filed by the later of forty−five (45) days after the date of entry of this Order, or forty−five (45) days after the first responsive pleading by the last responding defendant. Any and all pretrial motions, including motions for summary judgment, Daubert motions, and motions in limine must be filed no later than eighty (80) days prior to the trial date. Responses to summary judgment motions must be filed no later than fourteen (14) days after service of the motion, and replies in support of the motion must be filed no later than seven (7) days after service of the response, with both deadlines computed as specified in Rule 6, Fed. R. Civ. P. Each party is limited to one Daubert motion. If all evidentiary issues cannot be addressed in a 20−page memorandum, the parties must file for leave to exceed the page limit. Each party is also limited to one motion in limine (other than Daubert motions). If all evidentiary issues cannot be addressed in a 20−page memorandum, the parties must file for leave to exceed the page limit. All discovery, including expert discovery, shall be completed one hundred (100) days prior to the date of trial. The failure to engage in discovery pending settlement negotiations shall not be grounds for continuance of the trial date. All exhibits must be pre−marked, and a typewritten exhibit list setting forth the number and description of each exhibit must be submitted at the time of trial. Plaintiff's exhibits shall be marked numerically with the letter "P" as a prefix. Defendant's exhibits shall be marked numerically with the letter "D" as a prefix. For a jury trial, counsel shall prepare and submit proposed jury instructions to the Court. The Parties shall submit their proposed jury instructions and verdict form jointly, although they do not need to agree on each proposed instruction. Where the parties do not agree on a proposed instruction, that instruction shall be set forth in bold type. Instructions proposed only by a plaintiff should be underlined. Instructions proposed only by a defendant should be italicized. Every instruction must be supported by citation to authority. The parties should use the Eleventh Circuit Pattern Jury Instructions for Civil Cases as a guide, including the directions to counsel contained therein. The parties shall jointly file their proposed jury instructions via CM/ECF, and shall also submit their proposed jury instructions to the Court via e−mail at moore@flsd.uscourts.gov in WordPerfect or Word format. For a non−jury trial, the parties shall prepare and submit to the Court proposed findings of fact and conclusions of law fully supported by the evidence, which counsel expects the trial to develop, and fully supported by citations to law. The proposed jury instructions or the proposed findings of fact and conclusions of law shall be submitted to the Court no later than five (5) business days prior to the scheduled trial date. Pursuant to Administrative Order 2016−70 of the Southern District of Florida and consistent with the Court of Appeals for the Eleventh Circuits Local Rules and Internal Operating Procedures, within three days of the conclusion of a trial or other proceeding, parties must file via CM/ECF electronic versions of documentary exhibits admitted into evidence, including photographs of non−documentary physical exhibits. The Parties are directed to comply with each of the requirements set forth in Administrative Order 2016−70 unless directed otherwise by the Court.

THE FILING BY COUNSEL OF A NOTICE OF UNAVAILABILITY BY MOTION OR OTHERWISE IS NOT PROVIDED FOR UNDER THE LOCAL RULES AND SHALL NOT BE PRESUMED TO ALTER OR MODIFY THE COURT'S SCHEDULING ORDER. Signed by Chief Judge K. Michael Moore on 5/14/2018. (jm01)

_**Pattern Jury Instruction Builder**_ − To access the latest, up to date changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. (Entered: 05/14/2018)

| | | |
|---|---|---|
| 05/14/2018 | 38 | PAPERLESS ORDER OF REFERRAL TO MEDIATION. Trial having been set in this matter for the two week trial period beginning March 18, 2019, at 9:00 a.m. pursuant to Rule 16 of the Federal Rule of Civil Procedure and Rule 16.2 of the Local Rules of the United States District Court for the Southern District of Florida, it is hereby ORDERED AND ADJUDGED as follows: 1. All parties are required to participate in mediation. The mediation shall be completed no later than eighty (80) days before the scheduled trial date. 2. Plaintiff's counsel, or another attorney agreed upon by all counsel of record and any unrepresented parties, shall be responsible for scheduling the mediation conference. The parties are encouraged to avail themselves of the services of any mediator on the List of Certified Mediators, maintained in the office of the Clerk of this Court, but may select |

any other mediator. The parties shall agree upon a mediator and file a Notice of Mediator Selection within fifteen (15) days from the date of this Order. If there is no agreement, lead counsel shall file a request for the Clerk of Court to appoint a mediator in writing within fifteen (15) days from the date of this Order, and the Clerk shall designate a mediator from the List of Certified Mediators. Designation shall be made on a blind rotation basis. 3. A place, date, and time for mediation convenient to the mediator, counsel of record, and unrepresented parties shall be established. If the parties cannot agree to a place, date, and time for the mediation, they may motion the Court for an order dictating the place, date, and time. 4. The physical presence of counsel and each party or representatives of each party with full authority to enter in a full and complete compromise and settlement is mandatory. If insurance is involved, an adjuster with authority up to the policy limits or the most recent demand, whichever is lower, shall attend. 5. All discussions, representations and statements made at the mediation conference shall be confidential and privileged. 6. At least ten (10) days prior to the mediation date, all parties shall present to the mediator a brief written summary of the case identifying issues to be resolved. Copies of those summaries shall be served on all other parties. 7. The Court may impose sanctions against parties and/or counsel who do not comply with the attendance or settlement authority requirements herein, or who otherwise violate the terms of this Order. The mediator shall report non−attendance and may recommend imposition of sanctions by the Court for non−attendance. 8. The mediator shall be compensated in accordance with the standing order of the Court entered pursuant to Rule 16.2.B.6, or on such basis as may be agreed to in writing by the parties and the mediator selected by the parties. The cost of mediation shall be shared equally by the parties unless otherwise ordered by the Court. All payments shall be remitted to the mediator within 30 days of the date of the bill. Notice to the mediator of cancellation or settlement prior to the scheduled mediation conference must be given at least two (2) full business days in advance. Failure to do so will result in imposition of a fee for one hour. 9. If a full or partial settlement is reached in this case, counsel shall promptly notify the Court of the settlement in accordance with Local Rule 16.2.F, by filing a notice of settlement signed by the counsel of record within ten (10) days of the mediation conference. Thereafter, the parties shall forthwith submit an appropriate pleading concluding the case. 10. Within five (5) days following the mediation conference, the mediator shall file a Mediation Report indicating whether all required parties were present. The report shall also indicate whether the case settled (in full or in part), was continued with the consent of the parties, or whether the mediator declared an impasse. 11. If mediation is not conducted, the case may be stricken from the trial calendar, and other sanctions may be imposed. Signed by Chief Judge K. Michael Moore on 5/14/2018. (jm01) (Entered: 05/14/2018)

| 05/14/2018 | 39 | Second AMENDED COMPLAINT against Ross University School of Medicine filed in response to Order Granting Motion for Leave, filed by Oluwamuyiwa Awodiya.(kpe) Modified on 5/15/2018 (kpe). (Entered: 05/15/2018) |
|---|---|---|
| 05/29/2018 | 40 | ANSWER and Affirmative Defenses to Amended Complaint *(SECONDED AMENDED)* by Ross University School of Medicine. (Meddin, Christina) (Entered: 05/29/2018) |
| 05/29/2018 | 41 | NOTICE of Mediator Selection. Added Ross University School of Medicine. (Meddin, Christina) (Entered: 05/29/2018) |
| 05/30/2018 | 42 | Clerks Notice to Filer re 41 Notice of Mediator Selection and/or Hearing. **Mediator Not Added**; ERROR − The Filer failed to add all mediator. Filer is instructed to file a Notice of Entry of Parties/Mediator and add the additional mediator. (kpe) (Entered: 05/30/2018) |
| 05/31/2018 | 43 | NOTICE of Mediator Selection. Added Leslie W. Langbein. (Meddin, Christina) (Entered: 05/31/2018) |
| 06/22/2018 | 44 | ORDER denying 26 Request for Judicial Notice. Signed by Chief Judge K. Michael Moore on 6/22/2018. (jm01) (Entered: 06/22/2018) |
| 07/11/2018 | 45 | Consent Motion for Leave to File Third Amended Complaint 39 Amended Complaint by Oluwamuyiwa Awodiya. Responses due by 7/25/2018. (Attachments: # 1 Proposed Third Amended Complaint, # 2 Third Amended Complaint)(kpe) (Entered: 07/11/2018) |
| 07/11/2018 | 46 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's Motion for Leave to File a Third Amended Complaint. 45 . Federal Rule of Civil Procedure 15(a)(2) permits a party to amend its pleadings by leave of court or by written consent of the |

| | | |
|---|---|---|
| | | adverse party. The decision to grant or deny a motion to amend pleadings is within the sound discretion of the trial court. Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 598 (5th Cir. 1981). The policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading. Id. Thus, unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial. Id. A substantial reason could include "undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of the amendment." Grayson v. Kmart Corp., 79 F.3d 1086, 1110 (11th Cir. 1996). The Court does not find a substantial reason to deny Plaintiff's motion for leave to amend. Accordingly, UPON CONSIDERATION of the Motion 45 , the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Plaintiff's Motion for Leave to File a Third Amended Complaint is GRANTED. Plaintiff is instructed to file the Third Amended Complaint on the docket on or before July 16, 2018.<br><br>Clerks Notice: Filer must separately re–file the amended pleading pursuant to Local Rule 15.1, unless otherwise ordered by the Judge. Signed by Chief Judge K. Michael Moore on 7/11/2018. (jm01) (Entered: 07/11/2018) |
| 07/11/2018 | | Set Deadlines per 46 Order. Amended Complaint due by 7/16/2018. (asl) (Entered: 07/12/2018) |
| 07/16/2018 | 47 | THIRD AMENDED COMPLAINT against Ross University School of Medicine filed in response to Order Granting Motion for Leave, filed by Oluwamuyiwa Awodiya.(kpe) (Entered: 07/17/2018) |
| 07/30/2018 | 48 | NOTICE/STIPULATION of Substitution of Counsel by Ryan Roman on behalf of Ross University School of Medicine instead of prior counsel of record Seyfarth Shaw LLP. . Attorney Ryan Roman added to party Ross University School of Medicine(pty:dft). (Attachments: # 1 Text of Proposed Order Granting Substitution of Counsel) (Roman, Ryan) (Entered: 07/30/2018) |
| 07/30/2018 | 49 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 47 Amended Complaint by Ross University School of Medicine. (Attachments: # 1 Text of Proposed Order Granting Unopposed Motion)(Roman, Ryan) (Entered: 07/30/2018) |
| 07/31/2018 | 50 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's Unopposed Motion for an Extension of Time to Respond to the Complaint. 49 . UPON CONSIDERATION of the Motion 49 , the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion is GRANTED. Defendant shall respond to the Complaint on or before August 13, 2018. Signed by Chief Judge K. Michael Moore on 7/31/2018. (jm01) (Entered: 07/31/2018) |
| 07/31/2018 | | Reset Answer Due Deadline per 50 Order: Ross University School of Medicine response due 8/13/2018. (asl) (Entered: 07/31/2018) |
| 08/07/2018 | 51 | Joint MOTION for Settlement Conference in Lieu of Private Mediation re 38 Order Referring Case to Mediation,,,,,,,,,,,,,,,, by Ross University School of Medicine. (Roman, Ryan) (Entered: 08/07/2018) |
| 08/09/2018 | 52 | PAPERLESS ORDER REFERRING CASE TO MAGISTRATE JUDGE FOR SETTLEMENT CONFERENCE. THIS CAUSE came before the Court upon the Parties' Joint Motion for Referral to Settlement Conference. 51 . Therein, the Parties request that they be permitted to attend a settlement conference before a Magistrate Judge of this Court in lieu of attendance at mediation before a private mediator and request that this Court enter an order striking the prior notice of mediator selection. 51 at 2. Pursuant to the Local Rules, a Magistrate Judge is authorized to "conduct pretrial conferences, settlement conferences, omnibus hearings, and related pretrial proceedings in civil and criminal cases." Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion is GRANTED IN PART and DENIED IN PART. This matter is referred to United States Magistrate Judge Lurana S. Snow for the purpose of conducting a settlement conference. The Parties shall contact Judge Snow's chambers to arrange to complete the settlement conference and the Parties shall submit a |

| | | |
|---|---|---|
| | | status report to the Court within five (5) days of the conclusion of the settlement conference. However, the Court's Order of Referral to Mediation 38 remains in effect. If the Parties do not reach a settlement agreement during the settlement conference, the Parties must comply with the Court's Order of Referral to Mediation. Signed by Chief Judge K. Michael Moore on 8/9/2018. (jm01) (Entered: 08/09/2018) |
| 08/09/2018 | 53 | ORDER REFERRING CASE to Magistrate Judge Lurana S. Snow for for Settlement per 52 Order. Signed by Chief Judge K. Michael Moore on 8/9/2018. (asl) Modified to remove docket text on 8/9/2018 (asl). (Entered: 08/09/2018) |
| 08/10/2018 | 54 | PAPERLESS ORDER REFERRING CASE TO MAGISTRATE JUDGE FOR SETTLEMENT CONFERENCE. THIS CAUSE came before the Court upon the Parties' Joint Motion for Referral to Settlement Conference. 51 . The Court entered an order referring the Parties to Magistrate Judge Lurana S. Snow for the purpose of conducting a settlement conference. 52 . However, Judge Snow recused herself from the case and the case was reassigned to Magistrate Judge Barry S. Seltzer. 20 . Accordingly, the matter is referred to United States Magistrate Judge Barry S. Seltzer for the purpose of conducting a settlement conference. The Parties shall contact Judge Seltzer's chambers to arrange to complete the settlement conference and the Parties shall submit a status report to the Court within five (5) days of the conclusion of the settlement conference. However, as stated in the Court's previous order 52 , the Court's Order of Referral to Mediation 38 remains in effect. If the Parties do not reach a settlement agreement during the settlement conference, the Parties must comply with the Court's Order of Referral to Mediation. Signed by Chief Judge K. Michael Moore on 8/10/2018. (jm01) (Entered: 08/10/2018) |
| 08/10/2018 | 55 | PAPERLESS ORDER of Instructions for Setting a Settlement Conference. The District Court has entered an Order [DE 54] referring the case to the undersigned for a settlement conference. Accordingly, Counsel and Pro Se Plaintiff are ORDERED to meet and confer, either telephonically or in person, for the purpose of determining a date on which to conduct the settlement conference. No later than August 17, 2018, Defendant's counsel shall telephone Chambers with no fewer than three dates (for the full business day) on which the parties and their counsel will be available for the settlement conference. All parties must attend the settlement conference in person. Following the submission of proposed dates, the undersigned will enter an order setting the settlement conference with further instructions. Signed by Magistrate Judge Barry S. Seltzer on 8/10/2018. (pb00) (Entered: 08/10/2018) |
| 08/10/2018 | 56 | Unopposed MOTION for Leave to File Excess Page limits for Summary Judgment and Statement of Material Facts by Oluwamuyiwa Awodiya. (ebz) (Entered: 08/10/2018) |
| 08/13/2018 | 57 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's Motion to File Excess pages for Summary Judgment and Statement of Material Facts. 56 . Therein, Plaintiff requests that the Court permit Plaintiff to file a summary judgment motion and accompanying statement of material facts in excess of the page limits imposed by the Local Rules for the Southern District of Florida. UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, Plaintiff's Motion to File Excess Pages 56 is DENIED. All submissions must comply with the Local Rules of the Southern District of Florida and the Federal Rules of Civil Procedure. Failure to do so will result in the striking of non–compliant submissions. Signed by Chief Judge K. Michael Moore on 8/13/2018. (jm01) (Entered: 08/13/2018) |
| 08/13/2018 | 58 | ANSWER and Affirmative Defenses to Amended Complaint by Ross University School of Medicine. (Roman, Ryan) (Entered: 08/13/2018) |
| 08/16/2018 | 59 | Declaration in Support of Plaintiff's Motion for Partial Summary Judgment re 61 Motion for Partial Summary Judgment by Oluwamuyiwa Awodiya. (kpe) Modified on 8/17/2018 (kpe). (Main Document 59 replaced due to missing pages on 8/20/2018) (nc). Modified docket text on 8/20/2018 (nc). (Entered: 08/16/2018) |
| 08/16/2018 | 61 | MOTION for Partial Summary Judgment by Oluwamuyiwa Awodiya. Responses due by 8/30/2018 (Attachments: # 1 Statement of Material Facts In Support)(kpe) (Entered: 08/17/2018) |
| 08/17/2018 | 60 | ORDER Setting Settlement Conference for 10/1/2018 at 09:30 AM in Fort Lauderdale Division before Magistrate Judge Barry S. Seltzer. Signed by Magistrate Judge Barry S. Seltzer on 8/17/2018. *See attached document for full details.* (pb00) (Entered: 08/17/2018) |

| 08/20/2018 | 62 | Clerks Notice of Docket Correction re 59 Declaration in Support of Plaintiff's Motion for Partial Summary Judgment re 61 Motion for Partial Summary Judgment. **Correction** Document replaced due to missing pages. The corrected image is attached to this notice. (nc) (Entered: 08/20/2018) |
| --- | --- | --- |
| 08/23/2018 | 63 | Defendant's MOTION for Relief Under Rule 56(d) of the Federal Rules of Civil Procedure or, Alternatively, Motion for Extension of Time to Respond to Summary Judgment re 61 MOTION for Partial Summary Judgment , MOTION for Extension of Time to File Response/Reply/Answer by Ross University School of Medicine. (Attachments: # 1 Affidavit (Declaration of Ryan Roman in Support of Defendant's Motion), # 2 Exhibit A to Declaration (First Request for Production of Documents), # 3 Exhibit B (First Set of Interrogatories))(Roman, Ryan) (Entered: 08/23/2018) |
| 08/27/2018 | 64 | RESPONSE to Motion re 63 Defendant's MOTION for Relief Under Rule 56(d) of the Federal Rules of Civil Procedure or, Alternatively, Motion for Extension of Time to Respond to Summary Judgment filed by Oluwamuyiwa Awodiya. Replies due by 9/4/2018. (kpe) (Entered: 08/27/2018) |
| 08/27/2018 | 65 | Declaration in Support re 64 Response to Motion, by Oluwamuyiwa Awodiya. (kpe) (Entered: 08/27/2018) |
| 08/29/2018 | 66 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's MOTION for Relief Under Rule 56(d) of the Federal Rules of Civil Procedure or, alternatively, Motion for Extension of Time to Respond to Plaintiff's Motion for Partial Summary Judgment. 63 . Therein, Defendant requests that the Court deny or defer ruling on Plaintiff's Motion for Partial Summary Judgment 61 or alternatively, requests that the Court grant Defendant a thirty (30) day extension of time to respond to Plaintiff's Motion for Summary Judgment. Plaintiff responded in opposition arguing that the Court should deny Defendant's request. 64 .

Federal Rule of Civil Procedure 56(d) authorizes a party opposing a summary judgment motion to file a motion for additional time to conduct discovery so that it may appropriately oppose the motion. See Fed. R. Civ. P. 56(d); Reflectone, Inc. v. Farrand Optical Co., Inc., 862 F.2d 841, 843 (11th Cir. 1989). Specifically, the Rule permits a court to (1) defer consideration of a summary judgment motion or deny it, (2) allow additional time for the nonmovant to obtain affidavits, declarations, or take additional discovery, and (3) issue any other appropriate order upon a showing by the nonmovant that "it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). The protection afforded by Rule 56(d) is designed to safeguard against a premature grant of summary judgment. Smith v. Florida Dep't of Corr., 713 F.3d 1059, 1064 (11th Cir. 2013). It is widely recognized that courts should grant a Rule 56(d) motion when the discovery sought is "relevant to the issues presented by the motion for summary judgment." Snook v. Trust Co. of Ga. Bank of Savannah, 859 F.2d 865, 870 (11th Cir. 1988); see also Baron Servs., Inc. v. Media Weather Innovations LLC, 717 F.3d 907, 912 (Fed. Cir. 2013). On the other hand, Rule 56(d) is not designed to save a case from summary judgment for a party who is merely seeking to embark on an evidentiary fishing expedition. See e.g., Ellis v. J.R.'s Country Stores, Inc., 779 F.3d 1184, 1208 (10th Cir. 2015).

Plaintiff initiated the instant action on March 6, 2018 alleging five counts against Defendant. 1 . On April 9, 2018, Plaintiff filed an Amended Complaint. 21 . Then, with leave of the Court, Plaintiff filed a Second Amended Complaint on May 14, 2018. 39 . Finally, on July 16, 2018, Plaintiff filed a Third Amended Complaint alleging ten counts against Defendant. 47 . On August 13, 2018, Defendant filed its answers and affirmative defenses 59 , and three days later, on August 16, 2018, Plaintiff filed a Motion for Partial Summary Judgment. 63 . Defendant recently served is first set of discovery requests and argues that there are a number of key areas for which discovery is necessary in this action, including, discovery into Plaintiff's alleged disabilities, requests for accommodations, treatments sought and diagnoses made by third parties. 63 . UPON CONSIDERATION OF the Motion, the Response, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendant's Motion 63 is GRANTED IN PART and DENIED IN PART. Defendant's Request for Relief Under Rule 56(d) is GRANTED and thus, Defendant's Motion for an Extension of Time is DENIED AS MOOT. It is further ORDERED that Plaintiffs Motion for Partial Summary Judgment is DENIED WITHOUT PREJUDICE as premature. Signed by Chief Judge K. Michael Moore on 8/29/2018. (jm01) (Entered: 08/29/2018) |

| 09/04/2018 | 67 | MOTION for Partial Judgment on the Pleadings by Oluwamuyiwa Awodiya. (Attachments: # 1 Declaration in Support)(kpe) (Entered: 09/05/2018) |
|---|---|---|
| 09/07/2018 | 68 | Unopposed MOTION for Insurance Claims Adjuster to Appear Telephonically at Settlement Conference re 60 Order,, Set/Reset Hearings, by Ross University School of Medicine. (Roman, Ryan) (Entered: 09/07/2018) |
| 09/07/2018 | 69 | PAPERLESS ORDER denying 68 Motion for Insurance Claims Adjuster to Appear Telephonically at Settlement Conference. Signed by Magistrate Judge Barry S. Seltzer on 9/7/2018. (pb00) (Entered: 09/07/2018) |
| 09/18/2018 | 70 | RESPONSE in Opposition re 67 MOTION for Judgment on the Pleadings filed by Ross University School of Medicine. Replies due by 9/25/2018. (Roman, Ryan) (Entered: 09/18/2018) |
| 09/24/2018 | 71 | REPLY to 70 Response in Opposition to Motion by Oluwamuyiwa Awodiya. (kpe) (Entered: 09/24/2018) |
| 10/01/2018 | 72 | REPORT on Settlement Conference. (Case did not settle) Signed by Magistrate Judge Barry S. Seltzer on 10/1/2018. *See attached document for full details.* (pb00) Text Modified on 10/1/2018 (cqs). (Entered: 10/01/2018) |
| 10/01/2018 | 73 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Barry S. Seltzer: Settlement Conference held on 10/1/2018. Case reached an Impasse. Attorney Appearance(s): Ryan Roman for the Defendant, Oluwamuyiwa Awodiya (Plaintiff Pro Se) (Digital 9:33:22–9:38:50) (at) (Entered: 10/01/2018) |
| 10/02/2018 | 74 | ORDER OF RECUSAL signed by Magistrate Judge Barry S. Seltzer on 10/1/2018. Magistrate Judge Barry S. Seltzer recused. Case randomly reassigned by Clerk to Magistrate Judge Alicia O. Valle for all further proceedings. *See attached document for full details.* (ane) (Entered: 10/02/2018) |
| 10/30/2018 | 75 | Unopposed MOTION to Seal *Exhibit to Motion to Compel* per Local Rule 5.4 by Ross University School of Medicine. (Attachments: # 1 Text of Proposed Order Granting Unopposed Motion) (Roman, Ryan) (Entered: 10/30/2018) |
| 10/30/2018 | 76 | Defendant's MOTION to Compel *Plaintiff's Production of Documents and Better Responses to Interrogatories* by Ross University School of Medicine. Responses due by 11/13/2018 (Attachments: # 1 Exhibit A (First Set of Interrogatories), # 2 Exhibit B (First Request for Production), # 3 Exhibit C (Responses to Interrogatories), # 4 Exhibit D (Responses to Request for Production), # 5 Exhibit E (Stipulated Protective Order), # 6 Exhibit F (Amended Responses to Interrogatories), # 7 Exhibit G (Amended Responses to Request for Production), # 8 Exhibit H (Filed Under Seal))(Roman, Ryan) (Entered: 10/30/2018) |
| 10/31/2018 | 77 | PAPERLESS ORDER granting 75 Defendant's Unopposed Motion for Leave to File Exhibit to Motion to Compel Under Seal. Signed by Magistrate Judge Alicia O. Valle on 10/31/2018. (sd01) (Entered: 10/31/2018) |
| 10/31/2018 | 78 | ORDER Setting Hearing on Motion 76 Defendant's Motion to Compel Plaintiff's Production of Documents and Better Responses to Interrogatories. Hearing set for **11/16/2018 at 10:30 AM** in Fort Lauderdale Division before Magistrate Judge Alicia O. Valle. Signed by Magistrate Judge Alicia O. Valle on 10/31/2018. *See attached document for full details.* (sd01) (Entered: 10/31/2018) |
| 10/31/2018 | | SYSTEM ENTRY – Docket Entry 79 [misc] restricted/sealed until further notice. (1029398) (Entered: 10/31/2018) |
| 10/31/2018 | 80 | Clerks Notice to Filer re 79 Sealed Document. **Document Not Captioned**; In the future when filing a Sealed Document the Filer must File a Notice of Filing with the Exhibit attached with the proper caption pursuant to Local Rules. It is not necessary to refile this document. (nc) (Entered: 11/01/2018) |
| 11/02/2018 | 81 | MOTION to Continue *Hearing on Defendant's Motion to Compel* by Ross University School of Medicine. Attorney Octavia Monique Green added to party Ross University School of Medicine(pty:dft). Responses due by 11/16/2018 (Green, Octavia) (Entered: 11/02/2018) |

| 11/02/2018 | 82 | PAPERLESS ORDER granting 81 Joint Motion to Continue Hearing on Defendant's Motion to Compel. Hearing set for **11/21/2018 at 1:30 PM** in Fort Lauderdale Division before Magistrate Judge Alicia O. Valle. Signed by Magistrate Judge Alicia O. Valle on 11/2/2018. (sd01) (Entered: 11/02/2018) |
| --- | --- | --- |
| 11/06/2018 | 83 | MOTION for Protective Order by Oluwamuyiwa Awodiya. (kpe) (Entered: 11/07/2018) |
| 11/06/2018 | 84 | RESPONSE in Opposition to 76 Defendant's MOTION to Compel *Plaintiff's Production of Documents and Better Responses to Interrogatories* filed by Oluwamuyiwa Awodiya. See DE 83 for image. Replies due by 11/13/2018. (kpe) (Entered: 11/07/2018) |
| 11/08/2018 | 85 | PAPERLESS ORDER Setting Hearing on 83 Plaintiff's Motion for Protective Order (the "Motion"). Hearing set for **11/21/2018 at 1:30 PM** in Fort Lauderdale Division before Magistrate Judge Alicia O. Valle. The parties are to include the Motion in the Joint Status Report required by ECF No. 78 . The deadline for filing the Joint Status Report is extended to **Friday, November 16, 2018**. Signed by Magistrate Judge Alicia O. Valle on 11/8/2018. (sd01) (Entered: 11/08/2018) |
| 11/12/2018 | 86 | RESPONSE in Opposition re 83 MOTION for Protective Order filed by Ross University School of Medicine. Replies due by 11/19/2018. (Green, Octavia) (Entered: 11/12/2018) |
| 11/16/2018 | 87 | NOTICE by Ross University School of Medicine re 85 Order Setting Hearing on Motion, *Notice of Filing Joint Status Report* (Green, Octavia) (Entered: 11/16/2018) |
| 11/19/2018 | 88 | REPLY to Response in Opposition to Plaintiff's 83 MOTION for Protective Order filed by Oluwamuyiwa Awodiya. (kpe) (Entered: 11/20/2018) |
| 11/19/2018 | 89 | Second MOTION for Judicial Notice by Oluwamuyiwa Awodiya. (Attachments: # 1 Declaration in Support)(kpe) (Entered: 11/20/2018) |
| 11/20/2018 | 90 | NOTICE of Courtroom Assignment. The Motion Hearing scheduled on 11/21/2018 at 1:30pm before US Magistrate Judge Alicia O. Valle will be held in Courtroom 207 at the Federal Courthouse in Fort Lauderdale FL. (tpl) (Entered: 11/20/2018) |
| 11/21/2018 | 91 | PAPERLESS ORDER GRANTING ACCESS TO ELECTRONIC DEVICES IN THE COURTROOM FOR DISCOVERY HEARING. This cause comes before the Court upon Plaintiff's appearance at the Courthouse on November 21, 2018 with a cell phone and laptop in advance of the discovery hearing scheduled for this afternoon. Given Plaintiff's pro se status, the Court will consider his presentation at the Courthouse as an ore tenus request for electronic devices to be allowed into the Courthouse for use during the hearing. Plaintiff's ore tenus request is GRANTED. Consequently, Plaintiff and Defense counsel may bring cell phones and laptops into the discovery hearing before the undersigned. Signed by Magistrate Judge Alicia O. Valle on 11/21/2018. (sd01) (Entered: 11/21/2018) |
| 11/21/2018 | 92 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Alicia O. Valle: Motion Hearing held on 11/21/2018 re 76 Defendant's MOTION to Compel *Plaintiff's Production of Documents and Better Responses to Interrogatories* filed by Ross University School of Medicine, 83 MOTION for Protective Order filed by Oluwamuyiwa Awodiya. Oral argument heard from both sides. Order to follow. Total time in court: 2 hour(s). Attorney Appearance(s): Ryan Roman, Octavia Monique Green, Oluwamuyiwa Awodiya. (Digital 13:41:23) (tpl) (Entered: 11/21/2018) |
| 11/21/2018 | 93 | PAPERLESS ORDER ON DISCOVERY MOTIONS. For the reasons stated on the record at the hearing held on November 21, 2018, 76 Defendant's Motion to Compel Plaintiff's Production of Documents and Better Responses to Interrogatories is GRANTED IN PART AND DENIED IN PART. Additionally, 83 Plaintiff's Motion for Protective Order is DENIED. Signed by Magistrate Judge Alicia O. Valle on 11/21/2018. (sd01) (Entered: 11/21/2018) |
| 11/28/2018 | 94 | NOTICE by Ross University School of Medicine *of Filing the Parties' Proposed Stipulated Protective Order* (Attachments: # 1 Text of Proposed Order, # 2 Text of Proposed Order) (Green, Octavia) (Entered: 11/28/2018) |
| 11/30/2018 | 95 | PAPERLESS ORDER REGARDING 94 Notice of Filing the Parties' Proposed Stipulated Protective Order Governing Discovery Material (the "Notice"). The Notice contains two competing versions of a proposed Stipulated Protective Order and advises that the "Parties were unable to agree on the language in paragraph 8 and paragraph 11" of the |

| | | |
|---|---|---|
| | | proposed orders. (ECF No. 94 ). Upon review of the Notice, the proposed orders, and being fully advised in the matter, the Court approves the version of the Stipulated Protective Order at ECF No. [94–2] as appropriate for this case. Consequently, the parties are to execute [94–2] the Stipulated Protective Order and file the same with the Court for final execution. The Court finds that a hearing is unnecessary and DENIES Plaintiff's request for a hearing. Signed by Magistrate Judge Alicia O. Valle on 11/30/2018. (sd01) (Entered: 11/30/2018) |
| 11/30/2018 | 96 | MOTION for Extension of Time to File Response/Reply/Answer as to 89 MOTION Judicial Notice by Ross University School of Medicine. (Attachments: # 1 Text of Proposed Order)(Green, Octavia) (Entered: 11/30/2018) |
| 12/03/2018 | 97 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendants' Unopposed Motion for Extension of Time to Respond to Plaintiff's Second Motion for Judicial Notice 96 . UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 96 is GRANTED. Defendants shall respond to Plaintiff's Second Motion for Judicial Notice 89 on or before December 10, 2018. Signed by Chief Judge K. Michael Moore on 12/3/2018. (ah03) (Entered: 12/03/2018) |
| 12/03/2018 | 98 | NOTICE by Ross University School of Medicine re 95 Order,,, *(Notice of Filing the Parties' Stipulated Protective Order Governing Discovery Material)* (Attachments: # 1 Exhibit 1 (Stipulated Protective Order Executed by the Parties)) (Roman, Ryan) (Entered: 12/03/2018) |
| 12/03/2018 | 99 | STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY MATERIAL. Signed by Magistrate Judge Alicia O. Valle on 12/3/2018. *See attached document for full details.* (sd01) (Entered: 12/03/2018) |
| 12/10/2018 | 100 | RESPONSE in Opposition re 89 MOTION Judicial Notice filed by Ross University School of Medicine. Replies due by 12/17/2018. (Green, Octavia) (Entered: 12/10/2018) |
| 12/10/2018 | 101 | Plaintiff's Statement of Material Facts in Support of Plaintiff's Second 102 MOTION for Partial Summary Judgment by Oluwamuyiwa Awodiya. (kpe) (Entered: 12/11/2018) |
| 12/10/2018 | 102 | Plaintiff's Second MOTION for Partial Summary Judgment by Oluwamuyiwa Awodiya. Responses due by 12/26/2018. (Attachments: # 1 Declaration In Support)(kpe) (Entered: 12/11/2018) |
| 12/12/2018 | 103 | MOTION for Extension of Time To Continue Pretrial Deadlines by Ross University School of Medicine. Responses due by 12/26/2018 (Attachments: # 1 Text of Proposed Order)(Green, Octavia) (Entered: 12/12/2018) |
| 12/13/2018 | 104 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's Motion to Continue Pretrial Deadlines 103 . Therein, Defendant seeks a thirty (30) day extension of the discovery deadline for the purpose of allowing Defendant to supplement and/or amend its expert report in light of Plaintiff's Third Amended Calculation of Damages, which was served on the last day of discovery. 103 at 1. Defendant also seeks an extension of the deadline to file pretrial motions in order to incorporate information related to damages. UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDER AND ADJUDGED that the Motion 103 is GRANTED IN PART and DENIED IN PART. The deadline for discovery is extended through December 28, 2018 for the limited purpose of allowing Defendant to supplement and/or amend its expert report in light of Plaintiff's Third Amended Calculation of Damages. It is further ORDERED that Defendant shall file any pretrial motions on or before January 4, 2019. Signed by Chief Judge K. Michael Moore on 12/13/2018. (ah03) (Entered: 12/13/2018) |
| 12/13/2018 | 105 | ORDER denying 67 Motion for Judgment on the Pleadings. Signed by Chief Judge K. Michael Moore on 12/13/2018. *See attached document for full details.* (jm01) (Entered: 12/13/2018) |
| 12/17/2018 | 106 | REPLY to Response In Opposition to Second 89 MOTION for Judicial Notice filed by Oluwamuyiwa Awodiya. (kpe) (Entered: 12/18/2018) |
| 12/21/2018 | 107 | RESPONSE in Opposition re 102 MOTION for Partial Summary Judgment filed by Ross University School of Medicine. Replies due by 12/28/2018. (Attachments: # 1 Statement |

| | | of Material Facts in Opposition to 2nd Motion for Partial Summary Judgment, # 2 Declaration of Ryan Roman in Support of Opposition to Second Motion for Partial Summary Judgment)(Roman, Ryan) (Entered: 12/21/2018) |
|---|---|---|
| 12/26/2018 | 108 | Unopposed MOTION for Clarification of the Court's Order on Defendant's Motion to Continue Pretrial Deadlines re 104 Order, by Oluwamuyiwa Awodiya. Responses due by 1/9/2019. (kpe) (Entered: 12/27/2018) |
| 12/27/2018 | 109 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's Motion for Clarification 108 . Therein, Plaintiff requests clarification of the Court's Order granting Defendant an extension of time to file pretrial motions 104 because the Order did not address an extension of time for Plaintiff as well. Plaintiff has already filed a Motion for Summary Judgment 102 but has not filed any other pretrial motions and requests an extension of time to do so. UPON CONSIDERATION of the Motion 108 , the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Plaintiff shall have until on or before January 4, 2019 to file any additional pretrial motions, motions in limine, or Daubert motions. All other deadlines, including the deadline to conduct mediation, remain in effect. Signed by Chief Judge K. Michael Moore on 12/27/2018. (ah03) (Entered: 12/27/2018) |
| 12/27/2018 | 110 | NOTICE by Ross University School of Medicine re 107 Response in Opposition to Motion, *Filing Corrected Exhibit* (Attachments: # 1 Exhibit) (Green, Octavia) (Entered: 12/27/2018) |
| 12/27/2018 | 111 | Joint MOTION to Set Aside *Mediation or, Alternatively, To Extend Deadline to Conduct Mediation* by Ross University School of Medicine. (Attachments: # 1 Text of Proposed Order)(Green, Octavia) (Entered: 12/27/2018) |
| 12/28/2018 | 112 | PAPERLESS ORDER. THIS CAUSE came before the Court upon a Joint Motion to Excuse Mediation or, Alternatively, for an Extension of Time to Conduct Mediation 111 . Therein, the Parties state that they attended a settlement conference in October, which ended in an impasse, and that the Parties believe that any further efforts to mediate this case would be fruitless. On May 14, 2018, the Court entered a Paperless Order of Referral to Mediation 38 requiring all parties to participate in mediation no later than eighty (80) days before the scheduled trial date. On August 9, 2018, the Court referred the case to a Magistrate Judge for Settlement Conference 52 and specifically noted that "The Court's Order of Referral to Mediation 38 remains in effect. If the Parties do not reach a settlement agreement during the settlement conference, the Parties must comply with the Court's Order of Referral to Mediation." 52 . This was reiterated again in the Court's second Order Referring the Case for Settlement Conference. 54 . Now, the day before the Parties' deadline to conduct mediation, the Parties request that the Court excuse them from their mediation obligations. Accordingly, UPON CONSIDERATION of the Joint Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Joint Motion 111 is GRANTED IN PART and DENIED IN PART. The Parties are not excused from mediation. The Parties shall conduct mediation on or before January 4, 2019. The physical presence of counsel and each party or representatives of each party with full authority to enter in a full and complete compromise and settlement is mandatory. Within one (1) day following the mediation conference, the mediator shall file a Mediation Report indicating whether all required parties were present. The report shall also indicate whether the case settled (in full or in part) or whether the mediator declared an impasse. Signed by Chief Judge K. Michael Moore on 12/28/2018. (ah03) (Entered: 12/28/2018) |
| 01/03/2019 | 113 | Reply Declaration In Support of 102 Second MOTION for Partial Summary Judgment filed by Oluwamuyiwa Awodiya. (kpe) (Entered: 01/04/2019) |
| 01/03/2019 | 114 | Reply In Support of 102 Second MOTION for Partial Summary Judgment filed by Oluwamuyiwa Awodiya. (kpe) (Entered: 01/04/2019) |
| 01/03/2019 | 115 | REPLY Statement of Material Facts In Support of 102 Second MOTION for Partial Summary Judgment by Oluwamuyiwa Awodiya. (kpe) (Entered: 01/04/2019) |
| 01/04/2019 | 116 | MOTION in Limine *To Exclude Reference to Adtalem Global Education Inc. and Its Net Worth* by Ross University School of Medicine. (Attachments: # 1 Exhibit)(Green, Octavia) (Entered: 01/04/2019) |

| 01/04/2019 | 117 | MOTION to Strike *and Preclude Plaintiff From Testifying to Improper Lay Opinions* by Ross University School of Medicine. Responses due by 1/18/2019 (Attachments: # 1 Exhibit)(Green, Octavia) (Entered: 01/04/2019) |
|---|---|---|
| 01/04/2019 | 118 | NOTICE by Laurie L. Riemer . Attorney Laurie L. Riemer added to party Laurie L. Riemer(pty:med). (Riemer, Laurie) (Entered: 01/04/2019) |
| 01/04/2019 | 119 | Statement of: Statement of Material Facts in Support of Motion for Summary Judgment by Ross University School of Medicine (Attachments: # 1 Exhibit Declaration of R. Roman, # 2 Exhibit 1 to Declaration of R. Roman, # 3 Exhibit 2 to Declaration of R. Roman, # 4 Exhibit 3 to Declaration of R. Roman, # 5 Exhibit 4 to Declaration of R. Roman, # 6 SEALED – Exhibit 5 to Declaration of R. Roman, # 7 Exhibit 6 to Declaration of R. Roman, # 8 Exhibit 7 to Declaration of R. Roman, # 9 Exhibit 8 to Declaration of R. Roman, # 10 Exhibit 9 to Declaration of R. Roman, # 11 Exhibit 10 to Declaration of R. Roman, # 12 Exhibit 11 to Declaration of R. Roman, # 13 Exhibit 12 to Declaration of R. Roman, # 14 Exhibit 13 to Declaration of R. Roman, # 15 Exhibit 14 to Declaration of R. Roman, # 16 Exhibit 15 to Declaration of R. Roman, # 17 Exhibit 16 to Declaration of R. Roman, # 18 SEALED – Exhibit 17 to Declaration of R. Roman, # 19 Exhibit 18 to Declaration of R. Roman, # 20 Exhibit 19 to Declaration of R. Roman, # 21 Exhibit 20 to Declaration of R. Roman, # 22 Exhibit 21 to Declaration of R. Roman, # 23 Exhibit 22 to Declaration of R. Roman, # 24 Exhibit 23 to Declaration of R. Roman, # 25 Exhibit 24 to Declaration of R. Roman, # 26 Exhibit 25 to Declaration of R. Roman, # SEALED – (27) Exhibit 26 to Declaration of R. Roman, # 28 Exhibit 27 to Declaration of R. Roman)(Green, Octavia) –Modified/Sealed Exhibits per (129) Order on 1/11/2019 (gp).– (Entered: 01/04/2019) |
| 01/04/2019 | 120 | MOTION for Summary Judgment by Ross University School of Medicine. Responses due by 1/18/2019 (Attachments: # 1 Exhibit A)(Green, Octavia) (Entered: 01/04/2019) |
| 01/08/2019 | 121 | ORDER granting in part and denying in part 89 Motion for Judicial Notice. Signed by Chief Judge K. Michael Moore on 1/8/2019. *See attached document for full details.* (ah03) (Entered: 01/08/2019) |
| 01/08/2019 | 122 | PAPERLESS ORDER TO SHOW CAUSE. THIS CAUSE came before the Court upon a sua sponte review of the record. On May 14, 2018, the Court entered a Paperless Order of Referral to Mediation 38 requiring all parties to participate in mediation no later than eighty (80) days before the scheduled trial date. On December 28, 2018, the Court entered a Paperless Order denying the Parties request to be excused from mediation and ordering the Parties to conduct mediation on or before January 4, 2019. 112 . The Order also stated that "Within one (1) day following the mediation conference, the mediator shall file a Mediation Report indicating whether all required parties were present. The report shall also indicate whether the case settled (in full or in part) or whether the mediator declared an impasse." The Parties are hereby ORDERED to show cause by January 10, 2019 as to why no Mediation Report has been filed and also to provide a status report to the Court. Failure to do so may result in the imposition of sanctions. Signed by Chief Judge K. Michael Moore on 1/8/2019. (ah03) (Entered: 01/08/2019) |
| 01/09/2019 | 123 | FINAL MEDIATION REPORT by Laurie Riemer. Disposition: Case did not settle.(Green, Octavia) (Entered: 01/09/2019) |
| 01/09/2019 | 124 | RESPONSE TO ORDER TO SHOW CAUSE re 122 Order to Show Cause,,,, by Ross University School of Medicine. (Green, Octavia) (Entered: 01/09/2019) |
| 01/09/2019 | 125 | MOTION in Limine to Exclude Evidence Regarding Uncertainty of Damages, Ex–girlfriend, Counseling Notes, and Judicial Admissions by Oluwamuyiwa Awodiya. (kpe) Modified to restrict document due to error on 1/9/2019. See DE 127 for image (cbr). (Entered: 01/09/2019) |
| 01/09/2019 | 126 | MOTION to Exclude the Expert Testimony of Ronald Quintero by Oluwamuyiwa Awodiya. (kpe) (Entered: 01/09/2019) |
| 01/09/2019 | 127 | Clerks Notice of Docket Correction re 125 MOTION in Limine. **Document Restricted Due to Error**; The correct document has been attached to this notice. Original filing missing pages. (cbr) (Entered: 01/09/2019) |
| 01/11/2019 | 128 | MOTION to Seal per Local Rule 5.4 by Ross University School of Medicine. (Attachments: # 1 Text of Proposed Order Proposed Order) (Green, Octavia) (Entered: 01/11/2019) |

| 01/11/2019 | 129 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's Motion to Seal 128 . Having reviewed the Motion to Seal, the Court finds good cause to seal the materials requested. Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 128 is GRANTED. The Clerk of Court is DIRECTED to maintain under SEAL Exhibits 5, 17, and 26 to the Declaration of Ryan Roman, [119–6], [119–18] and [119–27], until further order of this Court, or upon the conclusion of this litigation, including any appeals. Signed by Chief Judge K. Michael Moore on 1/11/2019. (ah03) (Entered: 01/11/2019) |
| --- | --- | --- |
| 01/11/2019 | 130 | CLERK'S NOTICE OF COMPLIANCE with 129 PAPERLESS ORDER. DIRECTING The Clerk of Court to maintain under SEAL Exhibits 5, 17, and 26 to the Declaration of Ryan Roman, [119–6], [119–18] and [119–27], until further order of this Court, or upon the conclusion of this litigation, including any appeals. (gp) (Entered: 01/11/2019) |
| 01/22/2019 | 131 | RESPONSE in Opposition re 125 MOTION in Limine *to Exclude Evidence Regarding Uncertainty of Damages, Ex–Girlfriend, Counseling Notes, and Judicial Admissions* filed by Ross University School of Medicine. Replies due by 1/29/2019. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Green, Octavia) (Entered: 01/22/2019) |
| 01/22/2019 | 132 | STRICKEN RESPONSE in Opposition re 126 MOTION in Limine *to Exclude Evidence Regarding Uncertainty of Damages, Ex–Girlfriend, Counseling Notes, and Judicial Admissions* filed by Ross University School of Medicine. Replies due by 1/29/2019. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Green, Octavia) Modified on 1/23/2019 per DE 134 Notice of Striking (kpe). (Entered: 01/22/2019) |
| 01/22/2019 | 133 | RESPONSE in Opposition re 126 MOTION in Limine */ Daubert Motion to Exclude the Expert Testimony of Ronald Quintero and Incorporated Memorandum of Law* filed by Ross University School of Medicine. Replies due by 1/29/2019. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Green, Octavia) (Entered: 01/22/2019) |
| 01/22/2019 | 134 | NOTICE by Ross University School of Medicine re 132 Response in Opposition to Motion, *(Request to Strike DE 132)* (Green, Octavia) (Entered: 01/22/2019) |
| 01/23/2019 | 135 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's Notice to Strike 134 the Response In Opposition to Plaintiff's Daubert Motion 132 . Defendant timely filed a corrected Response at 133 . UPON CONSIDERATION of the Notice, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendant's Response In Opposition to Plaintiff's Daubert Motion at 132 is STRICKEN. The Clerk of the Court is instructed to STRIKE the Response In Opposition to Plaintiff's Daubert Motion 132 . Signed by Chief Judge K. Michael Moore on 1/23/2019. (ah03) (Entered: 01/23/2019) |
| 01/28/2019 | 136 | RESPONSE in Opposition re 117 MOTION to Strike *and Preclude Plaintiff From Testifying to Improper Lay Opinions* filed by Oluwamuyiwa Awodiya. Replies due by 2/4/2019. (ls) (Entered: 01/29/2019) |
| 01/28/2019 | 137 | RESPONSE in Opposition re 120 MOTION for Summary Judgment filed by Oluwamuyiwa Awodiya. Replies due by 2/4/2019. (ls) (Entered: 01/29/2019) |
| 01/28/2019 | 138 | AFFIDAVIT/DECLARATION re 137 Response in Opposition to Motion by Oluwamuyiwa Awodiya (ls) (Entered: 01/29/2019) |
| 01/28/2019 | 139 | Statement of: Material Facts in Opposition by Oluwamuyiwa Awodiya re 120 MOTION for Summary Judgment (ls) (Entered: 01/29/2019) |
| 01/28/2019 | 140 | MOTION for Judicial Notice re 137 Response in Opposition to Motion by Oluwamuyiwa Awodiya. (ls) (Entered: 01/29/2019) |
| 02/04/2019 | 141 | REPLY to Response to Motion re 117 MOTION to Strike *and Preclude Plaintiff From Testifying to Improper Lay Opinions* filed by Ross University School of Medicine. (Green, Octavia) (Entered: 02/04/2019) |
| 02/04/2019 | 142 | RESPONSE in Support re 120 MOTION for Summary Judgment filed by Ross University School of Medicine. (Green, Octavia) (Entered: 02/04/2019) |

| | | |
|---|---|---|
| 02/04/2019 | 143 | RESPONSE to 139 Statement of Material Facts , filed by Ross University School of Medicine. (Attachments: # 1 Affidavit Supporting Declaration of Ryan Roman)(Green, Octavia) Modified on 2/5/2019 (kpe). (Entered: 02/04/2019) |
| 02/05/2019 | 144 | Clerks Notice to Filer re 143 Reply to Response to Motion. **Incorrect Document Link**; ERROR – The filed document was not correctly linked to the related docket entry. The correction was made by the Clerk. It is not necessary to refile this document but future filings must comply with the instructions in the CM/ECF Attorney User's Manual. (kpe) (Entered: 02/05/2019) |
| 02/05/2019 | 145 | REPLY in Support of Plaintiff's 125 MOTION in Limine filed by Oluwamuyiwa Awodiya. (kpe) (Entered: 02/05/2019) |
| 02/05/2019 | 146 | REPLY in Support of Plaintiff's 126 MOTION to Exclude filed by Oluwamuyiwa Awodiya. (kpe) (Entered: 02/05/2019) |
| 02/12/2019 | 147 | RESPONSE in Opposition re 140 MOTION for Judicial Notice re 137 Response in Opposition to Motion filed by Ross University School of Medicine. Replies due by 2/19/2019. (Attachments: # 1 Exhibit A)(Green, Octavia) (Entered: 02/12/2019) |
| 02/19/2019 | 148 | REPLY to Plaintiff's Request for 140 Judicial Notice in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment filed by Oluwamuyiwa Awodiya. (kpe) (Entered: 02/19/2019) |
| 02/28/2019 | 149 | PRETRIAL STIPULATION by Ross University School of Medicine (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Roman, Ryan) (Entered: 02/28/2019) |
| 02/28/2019 | 150 | Proposed Voir Dire Questions by Ross University School of Medicine. (Green, Octavia) (Entered: 02/28/2019) |
| 03/01/2019 | 151 | NOTICE by Ross University School of Medicine re 149 Pretrial Stipulation – *NOTICE OF FILING PLAINTIFF'S STATEMENT OF THE CASE* (Attachments: # 1 Exhibit A) (Green, Octavia) (Entered: 03/01/2019) |
| 03/01/2019 | 152 | NOTICE by Ross University School of Medicine re 149 Pretrial Stipulation – *NOTICE OF FILING PLAINTIFFS OBJECTIONS TO DEFENDANTS EXHIBIT LIST* (Attachments: # 1 Exhibit A) (Green, Octavia) (Entered: 03/01/2019) |
| 03/01/2019 | 153 | MOTION to Bring Electronic Equipment into the courtroom by Ross University School of Medicine. Responses due by 3/15/2019 (Attachments: # 1 Text of Proposed Order)(Green, Octavia) (Entered: 03/01/2019) |
| 03/02/2019 | 154 | ORDER denying 102 Motion for Partial Summary Judgment; granting in part and denying in part 120 Motion for Summary Judgment. Signed by Chief Judge K. Michael Moore on 3/2/2019. *See attached document for full details.* (jm01) (Entered: 03/02/2019) |
| 03/02/2019 | 155 | ORDER granting 116 Motion in Limine; granting in part and denying in part 117 Motion to Strike ; denying 125 Motion in Limine; denying 126 Motion in Limine. Signed by Chief Judge K. Michael Moore on 3/2/2019. *See attached document for full details.* (jm01) (Entered: 03/02/2019) |
| 03/04/2019 | 156 | ORDER granting 153 Motion to Bring Electronic Equipment into the courtroom. Signed by Chief Judge K. Michael Moore on 3/4/2019. *See attached document for full details.* (ah03) (Entered: 03/04/2019) |
| 03/04/2019 | 157 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's Motion for Judicial Notice 140 . On December 27, 2018, the Court entered a Paperless Order granting Plaintiff an extension of time until January 4, 2019 to file any additional pretrial motions. 109 . On January 28, 2019 Plaintiff filed a Motion for Judicial Notice 140 . A district court has discretion in deciding how best to manage the cases before them, and that discretion extends to whether to consider untimely motions. See Enwonwu v. Fulton–Dekalb Hosp. Auth., 286 F. App'x 586, 595 (11th Cir. 2008). Here, Plaintiff filed his motion over three weeks after the Court's deadline for pretrial motions. Accordingly, UPON CONSIDERATION of the Motion, the pertinent portion of the records, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Plaintiff's Motion 140 is DENIED WITHOUT PREJUDICE. Signed by Chief Judge K. Michael Moore on 3/4/2019. (ah03) (Entered: 03/04/2019) |

| 03/05/2019 | 158 | PAPERLESS Minute Entry for proceedings held before Chief Judge K. Michael Moore: Final Pretrial Conference held on 3/5/2019. Issues addressed. Defense estimates approximately 2–3 days for trial; trial to be held in Miami; parties to attend calendar call on 3/14/2019 at 2:00 PM. Attorney Appearance(s): Ryan Roman, Octavia Monique Green, Other appearances: Pro Se Plaintiff, Mr. Awodiya. Court Reporter: William Romanishin, 305–523–5558 / Bill_Romanishin@flsd.uscourts.gov. (rg1) (Entered: 03/05/2019) |
|---|---|---|
| 03/06/2019 | 159 | NOTICE of Filing Discovery: Deposition Designations by Ross University School of Medicine. (Attachments: # 1 Exhibit A)(Green, Octavia) (Entered: 03/06/2019) |
| 03/08/2019 | 160 | MOTION in Limine *to Exclude New Theories of Liability* by Ross University School of Medicine. (Green, Octavia) (Entered: 03/08/2019) |
| 03/08/2019 | 161 | MOTION in Limine *to Preclude Plaintiff From Introducing Documents Produced After the Discovery Deadline Into Evidence* by Ross University School of Medicine. (Attachments: # 1 Exhibit RUSM's Request for Production to Plaintiff, # 2 Exhibit Email Correspondence)(Green, Octavia) (Entered: 03/08/2019) |
| 03/12/2019 | 162 | Proposed Jury Instructions by Ross University School of Medicine. (Green, Octavia) (Entered: 03/12/2019) |
| 03/12/2019 | 163 | NOTICE by Ross University School of Medicine *of Filing Proposed Verdict Form* (Green, Octavia) (Entered: 03/12/2019) |
| 03/14/2019 | 164 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's telephonic notification that he cannot make the scheduled calendar call due to a flight cancellation. The Court finds good cause to continue the calendar call and trial. Accordingly, UPON CONSIDERATION of the notification, the pertinent portions of the record, and being otherwise fully advised in the premises, it is ORDERED AND ADJUDGED that the calendar call scheduled for today, March 14, 2019 at 2:00 p.m. is hereby CANCELLED. It is further ORDERED that the currently scheduled trial is continued to the the two–week trial period commencing May 28, 2019at 9 a.m. in Courtroom 13–1, (thirteenth floor) United States Courthouse, 400 North Miami Avenue, Miami, Florida. All parties are directed to report to the newly scheduled calendar call on May 23, 2019, at 2 p.m., at which time all matters relating to the scheduled trial date may be brought to the attention of the Court. The calendar call will take place in Courtroom 13–1 (thirteenth floor), United States District Courthouse, 400 North Miami Avenue, Miami, Florida. All other deadlines not addressed herein are unaffected by this Order. Signed by Chief Judge K. Michael Moore on 3/14/2019. (ah03) (Entered: 03/14/2019) |
| 03/26/2019 | 165 | MOTION for Order to Designate Method of Damage Calculations by Oluwamuyiwa Awodiya. (kpe) (Entered: 03/27/2019) |
| 03/26/2019 | 166 | RESPONSE to Defendant's 160 MOTION in Limine *to Exclude New Theories of Liability* filed by Oluwamuyiwa Awodiya. Replies due by 4/2/2019. (kpe) (Entered: 03/27/2019) |
| 03/26/2019 | 167 | RESPONSE to Defendant's 161 MOTION in Limine *to Preclude Plaintiff From Introducing Documents Produced After the Discovery Deadline Into Evidence* filed by Oluwamuyiwa Awodiya. Replies due by 4/2/2019. (kpe) (Entered: 03/27/2019) |
| 04/01/2019 | 168 | MOTION to Continue *Trial* by Ross University School of Medicine. Responses due by 4/15/2019 (Attachments: # 1 Text of Proposed Order Proposed Order Granting Defendant's Motion to Continue Trial)(Green, Octavia) (Entered: 04/01/2019) |
| 04/03/2019 | 169 | RESPONSE in Opposition re 165 MOTION Order *to Designate Method of Damage Calculations* filed by Ross University School of Medicine. Attorney Donnie Marcel King added to party Ross University School of Medicine(pty:dft). Replies due by 4/10/2019. (King, Donnie) (Entered: 04/03/2019) |
| 04/03/2019 | 170 | REPLY to Response to Motion re 161 MOTION in Limine *to Preclude Plaintiff From Introducing Documents Produced After the Discovery Deadline Into Evidence* filed by Ross University School of Medicine. (King, Donnie) (Entered: 04/03/2019) |
| 04/03/2019 | 171 | REPLY to Response to Motion re 160 MOTION in Limine *to Exclude New Theories of Liability* filed by Ross University School of Medicine. (King, Donnie) (Entered: 04/03/2019) |

| 04/08/2019 | 172 | PAPERLESS ORDER REFERRING MOTIONS. PURSUANT to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida, the above−captioned cause is hereby referred to United States Magistrate Judge Alicia O. Valle to take all necessary and proper action as required by law regarding Defendant's Motions in Limine 160 and 161 . Signed by Chief Judge K. Michael Moore on 4/8/2019. (ah03) (Entered: 04/08/2019) |
| 04/08/2019 | 173 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's Motion to Continue Trial 168 . Therein, Defendant request the Court continue trial until the second week of the two−week trial period commencing May 28, 2019 because the first week conflicts with counsel's son's end of school year award ceremony in Chicago, Illinois. The Court finds good cause to hold trial during the second week of the two−week trial period. UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 168 is GRANTED. Signed by Chief Judge K. Michael Moore on 4/8/2019. (ah03) (Entered: 04/08/2019) |
| 04/08/2019 | 174 | PAPERLESS ORDER REFERRING MOTION. PURSUANT to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida, the above−captioned cause is hereby referred to United States Magistrate Judge Alicia O. Valle to take all necessary and proper action as required by law regarding Plaintiff's Motion to Designate Method of Damage Calculations 165 . Signed by Chief Judge K. Michael Moore on 4/8/2019. (ah03) (Entered: 04/08/2019) |
| 04/11/2019 | 175 | MOTION for Leave to File *Partial Motion for Summary Judgment* by Ross University School of Medicine. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Roman, Ryan) (Entered: 04/11/2019) |
| 04/11/2019 | 176 | ORDER OF REASSIGNMENT to Judge Roy Altman for all further proceedings, Chief Judge K. Michael Moore no longer assigned to case. Signed by Chief Judge K. Michael Moore on 4/11/2019. *See attached document for full details.* (yar) (Entered: 04/11/2019) |
| 04/11/2019 | 177 | REPLY to Plaintiff's 165 MOTION for Order to Designate Method Damage Calculations, filed by Oluwamuyiwa Awodiya. (kpe) (Entered: 04/12/2019) |
| 04/17/2019 | 178 | MOTION for Reconsideration and Alteration of Omnibus Order ( Responses due by 5/1/2019) by Oluwamuyiwa Awodiya. (kpe) (Entered: 04/17/2019) |
| 04/18/2019 | 179 | CLERK'S PAPERLESS NOTICE terminating previously scheduled hearing dates. This case has been transferred to the Honorable Roy K. Altman. The parties are hereby notified that any hearing dates scheduled before Chief Judge K. Michael Moore are hereby TERMINATED and will be rescheduled by Judge Roy K. Altman. (rg1) (Entered: 04/18/2019) |
| 04/22/2019 | 180 | AMENDED SCHEDULING ORDER: In Limine Motions due by 6/11/2019. Pretrial Stipulation due by 6/11/2019. Jury Trial set for 6/24/2019 in Fort Lauderdale Division before Judge Roy K. Altman. Calendar Call set for 6/18/2019 01:45 PM in Fort Lauderdale Division before Judge Roy K. Altman. Signed by Judge Roy K. Altman on 4/19/2019. *See attached document for full details.* (kpe)<br><br>***Pattern Jury Instruction Builder −*** To access the latest, up to date changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. (Entered: 04/22/2019) |
| 04/25/2019 | 181 | RESPONSE to Defendant's 175 MOTION for Leave to File Partial Motion for Summary Judgment, filed by Oluwamuyiwa Awodiya. Replies due by 5/2/2019. (kpe) (Entered: 04/25/2019) |
| 04/26/2019 | 182 | MOTION to Continue *Trial* re 180 Scheduling Order,, by Ross University School of Medicine. Responses due by 5/10/2019 (Attachments: # 1 Text of Proposed Order Granting Motion)(Roman, Ryan) (Entered: 04/26/2019) |
| 04/26/2019 | 183 | PAPERLESS Order Calendar Call reset for 6/11/2019 01:45 PM in Fort Lauderdale Division before Judge Roy K. Altman. Signed by Judge Roy K. Altman on 4/26/2019. (jz00) (Entered: 04/26/2019) |
| 04/30/2019 | 184 | ORDER granting 182 Motion to Continue. Calendar Call reset for 6/11/2019 01:45 PM in Fort Lauderdale Division before Judge Roy K. Altman, Jury Trial set for 7/8/2019 before |

| | | |
|---|---|---|
| | | Judge Roy K. Altman. Signed by Judge Roy K. Altman on 4/30/2019. *See attached document for full details.* (vmz) (Entered: 04/30/2019) |
| 05/01/2019 | 185 | RESPONSE in Opposition re 178 MOTION for Reconsideration re 154 Order on Motion for Partial Summary Judgment, Order on Motion for Summary Judgment MOTION to Alter Judgment filed by Ross University School of Medicine. Replies due by 5/8/2019. (Green, Octavia) (Entered: 05/01/2019) |
| 05/03/2019 | 186 | PAPERLESS ORDER Setting Oral Argument on 178 the Plaintiff's MOTION for Reconsideration re 154 Order on Motion for Partial Summary Judgment, Order on Motion for Summary Judgment MOTION to Alter Judgment; 165 the Plaintiff's MOTION for Order to Designate Method of Damage Calculations; 160 the Defendant's MOTION in Limine *to Exclude New Theories of Liability*; 175 the Defendant's MOTION for Leave to File *Partial Motion for Summary Judgment*; 161 The Defendant's MOTION in Limine *to Preclude Plaintiff From Introducing Documents Produced After the Discovery Deadline Into Evidence*. Motion Hearing set for Wednesday, 5/8/2019 at 02:30 PM in Fort Lauderdale Division, Courtroom 207A before Judge Roy K. Altman. The parties should be prepared to discuss the substance of any outstanding motions pending before the Court. Signed by Judge Roy K. Altman on 5/3/19. (tas) (Entered: 05/03/2019) |
| 05/06/2019 | 187 | REPLY to Plaintiff's 178 MOTION for Reconsideration and Alteration of Omnibus Order, filed by Oluwamuyiwa Awodiya. (kpe) (Entered: 05/06/2019) |
| 05/07/2019 | 188 | Unopposed MOTION to Continue *(filed by Defendant as a courtesy for Plaintiff who does not have access to CM/ECF)* re 186 Order Setting Hearing on Motion,,, by Ross University School of Medicine. Responses due by 5/21/2019 (Roman, Ryan) (Entered: 05/07/2019) |
| 05/07/2019 | 189 | PAPERLESS ORDER denying as moot 188 Motion to Continue in light of the Court's forthcoming order resetting all motions hearings for the Calendar Call, which will be held on June 11, 2019 at 1:45 p.m. Signed by Judge Roy K. Altman on 5/7/2019. (RKA) (Entered: 05/07/2019) |
| 05/07/2019 | 190 | PAPERLESS ORDER Setting Oral Arguments re 178 the Plaintiff's MOTION for Reconsideration re 154 Order on Motion for Partial Summary Judgment, Order on Motion for Summary Judgment, Motion to Alter Judgment; 165 the Plaintiff's MOTION for Order to Designate Method of Damage Calculations; 160 the Defendant's MOTION in Limine *to Exclude New Theories of Liability*; 175 the Defendant's MOTION for Leave to File *Partial Motion for Summary Judgment*; 161 the Defendant's MOTION in Limine *to Preclude Plaintiff From Introducing Documents Produced After the Discovery Deadline Into Evidence* : Motion Hearing RESET for 6/11/2019 at 01:45 PM in the Fort Lauderdale Division, Courtroom 207A before Judge Roy K. Altman. The parties should be prepared to discuss the substance of any outstanding motions pending before the Court. Signed by Judge Roy K. Altman on 5/7/19. (tas) (Entered: 05/07/2019) |
| 05/15/2019 | 191 | ORDER denying 175 Motion for Leave to File ; denying 178 Motion for Reconsideration ; denying 178 Motion to Alter Judgment. Signed by Judge Roy K. Altman on 5/14/2019. *See attached document for full details.* (cqs) Modified on 6/20/2019 (ch1)to change to opinion per chambers. (Entered: 05/16/2019) |
| 05/22/2019 | 192 | RESPONSE to the Court's May 16, 2019 Order EFC No. 191 , by Oluwamuyiwa Awodiya. (kpe) (Entered: 05/22/2019) |
| 05/29/2019 | 193 | Defendant's Brief on Extraterritorial Application of the Americans with Disabilities Act and the Rehabilitation Act in response to 191 Order on Motion for Leave to File, Order on Motion for Reconsideration, Order on Motion to Alter Judgment by Ross University School of Medicine. (Roman, Ryan) (Entered: 05/29/2019) |
| 06/03/2019 | 194 | MOTION in Limine to Preclude Prejudicial Evidence and Theories by Oluwamuyiwa Awodiya. (ls) (Entered: 06/03/2019) |
| 06/03/2019 | 195 | AFFIDAVIT/DECLARATION in Support re 194 MOTION in Limine filed by Oluwamuyiwa Awodiya. (ls) (Entered: 06/03/2019) |
| 06/04/2019 | 196 | NOTICE OF WITHDRAWAL OF MOTION by Ross University School of Medicine re 161 MOTION in Limine *to Preclude Plaintiff From Introducing Documents Produced After the Discovery Deadline Into Evidence* filed by Ross University School of Medicine |

| | | (Roman, Ryan) (Entered: 06/04/2019) |
|---|---|---|
| 06/10/2019 | 197 | Unopposed MOTION to Bring Electronic Equipment into the courtroom *(filed by Defendant as a courtesy for Plaintiff who does not have access to CM/ECF)* by Ross University School of Medicine. Responses due by 6/24/2019 (Roman, Ryan) (Entered: 06/10/2019) |
| 06/10/2019 | 198 | NOTICE by Ross University School of Medicine *of Filing Deposition Designations and Counter−Designations* (Attachments: # 1 Exhibit A (Plaintiff's Deposition Designations), # 2 Exhibit B (Defendant's Deposition Designations)) (Roman, Ryan) (Entered: 06/10/2019) |
| 06/10/2019 | 199 | PRETRIAL STIPULATION by Ross University School of Medicine (Attachments: # 1 Exhibit Joint Pretrial Stipulation, # 2 Exhibit 1 – Plaintiff's Exhibit List, # 3 Exhibit 2 – Defendant's Exhibit List, # 4 Exhibit 3 – Plaintiff's Witness List, # 5 Exhibit 4 – Defendant's Witness List)(Roman, Ryan) (Entered: 06/10/2019) |
| 06/10/2019 | 200 | Proposed Voir Dire Questions by Ross University School of Medicine. (Roman, Ryan) (Entered: 06/10/2019) |
| 06/10/2019 | 201 | Proposed Jury Instructions by Ross University School of Medicine. (Attachments: # 1 Exhibit A – Joint Jury Instructions, # 2 Exhibit B – Redline, # 3 Exhibit C – Plaintiff's Proposed Verdict Form, # 4 Exhibit D – Defendant's Proposed Verdict Form)(Roman, Ryan) (Entered: 06/10/2019) |
| 06/11/2019 | 202 | PAPERLESS NOTICE RESETTING CALENDAR CALL AND MOTION HEARINGS (TIME ONLY) to 2:00 p.m. on June 11, 2019. (tas) (Entered: 06/11/2019) |
| 06/11/2019 | 203 | PAPERLESS ORDER granting 197 the Plaintiff's Unopposed Motion for Permission to Bring Electronic Devices into the Courthouse. The Plaintiff may bring his cellular telephone and laptop computer into the U.S. Federal Building and Courthouse in Fort Lauderdale, Florida for the calendar call scheduled on June 11, 2019. Signed by Judge Roy K. Altman on 6/11/2019. (jz00) (Entered: 06/11/2019) |
| 06/11/2019 | 204 | NOTICE by Ross University School of Medicine *of Filing Record Evidence* (Green, Octavia) (Entered: 06/11/2019) |
| 06/12/2019 | 205 | PAPERLESS ORDER notifying the Plaintiff that the Court will provide, free of charge, real−time transcription services during the pendency of the trial currently set for the two−week trial period beginning July 8, 2019. Signed by Judge Roy K. Altman on 6/12/2019. (jz00) (Entered: 06/12/2019) |
| 06/13/2019 | 206 | RESPONSE in Opposition re 194 MOTION in Limine *to Exclude Prejudicial Evidence and Theories* filed by Ross University School of Medicine. Replies due by 6/20/2019. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(King, Donnie) (Entered: 06/13/2019) |
| 06/14/2019 | 207 | Proposed Voir Dire Questions by Ross University School of Medicine. (Roman, Ryan) (Entered: 06/14/2019) |
| 06/14/2019 | 208 | PRETRIAL STIPULATION by Ross University School of Medicine (Attachments: # 1 Exhibit A – Joint Pretrial Stipulation, # 2 Exhibit 1 – Plaintiff's Exhibit List, # 3 Exhibit 2 – Defendant's Exhibit List, # 4 Exhibit 3 – Plaintiff's Witness List, # 5 Exhibit 4 – Defendant's Witness List)(Roman, Ryan) (Entered: 06/14/2019) |
| 06/14/2019 | 209 | Proposed Jury Instructions by Ross University School of Medicine. (Attachments: # 1 Exhibit Exhibit A – Joint Proposed Jury Instructions, # 2 Exhibit Exhibit B – Proposed Verdict Forms)(Roman, Ryan) (Entered: 06/14/2019) |
| 06/18/2019 | 210 | ORDER Closing Case. Counts I, II, VIII, and IX of the Plaintiff's Third Amended Complaint [ECF No. 47] are DISMISSED with prejudice. All pending motions are DENIED as moot. The Clerk of Court is instructed to CLOSE this case. Signed by Judge Roy K. Altman on 6/17/2019. *See attached document for full details.* (kpe) Modified on 6/20/2019 (ch1)to change to opinion per chambers. (Entered: 06/18/2019) |
| 06/20/2019 | 211 | FINAL JUDGMENT. This action is DISMISSED on the merits. The Clerk is directed to CLOSE this case, all pending hearings and deadlines are CANCELLED, and any pending motions are DENIED as moot. Signed by Judge Roy K. Altman on 6/19/2019. *See attached document for full details.* (kpe) (Entered: 06/20/2019) |

| 06/26/2019 | 212 | MOTION for Amended and Additional Findings in the Court's Order Closing Case re 210 Order Dismissing Case, by Oluwamuyiwa Awodiya. Responses due by 7/10/2019 (jao) (Entered: 06/26/2019) |
|---|---|---|
| 06/26/2019 | 213 | AFFIDAVIT/Declaration in Support of Motion for Amended and Additional Findings in the Court's Order Closing the Case re DE 212 MOTION to Amend/Correct 210 Order Dismissing Case, filed by Oluwamuyiwa Awodiya. (jao) (Entered: 06/26/2019) |
| 06/26/2019 | 214 | Document filed in wrong case and has been correctly filed in the right case. Modified on 6/26/2019 (jao). Modified text on 6/26/2019 (asl). (Entered: 06/26/2019) |
| 06/26/2019 | 215 | Clerks Notice of Docket Correction re 214 Notice of Mediator Selection and/or Hearing. **Document Filed in Wrong Case**; Document restricted and docket text modified. Document refiled in correct case # 19−cv−60382. (jao) (Entered: 06/26/2019) |
| 07/02/2019 | 216 | TRANSCRIPT of Calendar Call and Motion Hearing held on 6−11−19 before Judge Roy K. Altman, Volume Number 1 of 1, 1−90 pages, Court Reporter: Francine Salopek, 954−769−5657 / Francine_Salopek@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter Francine Salopek before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter Francine Salopek and PACER. Redaction Request due 7/23/2019. Redacted Transcript Deadline set for 8/2/2019. Release of Transcript Restriction set for 9/30/2019. (fs) (Entered: 07/02/2019) |
| 07/09/2019 | 217 | ORDER denying 212 Motion for Amended and Additional Findings in the Courts Order Closing Case. Signed by Judge Roy K. Altman on 7/9/2019. *See attached document for full details.* (kpe) (Entered: 07/10/2019) |
| 07/17/2019 | 218 | Notice of Appeal as to 211 Judgment, 210 Order Dismissing Case, by Oluwamuyiwa Awodiya. FILING FEE: (NOT PAID). Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under Transcript Information. (apz) (Entered: 07/18/2019) |
| 07/18/2019 | | Transmission of Notice of Appeal, Order/Judgment under appeal and Docket Sheet to US Court of Appeals re 218 Notice of Appeal, Notice has been electronically mailed. (apz) (Entered: 07/18/2019) |
| 07/29/2019 | 219 | Acknowledgment of Receipt of NOA from USCA re 218 Notice of Appeal, filed by Oluwamuyiwa Awodiya. Date received by USCA: 7/18/2019. USCA Case Number: 19−12832−D. (apz) (Entered: 07/29/2019) |

# TAB 101

FILED by _PG_ D.C.

DEC 10 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT
S.D. of FLA – MIAMI

# UNITED STATES DISTRICT COURT

for the
Southern District of Florida

OLUWAMUYIWA AWODIYA,

*Plaintiff,*

–v–

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF
VETERINARY MEDICINE LIMITED

*Defendant.*

Case No.   0:18-cv-60482-KMM

Hon. Chief Judge: K. Michael Moore
Magistrate Judge: Alicia O. Valle

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF
## PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Oluwamuyiwa Awodiya ("Plaintiff"), in proper person, hereby files his Statement of Material Facts in Support of Plaintiff's Second Motion for Partial Summary Judgment.

1.      Ross University School of Medicine, School of Veterinary Medicine Limited ("RUSM" or "Defendant") operates a private, for-profit medical school. Answer ¶ 2.

2.      RUSM receives Federal financial assistance from the United States of America, Department of Education. Answer ¶ 49; *See also* Pl.'s Second Motion for Judicial Notice [ECF No. 89].

3.      RUSM is a "place of public accommodation" because it is a private school. 42 U.S.C. § 12181(7)(J).

4.      William Owen ("Dean Owen") is the Dean and Chancellor of RUSM. Admis. No. 80.

5.      Davendranand Sharma ("Dr. Sharma") is RUSM's "professor of behavior sciences and consultant psychiatrist for health services." Sharma Dep. 7:23-24.

1

6.      Bryan Hayse ("Dr. Hayse") is the Associate Dean of Student Affairs at RUSM. Admis. No 81; Ex. SJ-09.

7.      McMillan Cuffy ("Mr. Cuffy") is a counselor at RUSM. Admis. No. 48.

8.      Matthew Stewart-Fulton ("Mr. Stewart-Fulton") is one of the accommodation coordinators at RUSM. Admis. No 82; Answer ¶ 17.

9.      Plaintiff was a student at RUSM. He started his first semester at RUSM in May 2014. Awodiya Decl. ¶ 2.

10.      Plaintiff was given multiple diagnostic tests between December 2015 through January 2016 for his attention/concentration problems. Plaintiff's treating professionals stated, (1) "Conners CPT3 computer testing results [] states that the scores are 'associated with a very high likelihood of having a disorder' such as ADHD." Ex. SJ-01; (2) "The TOVA was administered. The results are not within normal limits and the overall pattern of performance suggests an attention problem, including ADHD." Ex. SJ-02; and (3) "The CAARS was also administered. The results indicated ADHD predominantly Inattentive presentation." *Id.*

11.      Plaintiff's ADHD assessment from December 2015 indicate that Plaintiff constantly has difficulty sustaining attention to tasks at work or in school, constantly has difficulty with tasks requiring persistence or organization (schoolwork or job duties), constantly has problems with procrastination/avoidance of tasks, constantly distracted by noise or activity, and constantly is forgetful in daily activities. Ex. SJ-03, at 3.

12.      Plaintiff's medical records also indicate that Plaintiff was struggling with completing exams due to compulsively checking that he has completed previous answers, was very worried about undermining his score by not completing the exams in the time allowed so he pulled his eyelashes out to the point where he wouldn't have any left. Ex. SJ-04, at 35.

13.     RUSM counseling records indicate that Plaintiff experienced "running out of time" on his exams. Ex. SJ-05. These records also show that "towards the end" of exams, Plaintiff would "los[e] his momentum and just circle questions without really thinking of the answers." Ex. SJ-06.

14.     RUSM admitted that Plaintiff is an otherwise qualified individual. *Compare* Compl. ¶ 86, *with* Answer ¶ 87.

15.     After Plaintiff failed his fifth semester in December 2015, he executed a ROI Agreement[1] with the RUSM Counseling Center. Ex. SJ-07; Answer ¶ 17.

16.     The ROI Agreement states that Plaintiff "authorize[d] RUSM Counseling Center" to discuss his "confidential information" with "RUSM Administration" for the purpose "**to provide information _relevant_ to academic _accommodations_**" and authorized them to do so with "**ongoing communication.**" Ex. SJ-07 (emphasis added). "RUSM admits that this would have permitted the Counseling Center, including the psychiatrist treating Plaintiff, to discuss his ADHD with the school's Accommodations Coordinator[.]" Answer ¶ 17.

17.     When Plaintiff signed the ROI Agreement, he verbally asked Dr. Sharma and Mr. Cuffy to tell RUSM administration (1) that he needed extended testing time for a suspected attention problem that needed to be diagnosed and (2) that he needed an earlier flight home to help him emotionally with failing the semester. Awodiya Decl. ¶ 3.

18.     In Dr. Sharma's own words, he stated, "I'm the one -- or the doctors make the request for accommodation, which is time-and-a-half. You get extra time. We actually put it we want the student to get the accommodation[.]" Sharma Dep. 37:17-21.

19.     Dr. Sharma admitted that he noticed Plaintiff's attention/concentration symptoms, including, constantly has difficulty sustaining attention to tasks, constantly has difficulty with tasks

---

[1] The term "ROI Agreement" refers to the Release of Information Consent Agreement.

3

requiring persistence or organization, constantly distracted by noise or activity, and constantly forgetful in daily activities. Sharma Dep. 12:9-21. Dr. Sharma stated, "what I saw was evidence of ADHD that required, you know, testing and confirmation." *Id.* 13:1-3. Dr. Sharma admitted that he noticed Plaintiff's symptoms in "December 2015." *Id.* 13:19-24.

20.     Dr. Sharma further admitted that he noticed Plaintiff's symptoms to the "extent" that Dr. Sharma "recommended an assessment for the ADHD," when Plaintiff signed the ROI Agreement "for the release of information relative to academic accommodations." Sharma Dep. 73:1-8.

21.     Dr. Sharma further admitted that Plaintiff's "ADHD symptoms that [he] observed in December 2015" were "relevant to academic accommodations." Sharma Dep. 74:13-22.

22.     Dr. Sharma admitted that he was "informed that [P]laintiff was running out of time on his exams." Sharma Dep. 23:7-9. Dr. Sharma further admitted that he believed that "[P]laintiff's ADHD, specific to him, was significantly limiting his ability to complete his exams in the time allowed." *Id.* 20:19-22.

23.     Dr. Sharma further stated, "did I prescribe the stimulant [Ritalin] because the student needed extra time? That is part of the problem that ADHD has, that it causes the student to take longer. So the medication would help that. So, yes, that's correct." Sharma Dep. 39:14-19.

24.     Dr. Hayse told Plaintiff that he could accommodate Plaintiff for future exams but not for exams that Plaintiff had already taken. Awodiya Decl.  ¶ 5. Dr. Hayse told Plaintiff that he would contact Mr. Cuffy about the suspected attention problem so that Plaintiff could receive extended testing time for future exams. *Id.*  ¶ 6.

25.     Mr. Cuffy's counseling note reads, "[Plaintiff] returned to office after talking to Dr. Hayes [*sic*] in Student Affairs regarding his academic situation. I subsequently received an email

from Dr. Hayes [*sic*] requesting that we talk at some point re: the client. After the meeting with

Dr. Hayes, [*sic*] the client was very disappointed but stable." Ex. SJ-11.

26.     When Plaintiff returned to Dominica to repeat his fifth semester in January 2016,

Plaintiff provided the RUSM Counseling Center with an assessment of his ADHD that was

performed by Dr. Mauricio in the United States. Mr. Cuffy's counseling note reads, "[Plaintiff]

was assessed in the U.S. for ADHD; he provided us with a copy of the results which are scanned

in his file. … Clinical assessment: Academic problems; repeating semester 5." Ex. SJ-13.

27.     Mr. Cuffy's counseling notes also reads, "that towards the end of the exam

[Plaintiff] lost his momentum and just circle questions without really thinking of the answers." Ex.

SJ-06.

28.     Plaintiff's first attempt to pass the NBME CBSE took place in Dominica and his

second through fifth attempts took place in the United States of America. Answer ¶ 23.

29.     On June 12, 2017, Plaintiff's independent psychiatrist and psychotherapist

informed Dean Owen that Plaintiff's anxiety and checking rituals inherent to his condition have

been adversely affecting his academic performance in medical school. Ex. SJ-15.

30.     Plaintiff also informed Dean Owen that he never finished an exam on time and he

was compelled to back track answers just to make sure they didn't disappear five seconds after he

went to the next question, explaining some of the ways that OCD has influenced his academic

performance. Ex. SJ-17.

31.     RUSM admits "that extended testing time for the NBME CBSE is a reasonable

accommodation for disabled students that need extended testing time." Admis. No. 58.

32.     RUSM admits "that RUSM did not provide Plaintiff with extended testing time for

the NBME CBSE." Admis. No. 16.

33.     Before Plaintiff applied and enrolled into RUSM's medical degree program, RUSM published a statement in its Admission Requirements section of its website" stating:

> It is the policy and practice of the University to comply with the Americans with Disabilities Act as applicable and practical in Dominica.

Compl. ¶ 106 (hereinafter referred to as the "ADA-Statement"); *Compare* Answer ¶ 107.

34.     Dr. Hayse—who made the final decision and oversaw the academic accommodations process—had no knowledge of any imposed compliance with the ADA nor the RA in Dominica. Hayse Dep. 14:11-18. In fact, Dr. Hayse even went as far as to say that they were not "beholden to" the ADA, rather, they just used it as a "guideline." Hayse Dep. 10:14-17.[2]

35.     RUSM also did not have a policy or requirement instructing its faculty to comply with the RA in Dominica, Hayse Dep. 14:11-18, 10:14-11:6, 11:17-21.

36.     Plaintiff asked Mr. Stewart-Fulton if "faculty at RUSM" was required "to comply" with Title III of the ADA and the RA. Fulton Dep. 31:14-21. Mr. Stewart-Fulton answered, "[i]n reference to when you were enrolled and the campus was located on Dominica, we were not required to comply with the ADA." *Id.* 32:1-4. He further answered that they simply "abided by the spirit" of the ADA and the RA. *Id.* 32:5-7. Mr. Stewart-Fulton further admitted that there was no policy "to comply" and therefore was not required to comply with the ADA and RA in Dominica. *Id.* 32:12-19.

37.     RUSM "focus their marketing efforts on attracting highly qualified, primarily U.S. and Canadian applicants[.]" Ex. SJ-20, at 19. RUSM admits that it published information for prospective students on its website, including in the Admissions Requirements section." Answer ¶ 106.

---

[2] The term "ADA" refers to Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182. The term "RA" refers to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

38.      Plaintiff had "serious concerns about attending a medical school … located in a less developed nation than the U.S." Awodiya Decl. ¶ 9. "The ADA-Statement about RUSM's ADA compliance was one of the most important factors in [Plaintiff's] decision to leave the U.S. to become a student at RUSM in Dominica." Awodiya Decl. ¶ 14-15; *Id.* ¶ 10-12.

39.      Plaintiff "thought the ADA-Statement was only applicable to U.S. students, as opposed to non-U.S. students, because of the word 'Americans' in 'Americans with Disabilities Act.'" Awodiya Decl. ¶ 16. "[Plaintiff] didn't know that the ADA had different divisions or parts and that geographical applicability could differ among any parts of the ADA." *Id.* ¶ 18.

DATED this 7th day of December, 2018:

                                              Respectfully submitted,

                                              By: Oluwamuyiwa Awodiya, *pro se* litigant
                                                              15005 Dahlia Dr.
                                                              Bowie, MD 20721
                                                              (240) 602-1836
                                                              Plaintiff, in Proper Person



PRIORITY MAIL EXPRESS

PS 10001000006 PS 1000 July 2013 OD: 12.5 x 9.5

WRITE FIRMLY TO MAKE ALL COPIES LEGIBLE.

FROM: (PLEASE PRINT)
Oluwamuyiwa Awodiya
15005 Dahlia Dr.
Bowie MD 20721
PHONE 240-602-1836

TO: (PLEASE PRINT)
Wilkie D. Ferguson Jr. U.S. Courthouse
400 North Miami Avenue, Room 10077
Miami, FL 33128
PHONE

ZIP + 4 (U.S. ADDRESSEES ONLY)
3 3 1 2 8

U.S. POSTAGE PAID
$24.70
R2304M11573105

PRIORITY MAIL EXPRESS

VISIT US AT USPS.COM
ORDER FREE SUPPLIES ONLINE

USMS INSPECTED

UNITED STATES POSTAL SERVICE

# TAB 102

FILED by___PG___D.C.

DEC 1 0 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

# UNITED STATES DISTRICT COURT

for the
Southern District of Florida

|  |  |  |
|---|---|---|
| OLUWAMUYIWA AWODIYA, | ) | Case No.   0:18-cv-60482-KMM |
| *Plaintiff,* | ) | |
| | ) | |
| -v- | ) | Hon. Chief Judge: K. Michael Moore |
| | ) | Magistrate Judge: Alicia O. Valle |
| ROSS UNIVERSITY SCHOOL OF | ) | |
| MEDICINE, SCHOOL OF | ) | |
| VETERINARY MEDICINE LIMITED | ) | |
| *Defendant.* | ) | |
| | ) | |

## PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff Oluwamuyiwa

Awodiya ("Plaintiff"), in proper person, hereby submits his Second Motion for Partial Summary

Judgment ("Motion").

Plaintiff brings this Motion against Ross University School of Medicine, School of

Veterinary Medicine Limited ("RUSM") in whole or in part on his failure to accommodate claims

(under 42 U.S.C. § 12182; 29 U.S.C. § 794; 34 C.F.R. § 104), breach of fiduciary duty claim,

fraudulent misrepresentation claims (inducement and omission), and negligent misrepresentation

claim.

## Terms

The term "ADA" refers to Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182.

The term "RA" refers to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

The term "ADHD" refers to Attention Deficit Disorder Without Mention of Hyperactivity.

The term "Anxiety Disorder" refers to Anxiety State, Unspecified.

The term "OCD" refers to Obsessive Compulsive Disorder.

The term "Mental Impairments" refers to (i) Attention Deficit Disorder Without Mention of Hyperactivity, (ii) Anxiety State, Unspecified, and (iii) Obsessive Compulsive Disorder.

The term "NBME CBSE" or "COMP" refers to NBME Comprehensive Basic Sciences Examination.

The term "ROI Agreement" refers to the Release of Information Consent Agreement attached as Exhibit SJ-07.

The citation term "Admis. No." refers individually to each request in RUSM's responses to Plaintiff's request for admissions attached as Exhibit SJ-08.

The citation term "Sharma Dep." refers to Davendranand Sharma's deposition transcript attached as Exhibit SJ-21.

The citation term "Hayse Dep." refers to Bryan Hayse's deposition transcript attached as Exhibit SJ-22.

The citation term "Fulton Dep." refers to Matthew Stewart-Fulton's deposition transcript attached as Exhibit SJ-23.

## Table of Contents

Introduction .................................................................................................. 1

Standard of Review ....................................................................................... 1

Argument ....................................................................................................... 1

I.  FAILURE TO ACCOMMODATE CLAIMS .................................................... 1

    A.   Legal Framework. ....................................................................... 1

    B.   Plaintiff is Disabled. ................................................................... 2

        i.     "Concentrating" is a Major Life Activity. ....................... 3

        ii.   Plaintiff's Mental Impairments Substantially Limits Concentration. ......... 3

    C.   Plaintiff is an 'Otherwise Qualified' Individual. ....................... 5

    D.   Plaintiff Requested an Accommodation. ..................................... 6

        i.     Months Before Plaintiff's NBME CBSE Attempts. ....................... 6

        ii.   After Plaintiff's NBME CBSE Attempts. The Grievance Process. .......... 10

    E.   In the Alternative, Plaintiff's Need for an Accommodation was Obvious. .......... 11

    F.   A Reasonable Accommodation Existed. ..................................... 13

    G.   RUSM Failed to Provide a Reasonable Accommodation. .................... 13

II.  BREACH OF FIDUCIARY DUTY CLAIM ................................................... 13

    A.   The RUSM Counseling Center had a Fiduciary Duty to Plaintiff. ............... 13

III.  FRAUDULENT INDUCEMENT/OMISSION AND NEGLIGENT MISREPRESENTATION CLAIMS ... 14

    A.   RUSM Made a False Statement Regarding a Material Fact; and/or RUSM Misrepresented a Material Fact. ......................................... 15

        i.     The ADA-Statement. ....................................................... 15

        ii.   The ADA-Statement is False and/or Misrepresented. ............... 16

        iii.  The ADA-Statement is Material. .......................................... 16

    B.   RUSM had Knowledge that the ADA-Statement is False; and/or Made the Representation Without Knowledge as to its Truth or Falsity, or RUSM Ought to have Known of its Falsity. ............................. 18

    C.   RUSM Intended for Prospective Students in the U.S. to Rely on the ADA-Statement. ....................................................................... 19

    D.   RUSM Omitted a Material Fact that it had a Duty to Disclose to Prospective Students. ............................................................ 19

    E.   Plaintiff was Consequently Injured Acting in Reliance on the ADA-Statement and/or Injury Resulted to Plaintiff Acting in Justifiable Reliance on the ADA-Statement. ..................................................................... 19

        i.     Plaintiff's Reliance and Consequent Injury. ...................... 20

ii.     Justifiable Reliance. ................................................................................ 20

**Conclusion** .................................................................................................................. **20**

## Table of Authorities

### Cases

*Adigun v. Express Scripts, Inc.*, No. 17-15225, (11th Cir. Aug. 7, 2018) ...................................... 6

*Alboniga v. Sch. Bd. of Broward Cnty.*, 87 F. Supp. 3d 1319, (S.D. Fla. 2015)............................. 2

*Bagwell v. Morgan Cnty. Comm'n*, No. 15-15274, (11th Cir. Jan. 18, 2017)............................... 13

*Bank of Am., N.A. v. Grec Homes IX, LLC*, CASE NO. 13-21718-CIV-ALTONAGA/Simonton,

(S.D. Fla. Jan. 23, 2014) ........................................................................................................... 15

*Boudreau v. Bethesda Found. of Neb.*, Civil Action No. 1:14-cv-03451-CMA-CBS, (D. Colo. Jan.

27, 2016) ..................................................................................................................................... 10

*Brady v. Wal-Mart*, 531 F.3d 127, (2d Cir. 2008) ........................................................................ 12

*Butler v. Yusem*, 44 So. 3d 102, (Fla. 2010) ................................................................................. 20

*Doe v. Evans*, 814 So. 2d 370, (Fla. 2002) .................................................................................... 14

*Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, (11th Cir. 1997) ..................................................... 3

*Gracey v. Eaker*, 837 So. 2d 348, (Fla. 2002) .............................................................................. 13

*Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, (11th Cir. 2016) ................................................. 6, 17

*J.A.M. v. Nova Se. Univ., Inc.*, Case No. 0:15-cv-60248-KMM, (S.D. Fla. Aug. 12, 2015)...... 1, 2

*McCullum ex rel. DF & TF v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, (11th Cir. 2014)

..................................................................................................................................................... 12

*McLean v. Abington Mem'l Hosp.*, CIVIL ACTION NO. 15-671, (E.D. Pa. Sep. 15, 2015) ...... 10

*Moore v. Hexacomb Corp.*, 670 F. Supp. 2d 621, (W.D. Mich. 2009).......................................... 10

*Nattiel v. Fla. Dep't of Corr.*, CASE NO. 1:15-cv-00150-WTH-GRJ, (N.D. Fla. Nov. 27, 2017)

..................................................................................................................................................... 12

*Pope v. ABF Freight Sys., Inc.*, NO. 3:17-cv-564, (W.D.N.C. Jul. 24, 2018)................................. 3

*Robertson v. Las Animas*, 500 F.3d 1185, (10th Cir. 2007) ......................................................... 12

*Sessoms v. Trs. of the Univ. of Pa.*, No. 17-2369, (3d Cir. Jun. 20, 2018) ...................................... 6

*Tsavaris v. Pfizer, Inc.*, Case No. 1:15-cv-21826-KMM, (S.D. Fla. Feb. 1, 2016) ...................... 15

*U.S. v. Hialeah Housing Authority*, 418 Fed. Appx. 872, (11th Cir. 2011) .................................... 6

*Wachovia Insurance Services, Inc. v. Toomey*, 994 So. 2d 980, (Fla. 2008) ................................. 14

*ZC Insurance Co. v. Brooks*, 847 So. 2d 547, (Fla. Dist. Ct. App. 2003) ..................................... 19

### Statutes

42 U.S.C. § 12102 ................................................................................................................. 2, 3

42 U.S.C. § 12181 .................................................................................................................. 16

42 U.S.C. § 12182 .................................................................................................................. 18

### Other Authorities

Pattern Jury Instructions, Civil Cases, Eleventh Circuit, § 4.12, (2018 revision) .......................... 6

### Regulations

34 C.F.R. § 104 ............................................................................................................... 2, 3, 18

## INTRODUCTION

In May of 2014, Plaintiff became a medical student at RUSM. After passing his first four semesters in Dominica, he failed his fifth semester in December of 2015. When Plaintiff failed that semester, RUSM suspected, tested, and confirmed Plaintiff's concentration/attention limitations. Plaintiff informed RUSM numerous times that he needed extended testing time, but RUSM allows its faculty to be deliberately indifferent to disabled students in need of an accommodation. Contrary to what RUSM advertised to prospective students, RUSM did not have a policy—or required in any fashion—for its faculty to comply with the ADA in Dominica.

## STANDARD OF REVIEW

"A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

## ARGUMENT

### I.   Failure to Accommodate Claims

"To state a failure to accommodate claim, it must be shown that the plaintiff (1) is disabled, (2) is an 'otherwise qualified' individual, and (3) was discriminated against by way of the defendant's failure to provide a reasonable accommodation." *J.A.M. v. Nova Se. Univ., Inc.*, Case No. 0:15-cv-60248-KMM, at *8 (S.D. Fla. Aug. 12, 2015).

### A.   Legal Framework.

1

Since 34 C.F.R. § 104.4 effectuates the RA and because the RA and Title III of the ADA both prohibit discrimination on the basis of disability by an institution of higher education, these claims will be discussed together as a failure to accommodate claim. "No qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal financial assistance." 34 C.F.R. § 104.4(a). "The purpose of this part is to effectuate section 504 of the Rehabilitation Act of 1973, which is designed to eliminate discrimination on the basis of handicap in any program or activity receiving Federal financial assistance." 34 C.F.R. § 104.1.

"Both the ADA and the RA prohibit discrimination on the basis of disability by an institution of higher education. ... Because both statutes generally impose the same legal requirements, the Court will discuss the ADA and RA claims together, relying on cases construing those statutes interchangeably, unless a distinction is relevant." *J.A.M.*, Case No. 0:15-cv-60248-KMM, at \*5-6. "[T]he only material difference between the rights and remedies afforded plaintiffs under Title II and Section 504 lies in their respective *causation* requirements, but that this difference was *immaterial* where the plaintiff's claims are based on a failure to make reasonable accommodations for disabled individuals." *Alboniga v. Sch. Bd. of Broward Cnty.*, 87 F. Supp. 3d 1319, 1332 (S.D. Fla. 2015) (emphasis added) (citing *Bennett–Nelson v. La. Bd. of Regents,* 431 F.3d 448, 454 (5th Cir.2005)).

**B.    Plaintiff is Disabled.**

A disabled or handicapped person is any person who (i) has a "physical or mental impairment" which "substantially limits one or more major life activities," (ii) has a "record of" such an impairment, or (iii) is "regarded as" having such an impairment. 42 U.S.C. § 12102(1); *accord* 34 C.F.R. § 104.3(j)(1).

2

"However, for a failure to accommodate claim, an individual must show that he has a disability within the 'actual disability' prong or the 'record of' prong[.]" *Pope v. ABF Freight Sys., Inc.*, NO. 3:17-cv-564, at *6-7 (W.D.N.C. Jul. 24, 2018). "Has a record of such an impairment means has a *history of*, or has been *misclassified as having*, a mental or physical impairment that substantially limits one or more major life activities." 34 C.F.R. § 104.3(j)(2)(iii) (emphasis omitted and added). Plaintiff's Mental Impairments are so well documented and detailed that he satisfies both the 'actual disability' and the 'record of' prongs.

### i.   "Concentrating" is a Major Life Activity.

By statute, "major life activities include … concentrating[1]…" 42 U.S.C. § 12102(2)(A). Since only one major life activity is required to be disabled, Plaintiff does not find it necessary to argue all other possible major life activities in this Motion.

### ii.   Plaintiff's Mental Impairments Substantially Limits Concentration.

"[M]ental impairment means … any mental or psychological disorder." 34 C.F.R. § 104.3(j)(2)(i). Plaintiff was diagnosed with the following mental disorders, ADHD, Anxiety Disorder, and OCD. Each of these Mental Impairments substantially limit the same major life activity, concentration; and consequently, his ability to complete exams in the standard time allotted. "The ADA defines 'discrimination' to include 'not making reasonable accommodations to the known physical or mental **limitations** of an otherwise qualified individual with a disability." *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1224 (11th Cir. 1997) (emphasis added) (quoting 42 U.S.C. § 12112 (b)(5)(A)).

**Diagnostic tests**. After Plaintiff took multiple diagnostic tests between December 2015 through January 2016 his treating professionals stated, (1) Plaintiff's "Conners CPT3 computer

---

[1] Plaintiff may use the term "concentration" interchangeably with "attention."

3

testing results [] states that the scores are 'associated with a very high likelihood of having a

disorder' such as ADHD." Ex. SJ-01; (2) "The TOVA was administered. The results are not within

normal limits and the overall pattern of performance suggests an attention problem, including

ADHD." Ex. SJ-02; and (3) "The CAARS was also administered. The results indicated ADHD

predominantly Inattentive presentation." *Id.* Plaintiff's Conners CPT3, TOVA, and CAARS all

reached the same conclusion about Plaintiff's concentration problems.

**Medical record notes** by Plaintiff's treating professionals. On December 30, 2015, Dr.

Mauricio's medical note about Plaintiff reads:

> The patient reports the following concerns related to
> attention/concentration:
>
> [F]requently fails to give close attention to details or makes careless
> mistakes at work or in school[.]
>
> [C]onstantly has difficulty sustaining attention to tasks at work or in
> school[.]
>
> [I]ntermittently doesn't seem to listen when spoken to directly[.]
>
> [F]requently does not follow through on instructions or fails to finish
> work or duties[.]
>
> [C]onstantly has difficulty with tasks requiring persistence or
> organization (schoolwork or job duties)[.]
>
> [C]onstantly Has [*sic*] problems with procrastination/avoidance of
> tasks.
>
> [C]onstantly distracted by noise or activity.
>
> [C]onstantly is forgetful in daily activities, e.g., difficulty
> remembering appointments or obligations[.]
>
> [I]ntermittently finds it hard to follow conversations, even when
> being spoken to directly[.]

Ex. SJ-03, at 3. On June 17, 2016, Dr. Mauricio's medical note about Plaintiff reads:

> [H]ave not been on time for anything in the last couple of months,
> continuous missing events, study maybe 3 hours a day or less, don't
> feel a "focus" effect/ don't feel anything, stupid things distract [him]

4

> from main subject[]. He reports that he continues to be "always
> late", forgetting all his appointments...

*Id.* at 18.

Denise H. Unterman's (Plaintiff's psychotherapist) medical note reads, "[a]nxiety dating

to at least [high school]." Ex. SJ-04, at 35. Ms. Unterman's medical note further reads:

> [O]nset of anxious feelings in HS w/ worsening in college around
> exams when he started pulling out his eyelashes and chin hairs. [...]
> [S]truggling w/ completing exams due to compulsively checking
> that he has completed previous answers. [...] [H]e's very worried
> about undermining his score by not completing the exam in the time
> allowed.. He pulls his eyelashes to the point where he no longer has
> any.

*Id.* Ms. Unterman's goal for Plaintiff reads:

> Goal I: Anxiety Reduce [*sic*] the overall leve[l], frequency and
> intensity of the anxiety so that daily functioning is not impaired.

*Id.* at 36.

**RUSM counseling records** indicate that Plaintiff experienced "running out of time" on his

exams. Ex. SJ-05. These records also show that "towards the end" of exams, Plaintiff would "los[e]

his momentum and just circle questions without really thinking of the answers." Ex. SJ-06.

## C.  Plaintiff is an 'Otherwise Qualified' Individual.

RUSM admitted that Plaintiff is an otherwise qualified individual. Paragraph 86 of the

Complaint [ECF No. 47] reads:

> Plaintiff is otherwise qualified to participate in RUSM's curriculum
> and is able to participate in said program with reasonable
> accommodations in place.

Compl. ¶ 86.

RUSM admitted to the allegation in its Answer and Affirmative Defenses [ECF No. 58]

("Answer") as follows:

> In response to paragraph 86, RUSM admits the allegations.

5

Answer ¶ 87.

### D.     Plaintiff Requested an Accommodation.

The determination of whether a request for accommodation has been made, is a legal conclusion. "However stated, a plaintiff can be said to have made a request for accommodation when the defendant has 'enough information to know of both the disability and desire for an accommodation.'" *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1226 (11th Cir. 2016) (quoting *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir.2003) (internal quotation marks omitted)). "[A] plaintiff 'need not use magic words,' but 'should provide enough information about his or her limitations and desires to suggest at least the possibility that reasonable accommodation may be found ....'" *Adigun v. Express Scripts, Inc.*, No. 17-15225, at *4-5 (11th Cir. Aug. 7, 2018) (brackets omitted) (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999)); *accord U.S. v. Hialeah Housing Authority*, 418 Fed. Appx. 872, 876 (11th Cir. 2011). "[A]ccommodation request need not be formal, be in writing, or invoke any particular 'magic words[.]'" *Sessoms v. Trs. of the Univ. of Pa.*, No. 17-2369, at *8 (3d Cir. Jun. 20, 2018). The term "request" is a legal concept.

"Put another way, the third and fourth elements require [Plaintiff] to prove that [he] informed [RUSM] of both the substantial limitations [his] disability created and the need for an accommodation." Pattern Jury Instructions, Civil Cases, Eleventh Circuit, § 4.12, p. 7 (2018 revision).

### i.     Months Before Plaintiff's NBME CBSE Attempts.

After Plaintiff failed his fifth semester in December 2015, he executed a ROI Agreement with the RUSM Counseling Center. Ex. SJ-07; Answer ¶ 17. When Plaintiff signed the ROI Agreement, he verbally asked Dr. Sharma and Mr. Cuffy to tell RUSM administration (1) that he needed extended testing time for a suspected attention problem that needed to be diagnosed and

6

(2) that he needed an earlier flight home to help him emotionally with failing the semester. Awodiya Decl. ¶ 3.

The ROI Agreement states that Plaintiff "authorize[d] RUSM Counseling Center" to discuss his "confidential information" with "RUSM Administration" for the purpose "to provide information relevant to academic accommodations" and authorized them to do so with "ongoing communication." Ex. SJ-07. "RUSM admits that this would have permitted the Counseling Center, including the psychiatrist treating Plaintiff, to discuss his ADHD with the school's Accommodations Coordinator[.]" Answer ¶ 17.

**Dr. Sharma** is RUSM's "professor of behavior sciences and consultant psychiatrist for health services." Sharma Dep. 7:23-24. Dr. Sharma admitted that he has "helped other students to get test accommodations at Ross University." *Id.* 27:1-3. Although he may not make the final decision, Dr. Sharma stated that he is the one who makes the requests for accommodations for students. In Dr. Sharma's own words, he stated, "I'm the one -- or the doctors make the request for accommodation, which is time-and-a-half. You get extra time. We actually put it we want the student to get the accommodation[.]" *Id.* 37:17-21.

Dr. Sharma admitted that he noticed Plaintiff's attention/concentration symptoms, including, constantly has difficulty sustaining attention to tasks, constantly has difficulty with tasks requiring persistence or organization, constantly distracted by noise or activity, and constantly forgetful in daily activities. Sharma Dep. 12:9-21. Dr. Sharma stated, "what I saw was evidence of ADHD that required, you know, testing and confirmation." *Id.* 13:1-3. Dr. Sharma admitted that he noticed Plaintiff's symptoms in "December 2015." *Id.* 13:19-24. Dr. Sharma further admitted that he noticed Plaintiff's symptoms to the "extent" that Dr. Sharma "recommended an assessment for the ADHD," when Plaintiff signed the ROI Agreement "for the release of information relative

7

to academic accommodations." *Id.* 73:1-8. Dr. Sharma further admitted that Plaintiff's "ADHD symptoms that [he] observed in December 2015" were "relevant to academic accommodations." *Id.* 74:13-22.

Dr. Sharma admitted that he was "informed that [P]laintiff was running out of time on his exams." Sharma Dep. 23:7-9. Dr. Sharma further admitted that he believed that "[P]laintiff's ADHD, specific to him, was significantly limiting his ability to complete his exams in the time allowed." *Id.* 20:19-22. Dr. Sharma also stated that Plaintiff told him that he was continuing to "r[u]n out of time" on his exams even though he passed them in March 2016. *Id.* 18:24-19:7. Dr. Sharma further stated, "did I prescribe the stimulant [Ritalin] because the student needed extra time? That is part of the problem that ADHD has, that it causes the student to take longer. So the medication would help that. So, yes, that's correct." *Id.* 39:14-19. Then Dr. Sharma admitted that Plaintiff told him that he was still running out of time on his exams despite the medication. *Id.* 40:24-41:7.

**Dr. Hayse** has served as the Associate Dean of Student Affairs at RUSM. Ex. SJ-09. His "[a]reas of oversight include ... academic accommodations." *Id.* Dr. Hayse was responsible for making the "final decision" on academic accommodations. Hayse Dep. 23:22-24:8. Plaintiff also informed Dr. Hayse of his limitations and the need for extended testing time. On the same day that Plaintiff signed the ROI Agreement in December 2015, he had a joint meeting with Dr. Sharma and Mr. Cuffy about failing the semester. Ex. SJ-10. Dr. Sharma's counseling note reads, "[f]elt he was treated unfairly because he failed by one point ... [h]e wanted to speak to the Dean about changing his grade." *Id.* at 1. The same counseling note also reads, "[i]s trying to see if he can have his grade changed. EMt [*sic*] with student affairs." *Id.* at 2.

The next day Plaintiff met with Dr. Hayse in Student Affairs. Plaintiff asked Dr. Hayse if he could retake his exams with extended testing time because the RUSM Counseling Center suspected an attention problem that needed to be diagnosed. Awodiya Decl. ¶ 4. Dr. Hayse told Plaintiff that he could accommodate Plaintiff for future exams but not for exams that Plaintiff had already taken. *Id.* ¶ 5. Dr. Hayse told Plaintiff that he would contact Mr. Cuffy about the suspected attention problem so that Plaintiff could receive extended testing time for future exams. *Id.* ¶ 6.

**Mr. Cuffy** is a counselor at RUSM. Admis. No. 48. Mr. Cuffy's counseling note reads, "[Plaintiff] returned to office after talking to Dr. Hayes [*sic*] in Student Affairs regarding his academic situation. I subsequently received an email from Dr. Hayes [*sic*] requesting that we talk at some point re: the client. After the meeting with Dr. Hayes, [*sic*] the client was very disappointed but stable." Ex. SJ-11. Another counseling note three days later by Mr. Cuffy reads, "[a]fter exhausting all avenues of getting his grades changed, he is at the point where he is accepting to come back here in January to repeat semester 5." Ex. SJ-12.

When Plaintiff returned to Dominica to repeat his fifth semester in January 2016, Plaintiff provided the RUSM Counseling Center with an assessment of his ADHD that was performed by Dr. Mauricio in the United States. Mr. Cuffy clinically assessed Plaintiff with ADHD and Anxiety Disorder. Answer ¶¶ 14-15. Mr. Cuffy's counseling note reads, "[Plaintiff] was assessed in the U.S. for ADHD; he provided us with a copy of the results which are scanned in his file. ... Clinical assessment: Academic problems; repeating semester 5." Ex. SJ-13. *See also* diagnostic tests and medical record notes *supra* pp. 3-4. Mr. Cuffy's counseling notes also reads, "that towards the end of the exam [Plaintiff] lost his momentum and just circle questions without really thinking of the answers." Ex. SJ-06.

9

Dr. Sharma, Dr. Hayse, and Mr. Cuffy were each informed of Plaintiff's limitations and the need for an accommodation.

### ii. After Plaintiff's NBME CBSE Attempts. The Grievance Process.

In 2017, the RUSM Promotions Committee recommended Plaintiff for dismissal because of his performance on his NBME CBSE attempts. Dean Owen denied Plaintiff the opportunity to continue despite being informed by Plaintiff's mental health providers that Plaintiff suffers from a disability that adversely affects his academic performance.

"[S]omeone other than the disabled person may request an accommodation on behalf of the disabled person." *Moore v. Hexacomb Corp.*, 670 F. Supp. 2d 621, 629 (W.D. Mich. 2009). "[A] family member, friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability." *Id.* at 629-630 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999)); *accord McLean v. Abington Mem'l Hosp.*, CIVIL ACTION NO. 15-671, at *15 (E.D. Pa. Sep. 15, 2015); *Boudreau v. Bethesda Found. of Neb.*, Civil Action No. 1:14-cv-03451-CMA-CBS, at *10 n.2 (D. Colo. Jan. 27, 2016).

On June 1, 2017, the RUSM Promotions Committee instructed Plaintiff to email an appeal letter to Dean Owen at PromotionAppeals@RossU.edu "[i]f additional information has become available or if you believe university procedure wasn't followed." Ex. SJ-14.

On June 12, 2017, Plaintiff's independent psychiatrist and psychotherapist informed Dean Owen that Plaintiff's mental impairment had adversely affected his academic performance in medical school. Ex. SJ-15. Plaintiff's psychiatrist and psychotherapist sent an email to Dean Owen which states:

> We are writing on behalf of [Plaintiff], a student in your program.
>
> We have been treating Mr. Awodiya for the past several months for ADHD and Obsessive Compulsive Disorder. He has had

10

> symptoms of the latter for the past 4-6 years but did not understand the nature of the diagnosis until recently. We believe that the **anxiety and checking rituals inherent to this condition** have been **adversely affecting his academic performance** in medical school.

*Id.* (emphasis added).

On June 13, 2017, RUSM confirmed that it received Plaintiff's appeal letter to Dean Owen.

Ex. SJ-16. Plaintiff's appeal letter to Dean Owen stated:

> [M]y objective is to keep this letter relevant to how **OCD has influenced my academic performance**.
>
> ....
>
> My biggest challenge with OCD is the **extreme anxiety** and urges that overwhelm me. ... Honestly, I don't fully understand everything about my OCD yet, but sometimes there isn't a solution to sooth my anxiety. Therefore, when I can't identify why I feel the way I do, I get hopelessly overwhelmed. Sometimes the solution is not even logical, like pulling out my eyelashes.
>
> I'm the student who **never finished an exam on time**. I was **compelled to back track my answers just to make sure they didn't disappear 5 seconds after I went to the next question**. ... These are just some of the ways that OCD has influenced my academic performance.
>
> ... I cannot tell you that I can fix this overnight, but I can tell you that progress can be made.

Ex. SJ-17 (emphasis added).

On June 29, 2017, Dean Owen sent a letter to Plaintiff which states that he "carefully reviewed [Plaintiff's] academic record, [Plaintiff's] **appeal** of the Student **Promotions Committee's recommendation for dismissal**, and [Plaintiff's] pre-matriculation credentials." Ex. SJ-18 (emphasis added). Dean Owen still decided to dismiss Plaintiff. *Id.*

### E.   In the Alternative, Plaintiff's Need for an Accommodation was Obvious.

Even if RUSM could somehow create a question of fact as to whether Plaintiff made a "request" for an accommodation, a request is not required when Plaintiff's need for an

accommodation was obvious. The same facts already set forth above, support this alternative as well.

"[T]he entity will know of the individual's need for an accommodation because it is obvious." *McCullum ex rel. DF & TF v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (quoting *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir.2007)). "Whether the public entity's knowledge derives from an individual's request for an accommodation or an individual's obvious need for an accommodation, the critical component of the entity's knowledge is that it is aware not just that the individual is disabled, but that the individual's disability affects his ability to receive the benefits of the entity's services." *Robertson v. Las Animas*, 500 F.3d 1185, 1197 n.10 (10th Cir. 2007).

"[A] disabled person's failure to expressly 'request' an accommodation [] is not fatal to an ADA claim where the defendant otherwise had knowledge of an individual's disability and needs but took no action. A specific demand may be unnecessary where the need for an accommodation is obvious." *Nattiel v. Fla. Dep't of Corr.*, CASE NO. 1:15-cv-00150-WTH-GRJ, at *2 (N.D. Fla. Nov. 27, 2017) (second bracket added) (quoting *McCoy v. Texas Dep't of Criminal Justice*, 2006 WL 2331055 at *7 (S.D. Tex 2006)).

"Application of this general rule [that a request for accommodation is a prerequisite to liability for failure to accommodate] is not warranted, however, where the disability is obvious or otherwise known to the employer without notice from the employee." *Brady v. Wal-Mart*, 531 F.3d 127, 135 (2d Cir. 2008) (brackets in original) (quoting *Felix v. New York City Transit Authority*, 154 F.Supp.2d 640 (S.D.N.Y. 2001)). "[W]hen an employer has independent knowledge of an employee's disability[,] [t]he rule requiring a request for accommodation [does not apply] in such circumstances." *Id.* (last bracket in original). "A requirement that such an

employee ask for accommodation would be tantamount to nullifying the statutory mandate of accommodation for one entire class of disabled (as that term is used in the ADA) employees. We therefore hold that an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious — which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Id.*

"Lastly, the regulations governing the ADA provide that, to determine the appropriate reasonable accommodation, an employer may need to initiate an informal, interactive process with the individual with a disability in need of an accommodation to identify the person's limitations and potential reasonable accommodations." *Bagwell v. Morgan Cnty. Comm'n*, No. 15-15274, at *7 (11th Cir. Jan. 18, 2017) (quotation marks omitted).

### F.     A Reasonable Accommodation Existed.

RUSM admits "that extended testing time for the NBME CBSE is a reasonable accommodation for disabled students that need extended testing time." Admis. No. 58.

### G.     RUSM Failed to Provide a Reasonable Accommodation.

RUSM admits "that RUSM did not provide Plaintiff with extended testing time for the NBME CBSE." Admis. No. 16.

## II.     Breach of Fiduciary Duty Claim

The RUSM Counseling Center had an ongoing duty to provide RUSM administration with confidential information reposed by Plaintiff, if the information was relevant to academic accommodations.

"The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).

### A.     The RUSM Counseling Center had a Fiduciary Duty to Plaintiff.

13

"The counselor-counselee relationship has been characterized as a fiduciary one." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). "Fiduciary relationships usually arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties[.]" *Wachovia Insurance Services, Inc. v. Toomey*, 994 So. 2d 980, 998 n.7 (Fla. 2008) (alterations omitted).

As stated above, Plaintiff verbally asked Dr. Sharma and Mr. Cuffy, to communicate with RUSM administration on his behalf. *See supra* pp. 6-7. The RUSM Counseling Center's fiduciary duty is outlined, in *writing*, in the joint ROI Agreement. Restated here, the ROI Agreement states that Plaintiff "authorize[d] RUSM Counseling Center" to discuss his "confidential information" with "RUSM Administration" for the purpose "**to provide information relevant to academic accommodations**" and authorized them to do so with "**ongoing communication**." Ex. SJ-07 (emphasis added). "RUSM admits that this would have permitted the Counseling Center, including the psychiatrist treating Plaintiff, to discuss his ADHD with the school's Accommodations Coordinator[.]" Answer ¶ 17.

**III.    Fraudulent Inducement/Omission and Negligent Misrepresentation Claims**

RUSM falsely advertised to prospective students that the university required its faculty "to comply" with the Americans with Disabilities Act in Dominica. RUSM admitted that the advertisement was intended for prospective students but used the phrase "as applicable" to exclude these same students from the purported "policy" or requirement that it advertised to have.

"To state a claim for fraudulent inducement pursuant to Florida law, [Plaintiff] must allege four elements: '(1) a false statement regarding a material fact; (2) the statement maker's knowledge

14

that the representation is false; (3) intent that the representation induces another's reliance; and (4) consequent injury to the party acting in reliance." *Bank of Am., N.A. v. Grec Homes IX, LLC*, CASE NO. 13-21718-CIV-ALTONAGA/Simonton, at *11 (S.D. Fla. Jan. 23, 2014) (quoting *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1315 (11th Cir. 2007) (citations omitted)).

"A plaintiff may establish negligent misrepresentation by proving (1) a misrepresentation of a material fact; (2) the representor made the representation without knowledge as to its truth or falsity, or under circumstances in which the representor ought to have known of its falsity; (3) the representor intended to induce another to act on the misrepresentation; and (4) injury resulted to the party acting in justifiable reliance on the misrepresentation." *Tsavaris v. Pfizer, Inc.*, Case No. 1:15-cv-21826-KMM, at *9 (S.D. Fla. Feb. 1, 2016) (quoting *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1503 (11th Cir. 1993) (citation omitted).

### A.   RUSM Made a False Statement Regarding a Material Fact; and/or RUSM Misrepresented a Material Fact.

#### i.   The ADA-Statement.

Paragraph 106 of the Complaint reads, "[c]ontinuously between 2012 and 2018, and before Plaintiff applied and enrolled into RUSM's medical degree program, RUSM published a statement in its Admission Requirements section of its website" stating:

> It is the **policy** and practice **of the University to comply** with the Americans with Disabilities Act **as applicable** and practical **in Dominica**.

Compl. ¶ 106 (emphasis added) (hereinafter referred to as the "**ADA-Statement**"); *See also* Ex. SJ-19, at 3 (the ADA-Statement as it appeared on October 31, 2012).

RUSM did not deny and therefore admitted the allegation of the ADA-Statement in its Answer, as it reads:

> In response to paragraph 106, RUSM states that the website speaks for itself and RUSM denies any allegations inconsistent therewith.

15

Answer ¶ 107.

### ii. The ADA-Statement is False and/or Misrepresented.

First, RUSM did not have a policy instructing its faculty "to comply" with the Americans

with Disabilities Act in Dominica. Second, RUSM believed or took the position that Title III of

the Americans with Disabilities Act was not applicable in Dominica and then used this malicious

belief to elude the compliance that it advertised to prospective students.

Title I of the Americans with Disabilities Act is only applicable to employees. 42 U.S.C. §

12112(a). Title II of the Americans with Disabilities Act is only applicable to public entities. 42

U.S.C. § 12132. In contrast, Title III of the Americans with Disabilities Act is applicable to private

entities including "postgraduate private school[s]." 42 U.S.C. § 12181(7)(J). RUSM is a "private,

for-profit medical school." Answer ¶ 2.

Dr. Hayse—who made the final decision and oversaw the academic accommodations

process—had no knowledge of any imposed compliance with the ADA nor the RA in Dominica.

Hayse Dep. 14:11-18. In fact, Dr. Hayse even went as far as to say that they were not "beholden

to" the ADA, rather, they just used it as a "guideline." Hayse Dep. 10:14-17. *See also* Admis. No.

29 (RUSM admitting that the school "is not required to comply with Title III of the ADA in

Dominica").

### iii. The ADA-Statement is Material.

Even though RUSM's main campus location in Dominica was required to comply with

Title IV, HEA statutes and regulations—including the RA—in exchange to receive Federal

financial assistance, *see* Pl.'s Second Motion for Judicial Notice [ECF No. 89], RUSM also did

not have a policy or requirement instructing its faculty to comply with the RA in Dominica, Hayse

Dep. 14:11-18, 10:14-11:6, 11:17-21.

16

Since RUSM did not have a policy—or required in any fashion—for its faculty to comply with either Title III of the Americans with Disabilities Act or the RA, it perpetuated discrimination by providing its faculty the option to be deliberately indifferent to the *known* limitations of disabled students who needed reasonable accommodations in Dominica.

In addition to ignoring the known needs and limitations of disabled students, RUSM blindly adheres to its own formalisms[2] about the manner of requests for accommodations which are actually just administrative methods used to perpetuate discrimination of disabled students by refusing to provide reasonable accommodations for oral requests, by requiring magic words to get accommodations, and by refusing to offer (or investigate) a reasonable accommodation after someone else—other than the disabled student—informed RUSM faculty of the disabled student's limitations and need for an accommodation.

Taking depositions, Plaintiff asked Dr. Sharma if students need to expressly "say" the word "accommodations" in order to get accommodations, Dr. Sharma answered, "[y]es, they have to." Sharma Dep. 29:7-18. In this example, the magic word here is "accommodations." Dr. Sharma further stated:

> I can only send the documentation to the accommodations office, what we have, and they would receive accommodation.
>
> ... You have -- you have good documentation, in my opinion. Other students may have had one less test done, but still with a good diagnostic report of ADHD. So they would be given accommodations.

Sharma Dep. 27:13-23. In addition to requiring magic words, Dr. Sharma explained that nobody can request for accommodations on a student's behalf, stating:

---

[2] "[W]hat matters is not 'formalisms about the manner of the request,' but that the employer has notice of the employee's disability and wish to be accommodated." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1226 (11th Cir. 2016) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir.1999)).

17

> Nobody can apply for accommodation. Not the student's mother, the student's father, not the student's psychiatrist, the student's counselor. Nobody can apply for accommodations. Only the student, and it has to be done in writing. ... Nobody else, mother, faculty, the dean, the **president of the USA**.
>
> ....
>
> The dean cannot ask for the accommodation on the student's behalf. ... It doesn't matter. Nobody. Nobody can ask for the accommodation. Only the student.

Sharma Dep. 43:12-16, 43:21-24 (emphasis added), 44:4-9. *See also* Sharma Dep. 44:24-45:9.

RUSM's formalisms are at odds with the text of the ADA and RA regulations, stating:

> An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration— (i) that have the effect of discriminating on the basis of disability; or (ii) that perpetuate the discrimination of others who are subject to common administrative control.

42 U.S.C. § 12182(b)(D); *accord* 34 C.F.R. §§ 104.4(b)(1)(v), (b)(4).

**B.   RUSM had Knowledge that the ADA-Statement is False; and/or Made the Representation Without Knowledge as to its Truth or Falsity, or RUSM Ought to have Known of its Falsity.**

Mr. Stewart-Fulton is one of the accommodation coordinators at RUSM. Answer ¶ 17.

Taking his deposition, Plaintiff asked Mr. Stewart-Fulton if "faculty at RUSM" was required "to comply" with Title III of the ADA and the RA. Fulton Dep. 31:14-21. Mr. Stewart-Fulton answered, "[i]n reference to when you were enrolled and the campus was located on Dominica, we were not required to comply with the ADA." *Id.* 32:1-4. He further answered that they simply "abided by the spirit" of the ADA and the RA. *Id.* 32:5-7. Mr. Stewart-Fulton further admitted that there was no policy "to comply" and therefore was not required to comply with the ADA and RA in Dominica. *Id.* 32:12-19. These admissions are consistent with Dr. Hayse's testimony. *See supra* p. 16.

## C. RUSM Intended for Prospective Students in the U.S. to Rely on the ADA-Statement.

RUSM distinctly wanted *prospective* students to leave the U.S. to attend its school in Dominica. RUSM "focus their marketing efforts on attracting highly qualified, primarily U.S. and Canadian applicants[.]" Ex. SJ-20, at 19 (Form 10-K SEC filing for the 2012 fiscal year). "RUSM admits that it published information **for** prospective students on its website, including in the Admissions Requirements section." Answer ¶ 106 (emphasis added). The ADA-Statement was in the Admissions Requirements section. *See supra* p. 15.

## D. RUSM Omitted a Material Fact that it had a Duty to Disclose to Prospective Students.

"Florida law recognizes that fraud can occur by omission, and places a duty on one who undertakes to disclose material information to disclose that information fully." *ZC Insurance Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. Dist. Ct. App. 2003).

RUSM materially omitted that it believed or took the position that no part of the ADA was applicable to the prospective students once they became students in Dominica and/or therefore did not have any policy directing its faculty to comply with the ADA in Dominica. RUSM made deliberate efforts to attract prospective students to leave the U.S. to attend its medical school in Dominica. It advertised to these prospective students that it was the "policy" of the school "to comply" with the Americans with Disabilities Act as applicable in Dominica. But, as evidenced by Dr. Hayse's and Mr. Stewart-fulton's testimony, RUSM in fact did not have a compliance policy nor did they feel obligated to comply with the ADA in Dominica. *Supra*. RUSM had a duty to advise prospective students that its faculty was not "beholden to" the ADA, *supra* p. 16, and that they only "abided by the spirit" of the ADA, *supra* p. 18.

## E. Plaintiff was Consequently Injured Acting in Reliance on the ADA-Statement and/or Injury Resulted to Plaintiff Acting in Justifiable Reliance on the ADA-Statement.

19

### i. Plaintiff's Reliance and Consequent Injury.

Plaintiff had "serious concerns about attending a medical school ... located in a less developed nation than the U.S." Awodiya Decl. ¶ 9. "The ADA-Statement about RUSM's ADA compliance was one of the most important factors in [Plaintiff's] decision to leave the U.S. to become a student at RUSM in Dominica." Awodiya Decl. ¶ 14-15; *Id.* ¶ 10-12. Consequently, Plaintiff was denied the benefits and equal enjoyment of RUSM's medical program that was advertised by the ADA-Statement because RUSM refused to require its faculty to comply with the ADA in Dominica and therefore allowed compliance to be optional and for its faculty to be deliberately indifferent to Plaintiff's disability and needs.

### ii. Justifiable Reliance.[3]

Plaintiff was justified in relying on RUSM's ADA-Statement because he was a layperson with minimal knowledge of law and had no reason to suspect that the information was being misrepresented. In fact, Plaintiff "thought the ADA-Statement was only applicable to U.S. students, as opposed to non-U.S. students, because of the word 'Americans' in 'Americans with Disabilities Act.'" Awodiya Decl. ¶ 16. "[Plaintiff] didn't know that the ADA had different divisions or parts and that geographical applicability could differ among any parts of the ADA." *Id.* ¶ 18.

### CONCLUSION

Plaintiff Oluwamuyiwa Awodiya respectfully requests that the Court enter an Order (i) granting summary judgment in favor of the Plaintiff, in whole or in part on each claim herein; (ii) stating any material fact that is not genuinely in dispute and treating the fact as established in this case; and/or (iii) granting Plaintiff such other and further relief as the Court deems just and proper.

---

[3] "Justifiable reliance is not a necessary element of fraudulent misrepresentation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

DATED this 7th day of December, 2018:

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

## **CERTIFICATE OF SERVICE**

I do hereby certify that on this 7th day of December, 2018, I have caused a true and

correct copy of (i) PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY

JUDGMENT, (ii) DECLARATION OF OLUWAMUYIWA AWODIYA IN SUPPORT OF

PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT, and (iii)

PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S

SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT by mailing a copy to the Court,

where the Court's CM/ECF system will send notification to the following:

**Ryan Roman**
Akerman Senterfitt
Suntrust International Center
1 SE 3rd Avenue
25th Floor
Miami, FL 33131-1714
305-374-5600
Fax: 305-374-5095
Email:
ryan.roman@akerman.com

**Octavia Monique Green**
Akerman LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, FL 33131
(305) 982-5670
Email:
octavia.green@akerman.com

By: Oluwamuyiwa Awodiya, *pro se* litigant

1



USPS INSPECTED

U.S. POSTAGE PAID
PME 2-Day
BOWIE, MD
20715
DEC 08, 18
AMOUNT

1007        33128-1801        $24.70
R2304M115731-05

E K557426365U

**PRIORITY MAIL EXPRESS™**

UNITED STATES POSTAL SERVICE®

CUSTOMER USE ONLY

FROM: (PLEASE PRINT)    PHONE: 240-602-1836

Oluwamuyiwa Awodiya
15005 Dahlia Dr.
Bowie, MD 20721

TO: (PLEASE PRINT)    PHONE:

Wilkie D. Ferguson, Jr. U.S. Courthouse
400 North Miami Avenue, Room 8N09
Miami, FL 33128

ZIP + 4® (U.S. ADDRESSES ONLY)

3 3 1 2 8 - ____

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 insurance included.

ORIGIN (POSTAL SERVICE USE ONLY)

PO ZIP Code: 20716
Scheduled Delivery Date (MM/DD/YY): 12/10/18
Date Accepted (MM/DD/YY): 12/8/18
Scheduled Delivery Time: ☐ 12 NOON
Time Accepted: 10:17 ☒ AM ☐ PM
Weight: 1 lb 10.00 oz
Postage: $24.70
Total Postage & Fees: $24.70

DELIVERY (POSTAL SERVICE USE ONLY)

EP13F July 2013    OD: 12.5 x 9.5

PS 10001000006

* Money Back Guarantee to U.S., select APO/FPO/DPO, and select International destinations. See DMM and IMM at pe.usps.com for complete details.

‡ Money Back Guarantee for U.S. destinations only.

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

UNITED STATES POSTAL SERVICE



# **Exhibit SJ-01**

(Dr. Earl John Mauricio's January 5, 2016 email to Plaintiff)

**Member name:** Oluwamuyiwa O. Awodiya
**Date of birth** ▮▮▮▮▮▮▮▮
**Gender:** Male
**Primary care physician:** ENARUNA MAE TYCHUS MD, M.D.
**Date printed:** 9/13/2018

To:
Oluwamuyiwa O. Awodiya

From:
EARL JOHN D MAURICIO MD, M.D.

Received:
1/5/2016  4:23 PM EST

Note:

Cannot reply to an expired message

Dear Mr. Miwa,

I received your Conners CPT3 computer testing results which states that the scores are "associated with a very high likelihood of having a disorder" such as ADHD. You may request a copy of your test results via medical records or by contacting the Northwest DC clinic where you had the test done, at 202 419 6950.

Sincerely,
Earl Mauricio MD

Certain content delivered by MyChart®, licensed from Epic Systems Corporation, © 1999 to 2017, patents pending.

# Exhibit SJ-02

(McMillan Cuffy's Counseling Note dated 1-18-2016)

**Name:** Oluwamuyiwa O   **DOB:** ▇▇▇▇▇   **Student ID:** ▇▇▇▇▇
Awodiya (M)

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                          Note Date: 01/18/2016 11:18 AM
[5597]
Pt. Phone:                    DOB: ▇▇▇▇▇ (Age 23)

**Summary of note:** Attention Deficit Disorder Without Mention Of Hyperactivity
**Allergies:** No Entry
**Current Medications:** Ambien 5mg Tablet, Wellbutrin XL 300mg Extended-Release Tablet
**Semester:** Semester 5

**Progress:**
**Followup**

Session content: The TOVA was administered. The results are not within normal limits and the overall
pattern of performance suggests an attention problem, including ADHD. The CAARS was also
administered. The results indicated ADHD predominantly Inattentive presentation.

Clinical assessment: ADHD predominantly Inattentive presention without hyperactivity

**Assessment:**
1)Attention Deficit Disorder Without Mention Of Hyperactivity - F90.9, 314.00

**Plan:**
Counseling 1 Hour (F90.9)
*Referral Orders:* Referral To Psychiatry (F90.9)

Signed by: McMillan Cuffy on Jan/18/2016 11:18 AM

*Locked by: McMillan Cuffy on Jan/18/2016 11:18 AM*

1 of 1

This document has been signed electronically.

# **Exhibit SJ-03**

(Dr. Earl John Mauricio's medical notes)

**Oluwamuyiwa O Awodiya**
**12/30/2015 4:30 PM Office Visit**
MRN: ▇▇▇

Description: **23 year old male**
Provider: **EARL JOHN D MAURICIO MD**

Encounter #: **210281061**
Center: **LARGO**

Department: **Psychiatry Largo**

## Visit Summary

### PCP and Center

| Primary Care Provider | Phone | Center |
|---|---|---|
| Enaruna Mae (M.D.) Tychus, M.D. | 301-618-5500 | LARGO |

### Registration
Non- EpicCare Patient

### Reason for Visit
**ATTENTION DEFICIT**
▇▇▇▇

### Diagnoses

| | Codes | Comments |
|---|---|---|
| ▇▇▇▇ | ▇▇ | |

## Progress Notes

**Mauricio, Earl John D (M.D.) at 12/30/2015 4:34 PM**

Status: Signed
**\*\*Sensitive Note\*\***

*Initial Psychiatric Evaluation 12/30/2015*
*Length of Session: 40-50 minutes*
*Type of Service: Individual*

### Identifying Information:
Oluwamuyiw "Miwa" O Awodiya is a 23 yr old Black single male who presented today for psychiatric evaluation, as referred by nurse triage/ call center on x 12/30/15 which noted- "requests evaluation or treatment for ADHD; disposition of BH - appoint w psychiatry suggested".

### Chief Complaint: ▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇ the even more primary reason is that they think that i should be on a stimulant, um they did half the test, and i think it was a card test, and it showed that i was inattentive and stuff like that, so since i have to come back in April to the states (to take the steps/ usmle exams), i thought it would be wise to have you guys handle that instead of them, so that there would be no interruption in my treatment"; school counseling said they are going to put me on a stimulant; they said i was inattentive;

### History of Present Illness/ Presenting Issues: ▇▇▇▇▇▇▇▇▇

Awodiya, Oluwamuyiwa O
MRN: ▇▇▇

Page 2

**Progress Notes (continued)**

Mauricio, Earl John D (M.D.) at 12/30/2015  4:34 PM (continued)

He adds, "and for the inattentiveness, i guess the therapist caught when i was going through the questions... they have always been there, ███████ ███████████████, i just never thought it was a problem, um, so the inattentiveness i think goes back to high school".

███████████████████████████████████████████████; the inattentiveness, since i was younger i somehow reasoned within my head, so i kinda ignored it so much that i don't notice it".

███████████████████ He expressed general ambivalence/ hesitation regarding psychotropic meds, saying that he does not want to take wellbutrin (although he reports that he continues to take it), and that he had stopped taking his prn xanax and prn ativan since he arrived from the Caribbean for his christmas break from med school on x 121815. He is returning back to med school on x 1/8/16. He wonders if he can manage his █████████ and inattentive/cognitive via counseling/ psychotherapy which he plans to pursue while he is in the carribean/ dominica. ██████████████████.

The patient reports the following concerns related to attention/concentration:
frequently fails to give close attention to details or makes careless mistakes at work or in school
constantly has difficulty sustaining attention to tasks at work or in school
intermittently doesn't seem to listen when spoken to directly
frequently does not follow through on instructions or fails to finish work or duties
constantly has difficulty with tasks requiring persistence or organization (schoolwork or job duties)
constantly  Has problems with procrastination/avoidance of tasks.
constantly distracted by noise or activity.
constantly is forgetful in daily activities, e.g., difficulty remembering appointments or obligations,

intermittently finds it hard to follow conversations, even when being spoken to directly;
Finds it   somewhat difficult waiting for turn appropriate or not interrupting others. constantly notes problems with psychomotor/internal sense of restlessness.

Childhood academic performance was Poor.
does report history of behavioral problems as a child-███████████████████
█████████████████████████.

does not have a history of special education programming as a child.
Current job/school performance is Poor- i have to repeat the semester.

*Adult ADHD Self-Report Scale Symptom Checklist:*

Awodiya, Oluwamuyiwa O
MRN:█████████

**Progress Notes (continued)**

Mauricio, Earl John D (M.D.) at 12/30/2015  4:34 PM (continued)

1) Patient has trouble wrapping up the final details of a project once the challenging parts have been done: Somewhat

2) Patient has difficulty getting things in order when having to do a task that requires organization: Quite a bit

3) When there is a task that requires a lot of thought, Patient avoids or delays getting started: Very much

4) Patient has problems remembering appointments or obligations:
Very much- if i don't put in my phone i'd forget it

5) Patient fidgets or squirms with hands or feet when required to sit for long periods of time: Quite a bit

6) Patient feels overly active and compelled to do things, as if driven by a motor: Not at all
Part A: 4/6

7) Patient makes careless mistakes when having to work on a boring or difficult project: Very much

8) Patient has difficulty keeping attention when doing boring or repetitive work: Very much

9) Patient has difficulty concentrating on what people say even when being directly spoken to: Quite a bit

10) Patient misplaces or has difficulty finding things at home or work: Quite a bit

11) Patient isdistracted by activity or noise: Very much

12) Patient leaves their seat in meetings or other situations in which people are expected to remain seated: Not at all

13) Patient feels restless or fidgety: Quite a bit

14) Patient has difficulty unwinding and relaxing when they have alone time: A little bit

15) Patient finds him/herself talking too much in social situations: A little bit

16) Patient finds him/herself finishing the sentences of other people: Not at all

17) Patient has difficulty waiting his/ her turn in situations when taking turns is required: Not at all

18) Patient interrupts others when they are busy: Not at all
Part B: 6/12

(-) mania, hypomania, psychosis, panic attacks, anxiety, obsessions, compulsions,

| | |
|---|---|
| Little interest or pleasure in doing things? | 2 - MORE THAN HALF THE DAYS |
| Feeling down, depressed, or hopeless? | 3 - NEARLY EVERY DAY |
| Trouble falling or staying asleep, or sleeping too much? | 3 - NEARLY EVERY DAY |
| Feeling tired or having little energy? | 3 - NEARLY EVERY DAY |
| Poor appetite or overeating? | 1 - SEVERAL DAYS |
| Feeling bad about yourself? or that you are a failure or have let yourself or your family down? | 3 - NEARLY EVERY DAY |
| Trouble concentrating on | 3 - NEARLY EVERY DAY |

Awodiya, Oluwamuyiwa O
MRN: ▓▓▓▓▓▓

Page 4

 **KAISER PERMANENTE.**

**Oluwamuyiwa O Awodiya**
**6/17/2016 1:50 PM  Office Visit**
**MRN:**

Encounter #: **217821994**
Center: **LARGO**

Description: **23 year old male**
Provider: **EARL JOHN D MAURICIO MD**
Department: **Psychiatry Largo**

## Visit Summary

### PCP and Center

| Primary Care Provider | Phone | Center |
|---|---|---|
| Enaruna Mae (M.D.) Tychus, M.D. | 301-618-5500 | LARGO |

### Registration
Non- EpicCare Patient

### Reason for Visit
**ATTENTION DEFICIT**

### Diagnoses

| | Codes | Comments |
|---|---|---|
| **ADHD**  - Primary | F90.9 | |

## Progress Notes

### Mauricio, Earl John D (M.D.) at 6/17/2016  4:04 PM

Status:  Signed
**Sensitive Note**

### Medication Management Visit
Time: 20 min

S: Pt seen today for follow-up, symptoms assessment and medication review.  Chart and history reviewed.  Pt reports maintaining medication compliance, tolerability and overall continued dissatisfaction with his ritalin medication, which he noted in written detail as follows ("i'm pretty sure it's the ritalin"- Pros- legs stops shaking, excessively, no muscle cramps, helps resist biting lip/skin, makes me want to leave the house (may be the bupropion), don't interrupt people when they are talking; Cons- immediately put to sleep/ drowsy/ tired, have not been on time for anything in the last couple of months, continuous missing events, study maybe 3 hours a day or less, don't feel a "focus" effect/ don't feel anything, stupid things distract me from main subject).  He reports that he continues to be "always late", forgetting all his appointments, and that the higher dosage of ritalin causes increased paradoxical sedation, as he had previously described in prior visits ("i went down to 5mg of ritalin, but the higher dosage made me more sleepy").  He was given advice and psychoeducation regarding emplying behavioral management techniques/ cbt, to include attending the adhd support group, along with discussing other psychotropic medication options such as adderall, for which he is agreeable/ wanting to try.  Otherwise he has no further complaints, noting that he is continuing to struggle with studying for his medical licensure exams coming up in about x

Awodiya, Oluwamuyiwa O
MRN:

**Progress Notes (continued)**

**Mauricio, Earl John D (M.D.) at 6/17/2016  4:04 PM (continued)**

a couple of weeks.

| | |
|---|---|
| Little interest or pleasure in doing things? | 0 - NOT AT ALL |
| Feeling down, depressed, or hopeless? | 2 - MORE THAN HALF THE DAYS |
| Trouble falling or staying asleep, or sleeping too much? | 3 - NEARLY EVERY DAY |
| Feeling tired or having little energy? | 3 - NEARLY EVERY DAY |
| Poor appetite or overeating? | 0 - NOT AT ALL |
| Feeling bad about yourself? or that you are a failure or have let yourself or your family down? | 3 - NEARLY EVERY DAY |
| Trouble concentrating on things, such as reading the newspaper or watching television? | 3 - NEARLY EVERY DAY |
| Moving/speaking slowly so others could notice or being fidgety/restless/moving more than usual? | 0 - NOT AT ALL |
| Thoughts that you would be better off dead,  or of hurting yourself in some way? | 0 - NOT AT ALL |
| PHQ 9 Total Score | 14 |
| Depression severity | C) 10 -14 MODERATE |
| How hard have these problems made it for you to work, tend to things at home, or get along with others? | VERY DIFFICULT |

**Past psych medications:** (+) ritalin,

**Current Meds:**ritalin 15mg qd; wellbutrin sr 300mg qd; xanax about 0.25mg prn (not taking); ativan 01mg qhs prn (not taking);
Other meds:███████, Methylphenidate,███████, and buPROPion

**Patient Active Problem List**
Diagnosis
• ADHD

████████████████████████████████████████████████

Awodiya, Oluwamuyiwa O
MRN:███████

# **Exhibit SJ-04**

(Denise H. Unterman's medical notes)

 **KAISER PERMANENTE**.

**Oluwamuyiwa O Awodiya**
**4/18/2017 3:45 PM   Office Visit**
**MRN:** ▆▆▆▆▆

Description: **24 year old male**
Provider: **DENISE HAGLEY UNTERMAN LCSW**

Encounter #: **235065077**
Center: **LARGO**

Department: **Psychothe-Adlt Largo**

## Visit Summary

### PCP and Center

| Primary Care Provider | Phone | Center |
|---|---|---|
| Enaruna Mae (M.D.) Tychus, M.D. | 301-618-5500 | LARGO |

### Registration
Non- EpicCare Patient

### Reason for Visit
**ANXIETY**

### Diagnoses

| | Codes | Comments |
|---|---|---|
| **TRICHOTILLOMANIA**   - Primary | F63.3 | |
| **OBSESSIVE COMPULSIVE DISORDER** | F42.9 | |

## Progress Notes

**Unterman, Denise H (L.C.S.W.), L.C.S.W. at 4/18/2017  3:45 PM**

Status:  Signed
**\*\*Sensitive Note\*\***

Psychotherapy New Evaluation - Confidential

Pt asked to be called Mee-wah.  He said good-naturedly, "I give everyone 10 free passes to get my name right!'

S:   Chief Complaint: Pt has been pulling his eyelashes out and struggles to complete exams due to compulsive checking behavior.
      Symptoms Checklist for Major Depressive Episode

This SmartLink has not been configured with any valid records.

This SmartLink has not been configured with any valid records.

**Mental Status Exam:**
appearance: attire/dress is appropriate , eye contact is good, hygiene is good
behavior: normal, collaborative, engaged

Awodiya, Oluwamuyiwa O
MRN: ▆▆▆▆▆

**Progress Notes (continued)**

Unterman, Denise H (L.C.S.W.), L.C.S.W. at 4/18/2017  3:45 PM (continued)

mood: normal, stable, w/ full affective range
speech: normal in RTV
thought content: denies suicidal ideation, plan, or intent, denies homicidal
ideation, plan, or intent
thought process: coherent, logical, relevant
delusions: negative
hallucinations: negative
insight: good
judgment: good



HPI:  Pt reports onset of anxious feelings in HS w/ worsening in college around exams when he
started pulling out his eyelashes and chin hairs.  Initially he used his fingers but now uses tweezers
for greater precision.  Currently in 2nd year of medical school at Ross University where's he's doing
well but struggling w/ completing exams due to compulsively checking that he has completed
previous answers.  Also, when he's confident that he knows an answer, he nonetheless selects one
that "sounds more complicated" because he "can't believe the easy one is right".  Board exams are
coming up in a few months and he's very worried about undermining his score by not completing the
exam in the time allowed..  He pulls his eyelashes to the point where he no longer has any.  He's
researched his Sxs and is his today to "find out if something's wrong w/ me and what can be done."  I
shared his dx, explained trichotillomania and the difference between compulsive traits and compulsive
personality disorder.  We explored self-esteem issues, whether he considers himself intelligent, and
wondered together why he might not trust himself to know exams answers.  He expressed relief at
talking about his, admitting that he's always viewed himself as "stupid" because his mother frequently
told him that he was growing up.  His thought process is along the lines of, "If I think I know the
answer, it couldn't possibly be right."   I described CBT and shared some strategies that he can try
between now and his next visit, which he wants to hold off on till after his exam as he's consumed w/
studying.  Also, he didn't want to go to another site w/ earlier availability.
Psychiatric History: Anxiety dating to at least HS
Family Psychiatric History; Not obtained
Social History:  Pt is one of 2 children of Nigerian descent.  Raised by his mother.  Sister is also in
medical school.  He'll be residing w/ his mother for the next 2 years while doing clinical rotations in
Maryland.
Substance Abuse History: Denied
Tobacco Use:
History
Smoking Status
• Never Smoker
Smokeless Tobacco
• Not on file


Medical History (incl. Meds.):Patient Active Problem List:
ADHD

Awodiya, Oluwamuyiwa O
MRN: ▉▉▉▉▉▉

**Progress Notes (continued)**

**Unterman, Denise H (L.C.S.W.), L.C.S.W. at 4/18/2017  3:45 PM (continued)**

███████████████████████████████████████████████

Current Outpatient Prescriptions:
• DEXTROAMPHETAMINE-AMPHETAMINE 15 mg Oral Tab, Take 1 tablet by mouth 2 times a day, Disp: 60, Rfl: 0
• buPROPion 300 mg Oral 24hr SR Tab, Take 1 tablet by mouth daily, Disp: 90, Rfl: 1

███████████████████████████████████████████████

O:  General Appearance/Interview Behavior: Slender, friendly, good sense of humor, very bright, candid, intellectually curious
     Suicidal/Homicidal/Violent Ideation: Denied

A:  DSM IV Axis I: Trichotillomania
         Axis II: Compulsive Behaviors
         Axis III: See medical Hx
         Axis IV: compulsive Sxs
         Axis V (current/best in last year): 80

Is patient being considered for referral to Case Management Services?: no
(If yes, use current case management referral protocol).
Dual diagnosis?:  no



P:  We discussed the diagnosis, the reasonable options and following treatment plan.
Goal I: Anxiety Reduce the overall lever, frequency and intensity of the anxiety so that daily functioning is not impaired.

Anticipated achievement date: TBD

Additional Recommendation/Interventions:  CBT to begin in June.  Continue MM for ADHD.
Follow-up Appointment: 6/2/17 w/ Denise Unterman, LCSW-C

Electronically signed by Unterman, Denise H (L.C.S.W.), L.C.S.W.,4/20/2017  1:20 PM

**Medications**

**Infusion Orders**

Awodiya, Oluwamuyiwa O
MRN: ███████

# **Exhibit SJ-05**

(Davendra Sharma's Counseling Note dated 3-11-2016)

**Name:** Oluwamuyiwa O    **DOB:**                    **Student ID:**
Awodiya (M)

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                              Note Date: 03/11/2016 09:05 AM
[5597]
Pt. Phone:                    DOB:          (Age 23)

**Summary of note:** Anxiety State, Unspecified, Relationship Distress With Spouse or Intimate Partner
**Allergies:** No Entry
**Current Medications:** Ritalin 10mg Tablet, Ambien 5mg Tablet, Wellbutrin XL 300mg Extended-Release
Tablet, Diclofenac Sodium 75mg Delayed-Release Tablet, Losartan Potassium 25mg Tablet
**Semester:** Semester 5

**Progress:**



Despit running out of time passed his exams

Stopped his relationship with his facebook friend

Still talking to the All Saints girl

She visits his apratment

Seems to like him.Feels it has no future.

Mother is fine and is supportive

MSE

Mood is fine

*- Entered by Davendra Sharma on Mar-11-2016 09:05 AM*

**Assessment:**
1)Anxiety State, Unspecified - F41.9, 300.00
2)Relationship Distress With Spouse or Intimate Partner - V61.10

Stable
*- Entered by Davendra Sharma on Mar-11-2016 09:05 AM*

**Plan:**
*RX:* Ritalin 10mg Tablet (F41.9) Take 1 Tablet  As Directed Qty 90. No Refills.
Ritalin 5mg Tablet (F41.9) Take 1 Tablet  As Directed Qty 90. No Refills.

He has welbutrin 300 mg

For ritalin 15 mg tid
*- Entered by Davendra Sharma on Mar-11-2016 09:05 AM*

1 of 2

This document has been signed electronically.

RUSM 000132

# **Exhibit SJ-06**

(McMillan Cuffy's Counseling Note dated 3-11-2016)

**Name:**   Oluwamuyiwa O    **DOB:**                          **Student ID:**
              Awodiya (M)

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                         Note Date: 03/11/2016 02:27 PM
[5597]
Pt. Phone:                    DOB:           (Age 23)

**Summary of note:** Academic or Educational Problem, Other Problem Related to Psychosocial
Circumstances
**Allergies:** No Entry
**Current Medications:** Ritalin 5mg Tablet, Ritalin 10mg Tablet, Ambien 5mg Tablet, Wellbutrin XL
300mg Extended-Release Tablet
**Semester:** Semester 5

**Progress:**
**Followup**

Session content: Client reported that although he passed,  he did not do as well on mini 2. He said that
towards the end of the exam he lost his momentum and just circle questions without really thinking of the
answers.  He further reported that he blocked off his Ex on FB but was hoping that she would reach out
and inquire why he took her off his list of friends her but she did not.  He further admitted that he has had
the urge to go back and befriend her but did not because it would be too awkward and was not prepared
to have this conversation why he blocked her off fb.  He admitted during the session that having
female friends as part of his social network/support system is very important to him  and makes him
functional and the opposite is true for him; that when he does not have female friends he does not perform
at his best.  He requested two more sessions before the semester ends.

Clinical assessment: Academic difficulty

**Assessment:**
1)Academic or Educational Problem - V62.3
2)Other Problem Related to Psychosocial Circumstances - V62.89

**Plan:**
Counseling 1 Hour (V62.3)

Signed by: McMillan Cuffy on Mar/11/2016 02:27 PM

*Locked by: McMillan Cuffy on Mar/11/2016 02:27 PM*

1 of 1

This document has been signed electronically.

RUSM 000151

# Exhibit SJ-07

(Release of Information Consent Agreement)

# ROSS UNIVERSITY

Department of Behavioral Sciences – Counseling Center

*222 2455*

**Consent to Release Confidential Information**

| RELEASE OF INFORMATION CONSENT |
|---|
| ☐ **Introduction:** By signing this form, you are authorizing the Ross University School of Medicine's (RUSM) Counseling Center to release otherwise confidential psychological information to one or more people whom you designate. Please read carefully. If you have any questions about signing this document and/or would like a copy of this form, please ask and we will provide you this information. Please understand that you may end this Agreement at any time. |
| ☐ **I authorize the RUSM Counseling Center to: (Check all that pertain)** ☒ Discuss otherwise confidential information pertaining to my treatment ☐ Transmit a copy of my otherwise confidential health record ☐ Transmit a letter or treatment summary containing my otherwise confidential information |
| ☐ **I authorize the release of the information specified above to:** RUSM Administration To: Street Address: City, State and Zip Code: |
| ☐ **This information is released for the following purpose(s):** ☒ To facilitate treatment planning ☒ To provide information relevant to academic accommodations and/or medical leave of absence ☐ Other: |
| ☐ **If you have authorized us to discuss confidential information, specify the period during which we may communicate with the person(s) listed above, by checking the appropriate box below:** ☒ I authorize ongoing communication unless I revoke this consent. ☐ I authorize communication only until _____ (specify date). |
| ☐ **Other restrictions or limitations on information to be released:** Specify: ☒ No other limitations. |
| ☐ **Statement of Acknowledgement:** I understand that I do not have to agree to release confidential information, and that I may withdraw this consent at any time except insofar as action has already been taken in reliance thereupon. A facsimile of this form will be regarded as valid as the original. |

| *Muyina Awodiya* | Oluwamuyiwa Awodiya | 12/9/15 |
|---|---|---|
| Signature of Client | Client Printed Name | Date |
| *(signature)* | *McMillan Guiffre, M.Sc* | 12/9/15 |
| Signature of Counselor | Counselor Printed Name | Date |

RUSM 000168

# **Exhibit SJ-08**

(Defendant's Responses to Plaintiff's Requests for Admission)
Hereinafter, each Request No. are individually an "Admission No."

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: 0:18-CV-60482-KMM**

OLUWAMUYIWA AWODIYA,

        Plaintiff,

   v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE,

        Defendant.

_____

## RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION

    Defendant ROSS UNIVERSITY SCHOOL OF MEDICINE, by and through its attorneys

Seyfarth Shaw LLP, hereby submits its Response To Plaintiff's First Set of Requests for

Admission.

**REQUEST FOR ADMISSION NO. 1:**

    Admit that the formal legal name of the organization that operates RUSM is Ross
University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited.

**RESPONSE TO NO. 1:**

    Denied. The entity that operates Ross University School of Medicine (RUSM) is Ross

University School of Medicine, School of Veterinary Medicine Limited, a Dominican entity

different from Ross University School of Medicine, School of Veterinary Medicine (St. Kitts)

Limited, which is a Kittitian entity that operates Ross University School of Veterinary Medicine.

**REQUEST FOR ADMISSION NO. 2:**

    Admit that RUSM receives United States federal financial assistance through federal
student aid.

## RESPONSE TO NO. 15:

Defendant objects to this request because it appears to assume facts not in evidence,

including that Plaintiff was disabled, required accommodations to his disability(ies) during tests,

and requested such accommodations from RUSM. Subject to and without waiving that objection,

Defendant notes that it permitted Plaintiff to take the NBME CBSE a fifth time and denies

Request No. 15.

## REQUEST FOR ADMISSION NO. 16:

Admit that RUSM did not provide Plaintiff with extended testing time for the NBME
CBSE.

## RESPONSE TO NO. 16:

Admitted.

## REQUEST FOR ADMISSION NO. 17:

Admit that extended testing time was an available accommodation for the NBME CBSE
exam. (See attached Exhibit 10 at page 2).

## RESPONSE TO NO. 17:

Defendant admits that extended testing time for the NBME CBSE is an accommodation

sometimes provided to disabled students taking the exam and that Page 2 of Exhibit 10

references this possible accommodation. To the extent that Request No. 17 requests an admission

of anything else, it is objectionable because it is ambiguous, and Defendant is therefore unable to

admit or deny the assertion.

## REQUEST FOR ADMISSION NO. 18:

Admit that the decision to provide students with test accommodations for the NBME
CBSE is made by RUSM. (See attached Exhibit 10 at page 2).

## RESPONSE TO NO. 18:

Defendant admits that RUSM, not the NBME, is the entity that determines whether its

students require accommodations to a disability when taking the NBME CBSE and that this is

6

**REQUEST FOR ADMISSION NO. 25:**

Admit that Ross University School of Medicine and Ross University School of Veterinary Medicine are registered as the same corporation.

**RESPONSE TO NO. 25:**

Denied.

**REQUEST FOR ADMISSION NO. 26:**

Admit that RUSM asserts that "Title III of the Americans with Disabilities Act of 1990 ("ADA") does not extend to conduct occurring outside the United States, and it follows that it does not extend to the Defendant's activities in Dominica." (See Dkt. No. 30).

**RESPONSE TO NO. 26:**

Admitted.

**REQUEST FOR ADMISSION NO. 27:**

Admit that Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited with Adtalem Global Health, Inc., asserted that Title III of the ADA is applicable only in the United States and its territories. (See Galligan v. Adtalem Global Education, Inc. et al). (See also Archut v. Ross Univ. Sch. of Veterinary Med., CIVIL ACTION NO. 10-1681 (MLC) (D.N.J. Nov. 19, 2012)).

**RESPONSE TO NO. 27:**

Admitted.

**REQUEST FOR ADMISSION NO. 28:**

Admit that RUSM made the following statement on the admission requirements page of the RUSM website "It is the policy and practice of the University to comply with the Americans with Disabilities Act as applicable and practical in Dominica."

**RESPONSE TO NO. 28:**

Admitted.

**REQUEST FOR ADMISSION NO. 29:**

Admit that it is false that RUSM will comply with the Americans with Disabilities Act in Dominica.

46502448v.1

**RESPONSE TO NO. 29:**

Defendant objects to this Request because it is ambiguous (in that there are multiple

provisions in the ADA, some of which apply outside the United States under some circumstances

and some of which do not) and also apparently premised on the legal fallacy that Title III of the

ADA applies in Dominica. Subject to that objection, Defendant admits that RUSM is not

required to comply with Title III of the ADA in Dominica but also denies that it is "false" that its

conduct in Dominica would comply with the ADA if the statute were to apply there.

**REQUEST FOR ADMISSION NO. 30:**

Admit that it is false that the Americans with Disabilities Act is applicable to RUSM in
Dominica.

**RESPONSE TO NO. 30:**

Defendant objects to this Request because it is ambiguous (in that there are multiple

provisions in the ADA, some of which apply outside the United States under some circumstances

and some of which do not). Subject to this objection, Defendant admits that Title III of the ADA

does not apply to RUSM in Dominica.

**REQUEST FOR ADMISSION NO. 31:**

Admit that RUSM made a false statement regarding a material fact posted on the
admission requirements page of the RUSM website.

**RESPONSE TO NO. 31:**

Denied.

**REQUEST FOR ADMISSION NO. 32:**

Admit that RUSM had knowledge that the representation of the applicability and
compliance with the Americans with Disabilities Act in Dominica was false.

**RESPONSE TO NO. 32:**

Denied.

46502448v.1

DATED:  June 8, 2018

Respectfully submitted,

ROSS UNIVERSITY SCHOOL OF
MEDICINE

By: _____
Christina Forte Meddin
cmeddin@seyfarth.com
Brian Stolzenbach
bstolzenbach@seyfarth.com

SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, GA  30309-3958
Telephone:     (404) 885-1500
Facsimile:     (404) 892-7056

Attorneys for Defendant

16

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO: 0:18-CV-60482-KMM

OLUWAMUYIWA AWODIYA,

      Plaintiff,

  v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE,

      Defendant.

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## SECOND SET OF REQUESTS FOR ADMISSION

Defendant, ROSS UNIVERSITY SCHOOL OF MEDICINE, by and through its attorneys, Seyfarth Shaw LLP, and in response to Plaintiff's Second Set of Requests for Admission, states as follows:

### Preliminary Objection

Defendant objects to Plaintiff's Instructions 1-4, 14, and 18 to the extent they seek to impose more or different requirements than the applicable Federal Rule(s) of Civil Procedure and Local Rule(s) of the Court. Defendant will answer in accordance with those rules and not Plaintiff's Instructions.

Defendant objects to Plaintiff's Definitions 10 and 15 because they create ambiguity and may seek to impose requirements on Defendant that are inconsistent with applicable rules. Defendant will interpret the terms "you" and "your" to refer to Defendant and the term "its," when referring to Defendant, as Defendant alone.

Defendant will interpret the terms identified in Instruction 15 in accordance with standard English usage.

**REQUEST NO. 48:**

Admit that McMillan Cuffy is a counselor at RUSM.

**RESPONSE:**

Defendant admits that Mr. Cuffy is counselor who provides counseling services to RUSM students through the RUSM Counseling Center. To the extent the Request seeks the admission of anything more or different, Defendant denies the Request.

**REQUEST NO. 49:**

Admit that Dr. Davendranand Sharma is a psychiatrist at RUSM.

**RESPONSE:**

Denied.

**REQUEST NO. 50:**

Admit that Dr. Davendra Sharma is a professor at RUSM.

**RESPONSE:**

Admitted.

**REQUEST NO. 51:**

Admit that Dr. Davendra Sharma had knowledge of Plaintiff's ADHD. (See attached Exhibit 8.)

**RESPONSE:**

Admitted.

**REQUEST NO. 52:**

Admit that Plaintiff's Conners CPT3 Assessment Report was furnished by Plaintiff to the RUSM Counseling Center in January 2016.

2

**RESPONSE:**

Admitted.

**REQUEST NO. 58:**

Admit that extended testing time for the NBME CBSE is a reasonable accommodation for some disabled students that need extended testing time.

**RESPONSE:**

Admitted.

**REQUEST NO. 59:**

Admit that RUSM intended for prospective students to rely on the following statement posted on the Admissions Requirements page of the RUSM website: "It is the policy and practice of the University to comply with the Americans with Disabilities Act as applicable and practical in Dominica. No qualified individual with a disability will be denied access to or participation in services, programs, or activities of Ross University School of Medicine."

**RESPONSE:**

Defendant admits that its current website contains this statement, but

Defendant is without knowledge or information sufficient to admit or deny that the

website contained the same statement when Plaintiff applied to RUSM.

**REQUEST NO. 60:**

Admit that in 2015, the first-attempt residency attainment rate for RUSM students was 88%. (See *Institutional Outcomes* at https://medical.rossu.edu/student-consumer-information.html).

**RESPONSE:**

Admitted.

**REQUEST NO. 61:**

Admit that 91% of RUSM 2014-2015 graduates attained residency placements by July 1, 2016 after single or multiple USMLE exam attempts or residency placement attempts. (See *Institutional Outcomes* at https://medical.rossu.edu/student-consumer-information.html)[.]

**4**

46670927v.1

DATED:  June 13, 2018

Respectfully submitted,

ROSS UNIVERSITY SCHOOL OF
MEDICINE


By:  */s/ Christina Forte Meddin*
Christina Forte Meddin
cmeddin@seyfarth.com
Brian Stolzenbach
bstolzenbach@seyfarth.com

SEYFARTH SHAW LLP
1075 Peachtree Street, N.E., Suite 2500
Atlanta, GA 30309-3958
Telephone:   (404) 885-1500
Facsimile:   (404) 892-7056

46670927v.1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

OLUWAMUYIWA AWODIYA,                          CASE NO. 0:18-cv-60482-KMM-AOV

      Plaintiff,

v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

      Defendant.
_____/

## DEFENDANT'S RESPONSES AND OBJECTIONS TO
## PLAINTIFF'S THIRD REQUESTS FOR ADMISSION

Defendant Ross University School of Medicine, School of Veterinary Medicine Limited

("RUSM"), by counsel, hereby files its responses and objections to the Third Requests for

Admissions served by plaintiff Oluwamuyiwa Awodiya ("Plaintiff").

## RESPONSES AND OBJECTIONS

### Request No. 79

      Admit that Devendra Sharma was a psychiatrist at RUSM.

### Response:

      Admitted.

### Request No. 80

      Admit that William Owens is the Dean and Chancellor of RUSM.

### Response:

      Admitted.

### Request No. 81

      Admit that Bryan Hayse is an Associate Dean at RUSM.

**Response:**

Admitted.

**Request No. 82**

Admit that Matthew Stewart-Fulton is an Accommodations Coordinator at RUSM.

**Response:**

Admitted.

**Request No. 83**

Admit that Davendra Sharma had knowledge of Plaintiff's "Anxiety State, Unspecified."

**Response:**

RUSM admits that, on March 11, 2016, Dr. Sharma assessed Plaintiff with "Anxiety State,

Unspecified- F41.9, 300.00."

**Request No. 84**

Admit that William Owen had knowledge of Plaintiff's ADHD.

**Response:**

RUSM admits that, on June 12, 2017, an email was sent from Dr. Denise H. Unterman and

Dr. Earl John Mauricio to promotionsappeals@rossu.edu, advising Dr. Owen that Dr. Unterman

and Dr. Mauricio had been treating Plaintiff "for the past several months for ADHD and Obsessive

Compulsive Disorder."

**Request No. 85**

Admit that William Owen had knowledge of Plaintiff's OCD.

**Response:**

RUSM admits that, on June 12, 2017, an email was sent from Dr. Denise H. Unterman and

Dr. Earl John Mauricio to promotionsappeals@rossu.edu, advising Dr. Owen that Dr. Unterman

2

Dated: November 7, 2018

Respectfully submitted,

**AKERMAN LLP**
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, Florida 33131
Telephone: (305) 374-5600
Facsimile: (305) 374-5095

By: *s/Ryan Roman*
Michael C. Marsh
Florida Bar No. 0072796
michael.marsh@akerman.com
simone.tobie@akerman.com
Ryan Roman
Florida Bar. No. 0025509
ryan.roman@akerman.com
dorothy.matheis@akerman.com
Octavia M. Green
Florida Bar No. 119179
octavia.green@akerman.com
simone.tobie@akerman.com

8

46726449;4

# **Exhibit SJ-09**

(Dr. Bryan Hayse's faculty profile)

**ROSS UNIVERSITY**
SCHOOL OF MEDICINE

Alumni   Current Students   Gainful Employment   Student Consumer Info



**ADMISSIONS**   **MD PROGRAM**   **STUDENT LIFE**   **ABOUT**



🏠   MD Program   Faculty   BryanHayse

# BRYAN   HAYSE

ASSOCIATE DEAN, MEDICAL SCIENCES

Dr. C. Bryan Hayse has served as the Associate Dean, Medical Sciences Student Affairs at Ross University School of Medicine since 2015. Areas of oversight include academic advising, student-faculty mentoring, student professionalism and integrity, academic accommodations, counseling and psychological services, campus life, new and continuing student orientation, housing, and campus level financial aid, immigration, and registrar services. Throughout his career Dr. Hayse has worked in close partnership with faculty, fellow administrators, and students to establish several student centered initiatives focused on enhancing overall academic and personal development by empowering students to achieve life-long goals.

Dr. Hayse earned his bachelor's and master's degrees in science from Murray State University and doctorate in higher education leadership and policy from Vanderbilt University. Prior to arriving at RUSM, Dr. Hayse served in a variety of student affairs and faculty roles at Young Harris College, GA; Belmont University, TN; Centenary College of Louisiana; and Murray State University, KY.

**CONTACT INFORMATION**

**Bryan Hayse | Student Affairs**
Phone: 865-338-5719
bryanhayse@rossu.edu

 **AREAS OF EXPERTISE**

Student Affairs, Academic Advising, Student Conduct and Professionalism, Student Orientation and Transition, Residence Life and Housing,

 **EDUCATION**



**ROSS UNIVERSITY**
SCHOOL OF MEDICINE

2300 SW 145TH AVENUE, SUITE 200, MIRAMAR, FL 33027 ADMISSIONS: +855-MD-ROSSU EMAIL: <u>ADMISSIONS@ROSSU.EDU</u>



**CONTACT ROSS**   **REQUEST INFORMATION**   **EMPLOYMENT**   **PRIVACY POLICY**

Academic Catalog | Student Handbook

© 2018 Ross University School of Medicine. All rights reserved.

# <u>Exhibit SJ-10</u>

(Davendra Sharma's Counseling Note dated 12-09-2015)

**Name:** Oluwamuyiwa O **DOB:** ▮▮▮▮ **Student ID:** ▮▮▮▮
Awodiya (M)

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                           Note Date: 12/09/2015 04:29 PM
[5597]
Pt. Phone:                    DOB: ▮▮▮▮ (Age 23)

**Summary of note:** Academic or Educational Problem, Adjustment Disorders - With mixed anxiety and depressed mood
**Allergies:** No Entry
**Current Medications:** Diclofenac Sodium 75mg Delayed-Release Tablet, Losartan Potassium 25mg Tablet
**Semester:** Semester 1, Semester 5

**Progress:**
Saw Mr. Cuffy after he received a faliling grade for semester 5 and felt hopeless entertaining thoughts of ending his life.

I was called in to see him by Mr Cuffy



He admitted to feeling very sad about the failure.

He did not have a clear intent to self harm but felt the thoughts kept coming back to him about not living.

Felt he was treated unfairly because he failed by one point

No past repeats.

Additional stressors.

Poor relationship with his mother with whom he lives and feels she is closer to his sister but does not give him any emotional support.

Has abetter relationship with his father, who is separated from patient's mother.

Sister at Ross but they have a poor relationhsip as she does not understand him

He had a "relationship break up" this semester because the girl who has passed and is leaving had three affairs including one where he saw her going with a male student to his place to sleep over. When he had confronted her she said that she was going to go with the other student to spend the night.

He seems ambivalent about her as he says she does not understand why she does what she did.



He wanted to speak to the Dean about changing his grade.

He was advised to speak to the chair of promotions and student services.

At the end of the session yesterday he claimed to not have any intent to harm himself.

1 of 3

This document has been signed electronically.

RUSM 000125

**Name:**   Oluwamuyiwa O   **DOB:**   **Student ID:**
Awodiya (M)

**Diagnosis:**

---

Did not want his mother involved.

Was feeling sad but not severely depressed

Was not psychotic.

Was not suicidal or homicidal.

Came for follow with the counselor and myself today:

 Is trying to see if he can have his grade changed. EMt with student affairs

Also will write to appeal for promotion.

Tried to get his mother on the phone and left a message for her to call

Called Ryan Didier to see if we can gt him out earlier

MSE

He feels lonely

Denies wanting to harm himself but does not like the thoughts of sadness.

Feels sad about what has happened.

Claims Mum is supporitve and wants him to appeal. Makes him feel btter but she does not want him to repeat.

no delusions

No hallucinations

Mood seems better at the end of our session which Mr Cuffy sat in.

*- Entered by Davendra Sharma on Dec-09-2015 04:29 PM*

**Assessment:**
1)Academic or Educational Problem - V62.3
2)Adjustment Disorders - With mixed anxiety and depressed mood - 309.28

 Still adjusting to the reality of his failure
*- Entered by Davendra Sharma on Dec-09-2015 04:29 PM*

**Plan:**
to follow up daily

Spoke to Ryan about getting his Liat flight changed to Saturday to get him home

Left message for mother to call me on my cell or the counselor.

Need to talk to her with Miwa to let her know of the plan for him to repeat the semester.

2 of 3

This document has been signed electronically.

RUSM 000126

**Name:** Oluwamuyiwa O   **DOB:**            **Student ID:**
Awodiya (M)

**Diagnosis:**

---

lorazepam 0.5 mg nocte and prn.

Spoke with his mother who is supportive of him coming home earlier.

Dear Ryan

Thanks for agreeing to help as much as you can to have Mr. Awodiya get to San Juan on Saturday instead of his schedule 19th departure date.

He does not have the resources to make the flight change and would also need to have the South West ticket changed to return to Maryland.

I greatly appreciate your help as it is hard for him to be here and seeing his colleagues study for the Comp. when he knows he may have to repeat and the impact on his emotional health has been pretty bad.

This plan which his mother is aware of, for him to return earlier, would be of great value in his clinical care developed for him.

Regards

Dr. Sharma
*- Entered by Davendra Sharma on Dec-09-2015 04:29 PM*
Signed by: Davendra Sharma on Dec/09/2015 04:29 PM

*Locked by: Davendra Sharma on Dec/09/2015 04:29 PM*

This document has been signed electronically.

RUSM 000127

# Exhibit SJ-11

(McMillan Cuffy's Counseling Note dated 12-10-2015)

**Name:**  Oluwamuyiwa O  **DOB:**  6/20/1992  **Student ID:** ▮▮▮▮▮▮▮
Awodiya (M)

**Diagnosis:**

---

### RUSM Counseling Center
### P.O. Box 266
### Roseau, DM 11111
### (767)255-6553

Oluwamuyiwa O Awodiya (M)  Note Date: 12/10/2015 09:27 AM
[5597]
Pt. Phone:  DOB: 06/20/1992 (Age 23)

**Summary of note:** At 4:00 p.m, client was seen again with the consulting psychiatrist.  He was prescribed meds and part of his plan was to get him back home sooner than his scheduled 12/19/15 flight.  Dr. Sharma engaged Mr. Didier to assist with flight arrangements to get
**Allergies:** No Entry
**Current Medications:** No Entry
**Semester:** Semester 5

**Intake:**

**Subjective:**

**Objective:**

## Counseling Crisis Note

Contact start time:
Contact end time:

Referral Source:

Presenting Concerns:   Client returned to office after talking to Dr. Hayes in Student Affairs regarding his academic situation.  I subsequently received an email from Dr. Hayes requesting that we talk at some point re: the client.  After the meeting with Dr. Hayes, the client was very disappointed but stable.

Self harm/Suicide/Homicide Screen:  self harm ideation present

Treatment/Interventions: Supportive-Expressive Psychotherapy, cognitive coping techniques, feeling identification, safety planning, support, comments Using a CBT appraoch

Impressions/recommendations:  adjustment disorder with mixed emotions.

**Assessment:**
1)Academic or Educational Problem - V62.3
2)Adjustment Disorders - With mixed anxiety and depressed mood - 309.28

**Plan:**
Counseling Crisis (V62.3)

Signed by: McMillan Cuffy on Dec/10/2015 09:27 AM

*Locked by: McMillan Cuffy on Dec/10/2015 09:27 AM*

1 of 2

This document has been signed electronically.

RUSM 000141

# **<u>Exhibit SJ-12</u>**

(McMillan Cuffy's Counseling Note dated 12-13-2015)

**Name:** Oluwamuyiwa O Awodiya (M)   **DOB:** ▮▮▮▮   **Student ID:** ▮▮▮▮

**Diagnosis:**

---

### RUSM Counseling Center
### P.O. Box 266
### Roseau, DM 11111
### (767)255-6553

Oluwamuyiwa O Awodiya (M)    Note Date: 12/13/2015 03:28 PM
[5597]
Pt. Phone:    DOB: ▮▮▮ (Age 23)

**Summary of note:** Academic or Educational Problem, Persistent Depressive Disorder (Dysthymia)
**Allergies:** No Entry
**Current Medications:** No Entry
**Semester:** Semester 5

**Progress:**
**Followup**

Progress since last session: less severe symptoms

Session content: Client was seen on Friday for a follow up visit.  His mom made flight  reservations for him on LIAT to fly back on Sunday 12/13/15 but the hold on the ticket expired.  He has agreed to stay on the island until his original flight on 12/19/12. However, he is stable and doing well.  He denied having thoughts of harming himself.  After exhausting all avenues of getting his grades changed, he is at the point where he is accepting to come back here in January to repeat semester 5.

Clinical assessment: Minor depessive episode.

Overall Impression: stable
Appearance: casual
Attention and Concentration: good
Interpersonal: cooperative
Mood: depressed
Affect: sad
Thought process: normal
Judgment: fair

Suicide/self-harm risk: no risk
Insight: adequate
Reaction to session: cooperative
Additional Comments: Client will continue checking in with counseling on a daily basisi until he leaves the island.

**Assessment:**
1)Academic or Educational Problem - V62.3
2)Persistent Depressive Disorder (Dysthymia) - 300.4

1 of  2

This document has been signed electronically.

RUSM 000145

**Name:**  Oluwamuyiwa O  **DOB:**  ▮▮▮▮▮▮  **Student ID:** ▮▮▮▮▮▮▮
          Awodiya (M)

**Diagnosis:**

---

**Plan:**
Counseling 20 - 30 Minutes (V62.3)

Signed by: McMillan Cuffy on Dec/13/2015 03:28 PM

*Locked by: McMillan Cuffy on Dec/13/2015 03:28 PM*

2 of 2

This document has been signed electronically.

# **Exhibit SJ-13**

(McMillan Cuffy's Counseling Note Dated 1-11-2016)

**Name:** Oluwamuyiwa O Awodiya (M)  **DOB:**  [redacted]  **Student ID:** [redacted]

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)  Note Date: 01/11/2016 11:10 AM
[5597]
Pt. Phone:  **DOB:** [redacted] (Age 23)

**Summary of note:** see client in one wk
**Allergies:** No Entry
**Current Medications:** No Entry
**Semester:** Semester 5

**Progress:**
**Followup**

Session content: Client is stable and doing well.  He reported that he is on buproprion and doing very well. Client was assessed in the U.S. for ADHD;  he provided us with a copy of the results which are scanned in his file.  He is scheduled to take the TOVA next week.  He was advised to do an EKG and is also scheduled to see the psychiatrist next week.

Clinical assessment: Academic problems;  repeating semester 5.

Overall Impression: stable
Appearance: appropriate
Attention and Concentration: good
Interpersonal: cooperative
Mood: normal/stable
Affect: bright
Thought process: normal
Judgment: good

Suicide/self-harm risk: no risk
Insight: good
Reaction to session: active/eager

**Assessment:**
1)Academic or Educational Problem - V62.3

**Plan:**
Counseling 1 Hour (V62.3)
*Referral Orders:* Referral To Medical Clinic (V62.3)

Signed by: McMillan Cuffy on Jan/11/2016 11:10 AM

1 of 2

This document has been signed electronically.

# <u>Exhibit SJ-14</u>

(RUSM's Promotions Committee June 1, 2017 letter)

**Ross University**
**School of Medicine**

Office of the Registrar
2300 SW. 145ᵗʰ Ave., Suite 200
Miramar, FL. 33027
Phone 754-208-4591
Fax 732-509-4820
Registrar@RossU.edu



# ROSS UNIVERSITY
## SCHOOL OF MEDICINE

June 1, 2017

Oluwamuyiwa Awodiya
15005 Dahlia Drive
Bowie, MD 201721

Dear Oluwamuyiwa:

The Ross University School of Medicine Student Promotions Committee – Foundations of Medicine Sub-committee has reviewed your letter of appeal and academic history. After careful consideration, I regret to inform you the academic dismissal on April 13, 2017, is upheld.

If additional information has become available or if you believe university procedure wasn't followed, you may appeal this decision by submitting an appeal to the Dean. Appeal letters must state the reason for the appeal and be emailed to Dean Owen at PromotionAppeals@RossU.edu within 15 calendar days of the date on this notification letter, June 16, 2017. The Dean or his designee will make a final decision on each appeal within 15 calendar days of the Dean's receipt of the written appeal. Please refer to the RUSM Student Handbook for additional information regarding the appeals process.

Please be advised that if you are a recipient of federal student loans, RUSM must inform your lender(s) that you have not attended RUSM since the last day you attended classes. The impact of your status on your federal student loans will depend on your specific situation, applicable regulations and the terms and conditions of your loan(s). Please visit www.studentloans.gov to complete your exit interview as required by federal regulations.

Should you have questions or need additional assistance, please contact the Office of the Registrar at Registrar@RossU.edu.

Sincerely,

Niels Larsen, PhD
Professor, Department of Physiology and Biochemistry
Chair, Student Promotions Committee-Foundations of Medicine Sub-committee

cc:     Academic & Student Affairs
        Academic & Student Operations
        Student Finance
        Registrar

RUSM 000070

# **Exhibit SJ-15**

(Plaintiff's psychiatrist and psychotherapist's June 12, 2017 email to Dean Owen)

--------------- Original Message ---------------

From: [denise.h.unterman@kp.org]

Sent: 6/12/2017 1:47 PM

To: promotionappeals@rossu.edu

Subject: Oluwanuyiw Awodiya, Student I.D 

William F. Owen, M.D.

Dean, Ross University Medical School

Dear Dean Owen:

We are writing on behalf of Oluwanuyiw Awodiya, a student in your program.
We have been treating Mr. Awodiya for the past several months for ADHD
and Obsessive Compulsive Disorder. He has had symptoms of the latter for
the past 4-6 years but did not understand the nature of the diagnosis
until recently. We believe that the anxiety and checking rituals inherent
to this condition have been adversely affecting his academic performance
in medical school. Mr. Awodiya is currently in CBT therapy and is
acquiring strategies for managing his symptoms. He is considering
psychotropic medication, as well. He is very engaged in and committed to
treatment, dedicated to the pursuit of a career in medicine, and we hope
that his high level of motivation will be considered in the appeal
process.

Sincerely,

Denise H. Unterman, LCSW-C

Adult Psychotherapist

Earl John Mauricio, M.D.

Adult Psychiatrist

# **Exhibit SJ-16**

(RUSM's June 13, 2017 email to Plaintiff)

# Question Received: SubjectAppeal Dismissal Case #02149780

### Student Services <studentservices@rossu.edu>

Tue 6/13/2017 9:57 AM

To: Awodiya, Oluwamuyiwa <OluwamuyiwaAwodiya@students.rossu.edu>;

Thank you for your inquiry.

Your question for Case #02149780 has been received.

Case Details:
 Status: New
 Subject: Appeal Dismissal
 Department: Registrar
 Department Email: PromotionAppeals@rossu.edu
 Category 1: Promotion Appeals
 Category 2: General
 Date Created: 6/13/2017
 Last Updated: 6/13/2017

-----------------------------------------------------------------

Dear Dean Owen,

This email contains my appeal letter. As well as 4 screenshots of my NBMEs that I mentioned in the letter.

My psychotherapist and psychiatrist stated that they have sent a separate letter to you as well.

Sincerely,

Oluwamuyiwa Awodiya

██████████

-----------------------------------------------------------------

If you have any additional questions pertaining to this case you may either reply to this email or login to myRoss and navigate to askRoss.

ref:_00D80cFjT._5008011Pi7n:ref

# **Exhibit SJ-17**

(Plaintiff's Appeal Letter to Dean Owen)

Dear Dr. Owen,

Thank you and bless you for taking the time from your busy day to read my appeal letter. I am Oluwamuyiwa Awodiya and the purpose of this letter is to seek one more chance to take the NBME comp exam.

This year I was diagnosed with OCD. This finding for me was like a miracle. Not because I'm glad to have it, but because it explains so many parts of my life, financially, socially, and academically. There is something satisfying about knowing that I can take steps towards improving my quality of life, instead of feeling hopeless. Although OCD affects numerous aspects of my life, my objective is to keep this letter relevant to how OCD has influenced my academic performance.

I want to start by answering some questions that you may have, before I dive into my experience with my recent diagnoses. Why has the OCD started to affect me now? This has most certainly been something I have been dealing with since before I even knew what OCD really was, realistically for the last 6 years. Why have I waited so long to get help? Well if you look at my name, it may be obvious that I come from a very cultured family. Although I was born in America, my family is very Nigerian. Getting help for any emotional or behavioral imbalances would not look good for me and would likely be an embarrassment to my family. Honestly, I had rather try and deal with my "weird" feelings by myself than to risk people seeing me as crazy.

My biggest challenge with OCD is the extreme anxiety and urges that overwhelm me. I wish my anxiety was as easy as just washing my hands a million times but it's not that simple. Honestly, I don't fully understand everything about my OCD yet, but sometimes there isn't a solution to sooth my anxiety. Therefore, when I can't identify why I feel the way I do, I get hopelessly overwhelmed. Sometimes the solution is not even logical, like pulling out my eyelashes. I really do not like to explain my OCD, simply because it is one of the hardest things to convey; and even harder for many people to understand.

I'm the student who never finished an exam on time. I was compelled to back track my answers just to make sure they didn't disappear 5 seconds after I went to the next question. I had rather pick a wrong answer because of the fear that it may actually be the right answer. These are just some of the ways that OCD has influenced my academic performance.

Ever since I was diagnosed almost 2 months ago, I have been working extremely hard to improve myself now that I know what this is, what this was, and what I'm up against. I cannot tell you that I can fix this overnight, but I can tell you that progress can be made.

I have not and will not be fighting this challenge by myself. I am getting enormous help from my psychotherapist Denise H Unterman, (L.C.S.W.) and psychiatrist Earl J Mauricio, MD. I have already started CBT and will continue to do so **indefinitely**. They will also send a letter directly to you on my behalf.

The progress so far has been noticeable. I took my last COMP exam on March 30th, 2017 and my score was a 60. The day before my COMP, March 29th, 2017, I took a paid NBME online (form 13) and scored a 58% (84 incorrect answers). Knowing the high validity of these exams, I knew the exam indicated that I would fail COMP again. A month after my diagnose and getting help with my OCD I took another paid NBME online (form 15) and improved quite a bit. On April 25th, 2017, I scored a 67.5% (65 incorrect answers). I did not include this into my last appeal because I did not know how the promotion committee would feel about a borderline passing score, even if I significantly improved. Four days ago, June 8th, 2017, I took another paid NBME online (form 17) and scored a 72% (56 incorrect answers). These exams were taken under standard (timed) pace. I hope that these monthly increases in my score can adequately display that I can beat my OCD and continue to improve. I just need one more chance to take COMP to prove that I can do it.

Along with this letter, I will include the screenshots of each of my NBME exams mentioned above. I recorded myself taking NBME form 15 but the video was about 5 hours long so it cannot be emailed. But it is available if needed. The letter from my psychotherapist and psychiatrist will come directly from them.

I promise Dean Owen, that I will not let you down if I am granted one more chance to take COMP. I will continue my therapy for the rest of my medical career; and I promise that I will not let my OCD handicap me now or in the future ever again.


Sincerely, thank you and God bless you,

Oluwamuyiwa Awodiya

# Exhibit SJ-18

(Dean Owen's June 29, 2017 letter to Plaintiff)



**ROSS UNIVERSITY**
SCHOOL OF MEDICINE

**William F. Owen, Jr. MD, FACP**
*Dean and Chancellor*
2300 SW 145th Avenue, Suite 200, Miramar, FL 33027
(t) 754-208-4743
(f) 754-208-4744
WOwen@RossU.edu

June 29, 2017

Oluwamuyiwa Awodiya
15005 Dahlia Drive
Bowie, MD 201721

Dear Oluwamuyiwa:

I have carefully reviewed your academic record, your appeal of the Student Promotions Committee's recommendation for dismissal, and your pre-matriculation credentials. I concur with the Promotion Committee's decision to dismiss you from Ross University School of Medicine effective April 13, 2017.

I hope you do not let this detour keep you from achieving your goal of helping people in need.

Sincerely,

William F. Owen, Jr., MD, FACP
Dean and Chancellor

Cc:   Sandra Herrin, University Registrar
      Gary Belotzerkovsky, Associate Dean, Academic & Student Operations
      Jennifer Dennis, Senior Director of Student Finance
      Danielle McDonald, Assistant Director of Clinical Student Conduct and Development
      Dr. Vijay Rajput, Associate Dean, Academic & Student Affairs

# **Exhibit SJ-19**

(RUSM's Admissions Requirements section of its website)

# Internet Archive Collection Report

**Page Title**

Admissions Requirements

**URL**

http://www.rossu.edu/medical-school/admissions/getstarted.cfm

**Original Collection/Capture Location**

https://web.archive.org/web/20121031221133/http://www.rossu.edu/medical-school/admissions/getstarted.cfm

**Collection Date**

October 31, 2012 22:11:33 UTC

**Collected by**

Internet Archive (Wayback Machine)

**Accessed by**

Oluwamuyiwa Awodiya

**Accessed Date**

June 3, 2018 at 6:02PM EST



ROSS UNIVERSITY
SCHOOL OF MEDICINE

**Welcome to Admissions**

**Contact Admissions**

**Apply to Ross**

**Attend an Information Seminar**

**Request Information**

**Admissions Requirements**
International Students
Transfer Applicants

**Meet Some Ross Students**

**Tuition and Fees**

**Financial Aid Information**

**Application and Deposit Fees**

**Scholarships**

**Partnerships**

Home / Admissions / Admissions Requirements

## Medical School Admissions Requirements

The Admissions Committee of the faculty gives serious consideration to all candidates showing the potential to meet the rigorous academic requirements of a highly structured curriculum. To be considered for admission to Ross University, our Admissions Committee will look at a variety of factors in determining suitability for our program including:

- Undergraduate cumulative GPA
- GPA in required pre-medical course work
- Performance in advanced biology and chemistry courses
- Competitiveness of undergraduate school and curriculum
- Graduate work and records
- MCAT scores
- Personal essay
- Pre-med committee evaluations
- Letters of recommendation from academic and/or professional references
- Extracurricular activities and accomplishments
- Work history and professional or volunteer experiences
- Personal qualities
- Personal interview



Applicants who have completed their undergraduate studies in countries having an educational system different from that of the United States or Canada will be evaluated on their merits but will be expected to have completed a pre-medical curriculum comparable to that described above

### The Personal Interview

Ross University strongly believes in the value of a personal interview with prospective students. Applicants whose credentials are judged to be indicative of the potential for successful completion of the prescribed medical school curriculum will be invited for an interview, generally within two to four weeks after initial application materials have been received. The interview helps assess your overall personal and academic background, maturity, adaptability, character, aptitude, and most importantly, your motivation to become a doctor; however, applicants are advised that being granted an interview is not a guarantee of acceptance, though it does play a significant part in the decision by the Admissions Committee

### MCAT

Ross University requires all scores for the Medical College Admission Test (MCAT) to be submitted by the applicant prior to the interview. Ross University's MCAT institutional code number is 906. To learn more about the MCAT visit www.aamc.org/students/mcat/. Inquiries concerning application test dates, and locations for the MCAT should be directed to:

Medical College Admission Test Registration
The American College Testing Program
PO Box 4056
Iowa City, IA 52243
319-337-1357

### Pre-requisites

Ross University requires at least 90 credits of college work, but strongly recommends that the applicant complete four years in a liberal arts college before entering medical school. Pre-requisite courses cannot be more than 10 years old. The coursework should include the following prerequisite courses:

### Inorganic or General Chemistry
Two semesters of Inorganic or General Chemistry (eight semester hours) with laboratories

### Organic Chemistry
Two semesters of Organic Chemistry (eight semester hours) with laboratories

### General Biology or Zoology
Two semesters of Biology or Zoology (eight semester hours) with

Two semesters of Biology or Zoology (eight semester hours) with laboratories

**Physics**
Two semesters of Physics (eight semester hours) with laboratories

**Mathematics**
(College-level, preferably to include Calculus or Statistics)
One semester of Mathematics (three semester hours)

**English**
Two semesters of English (six semester hours)
Canadian students may satisfy the English requirements using 2 semesters of University humanities where essays composed at least 40% of the overall mark, those holding a grade 13 English credit in Ontario, International Baccalaureate English and Advanced Placement English.

**Application Checklist**
All letters of recommendation and transcripts must be mailed to Ross University, Office of Admissions, 630 US Highway 1, North Brunswick, NJ 08902-3311. A complete application consists of the following documents.

- A completed Ross University School of Medicine application.

- Official transcript(s) from each college and/or professional school attended (transcripts must include the required minimum of 90 credits, and all prerequisite courses must be either completed or in progress). Degree-granting transcripts must contain a graduation date.

- Two official letters of recommendation, which become the property of Ross University. One academic letter from a pre-medical professor acquainted with the applicant's academic ability or a recommendation from a college pre-health advisory committee; one from a physician acquainted with the applicant's health care work experience, if applicable. All letters must be on proper letterhead with contact information included, and sent directly from the recommender to the Ross University Admissions Office.

- Medical College Admission Test (MCAT) scores.

- Official report of scores from the TOEFL, if applicable.

- A passport-sized photo (optional).

- $100.00 USD application fee (non-refundable).

**Notification**
Persons whose applications are incomplete, or whose qualifications are not acceptable, will be so notified. The Admissions Committee's decision is communicated by letter to the applicant after the interview.

**Application Deadline**
Since we operate under rolling admissions, there are no application deadlines. We continue to accept applications for each semester until all seats are filled. In the event that all seats are filled before an applicant receives a decision, the application is automatically considered for the next available semester.

**Policy on Non-discrimination**
The University does not discriminate on the basis of race, color, national origin, gender, religion, disability, or age in admission to, access to, treatment in, or employment in its programs and activities. It is the policy and practice of the University to comply with the Americans with Disabilities Act as applicable and practical in Dominica. No qualified individual with a disability will be denied access to or participation in services, programs, or activities of Ross University.



Ross University School of Medicine, a subsidiary of DeVry Medical International.
P.O. Box 266 Roseau, Commonwealth of Dominica, West Indies.
Tel: 767 445 5355 | Fax: 767 445 5358



| School of Medicine | Admissions | Students | Contact Information |
|---|---|---|---|
| Curriculum | Apply | Academic Calendar | Toll Free: 855-MD-ROSSU |
| Academic Catalog | Information Seminar | Student Handbook | Email: Admissions@RossU.edu |
| Accreditation | Request Viewbook | Housing | |
| Clinical Affiliations | Tuition and Fees | MyRoss Login | Office Address: 630 US Highway 1 |
| Life on Dominica | Financial Aid | Student Services | North Brunswick, New Jersey 08902 |
| | Admissions Criteria | Library | |
| | | Ross Book Store | Contact Ross |
| | | Ross Online Store | Careers at Ross |
| | | | Site Map |

# Exhibit SJ-20

(Excerpts of Adtalem's [formally known as Devry] 2012 Annual Report)

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
## Form 10-K

(Mark One)

☑

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
## OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended: June 30, 2012**

**OR**

☐

## TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
## OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from          to**

**Commission file number: 1-13988**

# DeVry Inc.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **DELAWARE** | **36-3150143** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3005 HIGHLAND PARKWAY** | **60515** |
| **DOWNERS GROVE, ILLINOIS** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**Registrant's telephone number; including area code:**
**(630) 515-7700**

**Securities registered pursuant to section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered: |
|---|---|
| Common Stock $0.01 Par Value | NYSE, CSE |
| Common Stock Purchase Rights | NYSE |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑   No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☑

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑                                                    Accelerated filer ☐
Non-accelerated filer ☐ (Do not check if a smaller reporting company)        Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☑

State the aggregate market value of the voting and non-voting common equity held by nonaffiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the Registrant's most recently completed second fiscal quarter.  Shares of common stock held directly or controlled by each director and executive officer have been excluded.
December 31, 2011 - $2,600,610,356

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date.
August 24, 2012 — 64,123,380 shares of Common Stock, $0.01 par value

### DOCUMENTS INCORPORATED BY REFERENCE

Certain portions of the Registrant's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on November 7, 2012, are incorporated into Part III of this Form 10-K to the extent stated herein.

### *DeVry Medical International*

DeVry Medical International operates three institutions:
- Ross University School of Medicine confers the Doctor of Medicine (M.D.) degree;
- Ross University School of Veterinary Medicine confers the Doctor of Veterinary Medicine (D.V.M.) degree; and
- American University of the Caribbean School of Medicine confers the Doctor of Medicine (M.D.) degree.

Together, the three schools had 5,944 students enrolled in the May 2012 semester.

### *Ross University School of Medicine*

Since 1978, Ross University School of Medicine has been providing high quality medical education to prospective physicians. Ross University School of Medicine has graduated over 9,200 physicians during its three decades of service, and these graduates practice medicine in the US, Canada and Puerto Rico. The mission of Ross University School of Medicine is to prepare highly dedicated students to become effective, successful physicians. Ross University School of Medicine accomplishes this by focusing on imparting the knowledge, skills, and values required for its students to establish a successful and satisfying career as a physician.

Ross medical students complete a four-semester (approximately 16 months) Foundations of Medicine curriculum in modern classrooms and laboratories at a campus located in Dominica. The four semesters are followed by a one-semester course entitled Advanced Introduction to Clinical Medicine at the Dominica campus, the Ross clinical location in Miami or at an affiliated hospital facility in Saginaw, Michigan. After students successfully complete Step 1 of the U.S. Medical Licensing Examination™, which assesses whether medical school students understand and can apply scientific concepts that are basic to the practice of medicine, they complete the remainder of the 10-semester program by participating in clinical rotations under Ross University direction, and conducted at 75 affiliated teaching hospitals or medical centers affiliated with accredited medical education programs in the United States.

Ross' medical educational program is comparable to the educational programs offered at U.S. medical schools. Ross' program consists of three academic semesters per year — beginning in January, May and September — which allows the medical students to complete their basic science instruction in less time than they would at a U.S. medical school. The program prepares students for general medical practice and provides the foundation for postgraduate specialty training, which is primarily received in the United States.

### *Ross University School of Veterinary Medicine*

Since its founding in 1982, Ross University School of Veterinary Medicine has graduated more than 2,900 veterinarians. The mission of Ross University School of Veterinary Medicine is to prepare highly dedicated students to become effective, successful veterinarians in the United States.

Ross veterinary students complete a seven-semester pre-clinical curriculum in a technologically advanced campus in St. Kitts. This program is structured to provide a veterinary education that is comparable to educational programs at U.S. veterinary schools. After completing their pre-clinical curriculum, Ross veterinary students enter a clinical clerkship lasting approximately 48 weeks under Ross University direction at one of 22 affiliated U.S. Colleges of Veterinary Medicine. At both the Medical and Veterinary schools, students are introduced to clinical experiences and clinical skills early in their respective curriculums.

### *American University of the Caribbean School of Medicine*

On August 3, 2011, DeVry acquired the American University of the Caribbean School of Medicine ("AUC") which was founded in 1978. AUC confers the Doctor of Medicine degree and its campus is located in the country of St. Maarten. Over 4,500 graduates have received AUC M.D. degrees and are licensed and practicing medicine throughout the world.

AUC medical students complete a two-year basic sciences program taught at AUC's St. Maarten campus, followed by two years of clinical sciences taught at affiliated hospitals in the United States and England. AUC's educational program is comparable to the educational programs offered at U.S. medical schools.

The acquisition of AUC was consistent with DeVry's growth and diversification strategy, increasing its presence in high quality medical and healthcare education and expanding its academic offerings at the post-baccalaureate level. DeVry was attracted to AUC because of its highly regarded faculty, commitment to academic excellence, and an accomplished network of alumni. In addition, AUC has strong partnerships with residency placement hospitals across the United States.

### *Medical and Healthcare*

#### *DeVry Medical International*



The Ross University School of Medicine and Ross University School of Veterinary Medicine focus their marketing efforts on attracting highly qualified, primarily U.S. and Canadian applicants, with the motivation and requisite academic ability to complete their educational programs and pass the United States Medical Licensing Exam and the North American Veterinary Licensure Examination, respectively. Each institution's marketing effort includes direct e-mail marketing, webinars, visits to undergraduate campuses to meet students and their pre-med/pre-vet advisors, targeted direct mail campaigns, information seminars in 40 major markets throughout the United States, Canada, and Puerto Rico, alumni referrals, a national undergraduate poster campaign, radio advertisements in select markets and print ads in major magazines and newspapers.

Ross University School of Medicine and Ross University School of Veterinary Medicine each employ regional admissions representatives in 12 cities throughout the U.S. and in Ontario, Canada, who seek out and pursue students interested in our two programs. Senior Associate Directors of Admission and Associate Directors of Admission recruit, interview, admit, and enroll all new students to each of our three entering cohorts. The successful applicant must have all prerequisite sciences (with labs), mathematics, and English courses as dictated by the admissions committee of both the medical and veterinary schools. All candidates for admission must interview with an associate director and all admission decisions are made by the admissions committees of the medical and veterinary schools.

AUC focuses its marketing efforts on attracting highly qualified, primarily U.S. applicants, with the motivation and ability to complete their medical programs and pass the applicable licensure examinations. Approximately one-third of AUC's applicants come from referrals, with the remainder primarily from general advertising, including print and Internet media, AUC's website and visits by admissions advisors to U.S. undergraduate institutions. AUC employs admissions advisors who are located at AUC's administrative offices in Coral Gables, Florida and remotely throughout the United States and Toronto, Canada.

#### *Chamberlain College of Nursing*

Chamberlain utilizes varied marketing approaches to generate interest from potential students. Chamberlain recruiters visit Arizona, Illinois, Indiana, Missouri, Ohio, Florida, Texas, Georgia and Washington, D.C. metro area high schools, employ targeted direct mail, cultivate alumni referrals and participate in information seminars and career fairs. Chamberlain holds open house events to attract local prospective students, and advertises on the Internet, in healthcare career publications, in newspapers, and on the radio. Chamberlain's extensive informational website generates nearly one-third of all prospective student applications.

Chamberlain employs regional admissions representatives who arrange for student interviews and campus tours. Admission requirements include a high school diploma or GED; minimum cumulative grade point average requirements vary depending upon the program. Applicants to the pre-licensure programs must pass the Chamberlain standard pre-admission exam to be eligible for admission. Admissions decisions are made by an admissions committee.

#### *Carrington College and Carrington College California*

Carrington College and Carrington College California each utilize varied marketing approaches to generate interest from potential students. Admissions advisors visit high schools in Arizona, California, New Mexico, Nevada, Oregon, Washington and Idaho. Each institution also conducts local advertising campaigns using broadcast media, print media, targeted direct mail and the internet. In addition, each institution holds open house events for local prospective students, cultivates alumni referrals, and participates in information seminars and career fairs.

### *Becker Professional Education*

Becker Professional Education markets its courses directly to potential students and to selected employers, primarily the large global, national and regional public accounting firms. Alumni referrals, direct mail, print advertising, e-mail, digital and social media advertising and a network of student representatives at colleges and universities across the country also generate new students for Becker's review courses. The Becker web-site is another source of information for interested applicants.

Becker Professional Education has relationships with more than 2,000 public accounting firms, corporations, government agencies and universities. Becker delivers its CPA review courses on about 100 college campuses, recruiting students attending those institutions. Becker also is the preferred provider of CPA review for most of the country's largest public accounting firms, partnering with 99 of the top 100 public accounting firms, including each of the Big 4 Firms.

# Exhibit SJ-21

(Excerpts of Davendra Sharma's deposition transcript)

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:18-cv-60482-KMM

OLUWAMUYIWA AWODIYA,

Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

Defendant.

_____/

350 E. Las Olas Blvd.
Fort Lauderdale, Florida
October 16, 2018
12:59 p.m.

THE DEPOSITION OF

DAVENDRANAND SHARMA

Taken on Behalf of the Plaintiff

Pursuant to Notice of Taking Deposition

Commencing at 12:59 p.m.

15eb13da-d2c1-4023-bda4-c358c06300a(

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

---

**Page 2**

1  APPEARANCES:
2
   On behalf of Plaintiff:
3
   15005 Dahlia Drive
4  Bowie, MD 20721
   (240)602-1836
5  BY: OLUWAMUYIWA AWODIYA, PRO SE, ESQ.
6
   On behalf of Defendant:
7
   AKERMAN, SENTERFITT
8  1 SE 3rd Avenue, 25th Floor
   Miami, FL 33131-1714
9  (305)374-5600
   ryan.roman@akerman.com
10 BY: RYAN ROMAN, ESQ.
         -and-
11       OCTAVIA GREEN, ESQ.
12
13 ALSO PRESENT:
14 VALARIE BOMAR, ESQ.
   ADTALEM GLOBAL EDUCATION
15
16 REPORTED BY:
17 KELLY A. ESPOSITO
   ALPHA & OMEGA REPORTING SERVICES, INC.
18 1776 E. Sunrise Boulevard, First Floor
   Ft. Lauderdale, FL 33304
19 954.523.6422
20         * * * * *
21       STIPULATIONS
22       It is stipulated and agreed by and between
23 counsel for the respective parties that:
24       Reading and subscription of the deposition
25 by the witness are not waived.

---

**Page 3**

1          I N D E X
2
   Examination                    Page
3
4  Direct     By Mr. Awodiya:      4
   Cross      By Mr. Roman:       75
5  Redirect   By Mr. Awodiya:     83
6          PLAINTIFF EXHIBITS
7  No.                            Page
8  DE-01    Counseling Note dated       8
            12.14.15
9  DE-02    Doctor's Note dated 12.30.15  9
   DE-03    Counseling Note dated       17
10           2.12.16
   DE-04    Counseling Note dated       18
11           3.11.16
   DE-05    Release of Information      30
12           Consent
   DE-06    Counseling Note dated       70
13           12.9.15
14         DEFENSE EXHIBITS
15 No.                            Page
16 DE-07    Counseling Note dated 4.5.16  79
17
18
19
20
21
22
23
24
25

---

**Page 4**

1  Thereupon:
2          DAVENDRANAND SHARMA
3  a witness named in the notice heretofore filed,
4  being of lawful age and having been first duly
5  sworn, testified on his oath as follows:
6      THE WITNESS:  I so swear.
7          DIRECT EXAMINATION
8  BY MR. AWODIYA:
9     Q.  Hello.  Please state your name your full
10 name for the record.
11    A.  Davendranand Sharma.
12    Q.  Thank you.
13        May I refer to you as Dr. Sharma?
14    A.  Sure.
15    Q.  Dr. Sharma, my name is Oluwamuyiwa
16 Awodiya, and I'm the plaintiff in this case against
17 Ross University School of Medicine.
18        During this deposition, I will in most
19 part refer to myself as "plaintiff" as "Muyiwa" or
20 as "Awodiya".
21        For the record, do you understand that if
22 I say, "plaintiff, Muyiwa" or "Awodiya," that I am
23 refer to myself?
24    A.  Yes.
25    Q.  Additionally, let me tell you some ground

---

**Page 5**

1  rules for this deposition.  And if you have any
2  questions, you can ask me.  First, you are under
3  oath and have sworn to tell the truth.  The effect
4  of that oath is the same as if you were testifying
5  in court.  If you have a question that you don't
6  understand, tell me you don't understand it, and
7  I'll rephrase it as often as necessary, so you're
8  comfortable that you understand the question you're
9  answering.
10    A.  Yes.
11    Q.  It's also very important that you answer
12 my questions through spoken word, not through facial
13 expressions or gestures.  Please refrain from
14 answering questions with sounds like uh, uh-huh,
15 uh-uh, or words that may not get transcribed
16 accurately.  You must actually say a word.  If you
17 mean yes, say yes, not uh-huh.
18        Also, please allow any questions and any
19 objections to be fully stated before you speak.  The
20 court reporter cannot take down more than one person
21 speaking at the same time.  Otherwise, the record
22 will be jumbled and the questions and answers will
23 be disjointed.  Ross lawyers -- Ross University's
24 lawyers may make objections to questions that I ask
25 you.  They are objections for the judge to consider

2  (Pages 2 to 5)

15eb13da-d2c1-4023-bda4-c358c06300a0

10/16/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      Davendranand Sharma

---

Page 6

1   later. You are still required to answer the
2   question unless you are instructed not to by their
3   lawyers.
4           Everything that is said is being taken
5   down by the court reporter verbatim. You have an
6   opportunity to read the deposition transcript and
7   make corrections you believe are necessary. If you
8   make changes in your testimony that are inconsistent
9   with the answers given during the deposition, I will
10  be entitled to comment on those discrepancies at
11  trial to question your truthfulness.
12          Do not guess when providing responses.
13  Instead, please provide your best estimate based on
14  your recollection. If you need to take a break at
15  any time, please let me know. All I ask is that we
16  do not take a break while there's a question
17  pending.
18          Are you here today under the influence of
19  any medication or suffering from any physical,
20  mental, or emotional condition that would affect
21  your ability to hear my questions or to give
22  truthful answers?
23      A. No.
24      Q. Okay. Dr. Sharma, when did you first hear
25  about this lawsuit?

---

Page 7

1       A. I think it was an e-mail that came around
2   April 2016 from Ross University's attorneys office
3   saying that you --
4           MR. ROMAN: Hold on one second. I'm just
5       going to object to the extent that your
6       testimony would call for any disclosure of
7       attorney/client communication. Any
8       communication you had with an attorney for
9       Ross, I'll object on the basis of privilege,
10      and I'll instruct you not to answer those
11      questions. You can testify about when you
12      talked to certain people, who you talked to,
13      but not the substance of communications with
14      lawyers.
15          THE WITNESS: Sure. I understand.
16          So April 2016.
17  BY MR. AWODIYA:
18      Q. How long have you been working for Ross
19  University?
20      A. From 1993.
21      Q. And what is your job position at Ross
22  University?
23      A. I'm a professor of behavior sciences and
24  consultant psychiatrist for health services.
25      Q. I'm going to show you this document marked

---

Page 8

1   Exhibit DE-01.
2           (Thereupon, the referred-to document was
3           marked by the court reporter for
4           Identification as Plaintiff's Exhibit
5           DE-01.)
6   BY MR. AWODIYA:
7       Q. Can you confirm that this is your
8   counseling note for plaintiff dated December 14th,
9   2015?
10      A. Yes.
11      Q. In this counseling note, you put "Academic
12  or educational problem" next to "Summary of note;"
13  is that correct?
14      A. Yes.
15      Q. In the same counseling note, you also
16  wrote that you started screening plaintiff for ADHD;
17  is that also correct?
18          It should be under "Plan."
19      A. Yes.
20      Q. Did you screen plaintiff for ADHD because
21  he informed you that he needed extended testing time
22  for his exams?
23      A. No.
24      Q. Then why did you screen plaintiff for
25  ADHD?

---

Page 9

1       A. Because he was having academic problems.
2       Q. What type of academic problems?
3       A. Problems with passing his exams, as far as
4   I remember.
5       Q. Did he tell you why he was having problems
6   passing his exams?
7       A. Going into memory bank, you know, but if I
8   remember the situation, it was about not performing
9   at your best -- the plaintiff's best.
10      Q. When plaintiff returned to Dominica in
11  January 2016 after the winter break, did he give you
12  documents about his ADHD that was assessed in
13  Maryland?
14      A. Not that I recall.
15      Q. Not that you recall?
16      A. Yeah. Not that -- it may have been given
17  to the counseling center, but --
18      Q. Please see Exhibit DE-02.
19          (Thereupon, the referred-to document was
20          marked by the court reporter for
21          Identification as Plaintiff's Exhibit
22          DE-02.)
23  BY MR. AWODIYA:
24      Q. And please take time to read that in it's
25  entirety, if you can.

---

3  (Pages 6 to 9)

15eb13da-d2c1-4023-bda4-c358c06300aa

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

## Page 10

1       MR. ROMAN:  And I'll just make an
2    objection for the record that I don't believe
3    this is a document we've seen yet in this case.
4    So I'll just make that objection.  And I also
5    see there are redactions to certain portions.
6    So we would want the opportunity to see an
7    unredacted version so that we understand fully
8    what this document represents.
9       THE WITNESS:  Is there a page 3?  Oh,
10   here.  Page 3.  I got it.  Good.
11   BY MR. AWODIYA:
12      Q.  You've read it?
13      A.  Uh-huh.
14      Q.  Okay.  Do you remember receiving this
15   document when plaintiff returned back in
16   January 2016?
17      A.  No.
18      Q.  No?
19      Can you read out the date on the top of
20   this document?
21      A.  30th of December, 2015.
22      Q.  And this is during the Christmas break,
23   right?
24      A.  Yeah.
25      Q.  On this document it says, "School

## Page 11

1    counseling said that they are going to put me on a
2    stimulant; they said I was inattentive."
3       A.  School counseling said they are going to
4    put you on?
5       Q.  A stimulant.
6       A.  Yes.  Yes.
7       Q.  "They said I was inattentive."
8       A.  Yes.
9       Q.  Is that an accurate statement?
10      A.  Yes.
11      Q.  So before I went to break, you told
12   plaintiff that you thought he was inattentive?
13      A.  Yes.
14      Q.  On the document that says, "page 3" --
15      A.  Uh-huh.
16      Q.  -- can you read where it says, "He is
17   returning back to med school"?
18      A.  Okay.  I read it.
19      Q.  Okay.  What it reads is -- it says, "He is
20   returning back to med school on January 8th, 2016."
21      A.  Uh-huh.
22      Q.  "He wonders if he can manage his,"
23   redacted, "and inattentive/cognitive via
24   counseling/psychotherapy which he plans to pursue
25   while he is in the Caribbean/Dominica."

## Page 12

1       A.  Yes, I see it.
2       Q.  Under that it says, "The patient reports
3    the following concerns related to his
4    attention/concentration."
5       Now, under here are numerous ways that the
6    doctor has noted plaintiff's symptoms.
7       Do you -- is that a correct statement?
8       A.  Yes.
9       Q.  This document also says, "Constantly has
10   difficulty sustaining attention to task at work or
11   in school."  It says, "Constantly has difficulty
12   with tasks requiring persistence or organization.
13   Constantly distracted by noise or activity.
14   Constantly forgetful in daily activities, for
15   example, difficulty remembering appointments or
16   obligations."
17      Did you notice any of these symptoms in
18   plaintiff?
19      A.  When?  When I first saw you?
20      Q.  In any of your counseling sessions.
21      A.  Yes.
22      Q.  So would you agree that you observed that
23   plaintiff's ADHD affected his ability to perform
24   well on his exams?
25      A.  Well, remember, we didn't diagnosis you

## Page 13

1    with ADHD in December.  So what I saw was evidence
2    of ADHD that required, you know, testing and
3    confirmation.
4       Q.  And what was that evidence?
5       A.  The symptoms you just went through, this
6    list that is there.
7       Q.  Okay.  So just to be clear, you noticed
8    that plaintiff was experiencing these symptoms on
9    page 3 of Exhibit DE-02?
10      A.  Yes.  The symptoms you listed.
11      Q.  The symptoms --
12      A.  From "The patient reported following
13   concerns" to "difficulty remembering appointment or
14   obligations."
15      MR. ROMAN:  I'll just object, because I'm
16   not sure it's clear what time frame we're
17   talking about at this point.
18   BY MR. AWODIYA:
19      Q.  When did you notice these symptoms?
20      A.  I think from the first time I saw the
21   plaintiff, though, it wasn't for primarily academic
22   problems.
23      Q.  Was this December 2015?
24      A.  December 2015.
25      Are we finished with this one?

4  (Pages 10 to 13)

15eb13da-d2c1-4023-bda4-c358c06300a0

10/16/2018         Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.         Davendranand Sharma

---

Page 14

1    Q.  One more question on that document.
2        If you noticed those symptoms, why are
3    they not listed in your counseling records?
4        A.  In which counseling records?
5        Q.  The counseling records that Ross produced,
6    it didn't mention anything of what you witnessed.
7    It just kind of – it makes it seem – in my
8    opinion, it makes it seem as if you – the school
9    arrived to ADHD randomly or the diagnosis was just a
10   diagnosis.  There was no investigation into it.
11       From your – from – from your – from
12   Exhibit DE-01 –
13       A.  Wait.  Wait.  Sorry.  It's confusing.
14   It's like three questions going.  You're saying –
15   remind me of the first question.  You say, why was
16   it not – let me clarify.
17       Why was it not picked up in your initial
18   meeting or at some point we did not report it as a
19   problem?
20       Q.  Let me rephrase.
21       A.  Okay.
22       Q.  If you noticed that plaintiff was
23   experiencing these symptoms --
24       A.  Uh-huh.
25       Q.  – when you first met him in

---

Page 15

1    December 2015, why are they not listed inside of
2    your counseling notes --
3        A.  I gotcha.
4        Q.  – in December 2015?
5        A.  So I don't know, because I have to look at
6    those notes.  Are you talking about this set or all
7    the notes?
8        Okay.  If we're talking about this set,
9    then it actually has assessment of academic
10   problems.  That was not the primary problem that the
11   person – that the plaintiff was referred to me for.
12   That was not the primary problem I was supposed to
13   deal with.  And the person had already been seen by
14   the counselors.  I wasn't the primary person.  I was
15   the specialist to help the plaintiff with depressive
16   issues related to his break up – romantic break up.
17       Q.  I understand.
18       A.  With concerns about other problems, like
19   self-harm, and so on.  So that was my primary duty,
20   to help the plaintiff with those problems.  In the
21   meeting with the plaintiff, I recognized there were
22   other problems --
23       Q.  Thank you.
24       A.  – with academics.
25       Q.  Thank you.

---

Page 16

1        Okay.
2        A.  All right?
3        Just to be clear to your question as to
4    why we did not do anything, we actually recommended
5    assessment for ADHD in December while the plaintiff
6    was going back home to recover from the emotional
7    breakup situation.
8        Going too fast?
9        THE COURT REPORTER:  You're awesome.
10       THE WITNESS:  You're awesome typing fast.
11   Off the record.
12       So we actually started a process of
13   helping the plaintiff with the academic
14   problems, as we helped the plaintiff with the
15   relationship problem.  And I think we did help
16   with that.
17       And then, we started testing the patient
18   for ADHD.  And then, we also have the plaintiff
19   going home early.  So I think the university
20   did show responsibility for picking up the
21   diagnosis that was not made throughout the
22   plaintiff's life until he was in his 20s when
23   he came to Ross.
24       So that's the story I would support for
25   the plaintiff.

---

Page 17

1        Q.  Thank you.  Thank you very much.
2        Please see Exhibit DE-03.
3        (Thereupon, the referred-to document was
4        marked by the court reporter for
5        Identification as Plaintiff's Exhibit
6        DE-03.)
7    BY MR. AWODIYA:
8        Q.  What is the date on this document?
9        A.  12th of February, 2016.
10       Q.  On that day, did plaintiff tell you that
11   his ADHD was adversely affecting his ability to
12   complete his exams?
13       A.  There's nothing in the record.  I wouldn't
14   remember that, but it's not documented that what you
15   said was what you told me.
16       Q.  Let's refer to parts of this document to
17   see if it can help you recall.  In this document, is
18   it correct that it says – next to "Summary of
19   Note," you put "Attention Deficit Disorder Without
20   Mention of Hyperactivity"?
21       A.  Yes.
22       Q.  Does it also say that plaintiff "did not
23   feel right for the last mini"?
24       A.  Yes.
25       Q.  What is the connection between those two?

---

5  (Pages 14 to 17)

15eb13da-d2c1-4023-bda4-c358c06300a8

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

---

Page 18

1    Why is it summarized as attention deficit
2  disorder without mention of hyperactivity, and then,
3  mentions his mini?
4    A.  So the summary means that you have now
5  carried a new diagnosis or a diagnosis of attention
6  deficit that's been confirmed.  "Did not feel right
7  for the last mini" would be probably what you were
8  saying in your words.  So you would more know what
9  you meant by that, you know.  If you asked for my
10 interpretation, it could be many things, like you
11 were not feeling well prepared, you didn't study
12 enough, you know.  So it's just speculation.  But
13 those would be what you said, "did not feel right."
14    Q.  Okay.  Please see Exhibit DE-04.
15    (Thereupon, the referred-to document was
16    marked by the court reporter for
17    Identification as Plaintiff's Exhibit
18    DE-04.)
19 BY MR. AWODIYA:
20    Q.  Is this your counseling note for
21 plaintiff?
22    A.  Yes.
23    Q.  And what's the date on this document?
24    A.  11th of March, 2016.
25    Q.  Did plaintiff tell you that he was running

---

Page 19

1  out of time to complete his exams in the time
2  allowed?
3    A.  It says, "Despite running out of time
4  passed his exams."
5    So that would be, most likely, a notation
6  to what you said, that you ran out of time, but you
7  passed.
8    Q.  On this day, did plaintiff – did
9  plaintiff ask for extended testing time?
10    A.  Nothing recorded here about asking for
11 extra time.
12    Q.  Do you recall?
13    A.  No.
14    Q.  On the same counseling note, you put
15 "Anxiety State, Unspecified," and you prescribed
16 more Ritalin; is that correct?
17    A.  Correct.
18    Q.  Okay.  So this document states that
19 plaintiff was running out of time and you added a
20 new diagnosis to your notes?
21    A.  Uh-huh.
22    Q.  And gave him more Ritalin?
23    A.  Uh-huh.
24    Q.  On that date, did you believe that both
25 plaintiff's ADHD and anxiety significantly limited

---

Page 20

1  his ability to complete his exams in the time
2  allowed?
3    A.  From this note, I can't say that.  What
4  the note is pointing to is that you had a
5  diagnosis – the plaintiff had a diagnosis of ADHD,
6  was started on stimulant meds in February, is coming
7  for a follow-up, and is continuing with his
8  stimulant meds along with the Wellbutrin.  It
9  doesn't have anything about the plaintiff asking for
10 extra time.
11    Q.  Considering all of your counseling notes
12 and the symptoms you observed of plaintiff's
13 attention and concentration, did you believe that
14 his ADHD and anxiety significantly limited his
15 ability to complete his exams in the time allowed?
16    A.  I would agree ADHD in itself can affect
17 academic performance, and it's recorded here that
18 you were running out of time.
19    Q.  Do you believe that plaintiff's ADHD,
20 specific to him, was significantly limiting his
21 ability to complete his exams in the time allowed?
22    A.  Yes.
23    Q.  Did you also believe that he needed
24 extended testing time?
25    A.  I wouldn't be able to interpret that.  I

---

Page 21

1  believe that everybody is entitled to extra time,
2  according to the regulations of the school, that has
3  the diagnosis of ADHD.  It's a disability that
4  allows students apply to the Office of
5  Accommodations for extra time.  It's in the
6  student's handbook.
7    Q.  So based on the school's policy and
8  plaintiff's counseling sessions with you, you
9  believed that he needed extended testing time?
10    MR. ROMAN:  I'll just object.  I believe
11    that misstates the prior testimony.
12    THE WITNESS:  Sorry?
13    MR. ROMAN:  I just objected for the
14    record, because I thought it misstated the
15    prior testimony.
16    You can answer, if you understand the
17    question.
18 BY MR. AWODIYA:
19    Q.  Let me rephrase.
20    A.  That's okay.  Because – repeat what you
21 said there.  Sorry.
22    Q.  Based on your counseling sessions with the
23 plaintiff, and based on the school policies, do you
24 believe that plaintiff needed extended testing time?
25    A.  The thing is, it's not my belief that I

6  (Pages 18 to 21)

15eb13da-d2c1-4023-bda4-c358c06300a0

10/16/2018        Awodiya, Oluwamuyiwa v: Ross University School of Medicine et al.        Davendranand Sharma

---

Page 22

1    can talk to. I can only treat the plaintiff and get
2    him better with his ADHD. The need for extra time
3    is not my determination. It is available, according
4    to the regulations of the university. It is the
5    student, who has the diagnosis, who needs to request
6    it, if he thinks that he needs extra time, because
7    not every student with a diagnosis of ADHD requests
8    extra time. So we can only advise a student that
9    accommodations are available, if they reach to the
10   accommodation office and request it. You
11   understand?
12        It's not for me to tell the student, who
13   has ADHD, that they must, because they need it, they
14   should go. You understand?
15        It is my duty to let the student know that
16   there is regulations that provide extra time if they
17   request it.
18        Q. So let me ask you this.
19        A. Uh-huh.
20        Q. Is it correct that you're trying to say
21   that the school would act independently in relation
22   to your own belief of the student's need?
23        A. No, it's not my belief of the student's
24   need for extra time, you know. It's the student's
25   need for, one, treatment, and need -- the student

Page 23

1    has to need the extra time. It is not for me to
2    know that they would need it, because many students
3    do not ask for extra time for one reason or the
4    other.
5        Q. What language do you think -- let me
6    rephrase.
7        You were informed that plaintiff was
8    running out of time on his exams, correct?
9        A. Yes. It's there.
10       Q. And you also noticed that -- that his
11   ADHD -- let me rephrase.
12       Connect the symptoms you saw plaintiff
13   experiencing with his ADHD with him running out of
14   time, because to me it seems like that is the
15   plaintiff informing --
16       A. Okay. Let me -- they're all connected.
17   Symptoms lead to diagnosis of ADHD. ADHD has with
18   it problems in managing time. That is why ADHD is
19   afforded extra time by the Office of Accommodations,
20   which considers it a disability, all right,
21   according to the American Disability Act.
22       It's a condition, which we support
23   students, who have ADHD, for extra time.
24       Does that help you?
25       So we have no problem with a student

Page 24

1    requesting accommodations for extra time.
2        Q. Okay. I think I understand.
3        So let me ask you this. If a student
4    doesn't request an accommodation, but the school
5    notices that he needs an accommodation, do you think
6    the school is liable?
7        MR. ROMAN: Objection to the extent it
8    calls for a legal conclusion since Dr. Sharma
9    is not a lawyer.
10   BY MR. AWODIYA:
11       Q. Let me rephrase.
12       If you notice that a student needs an
13   accommodation, but he doesn't request an
14   accommodation --
15       I'm going to come back to it. I lost my
16   train of thought a little bit.
17       A. You want a break? I could use an extra
18   cup of coffee.
19       MR. AWODIYA: Let's take a break and go
20   off the record.
21       (Whereupon, a break was taken from 1:33 to
22   1:40 p.m.)
23   BY MR. AWODIYA:
24       Q. Did plaintiff tell you that -- let me
25   rephrase.

Page 25

1        Did plaintiff tell you that Matthew
2    Stewart-Fulton denied plaintiff's request for
3    accommodation?
4        A. I don't recall that.
5        Q. Do you know why plaintiff never received
6    test accommodations from Ross University?
7        A. Our counseling center record that I have
8    in my documentation, in my notation, doesn't show
9    that the plaintiff applied for accommodation.
10       Q. So outside of the documents, you don't
11   remember any conversations with plaintiff?
12       A. I remember a conversation recently about
13   the deposition here. Prior to that, I believe there
14   was a conversation about getting the documentation
15   you wanted from the -- our counseling center, and we
16   directed you to Shannon Evans in Knoxville.
17       Q. In Dominica you don't remember any of the
18   conversations you had with plaintiff?
19       A. Like what?
20       I mean -- about applying for
21   accommodation?
22       Are you saying I don't remember any of the
23   conversations?
24       Q. Well, because a couple of times you said,
25   it's not in the document, it's not in the counseling

7  (Pages 22 to 25)

15eb13da-d2c1-4023-bda4-c358c06300a0

10/16/2018       Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.       Davendranand Sharma

Page 26

1    record, and therefore, you can't recall.
2          Do you recall any information that was not
3    in the documents?
4          A.  I recall a lot of — your history, your
5    medical history, your concerns about your emotions,
6    your relationship difficulties, your problems with
7    passing the exams.  I recall a lot of those.  But
8    specific words or conversations, I don't.  I
9    certainly don't remember you specifically saying you
10   applied for accommodation.
11         Q.  Okay.  Let's go to the relationship thing.
12         Is it correct that you believe plaintiff's
13   relationship problems caused him anxiety?
14         A.  Yes.
15         Q.  Do you believe that that anxiety — at
16   that time, in Dominica, did you believe that his
17   anxiety was also affecting his exams in addition to
18   the ADHD?
19         A.  Yes.
20         Q.  Do you think that his anxiety contributed
21   to him running out of time on his exams in Dominica?
22         A.  It could.  It's just speculation, because
23   it's one of the factors that can affect academic
24   performance.  Sure, it could have affected
25   performance.

Page 28

1    don't give it from the clinic, from the counseling
2    services.
3          Q.  But you would give information to —
4          A.  Yes.  We pass the records.
5          Q.  And so, how would you help these students?
6          Would you recommend, based on their
7    documentation and the symptoms you observed, that
8    they get testing accommodations?
9          A.  Part of the counseling intake and the
10   screening for ADHD is every student is advised that
11   accommodation is available and that they have to
12   apply for it if they want it.  We don't encourage.
13   We don't force.  We just say to the students, "It's
14   your option.  It's available."
15         Not every student wants it.  Some — not
16   every student would want accommodation despite
17   having the diagnosis of ADHD, which can give them
18   the accommodations.
19         Q.  If a student wanted accommodations, and
20   you passed along the information to Ross University
21   administration, would you recommend in those
22   situations that they get academic accommodations?
23         A.  Absolutely, yes.
24         Q.  So if a student came to you and said he
25   was running out of time, do you think that — if the

Page 27

1          Q.  Have you helped other students to get test
2    accommodations at Ross University?
3          A.  Yes.
4          Q.  Compared to plaintiff, have other students
5    with less documentation of ADHD received
6    accommodations at Ross University?
7          A.  There have been students with the
8    diagnosis — they may have less documentation, but
9    everyone has the diagnosis adequately diagnosed,
10   including you.
11         Q.  When you say, "may have less," less in
12   what aspect?
13         A.  Accommodation is not my portfolio.  I can
14   only send the documentation to the accommodations
15   office, what we have, and they would receive
16   accommodation.  So based on the accommodations
17   office assessment that all the documents are in
18   place.
19         So your question is relating to yourself.
20   You have — you have good documentation, in my
21   opinion.  Other students may have had one less test
22   done, but still with a good diagnostic report of
23   ADHD.  So they would be given accommodations.
24         But they have to fulfill the accommodation
25   office's — accommodation is not my portfolio.  We

Page 29

1    student told the academic -- if the student told the
2    accommodation coordinator he was running out of time
3    on his exams, would that constitute informing him
4    the need of more time on his exams?
5          A.  If the student told the accommodations
6    office.
7          Q.  Yes.  The point I'm trying to express here
8    is that students don't necessarily know the specific
9    language, according to the ADA or to the
10   Rehabilitation Act, what constitutes a request.
11   They simply may say that they need help some way,
12   that I'm running out of time on exams, I'm not
13   completing exams.
14         A.  Uh-huh.  I understand.
15         Q.  Does a student need to expressly request
16   and say "accommodations" in order to get
17   accommodations?
18         A.  Yes, they have to.  It's always done by
19   the counseling service part of our process when we
20   make the diagnosis of ADHD.  It's called "standards
21   practice" or "best practices."
22         Every person who is diagnosed with ADHD is
23   guided to the student handbook that there is
24   accommodations available.  The process is very
25   straightforward.  They need to go to the

8  (Pages 26 to 29)

15eb13da-d2c1-4023-bda4-c358c06300a0

Page 30

1    accommodations office, and then, that -- what
2    happens then is, they're interviewed by the
3    accommodations officer. That is not for us. He
4    does it -- he or she does an interview of the
5    student. And if he's satisfied that there's
6    evidence of a disability, the student shows him the
7    fact that they have a diagnosis of ADHD, the student
8    then makes the accommodation request on the form
9    that the accommodations office has, and the student
10   would ask us to submit his or her records to --
11   that's the process.
12       Q. So once they ask you to submit their
13   documents --
14       A. Yes.
15       Q. -- to --
16       A. The accommodations office.
17       Q. That is when the obligation is triggered?
18       A. Yes. That's when we can only release the
19   student's records; only after that process is
20   completed, the process which I just outlined, where
21   the student is the one that must make the request.
22       Q. Please see Exhibit DE-05.
23           (Thereupon, the referred-to document was
24           marked by the court reporter for
25           Identification as Plaintiff's Exhibit

Page 31

1    DE-05.)
2    BY MR. AWODIYA:
3        Q. Is this the document you were talking
4    about?
5        A. This is the document about release of
6    information. The document about requesting
7    accommodations is not this document. This Exhibit,
8    DE-05, is not the request for accommodation.
9        Q. But this is the document for the
10   counseling center to send the information?
11       A. That's correct.
12       Q. Okay. Did you send any of plaintiff's
13   information to Ross University's administrators?
14       A. Not me. I didn't send anything.
15       Q. Do you know if anyone else did?
16       A. I wouldn't know for sure, but I believe a
17   request was made for the release of your
18   accommodation [sic], but this was not in that time.
19   This was more recently when the plaintiff had left
20   the university and returned to the U.S. for the
21   comprehensive shelf.
22       Q. Is it correct that the document for the
23   release --
24       A. Uh-huh.
25       Q. -- to Ross University administration was

Page 32

1    agreed upon in December 2015?
2        A. No. There's no evidence that there was a
3    document requesting accommodation.
4        Q. Not requesting accommodation.
5           Requesting that the counseling center send
6    the documentation --
7        A. No, there is no -- there's no evidence of
8    a request for sending a record.
9        Q. -- in December 2015.
10       A. There's a request for sending information
11   about the plaintiff's return to the U.S. for
12   emotional support in December 2015. We received --
13   in December 2015, as far as my records show, my
14   recollection, there's no request for release for
15   accommodations. You understand?
16       Q. Can you please read on that form what it
17   says under "This information is released for the
18   following purpose"?
19       A. "To facilitate treatment planning" and "to
20   provide information relevant to accommodations or
21   medical leave of absence."
22       Q. Under that --
23       A. And then, there is "Other" not ticked.
24           So the boxes are ticked for "facilitate
25   treatment planning" and "to provide information

Page 33

1    relevant to accommodation academic accommodation
2    and/or medical leave of absence."
3        Q. Under that, what is the next box checked?
4        A. "I authorize ongoing communication unless
5    I revoke this consent."
6        Q. Did you not feel that there was an ongoing
7    obligation?
8        A. For?
9        Q. The purpose of this document for academic
10   accommodations -- for information relevant to
11   academic accommodations?
12       A. No. I said it just now. No. This
13   document was done in the context of the plaintiff
14   needing to return to the USA early, because the
15   plaintiff had emotional crisis and there were
16   concerns about the patient's safety. So the
17   counseling service, including myself, and the
18   university administrator supported the plaintiff
19   returning early, and that involved changing the
20   plaintiff's return ticket which the plaintiff
21   couldn't afford at this time.
22           So I wrote to the university's
23   administrative director asking them to support the
24   student, to return him early, because the
25   plaintiff's mother was very worried about the

9  (Pages 30 to 33)

15eb13da-d2c1-4023-bda4-c358c06300a0

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 34

1    plaintiff.
2        So this document was signed for that
3    purpose, so we can give information about the
4    plaintiff's emotional health and request an early
5    return. This document was not for releasing
6    information about accommodation, because there was
7    no request for accommodations from me in
8    December 2015.
9        To make it more clear, there was no
10   diagnosis at that time. It was just at the start of
11   preliminary testing, screening for ADHD. So there
12   was no way documents could have been sent to support
13   accommodations for ADHD, because the diagnosis was
14   not made. It makes no sense.
15       Q. So when the diagnosis was made and
16   plaintiff did not revoke his consent, would that not
17   be considered ongoing?
18       A. Ongoing to what?
19       Q. Well, you said the documents didn't exist
20   at that time.
21       A. The diagnosis didn't exist.
22       Q. But the diagnosis existed after the winter
23   break?
24       A. Yes. Yes.
25       Q. Why weren't those records sent?

Page 35

1        A. Because, as I said, we do not release
2    information unless we request -- we receive a
3    request either from the student, who has the
4    diagnosis, and that has to be in writing, not a
5    verbal request, or it has to come from the
6    accommodations office in writing under a protected
7    e-mail that the -- that they are going through the
8    process of supporting a request for accommodation.
9    There was no request made for accommodations. So
10   that's why I said, there's no request. We cannot
11   give out information to the accommodations office.
12   Then we would be sued for giving information beyond
13   the scope. The scope of this document was only to
14   get the plaintiff back home early.
15       Q. Give me one second. I had something and
16   it's coming back to me.
17       A. Take your time.
18       Q. Oh. You said that a request has to be in
19   writing?
20       A. Yes.
21       Q. What if it's oral?
22       A. No.
23       Q. It doesn't count?
24       A. It doesn't count to the accommodations
25   office, as far as I know, and that's their -- that's

Page 36

1    their portfolio. I can only say, from my
2    experience, a verbal request is not a request for
3    accommodations.
4        Q. Would you say that when the diagnosis was
5    made --
6        A. Uh-huh.
7        Q. -- and after you observed all the
8    symptoms, that Ross University had possession of all
9    the necessary documents of plaintiff's ADHD and the
10   symptoms of his ADHD?
11       A. Yeah, we had -- we had made a diagnosis.
12   The diagnosis was done, and we accepted, and the
13   student was -- the plaintiff was being treated.
14       Q. Earlier you said that students with less
15   documentation have received -- you said earlier
16   students with less documentation of ADHD have
17   received accommodation action compared to plaintiff.
18       A. Uh-huh.
19       Q. Do you think that is fair?
20       MR. ROMAN: I'll just object as to vague
21   as to what "fair" means.
22   BY MR. AWODIYA:
23       Q. Let me rephrase.
24       Do you think that plaintiff was treated
25   equally?

Page 37

1        A. Well, I don't think there was a question
2    of equal treatment, if the plaintiff didn't apply
3    for accommodations. If the plaintiff had applied
4    and did not get it, I would say, seems something is
5    not right. We would have to look at why that was
6    not given. And that's not my portfolio. I can only
7    say that the documentation that the plaintiff had
8    appeared to me to be adequate for accommodations.
9        Q. So you believe that plaintiff had adequate
10   documentation of his ADHD to get test
11   accommodations?
12       A. That's me. I believe that. Again, that
13   doesn't mean the plaintiff would get accommodations,
14   because the final say is the accommodations office.
15   It doesn't mean that I believe it's correct. The
16   accommodations office have their own regulations,
17   and they could override my request, because I'm the
18   one -- or the doctors make the request for
19   accommodation, which is time-and-a-half. You get
20   extra time. We actually put it we want the student
21   to get the accommodation, but that doesn't mean they
22   get it.
23       Q. So even though you think that plaintiff
24   needs extra time, it's out of your hands as to
25   whether he gets extra time for his exams?

10  (Pages 34 to 37)

15eb13da-d2c1-4023-bda4-c358c06300a0

10/18/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 38

1      A.  No.  I go back to that question, and I
2  hope you can understand.  I cannot determine whether
3  you need or the plaintiff needs.  The plaintiff has
4  to determine that.  Many students do not ask for
5  accommodation with the diagnosis.
6      Q.  So why did you prescribe him Ritalin?
7      A.  Because that's my duty, to treat the
8  condition.  So I'll give you an example.  A student
9  may have the diagnosis, is on treatment, the
10  performance is much better, the student chooses not
11  to apply for accommodation.
12      Q.  So if the student --
13      A.  Which was the plaintiff's case.
14      Q.  In plaintiff's case?
15      A.  Medication helped the plaintiff to perform
16  better, do well on the exams.  So the question about
17  if I if felt there was a need for extra time does
18  not arise.  It does not arise, because it is not me
19  that can say the plaintiff needs the extra time.
20  It's the plaintiff, especially after receiving
21  treatment, that determines I would also like to get
22  extra time.
23      Q.  Did you feel -- at that time, in Dominica,
24  is it correct to say that you believed that his ADHD
25  significantly limited his ability to complete exams

Page 39

1  on time and that's why you prescribed the Ritalin?
2      A.  That's a very long question.  Do you mind
3  going back over it, because I'm not sure which one
4  I'm answering to?
5      Q.  No problem.  Let me rephrase it.
6      Did you prescribe the Ritalin to plaintiff
7  because his ADHD significantly limited his ability
8  to complete his exams on time?
9      A.  So I -- let me answer -- it's two
10  questions in one.  Maybe you could split it up.
11      So did I prescribe the treatment for the
12  ADHD?  Yes.  I treat ADHD with stimulant medication
13  primarily.
14      The second part of the question, did I
15  prescribe the stimulant because the student needed
16  extra time?  That is part of the problem that ADHD
17  has, that it causes the student to take longer.  So
18  the medication would help that.  So, yes, that's
19  correct.
20      And by helping the student to be better,
21  the need for extra time is often curtailed.
22      Q.  So are you trying to say that because of
23  medication it takes the question of required
24  extended testing time out of the equation?
25      Let me rephrase.

Page 40

1      In relation to plaintiff, are you saying
2  that -- I forgot it.  Sorry.  I lost the second half
3  of that --
4      A.  Thought?
5      Q.  Of the thought, yeah.
6      A.  Take your time, because --
7      Q.  I can't get it back.
8      A.  Do you want a break again?
9      Q.  No, I don't think a break will help.  Let
10  me just go back to my --
11      So is it correct to say that even if you
12  observed that plaintiff needed extended testing
13  time, that's not your role?
14      Your role is to treat it with medication?
15      MR. ROMAN:  I'll just object.  I believe
16  it misstates prior testimony.
17      THE WITNESS:  Yes.  Yes.  It's the same
18  thing we went over.  I can't determine the
19  need.  It's not my opinion about that.  The
20  patient -- the person has to determine if they
21  feel, despite medication, they still want extra
22  time.  It's not my determination.
23  BY MR. AWODIYA:
24      Q.  Is it correct that plaintiff was on
25  Ritalin in February 2016?

Page 41

1      A.  Correct.
2      Q.  Is it also correct that plaintiff told you
3  that he was running out of time on his exams a month
4  later, in March 2016?
5      A.  It's recorded.  We have it recorded, yeah.
6      Q.  That's a yes?
7      A.  Yes.
8      Q.  Do you know if Ross University's
9  faculty -- do you know if Ross University's faculty
10  handbook contains any information related to
11  accommodating disabled students?
12      A.  Faculty handbook or student handbook?
13      Q.  Faculty.
14      A.  I don't recall reading into the faculty
15  handbook.  So I can't answer that question.  I know
16  the student handbook has it.  It's not relevant for
17  the faculty handbook to have it.  It's a student
18  issue, not the faculty that applies for it.
19      Q.  If plaintiff informed another professor at
20  RUSM that he needed accommodations --
21      A.  Uh-huh.
22      Q.  -- is that enough to trigger the inquiry
23  into whether he needs an accommodation?
24      A.  I can't answer that, because that's not --
25  that's speculating on my part.  I don't know what

11   (Pages 38 to 41)

15eb13da-d2c1-4023-bda4-c358c06300ae

Page 42

1    would lead to this — what did you call it, the
2    process?
3        Q.   The inquiry.
4        A.   The inquiry, yeah.
5        Q.   Let me rephrase.
6        A.   The only thing I know leads to
7    accommodation is the student has to apply for it.
8        Q.   I just want to clarify something. Are you
9    saying that the student informing the school of the
10   need for accommodations is different than requesting
11   an accommodation?
12       A.   They're both the same thing. So the
13   request or the informing the school has to be
14   specifically to the accommodations officer and has
15   to be done in writing.
16       Q.   So only him can be informed of the need?
17       A.   Only the student can make the request for
18   accommodation to the accommodations office.
19       Q.   So if the student requested accommodations
20   from other faculty, he's liable for not getting
21   accommodations?
22           MR. ROMAN:  I'll just object to two
23       things. One, I think it calls for a legal
24       conclusion, in terms of some of the language,
25       and also, it's been asked and answered.

Page 43

1    BY MR. AWODIYA:
2        Q.   Let me rephrase.
3            If plaintiff informed the dean —
4        A.   Uh-huh.
5        Q.   — that he needed accommodations for his
6    ADHD, would that be enough?
7        A.   Enough to get accommodations?
8        Q.   To put the school on notice.
9        A.   On notice for?
10       Q.   That he need an accommodation.
11       A.   It's not enough. The student can inform
12   anybody. Nobody can apply for accommodation. Not
13   the student's mother, the student's father, not the
14   student's psychiatrist, the student's counselor.
15   Nobody can apply for accommodations. Only the
16   student, and it has to be done in writing. It has
17   to be done through a process where they go and get
18   interviewed by the accommodations officer. The
19   officer will now be satisfied that they have a
20   proper diagnosis made. Then start the process.
21   Nobody else, mother, faculty, the dean, the
22   president of the USA. You know, it's
23   confidentiality.
24       Q.   Is it still confidential if you told the
25   dean himself or if —

Page 44

1        A.   If the student told the dean, that's his
2    prerogative.
3        Q.   So then, it wouldn't be confidential?
4        A.   The dean cannot ask for the accommodation
5    on the student's behalf.
6        Q.   The dean is not part of the counseling
7    center.
8        A.   It doesn't matter. Nobody. Nobody can
9    ask for the accommodation. Only the student.
10       Q.   So if the student tells the dean, he can't
11   tell anyone else?
12       A.   No. Unless the student gives him
13   permission in writing.
14       Q.   Is that why you didn't inform the
15   accommodations coordinator that he might need
16   accommodations?
17       A.   We've been over that. I cannot do that.
18   It's not me to say the student needs it. The
19   student is the one to say, I need it. I want it.
20   When the student makes the request, the proper
21   documentation is in place, the student gets the
22   accommodation. It's not a difficult thing to
23   understand.
24       Q.   And his psychiatrist can't inform the
25   school?

Page 45

1        A.   No. Unless the student writes to say,
2    please release by medical records. I have applied
3    for accommodation.
4        Q.   A third party psychiatrist. Let's say
5    someone at Kaiser Permanente told the dean that his
6    disability was affecting his academic performance.
7    The dean is still not obligated to accommodate the
8    student?
9        A.   No.
10       Q.   Thank you.
11           I understand it fully. Thank you very
12   much.
13           And just to clarify, on Exhibit DE-05,
14   even though it says, "ongoing communication," you do
15   not consider it ongoing communication?
16       A.   You've got to clarify what you mean by
17   that. If it's ongoing -- this allows us to provide
18   accommodation for a future request. If the student
19   says, release my -- release records, because I've
20   applied for accommodation, yes, it's been signed, so
21   the student doesn't have to go through this form
22   again.
23       Q.   He doesn't have to go through the form
24   again?
25       A.   It has a limitation period. I'm trying to

12  (Pages 42 to 45)

15eb13da-d2c1-4023-bda4-c358c06300a

Page 70

1      MR. ROMAN: Would this be helpful,
2  Mr. Awodiya? This is the December 9th notes.
3  I don't know if that's what you're reading off
4  of now. This appears at least to be the first
5  visit. We've seen the December 12th.
6      MR. AWODIYA: This is enough. Can you
7  please read the first sentence?
8      MR. ROMAN: And we'll mark this one as
9  DE-06. Is that all right?
10     MR. AWODIYA: We can do that.
11     (Thereupon, the referred-to document was
12     marked by the court reporter for
13     Identification as Plaintiff's Exhibit
14     DE-06.)
15     THE WITNESS: Uh-huh.
16 BY MR. AWODIYA:
17     Q. Could you read the first line under
18 "Progress"?
19     A. I read it, yes.
20     Q. Can you --
21     A. "Saw Mr. Cuffy after he received a failing
22 grade for semester 5 and felt hopeless entertaining
23 thoughts of ending his life."
24     Q. And is it correct that this document also
25 says, "Felt he was treated unfairly because he

Page 71

1  failed by one point"?
2      A. Where do you see that? Where is that?
3      Q. It's about four or five lines down.
4      A. Oh, yes. Yes, yes. Good.
5      Q. And then, also says, "He wanted to speak
6  to the dean about changing his grade."
7      A. Yes.
8      Q. It also says, "He was advised to speak to
9  the chair of promotions and student services."
10     A. Yes. Good. Sounds like good advice.
11     Q. So --
12     A. Yes.
13     Q. -- what was the reason of your first
14 encounter with plaintiff?
15     A. Emotional problems. So now there's a
16 failing grade, which I didn't remember.
17     Q. Let me rephrase.
18     Did his relationship set the basis for
19 your first encounter with plaintiff?
20     A. Look, your emotional problems was the
21 reason that the student was referred to me. Whether
22 it was because the underlying relationship was a
23 factor, that he failed was a factor, the situation
24 was, there was an emotional crisis.
25     Q. Why did he want to talk with the dean

Page 72

1  about changing his grade?
2      A. Because he's upset about not passing,
3  obviously, I presume. Correct?
4      Q. And you also noted in December he was
5  showing symptoms of ADHD?
6      A. Sure.
7      Q. When he signed the form for relevant
8  accommodations, do you not think that was relevant?
9      A. Not -- what wasn't relevant?
10     Q. His symptoms of ADHD and him failing the
11 semester by one point.
12     A. That's two things you're asking. Not
13 failing the semester -- and what was the other one?
14 I can't answer to both the questions. So which one
15 you want?
16     So what was relevant? What are you
17 talking about?
18     Q. I'm sorry. Let me start over. I forgot
19 what I asked you. I was saying something about -- I
20 was saying something about -- oh. He was upset
21 about failing the semester.
22     A. Uh-huh.
23     Q. He went in to speak to the dean about
24 changing his grade.
25     A. Yes.

Page 73

1      Q. And you noticed symptoms of ADHD --
2      A. Yes.
3      Q. -- to the extent that you recommended an
4  assessment for the ADHD.
5      A. Yes. We went over that.
6      Q. And he signed the form for the release of
7  information relative to academic accommodations.
8      A. Yes.
9      Q. If you noticed these things --
10     A. Yes.
11     Q. -- at that time --
12     A. Uh-huh.
13     Q. -- how is that not relevant?
14     A. To what?
15     Q. Academic accommodations.
16     A. There's no relevance -- this form was done
17 for -- for the emotional crisis to get the student
18 back home.
19     Relevance for academic accommodation can
20 only come in place if there is a request. We went
21 over this over and over. Yes, yes, I would support
22 academic accommodation 100 percent, 1,000 percent,
23 100,000 percent if a request is made. I cannot send
24 details of a diagnosis to anybody unless there's a
25 request to send it and for a purpose. It's not my

19  (Pages 70 to 73)

15eb13da-d2c1-4023-bda4-c358c06300a

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      Davendranand Sharma

Page 74

1   opinion. It is what the plaintiff wants.
2          He wants accommodation, put it in writing.
3   It's done. It's granted. The university does not
4   deny students accommodation once documentation is
5   adequate.
6          Q. I don't want to dive back into the form.
7          A. That's what I'm saying. Yeah. I think
8   we've been over this and over this.
9          Q. I was just asking about the information
10  being relevant to academic accommodations.
11         So let me ask you this.
12         A. Yes.
13         Q. His ADHD symptoms that you observed in
14  December 2015 --
15         A. Uh-huh.
16         Q. -- do you consider it relevant to academic
17  accommodations?
18         A. Yes. Yes. We went over that. And the
19  diagnosis was correctly made, that there was ADHD
20  that the student had for a long time and did not get
21  treated for, and then, comes to me first time, gets
22  a diagnosis, and is treated for it. So that's it.
23  Student was helped. The student performed well.
24  Whether repeating the semester helped, the student
25  performed well. The student left Dominica in good

Page 75

1   spirits in April, went off to do the comp, right?
2   That's my recollection.
3          Q. (Nod in the positive.)
4          A. Student did not apply for accommodation or
5   request to give out documents for accommodation.
6   That's it.
7          MR. AWODIYA: I think we're good.
8          MR. ROMAN: We'll take a short break, and
9   I'll have some questions, and then, we'll wrap
10  it up. Let's take a quick break, and then,
11  we'll come back in.
12         (Whereupon, a break was taken from 3:17 to
13  3:24 p.m.)
14         CROSS-EXAMINATION
15  BY MR. ROMAN:
16         Q. Good afternoon, Dr. Sharma. As you know,
17  we've met before. My name is Ryan Roman. I'm one
18  of the attorneys representing Ross University.
19         I'd like to start by showing you -- and I
20  only have a quick set of questions on the medical
21  notes, some of which we've gone through today, and I
22  think only one of which we haven't shown you today.
23         Starting with Exhibit 06, do you have that
24  in front of you still? That was the most recent one
25  we used from December 9, 2015. Let me just write

Page 76

1   the exhibit number on it so we don't get too
2   confused.
3          A. Uh-huh.
4          Q. This is the December 9th, 2015 note.
5          Are these your notes from your appointment
6   with Mr. Awodiya on December 9, 2015?
7          A. Yes.
8          Q. And were these notes taken at or around
9   the time of that appointment?
10         A. Yes.
11         Q. Are these record that are kept by the
12  counseling center in the ordinary course of it's
13  business?
14         A. Yes.
15         Q. Okay. On that particular document, I want
16  to draw your attention to a paragraph towards the
17  bottom of that page. It starts with, "He had a
18  relationship break up."
19         Do you see that paragraph?
20         A. Yes.
21         Q. Take a moment to review that paragraph and
22  just let me know when you're finished.
23         A. Yes.
24         Q. Would -- so does this -- the notes from
25  this meeting on December 9th, 2015, does that

Page 77

1   include any information you obtained from
2   Mr. Awodiya about relationship issues?
3          A. Yes.
4          Q. And would that paragraph reflect the
5   information you learned?
6          A. That's correct.
7          Q. Okay. Do you see in this set of notes --
8   this December 9th, 2015 set of notes, any reference
9   to ADHD?
10         A. No.
11         Q. At this time, on December 9, 2015, had
12  Mr. Awodiya been diagnosed with ADHD?
13         A. No.
14         Q. All right. Do you recall when the
15  diagnosis was actually made?
16         A. The actual making of it, I think, was in
17  February 2016.
18         Q. And if I turn your attention to Exhibit
19  03, which is in that pile in front of you, I'll ask
20  if that is the appointment you're thinking of?
21         A. Yes, that's correct.
22         Q. Okay. All right. Next I'd like to turn
23  your attention to Exhibit 01.
24         A. Yes.
25         Q. And are these your notes from a meeting

20  (Pages 74 to 77)

15eb13da-d2c1-4023-bda4-c358c06300a

10/16/2018       Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.       Davendranand Sharma

Page 102

1    also the same diagnosis that we make. So that's not
2    uncommon that people sometimes seek a second
3    opinion. The plaintiff would know what was in his
4    mind when he chose to go to the other doctor. We
5    didn't recommend that the plaintiff go and see
6    somebody else, if that's what you're thinking.
7        Q. Can you read back his statement earlier in
8    the deposition where he says -- I can pull it up
9    exactly for you.
10       (Whereupon, the requested testimony was
11       read back by the court reporter.)
12       THE WITNESS: That's true. What's the
13    problem? Not with a doctor in the USA. We
14    recommended assessment, which was started in
15    our counseling center.
16   BY MR. AWODIYA:
17       Q. So wouldn't it make the U.S. doctors the
18    second opinion?
19       A. I don't know anything about U.S. doctor.
20    That statement that you just read is that we
21    started -- recommended that -- based on my seeing
22    your ADHD symptoms, we started the process in
23    Dominica, which was done. You had the -- the
24    plaintiff had the Conners done. There was no
25    recommendation for going to see another doctor in

Page 103

1    the USA.
2        Having said that, we don't say no either.
3    It's good. It was good. It was done and the
4    diagnosis was made by two psychiatrists. Wonderful.
5    So there's no doubt that there is an ADHD diagnosis,
6    which should have -- that's it. Which was treated
7    by me in Dominica.
8        Q. Perfect. Perfect.
9        A. Yes. I agree.
10       MR. AWODIYA: I don't have anything else.
11       THE COURT REPORTER: Read or waive?
12       MR. ROMAN: We'll read.
13       THE COURT REPORTER: Are you ordering
14    these transcripts?
15       MR. AWODIYA: Of course.
16       THE COURT REPORTER: How do you want it?
17       MR. ROMAN: I think we'll just do a
18    regular order. I'll let you know if that
19    changes.
20       (Deposition concluded at 4:01 p.m.)
21
22
23
24
25



1                CERTIFICATE OF OATH
2
    STATE OF FLORIDA  )
3
    COUNTY OF BROWARD  )
4
        I, the undersigned authority, certify that
5    DAVENDRANAND SHARMA personally appeared before me
    and was duly sworn.
6        WITNESS my hand and official seal this
    29th day of October, 2018.
7
8
9            KELLY A. ESPOSITO
             Notary Public, State of Florida
10           My Commission No. GG248978
             Expires: 9/3/2022
11   + + + + + + + + + + + + + + + + +
12               CERTIFICATE
13   STATE OF FLORIDA )
14   COUNTY OF BROWARD )
15       I, KELLY A. ESPOSITO, do hereby certify
    that I was authorized to and did stenographically
16   report the foregoing deposition of DAVENDRANAND
    SHARMA; that a review of the transcript was
17   requested; and that the transcript is a true record
    of my stenographic notes.
18       I FURTHER CERTIFY that I am not a
    relative, employee, attorney, or counsel of any of
19   the parties, nor am I a relative or employee of any
    of the parties' attorney or counsel connected with
20   the action, nor am I financially interested in the
    action.
21       Dated this 29th day of October, 2018.
22
             Kelly A. Esposito
23           KELLY A. ESPOSITO
24
25

1        ALPHA & OMEGA REPORTING SERVICES, INC.
         1776 EAST SUNRISE BOULEVARD, FIRST FLOOR
2            FORT LAUDERDALE, FLORIDA 33304
                  954.523.6422
3
    Ryan Roman, Esq.
4   1 SE 3rd AVenue, 25th Floor
    Miami, Florida 33131
5
6
    Re: Oluwamuyiwa Awodiya v. Ross University School of
7   Medicine
8   Case No. 0:18-cv-60482-KMM
9
10  Mr. Roman:
11       Enclosed please find your copy of the
    deposition of Oluwamuyiwa Awodiya, which was taken
12   on October 16, 2018, in the above-entitled case.
    Also attached are forms of Affidavit and an Errata
13   Sheet to be completed by the deponent when reading
    your copy of the deposition. These forms are
14   self-explanatory.
15       After the deponent has completed these
    forms, please return them to me at the above address
16   for inclusion in the original transcript.
17       Thank you for your cooperation,
18
19
20       Kelly A. Esposito
         Kelly A. Esposito
21
22
23
24
25

                      27  (Pages 102 to 105)

# Exhibit SJ-22

(Excerpts of Bryan Hayse's deposition transcript)

Page 1

1                    UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4   OLUWAMUYIWA AWODIYA,

5            Plaintiff

6   vs.                              CASE NO.

                                     0:18-cv-60482-KMM

7   ROSS UNIVERSITY SCHOOL OF

    MEDICINE, SCHOOL OF

8   VETERINARY MEDICINE LIMITED,

9            Defendant.

10

    ``````````````````````````````

11

12

13           VIDEO-CONFERENCED DEPOSITION OF

14                   BRYAN HAYSE

15

16                 NOVEMBER 5, 2018

17                   3:07 P.M.

18

19         ROSS UNIVERSITY SCOOL OF MEDICINE

20              KNOXVILLE, TENNESSEE

21

22

23

24         Deborah West, LCR-314 (TN), CLR

25

Page 2

1　　　　APPEARANCES OF COUNSEL
2　(Teleconference Appearance)
3　On behalf of the Plaintiff:
4　　　PRO SE
　　　　Oluwamuyiwa Awodiya
5　　　15005 Dahlia Drive
　　　　Bowie, Maryland 20721
6
　　On behalf of the Defendants:
7
　　　　Ryan Roman, Esquire
8　　　Akerman LLP
　　　　Three Brickell City Centre
9　　　98 Southeast Seventh Street
　　　　Miami, Florida 33131
10　　ryan.roman@akerman.com
11　On behalf of Adtalem Global Education:
12　　Valarie Bomar
　　　　VP, Senior Associate General Counsel
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1　　　　INDEX OF EXAMINATION
2　　　　　　　　Page
3　WITNESS: BRYAN HAYSE
4　Examination
5　By Mr. Awodiya　　　5
6　By Mr. Roman　　　37
7
8
9
10　　　　INDEX TO EXHIBITS
11　　　　　　　　Page
12　Exhibit Number 1,
　　　　Student handbook 2015-2016　　39
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1　　　　　STIPULATION
2　　　The deposition of BRYAN HAYSE, called as a
3　witness by the Plaintiff, pursuant to all
4　applicable rules on the 5th day of November, 2018,
5　at the offices of Ross University School of
6　Medicine, Knoxville, Tennessee, before Deborah
7　West, Licensed Court Reporter and Notary Public in
8　and for the State of Tennessee.
9　　　It being agreed that Deborah West, a Tennessee
10　Licensed Court Reporter may report the deposition
11　in machine shorthand, afterwards reducing the same
12　to typewritten form.
13　　　It being further agreed that all formalities
14　as to notice, caption, certificate, transmission,
15　et cetera, are expressly waived, EXCLUDING the
16　reading of the completed deposition by the witness,
17　and the signature of the witness.
18
19
20
21
22
23
24
25

Page 5

1　(3:07 P.M.)
2　　　　　BRYAN HAYSE,
3　having been first duly sworn, was examined and
4　testified as follows:
5　　　　　EXAMINATION
6　BY MR. AWODIYA:
7　　　Q　　Please state your name for the
8　record.
9　　　A　　Christopher Bryan Hayse.
10　　　Q　　Dr. Hayse, my name is Oluwamuyiwa
11　Awodiya and I am the plaintiff in this case against
12　Ross University School of Medicine.
13　　　　During this deposition I will in
14　most part refer to myself as plaintiff. For the
15　record, do you understand that if I say plaintiff
16　that I am referring to myself?
17　　　A　　I do.
18　　　Q　　Additionally, let me tell you some
19　ground rules for the deposition and if you have any
20　questions, you can ask me.
21　　　　First, you are under oath and have
22　sworn to tell the truth. The effect of that oath
23　is the same as if you were testifying in court.
24　　　　If I ask you a question that you
25　don't understand, tell me you don't understand it

2 (Pages 2 - 5)

Page 6

1 and I will rephrase it as often as necessary so
2 you're comfortable that you understand the question
3 you're answering. It's also very important that
4 you answer my questions through spoken word, not
5 through facial expressions or gestures.
6          Please refrain from answering
7 questions with sounds like uh-huh or uh-huh or
8 words that may not get transcribed accurately. You
9 must actually say a word. If you mean yes, say
10 yes, not uh-huh.
11          Also, please allow any questions and
12 objections to be fully stated before you speak.
13 The court reporter cannot take down more than one
14 person speaking at the same time. Otherwise, the
15 record will be jumbled and the questions and
16 answers will be disjointed.
17          Ross lawyers may make objections to
18 questions that I ask you. They are objections for
19 the judge to consider later. You are still
20 required to answer the question unless they
21 instruct you not to.
22          Everything that is said is being
23 taken down by the court reporter verbatim. You
24 will have an opportunity to read the deposition
25 transcript and make corrections you believe are

Page 7

1 necessary.
2          If you make changes in your
3 testimony that are inconsistent with the answers
4 given during the deposition, I will be entitled to
5 comment on those discrepancies at trial to question
6 your truthfulness.
7          Do not guess when providing your
8 responses. Instead, please provide your best
9 estimate based on your recollection. If you need
10 to take a break at any time, please let me know.
11 All I ask is we not take a break while there is a
12 question pending.
13          Are you here today under the
14 influence of any medication or suffering from any
15 physical, mental, or emotional condition that would
16 affect your ability to hear my questions or to give
17 truthful answers?
18     A    I am not.
19     Q    When did you first hear about this
20 lawsuit?
21     A    Earlier this semester. I don't know
22 that I can recall a specific date.
23     Q    When did this semester start?
24     A    In September.
25     Q    Do you remember ever seeing

Page 8

1 plaintiff in December of 2015?
2     A    I do.
3     Q    Can you tell me about your encounter
4 with him?
5     A    I can. I vaguely remember meeting
6 with plaintiff, and I don't recall what the meeting
7 was about. Since the lawsuit has come to my
8 attention, I was shown documents that were from
9 Mr. Cuffy referring to mine and your, plaintiff's
10 meeting, which jogged my memory from it.
11          So that's all I remember from this
12 meeting. I don't remember specifics. I remember
13 meeting after December, but I don't remember the
14 specifics of the December meeting.
15     Q    You said the document has jogged
16 your memory. Do you know what it caused you to
17 remember?
18     A    Only that my memory that you and I
19 met in January was inaccurate and that you and I
20 had met previously in December.
21     Q    What is your position at Ross
22 University?
23     A    I am currently the Associate Dean
24 for Medical Science Student Affairs.
25     Q    As part of that position, have you

Page 9

1 ever handled accommodations?
2     A    Rephrase.
3     Q    Have you ever played any role in a
4 student getting academic accommodations?
5     A    Yes is the quick answer.
6     Q    Can you describe it to me?
7     A    Yes. For the most part in the
8 process I am -- Mr. Stewart-Fulton, who I believe
9 you spoke with previously, is the chief officer
10 over accommodations for the Medical Sciences for
11 the first five semesters.
12          In my role I supervise
13 Mr. Stewart-Fulton, so he and I have conversations
14 about pending applications as he has questions
15 about them or just to get typical updates as a
16 supervisor would, as well as within the process I
17 oversee, if anybody appeals an accommodation that
18 he has made, I would be the one that would review
19 the appeal of that person.
20     Q    Is Mr. Stewart-Fulton required to
21 comply with Title III of the Americans with
22 Disability Act?
23          MR. ROMAN: I would object to the
24          extent it calls for a legal conclusion,
25          but you're welcome to answer the

3 (Pages 6 - 9)

Page 10

1    question.
2        THE WITNESS: Yeah. I would say as
3    far as the ADA is concerned, you know, we
4    comply with, and our policies are built
5    around having accommodations made for the
6    USMLE and around the USMLE processes and
7    policies.
8        Because at the end of the day we
9    want to make sure our students have
10   proper documentation to be at the best
11   stage to get accommodations from USMLE
12   when they get to step one and beyond.
13       Although what we do does not
14   determine that necessarily. So I would
15   say that what we do is uses ADA as
16   guideline, but we are not necessarily
17   beholden to.
18 BY MR. AWODIYA:
19   Q    Do you know if it's required to
20 comply with Section 504 of the Rehabilitation Act?
21       MR. ROMAN: Same objection, but you
22   can answer.
23       THE WITNESS: Is that the same
24   question?
25

Page 11

1 BY MR. AWODIYA:
2    Q    No. Section 504 of the
3 Rehabilitation Act is a different law than Title
4 III.
5    A    Yes, I apologize. Same answer to
6 the previous question. I apologize, I missed that
7 piece.
8    Q    Do you know if Ross is required to
9 comply with any U.S. laws in Dominica?
10       MR. ROMAN: Same objection. It
11   calls for a legal conclusion. You can
12   answer if you know.
13       THE WITNESS: I would say I will
14   refrain from answering because that is a
15   very wide-open question.
16 BY MR. AWODIYA:
17   Q    Are you aware of any contract
18 between Ross University in the United States that
19 states that they must comply with U.S. laws, some
20 U.S. laws in Dominica?
21   A    I am not aware of any such contract.
22   Q    If a violation to the Americans with
23 Disability Act occurred, could the student -- is
24 there any authority outside of Ross that the
25 student could go to?

Page 12

1    A    I am unsure. I would have to refer
2 to our legal counsel to ask that question if it
3 were to.
4    Q    Do you know -- like, do you -- has
5 anyone, not on a legal matter, more so as to a
6 procedure matter, is there a procedure for students
7 to report discrimination?
8    A    Yes. So to report discrimination, a
9 student would contact our office and we would refer
10 them to our Title III coordinator or a manager of a
11 person, depending on what the allegations were.
12   Q    Is RUSM required to comply with
13 Title IX in Dominica?
14       MR. ROMAN: Same objection. It
15   calls for a legal conclusion. You can
16   answer if you know.
17       THE WITNESS: I would seek counsel's
18   advice in compliance of the question, but
19   by the spirit of it we tried to abide by
20   it.
21 BY MR. AWODIYA:
22   Q    Okay. Just state for the record,
23 Ross lawyers are not -- their objections are not
24 advice. Their objections are for the judge to
25 consider later. Unless they ask you not to answer

Page 13

1 a question, you can go ahead and answer a question.
2    A    Uh-huh.
3        MR. ROMAN: Just to respond for the
4    record, I think Dr. Hayse did answer that
5    question. It's just that his answer is
6    he would talk to Ross lawyers. I don't
7    think he was talking about me.
8        THE WITNESS: Correct. That is
9    correct. So we have a relationship with
10   our legal team. So anything that comes
11   to us that might be a legal matter, I
12   always refer to them to ask advice before
13   responding because I don't have a legal
14   background.
15       So I want to make sure that the
16   advice I give to a student or anybody
17   coming forward that I give the correct
18   advice to get them through the process
19   for whatever reason.
20 BY MR. AWODIYA:
21   Q    Okay. I see. For the record, I
22 wasn't saying that you weren't answering. It was
23 more about the advice part.
24       Let me clarify a little bit about
25 the legal situation. When I asked if they are

4 (Pages 10 - 13)

Page 14

1 required to comply, I mean does Ross require their
2 employees to comply, not if they're legally
3 required to comply. I am asking if Ross, the
4 entity, requires their employees to comply with the
5 American with Disability Act.
6    A    I am not sure I understand the
7 question.
8    Q    It was a little long. Let me make
9 it shorter.
10    A    Yeah.
11    Q    Does Ross University itself require
12 its employees and faculties to comply with Title
13 III of the American with Disability Act in
14 Dominica?
15    A    Not to my knowledge.
16    Q    Is that also correct for Section 504
17 of the Rehabilitation Act?
18    A    That is correct.
19    Q    Okay. I am not going to keep you
20 long, because there's not much -- it's just I want
21 to go to the counseling documents just to see if we
22 can jog your memory a little bit about our
23 interaction.
24        Counsel, can you hand Dr. Hayse both
25 the counseling documents, the one labeled RUSM

Page 15

1 000141 and 144?
2        MR. ROMAN: Yes. We can use the
3        same composite exhibit called Fulton 1
4        which has those two pages as the first
5        two pages of the exhibit.
6 BY MR. AWODIYA:
7    Q    Okay. Dr. Hayse, do you see in this
8 document where it says, "Client returned to office
9 after talking to Dr. Hayse"?
10    A    I do.
11    Q    "And student affairs regarding his
12 academic situation"?
13    A    I do.
14    Q    Do you remember what the academic
15 situation was?
16    A    Unfortunately, I don't.
17    Q    Do you know why plaintiff would have
18 been disappointed after he left your office?
19    A    I do not.
20    Q    Did plaintiff tell you that he was
21 having some type of attention problem?
22    A    I don't recall.
23    Q    Same document. It says that
24 Mr. Cuffy received an email from you requesting
25 that you talk at some point about the plaintiff.

Page 16

1        Do you remember why you sent that
2 email to Mr. Cuffy?
3    A    No, unfortunately I do not remember.
4    Q    Do you remember if you and Mr. Cuffy
5 followed up after this email?
6    A    I do not remember.
7    Q    Would you have only sent that email
8 at the request of the student?
9    A    No.
10    Q    Is there any possible reason why you
11 would send an email to Mr. Cuffy regarding a
12 student?
13    A    Typically if I reach out to
14 counseling or Mr. Cuffy, in this case, it would be
15 if I referred a student to counseling, would be one
16 reason, or if counseling had asked me to see
17 somebody or had, I guess, opened the door to a
18 meeting with a student beforehand.
19        So that would be two examples of why
20 I would have reached back out, either to say I have
21 seen the student at your direction or to say I have
22 met with the student you have asked me to speak
23 with.
24    Q    I don't know if Ross has one of the
25 documents, but I think they can fact check. In one

Page 17

1 of the counseling documents, Dr. Sharma states that
2 plaintiff wanted to see you because of his grade
3 for our encounter in December of 2015.
4        Does that job your memory?
5    A    It does not.
6    Q    Do you have any reasons specific to
7 grades and academic situations as to why you would
8 send an email to the counseling center?
9    A    I do not have any specific criteria
10 for that, no.
11    Q    Would you be able to speak to
12 Mr. Cuffy about a student without a release of
13 information form?
14    A    I would. I could speak to him. He
15 might not be able to speak to me.
16    Q    So having a discussion about a
17 student, a release of information agreement would
18 need to be signed?
19    A    No. From my side, a student is
20 protected under FERPA on my side going by that. So
21 if I were to discuss a student that I had a meeting
22 with a counsel or anybody else with a need-to-know
23 basis, that I could do.
24        However, within counseling there is
25 much stricter guidelines that counselors go by. So

5 (Pages 14 - 17)

Page 18

1 Cuffy would have to have that release of
2 information to discuss detailed information with
3 me.
4     Q    Okay. So the answer was a little
5 long. Can you let me ask you this: Is there any
6 topic you can talk about with the counseling center
7 about a plaintiff -- I mean, about a student?
8     A    Yes.
9     Q    Without a release of information
10 agreement? Sorry, that was my fault.
11    A    That's okay. I cut you off. Yes, I
12 could talk to them about anything that I feel is
13 appropriate that's relevant to their duties as a
14 counselor or their duties within RUSM.
15    Q    Can you give me examples of this
16 duty?
17    A    Yeah. So if a student -- if I were
18 to meet with a student about, let's say, grades,
19 you mentioned grades earlier, a concern about
20 grades, I could reach out to, depending on what the
21 specific concern was or why a student was
22 struggling, I might reach out to counseling, a
23 counselor, or the counseling office in general, and
24 say I met with this student and they are struggling
25 because of grades and mentioned these things, I

Page 19

1 think it would be good for you to reach out to them
2 and have a conversation with them.
3        I might also reach out to the Center
4 for Teaching and Learning, to the director there or
5 one of the faculty in the Center for Teaching and
6 Learning, and say the same thing.
7        If a student is struggling with
8 grades, they mention biochemistry or a lack of
9 being able to study, this might be a topic of
10 conversation I have with that student. Because I
11 felt that it would be educationally relevant to
12 reach out to them.
13       Where it is not appropriate is if I
14 just reach out to somebody just to tell them
15 something that wasn't relevant to their job
16 necessarily.
17    Q    I understand. So that would make
18 sense. I understand what you mean by duty. But
19 why would you ask him to contact you? If it was
20 about his duty, is it safe to say you would have
21 put it in the email going to him more as like a
22 one-way communication?
23    A    It's hard to tell what I was
24 thinking that long ago. It might be that I was
25 busy and knew I needed to connect and knew it would

Page 20

1 be quicker to have the conversation over the phone.
2 There are a number of reasons that I might have
3 said contact me to talk more about this.
4     Q    Is there anything that you think
5 would jog your memory even more?
6     A    I don't believe so, outside of a
7 recording of our conversation.
8     Q    From these two documents, it seems
9 that plaintiff saw you more than once. Do you know
10 why he might have gone to the counseling center and
11 then saw you again and then gone back to the
12 counseling center?
13    A    I do not.
14    Q    Do you know who Mr. Didier is?
15    A    Spell it.
16    Q    It's on the first document right
17 next to Dr. Sharma engaged Mr. Didier?
18    A    Mr. Didier.
19    Q    Who is he?
20    A    He's the campus executive for the
21 then Dominica campus.
22    Q    Does he still work with RUSM?
23    A    He does.
24    Q    Is there any reason why his name is
25 not listed on the faculty website of Ross?

Page 21

1     A    I don't have an answer to that.
2     Q    Does he handle academic
3 accommodations?
4     A    He does not.
5     Q    Does he handle medical leaves?
6     A    He does not.
7     Q    So what does he do?
8     A    He oversees the operational aspects
9 of the Dominica campus. So he has security reports
10 in to him, finance and accounting reports in to
11 him, the gym ultimately reports in to him,
12 housekeeping reports in to him. Maintenance
13 reports in to him.
14       There is probably an area -- oh,
15 supply chain reports in to him. There is probably
16 an area I am forgetting. But mostly the
17 operational aspects of the institution.
18    Q    Okay. Can you -- you said earlier
19 that you supervised Mr. Stewart-Fulton?
20    A    Correct.
21    Q    Can you tell me a little bit about
22 the academic accommodations process?
23    A    Certainly. So any student who comes
24 to our office seeking academic accommodations,
25 anybody in our office refers that student to speak

6 (Pages 18 - 21)

Page 22

1  with Mr. Stewart-Fulton to get more details and to
2  get the application to do so and talk through the
3  requirements.
4          And then once those documents are
5  turned in, anything that has been asked for,
6  whether it is documentation from a physician or a
7  narrative from the student, et cetera, that is then
8  reviewed by Mr. Stewart-Fulton as well as other
9  accommodations colleagues within the organization.
10         And then a decision is made and then
11 given to the student, or if other documentation is
12 needed or questions were had, that he would
13 facilitate that process.  And he also reaches out
14 to any faculty members who oversee areas wherein a
15 student would receive those accommodations.
16         So, for instance, if a student were
17 to get extra time for an exam, Mr. Stewart-Fulton
18 would reach out to Dr. Paul Abney and the exam
19 center staff to let them know.
20         COURT REPORTER:  I lost you.
21         THE WITNESS:  Those who oversee the
22     exam center and let them know that an
23     accommodation has been approved.  And so
24     the student would start -- and the date
25     in which that student would start

Page 23

1          receiving that accommodation, as an
2          example.
3  BY MR. AWODIYA:
4      Q    When you said "come to our office,"
5  who do you mean "our"?
6      A    Thank you.  Yes.  So the student
7  affairs office.  So still kind of referring to
8  Dominica -- because that's the last time we had an
9  actual office with everybody there -- walk into
10 student affairs.
11         There is a receptionist there.  Or
12 any time that somebody is speaking to me as an
13 academic adviser, the chief of student affairs
14 office are there, or just talking to anybody else
15 in that division, if somebody happens to come up
16 about -- if a student asks about academic
17 accommodations, that might be an orientation
18 session or a one-or-one conversation, we would
19 refer then to Mr. Stewart-Fulton given his
20 expertise in that area that the rest of us don't
21 necessarily have.
22     Q    Have you ever at any point in your
23 position at Ross been responsible for making the
24 final decision on academic accommodations?
25     A    When I first arrived, the process

Page 24

1  was laid out where the conduct -- the academic
2  accommodations coordinator would make
3  recommendations to the associate dean, which would
4  be me.  And then that policy was changed at some
5  point in the 2016 early academic year, I don't
6  remember exactly when that change was made.
7          So prior to that change, the
8  referral would come to me for the final decision.
9  And then I would review that, that accommodation
10 with Mr. Stewart-Fulton and sign off on.  And then
11 since that time, it has been moved to where
12 Mr. Stewart-Fulton along with Ms. Jeanie Robertson,
13 who also oversees the accommodations for the
14 clinical side, the two then work in collaboration
15 to make any type of decisions regarding academic
16 accommodations.
17     Q    That was a very thorough answer.  I
18 want to make sure I don't forget anything.  So the
19 policies, where were the policies located for
20 academic accommodations?
21     A    In the student handbook as well as
22 the academic catalog.
23     Q    Does RUSM deny oral requests for
24 academic accommodations?
25     A    All academic accommodations must be

Page 25

1  in written form.
2      Q    Can a student's family member write
3  the request for academic accommodations on behalf
4  of the student?
5      A    I have never been asked that
6  question, and my initial answer would be no to
7  that.
8      Q    Do you have a reason for that being
9  your initial answer?
10     A    Yeah.  I have not thought about that
11 before.  I would say that no, it would have to come
12 from the student.  But like I say, I never have
13 been asked that before so I have not put much
14 thought into it.
15         But I would say at this point my
16 answer would be no, it would have to come directly
17 from the student.
18     Q    Policy-wise is there anything
19 preventing somebody's family member from requesting
20 academic accommodations for a student?
21     A    Again, I have not been asked.  I
22 would have to review the policy to see if we have
23 anything specific pertaining to that.  I will add
24 to that, I can't think of any other example where a
25 student's family member or anybody other than the

7 (Pages 22 - 25)

Veritext Legal Solutions
800-726-7007                                          305-376-8800

Page 41

1                    REPORTER CERTIFICATE

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4          I, Deborah West, Licensed Court Reporter, LCR

5    #314, in and for the State of Tennessee, do hereby

6    certify that the deposition of Bryan Hayse, was

7    reported by me and that the foregoing transcript,

8    pages 1 through 41, inclusive, is a true and

9    accurate record to the best of my knowledge, skills

10   and ability.

11             I further certify that I am not related

12   to, nor an employee or counsel of any of the

13   parties to the action as defined under T.C.A

14   Section 24-9-136, nor am I financially interested

15   in the outcome of this case.

16        In witness thereof, I have hereunto set my

17   hand on this the 17th day of November, 2018.  The

18   witness HAS NOT waived signature.

19

20

21                    *Deborah P West*

22                    _____

                      Deborah West, LCR 314 TN
23                    Expiration:  6/30/2020

24

25

# Exhibit SJ-23

(Excerpts of Matthew Stewart-Fulton's deposition transcript)

Page 1

1                    UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4    OLUWAMUYIWA AWODIYA,

5            Plaintiff

6    vs.                              CASE NO.
                                      0:18-cv-60482-KMM

7    ROSS UNIVERSITY SCHOOL OF

     MEDICINE, SCHOOL OF

8    VETERINARY MEDICINE LIMITED,

9            Defendant.

10

     ``````````````````````````````

11

12

13            VIDEO-CONFERENCED DEPOSITION OF

14                 MATTHEW STEWART-FULTON

15

16                  NOVEMBER 5, 2018

17                    1:06 P.M.

18

19            ROSS UNIVERSITY SCOOL OF MEDICINE

20                 KNOXVILLE, TENNESSEE

21

22

23

24          Deborah West, LCR-314 (TN), CLR

25

Page 2

1    APPEARANCES OF COUNSEL
2  (Teleconference Appearance)
3  On behalf of the Plaintiff:
4    PRO SE
     Oluwamuyiwa Awodiya
5    15005 Dahlia Drive
     Bowie, Maryland 20721
6
   On behalf of the Defendants:
7
     Ryan Roman, Esquire
8    Akerman LLP
     Three Brickell City Centre
9    98 Southeast Seventh Street
     Miami, Florida 33131
10   ryan.roman@akerman.com
11 On behalf of Adtalem Global Education:
12   Valarie Bomar
     VP, Senior Associate General Counsel
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          INDEX OF EXAMINATION
2                  Page
3  WITNESS: MATTHEW STEWART-FULTON
4  Examination
5  By Mr. Awodiya              5, 40
6  By Mr. Roman               36
7
8
9
10
11          INDEX TO EXHIBITS
12                  Page
13 Exhibit Number 1
      Bates RUSM 141, 142, 183, 242-243,
14    326, 371-372           36
15 Exhibit Number 2
      Bates RUSM 179-182      37
16
17
18
19
20
21
22
23
24
25

Page 4

1            STIPULATION
2       The deposition of MATTHEW STEWART-FULTON,
3  called as a witness by the Plaintiff, pursuant to
4  all applicable rules on the 5th day of November,
5  2018, at the offices of Ross University School of
6  Medicine, Knoxville, Tennessee, before Deborah
7  West, Licensed Court Reporter and Notary Public in
8  and for the State of Tennessee.
9       It being agreed that Deborah West, a Tennessee
10 Licensed Court Reporter may report the deposition
11 in machine shorthand, afterwards reducing the same
12 to typewritten form.
13      It being further agreed that all formalities
14 as to notice, caption, certificate, transmission,
15 et cetera, are expressly waived, EXCLUDING the
16 reading of the completed deposition by the witness,
17 and the signature of the witness.
18
19
20
21
22
23
24
25

Page 5

1  (1:06 P.M.)
2          MATTHEW STEWART-FULTON,
3  called as a witness and having been first duly
4  sworn, was examined and testified as follows:
5          EXAMINATION
6  BY MR. AWODIYA:
7     Q    Please state your full name for the
8  record.
9     A    Matthew John Stewart-Fulton.
10    Q    May I call you Mr. Fulton or what
11 would you prefer to be called?
12    A    Please call me Matthew.
13    Q    Matthew. Okay. Matthew, my name is
14 Oluwamuyiwa Awodiya, and I am the plaintiff in this
15 case against Ross University School of Medicine.
16         During this deposition I will, in
17 most part, refer to myself as plaintiff. For the
18 record, do you understand that if I say plaintiff
19 that I am referring to myself?
20    A    I do.
21    Q    Additionally, let me tell you some
22 ground rules for this deposition and if you have
23 any questions you can ask me.
24         First, you are under oath and have
25 sworn to tell the truth. The effect of that truth

2 (Pages 2 - 5)

Page 30

1  documentation from that student's record with the
2  counseling center.
3      Q    How do you personally know that?
4      A    Because that is what the counseling
5  center advised me when I took on this role.
6      Q    Can that process occur before the
7  student actually comes to you and submits another
8  request for academic accommodations?
9      A    I don't understand what you mean by
10 another request in relation to the information
11 release.
12     Q    If the student first requests that
13 the counseling center send the documentation -- let
14 me rephrase.
15         Can the student have the
16 documentation sent over to the accommodations
17 coordinator before the student goes to the
18 accommodations coordinator to ask for a request?
19     A    Yes, they can.
20     Q    Okay.  Were you contacted on behalf
21 of plaintiffs by the counseling center at any
22 point?
23     A    Not to my recollection.
24     Q    Would you remember if you were?
25     A    It's possible.  But I don't remember

Page 31

1  all the contacts that I have had from the
2  counseling center.
3      Q    So is it correct that you can
4  neither confirm nor deny whether you received
5  communication from the counseling center on behalf
6  of plaintiff?
7      A    I do not have in my records any
8  documentation from the counseling center regarding
9  the plaintiff.
10     Q    What about phone calls?
11     A    I don't recall if I had any phone
12 calls with the counseling center about the
13 plaintiff.
14     Q    Is faculty at RUSM required to
15 comply with Title III of the Americans with
16 Disabilities Act?
17     A    Are you referring to the ADA?
18     Q    Yes.
19     A    No.
20     Q    Are they required to comply with
21 Section 504 of the Rehabilitation Act?
22         MR. ROMAN:  I will object to this
23         and the last question to the extent it
24         calls for a legal conclusion.  If the
25         witness can answer, he may do so.

Page 32

1          THE WITNESS:  In reference to when
2          you were enrolled and the campus was
3          located on Dominica, we weren't required
4          to comply with the ADA.  Although in the
5          interest of supporting our students, we
6          abided by the spirit of the ADA and
7          Section 504 of the Rehabilitation Act to
8          provide appropriate accommodations within
9          the process that was defined in the
10         student handbook.
11 BY MR. AWODIYA:
12     Q    So just to clarify, there is no
13 policy that requires faculty to comply with those
14 laws you just stated?
15     A    That's my recollection based on
16 what's in the student handbook.
17     Q    So you, yourself, are not required
18 to comply with those laws in Dominica?
19     A    That is my understanding.
20     Q    Where did you get your knowledge
21 about what is required from Title III of the
22 Americans with Disabilities Act?
23     A    From review of the Americans with
24 Disabilities Act and Section 504 of the
25 Rehabilitation Act.  From consultation with the

Page 33

1  hiring manager who brought me into this position.
2  And consultation with, at the time, the DeVry legal
3  office.
4      Q    But they did not tell you that you
5  were required to comply with those laws?
6          MR. ROMAN:  I will object, for the
7          record, to the extent it calls for any
8          communications you had with DeVry's legal
9          counsel that would be covered by
10         attorney-client privilege and I would
11         instruct you not to answer.
12         To the extent you have spoken with
13         any of the other folks you described or
14         anyone else, you may answer the question.
15         THE WITNESS:  The answer, I think,
16         ultimately goes back to the legal office,
17         so I will not answer any further on that.
18 BY MR. AWODIYA:
19     Q    Has anyone that is not in the legal
20 office of Ross University tell you that you -- let
21 me rephrase.
22         Is it correct to say that you were
23 never told that you had to comply with those laws?
24     A    That conversation goes back to the
25 conversation with the legal office.

9 (Pages 30 - 33)

Page 55

```
 1              REPORTER CERTIFICATE
 2    STATE OF TENNESSEE
 3    COUNTY OF KNOX
 4         I, Deborah West, Licensed Court Reporter, LCR
 5    #314, in and for the State of Tennessee, do hereby
 6    certify that the deposition of MATTHEW
 7    STEWART-FULTON was reported by me and that the
 8    foregoing transcript, pages 1 through 55,
 9    inclusive, is a true and accurate record to the
10    best of my knowledge, skills and ability.
11              I further certify that I am not related
12    to, nor an employee or counsel of any of the
13    parties to the action as defined under T.C.A
14    Section 24-9-136, nor am I financially interested
15    in the outcome of this case.
16         In witness thereof, I have hereunto set my
17    hand on this the 17th day of November, 2018.  The
18    witness HAS NOT waived signature.
19
20
21              Deborah P West
22              _____
                Deborah West, LCR 314 TN
23              Expiration:  6/30/2020
24
25
```

# TAB 119-2

# EXHIBIT 1

Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

3                    CASE NO. 0:18-cv-60482-KMM-AOV
4

     OLUWAMUYIWA AWODIYA,
5

              Plaintiff,
6

     vs.
7

     ROSS UNIVERSITY SCHOOL OF
8    MEDICINE, SCHOOL OF VETERINARY
     MEDICINE LIMITED,
9

              Defendant.
10   _____/
11

12

13                              Suite 1600
                                350 East Las Olas Boulevard
14                              Fort Lauderdale, Florida  33301
                                Wednesday, 10:19 A.M.-6:23 P.M.
15                              December 5, 2018
16

17        VIDEOTAPE DEPOSITION OF OLUWAMUYIWA AWODIYA
18

19        Taken before Carla D. Smith, RPR, RMR, Notary Public
20   in and for the State of Florida at Large, pursuant to
21   Notice of taking Deposition in the above cause.
22

23

24

25

Page 33

1   time do you have to just kind of, you know, get up and

2   go to the bathroom during the middle of an exam.  But

3   back yeah.  Honestly, I forgot what your question was.

4       Q.   Well, whether you had asked for any

5   accommodation for any of the symptoms.  Whether -- I

6   think you said you had not, is that correct?

7       A.   I don't -- I don't -- I don't see how I could

8   ask for accommodation if I didn't know -- if I didn't

9   know that these symptoms were the result of something or

10   was labeled as something.  There is no logical reason

11   why I would ask for an accommodation.

12       Q.   Because there had not been a diagnosis so you

13   didn't know what it was?

14       A.   Because I thought that I was normal.

15       Q.   When did you realize that that was not

16   normal?

17       A.   I guess people would make remarks about my

18   concentration I guess.  But, you know, it would be

19   general people.  No one really, a doctor or anybody like

20   that.

21           But when Dr. Sharma said that -- when

22   Dr. Sharma said that I have some type of concentration

23   problem, that's when I started to -- that's when --

24   that's when everything started to make a little bit more

25   sense.

Page 38

1      Q.    After high school after you graduated from

2    high school?

3      A.    Uh-huh.

4      Q.    Did you --

5            What other institutions did you attend after

6    high school?

7      A.    Morgan State University.

8      Q.    Did you attend any community college prior to

9    Morgan State?

10     A.    I think technically it would have been prior

11   but the day that I graduated high school I think the

12   next day during the summer I was going to the fall -- to

13   Morgan State but before I became a freshman in the fall

14   I took summer classes at the community college just

15   because like I don't know what to do with myself during

16   the summer.  So might as well just be in a class.

17          So I think technically it was before but I

18   was still my freshman, the typical freshman year was at

19   Morgan State.  I didn't -- I didn't -- I don't know how

20   to explain it.  I know it's like a weird thing that I

21   did but that's what I did.

22          Most people would take a break off after high

23   school and then start college in the fall.  I didn't do

24   that.  Kind of just took community college classes.  I

25   think that's what -- I'm pretty sure that's what I did,

Page 39

1   I think.  Yeah, I took some PG classes and then began my

2   freshman -- what I consider my freshman year at Morgan.

3   I don't know credit wise I think I was like a late

4   freshman type because I came in with some other grades.

5        Q.    When you say PG, that's Prince George

6   Community College?

7        A.    Yes.

8        Q.    You graduated Morgan State in three years,

9   right?

10       A.    Yes.

11       Q.    When you were at Morgan State, did you ever

12   receive any extra testing time so you could finish

13   exams?

14       A.    Officially or unofficially?

15       Q.    Either way.

16       A.    Either way?  Yes.

17       Q.    Do you recall in what courses?

18       A.    It would be random.  There is no like set

19   subject it would happen.  It would happen in anything;

20   biology, chemistry, math, English.  I really struggled

21   in classes that are very word based.  Yeah, word-based

22   classes.  What am I saying word based?

23            Classes that require you to read a lot of

24   like books and stuff in preparation for a test.  Those

25   classes I kind of had to get really creative because

Page 97

1              THE WITNESS:  Yes.

2      BY MR. ROMAN:

3          Q.    After that contact from the counseling

4      center, you went into the counseling center and met with

5      Mr. Cuffy, correct?

6          A.    Yes.

7          Q.    And do you recall a safety plan that you

8      signed with Ross University?

9          A.    Uh-huh.

10         Q.    I'm going to show you what we'll mark as

11     Exhibit 2.

12              And is this the safety plan that you signed

13     with Ross on December 8, 2015?

14         A.    Yep.

15              (Thereupon, the document/item referred to was

16     marked for identification as Exhibit 2.)

17         Q.    And is that your handwriting in the middle?

18         A.    Yes.

19         Q.    Okay.  And is that your signature at the

20     bottom?

21         A.    Yes.

22         Q.    Was this --

23              Do you recall whether December 8th, 2015 was

24     the day you first got the call from the counseling

25     center asking you to come in?

Page 105

1    But it was one December assessment that Dr. Mauricio

2    did.  And then there was a diagnostic test as well that

3    I gave to the school.

4        Q.    Did Dr. Mauricio make a diagnosis of ADHD in

5    December of 2015?

6        A.    He needed -- no, he needed my --

7               In December 2015?

8        Q.    Correct.

9        A.    No, he needed my CARS to come back.  Not my

10   CARS, sorry.  He needed my Conners to come back.  So

11   that was the last diagnostic test that he wanted.  He

12   did all the other stuff, the assessment part but then he

13   wanted -- before he could confirm it I guess that's like

14   protocol.  I don't know what it is, you know, but before

15   he could ultimately confirm it, he wanted a diagnostic

16   test, diagnostic computer test done as well, which that

17   one came back right before I went back to Dominica,

18   which I was able to get -- to get to the counseling

19   center.

20       Q.    With regards to Mr. Stewart-Fulton, did you

21   meet with him?

22       A.    Yes.

23       Q.    And how many times did you meet with him?

24       A.    I think once.

25       Q.    And during that meeting, did you make any

Page 122

1           Based on your response, I can conclude then

2   that Mr. Stewart-Fulton never gave you this document,

3   correct?

4      A.   No.  Didn't know this existed.

5      Q.   And do you know whether this document was

6   contained in the student portal?

7      A.   I have no idea.  This was -- if it did exist,

8   I didn't know it existed.

9      Q.   Did anyone ever tell you about this document?

10      A.   No.

11      Q.   In this document on page 3 it asks a student

12   who is submitting this form to attach a two-page

13   personal statement describing your disability and its

14   impact on your daily life and educational functioning.

15           Did you ever submit a personal statement like

16   that to anyone in the dean of student affairs office?

17      A.   Nobody asked me to.

18      Q.   And so you never did submit anything like

19   that, correct?

20      A.   Nobody asked me to.

21      Q.   Okay.  Sorry I also want to ask that question

22   though.  So nobody asked you to.  Can I then conclude

23   from that, that you never submitted a two-page personal

24   statement?

25      A.   A two-page statement?

Page 148

1    said something about --

2         Q.    Well, I'm asking -- let me ask this.

3               Earlier you said that until the litigation

4    you didn't know anything about the ADA.  You were going

5    to bring a breach of contract claim.  You didn't think

6    about the ADA until you read something about it.

7               Now, when it's convenient, you're saying when

8    I applied I cared very much about the ADA.  That was one

9    of the key statements I focused on and relied upon in

10   coming to Ross.  It just seems a little inconsistent.

11        A.    What you're saying is incorrect.

12        Q.    Okay.  Explain to me why I'm wrong.

13        A.    Pre-litigation or my preparations for

14   litigation, I didn't know what the ADA requirements,

15   obligations, the actual substance of the Americans with

16   Disability Act was.  I didn't know what I was

17   technically entitled to as a matter of law.

18               I wasn't a lawyer.  I didn't know how to look

19   up case law.  I didn't know how to look up -- to be

20   perfectly honest, I don't even -- I don't even know if

21   the normal citizens or if it's just me but I don't

22   really -- until this lawsuit I realized I didn't know

23   any laws.  I didn't know what a statute was.  I just

24   knew basic law stuff like for moral reasons like don't

25   steal and stuff like that or from like TV.

Page 149

1          So the Americans with Disability Act I knew

2     of it but I didn't know what -- beneath that I didn't

3     know what was actually technically required.  I just

4     knew that it was some type of thing that stopped

5     discrimination from disabled people.  And that was my

6     interpretation of it when I saw it on the website that

7     the Americans with Disability Act will prevent

8     discrimination against Americans.

9          Q.   When you enrolled at Ross, did you believe

10    you were disabled in anyway?

11         A.   No.  When I enrolled, no.

12              When I enrolled in what, 2014?

13         Q.   That's correct?

14         A.   Yeah, no.  I didn't believe I was disabled.

15         Q.   Did you apply to any U.S. medical schools?

16         A.   I graduated undergrad in 2013.  Then I went

17    the rest of 2013 finished.  So I had applications and

18    everything -- no, no.  So the problem was with -- I had

19    applications and stuff done but I didn't follow -- two

20    things prevented me from going all the way around to the

21    next cycle.

22              First, I missed a previous cycle.  So I was

23    considering whether I should wait to go to the next

24    cycle because Ross had the rolling admission.  So when I

25    had graduated in 2013 in order to start the next fall

Page 154

1                THE VIDEOGRAPHER:   We're now back on the

2          record at 3:44.   This marks the beginning of

3          Media 4.   You may proceed.

4                MR. ROMAN:   Thank you.

5     BY MR. ROMAN:

6          Q.     Mr. Awodiya, I'm going to show you what we'll

7     mark as I believe it's Exhibit 4 that we are up to and

8     this appears to be a letter dated March 15, 2013 from

9     the office of admission at Ross to you.

10               Have you seen this letter before?

11         A.    It sounds right.

12               (Thereupon, the document/item referred to was

13    marked for identification as Exhibit 4.)

14         Q.    Have you seen this before, do you recall?

15         A.    I can't confirm that I saw it.   I don't see

16    anything wrong with it but I can't recall specifically

17    that I saw it.

18         Q.    Did you receive a acceptance letter from Ross

19    in or around March of 2013?

20         A.    I must have but I can't say that this was the

21    exact letter that I received.   I don't remember.   It's

22    2013; yeah, it's five years ago.   That's -- that's -- I

23    can't remember the language of any -- of admissions.   I

24    don't know what this letter qualifies as but I certainly

25    can't remember the language specifically if this was

Page 155

1   that year.

2       Q.    Do you have any reason to believe this is not

3   an accurate depiction of the letter sent to you on

4   March 15, 2013 by Ross?

5       A.    No.

6       Q.    Okay.  Inside of this letter it references a

7   conditional acceptance to Ross.

8             Were you conditionally accepted to Ross

9   University?

10      A.    Yes.

11      Q.    And what was the condition?

12      A.    Complete MERP.

13      Q.    What's MERP?

14      A.    Medical Education Review Program.

15      Q.    What is that program?  Just describe for me.

16   You went through MERP, right?

17      A.    Uh-huh.

18      Q.    What is MERP?

19      A.    MERP was like -- MERP was like they gave us

20   like biochem class.  We had anatomy, anatomy stuff like

21   that.  So I think it was -- I think what it was supposed

22   to be was supposed to be like some type of -- it was

23   supposed to be a class that represents or would in some

24   way relate to what the first semester at Ross would be

25   like.  So I think the information that was introduced

Page 159

1       Q.     Sorry.  This letter as I look over it appears

2    to be a letter to you informing you of your admission to

3    Ross it says "for the class beginning May 5, 2014."

4             And in the second paragraph it says, "Your

5    completion of MERP has proven to our admissions

6    committee that you have the potential to be an

7    outstanding addition to our medical program."

8             So what I was asking was is this the followup

9    letter saying now that you have completed MERP, you're

10   admitted to Ross?

11      A.     Most likely.

12      Q.     And did you, in fact, start up at Ross on or

13   around May 5th, 2014?

14      A.     From what I can recall.

15      Q.     Do you recall what your best semester grade

16   point average wise was at Ross?

17      A.     I think it was the semester where I saw all

18   the information for the second time.  So that would be

19   my repeat fifth semester.

20      Q.     And is it safe to assume that your worse

21   semester was the first time you took that fifth semester

22   when you failed?

23      A.     My worse semester -- oh, I guess technically

24   yeah.  The other semesters -- my first semester I think

25   I got the minimum like one point less it was -- like

Page 160

1   literally there is like a one point difference between

2   my first semester and the semester that I failed.  So I

3   guess technically it's -- actually, I don't -- I

4   don't -- I can't testify because I don't know what the

5   actual percentage was for that -- because Ross changes

6   the minimum passing score.  So I don't know if my

7   minimum passing score that I received in first semester

8   was lower than my minimum passing score in the semester

9   that I failed.  So when you say "worse", I don't -- if

10  you mean worse just because I failed, then yes.

11          If you mean worse based on the score that I

12  received compared to my students, I can't say that

13  because I would have to look at the UPS for the other

14  semesters.

15      Q.   But is it fair to characterize that first

16  semester as a poor semester for you?

17      A.   The first semester?

18      Q.   Yes.

19      A.   I wouldn't say "poor".  It was acceptable but

20  not great.

21      Q.   You said it was very close to not passing,

22  correct?

23      A.   Yes.

24      Q.   Do you recall what your grade point average

25  was when you left Ross?

Page 199

1    the requirements.

2         Q.    Was there any additional classroom time

3    before taking the fifth exam?

4         A.    Yeah, I took a prep course at some point.  I

5    remember taking a prep course in something.

6         Q.    We'll mark this the next exhibit.  Sorry.

7               You can put some of those aside if you want.

8         A.    Yes.

9               (Thereupon, the document/item referred to was

10   marked for identification as Exhibit 12.)

11        Q.    I'm showing you a letter dated October 28,

12   2016 from Sandra Herrin to you.  Do you recall receiving

13   this letter?

14        A.    I think so.

15        Q.    And you were --

16               You were dismissed after the fourth attempt

17   to take the CBSE exam, correct?

18        A.    I guess you would call it a tentative

19   dismissal or --

20        Q.    Well, you appealed, right, and then you were

21   readmitted?

22        A.    Uh-huh.

23        Q.    Okay.  So ultimately you were readmitted

24   after this but it appears, according to the letter, they

25   reference a dismissal for failure to pass the NBME CBSE

Page 200

1    in four consecutive attempts.

2              Do you see that?

3         A.    Yes.  I'm sorry, you asked me if --

4         Q.    If this was the dismissal for failing to past

5    the CBSE exam in four consecutive attempts, right?

6         A.    Yes.

7         Q.    Okay.  And then I'm going to show you next

8    what we'll mark as Exhibit 13.  And this appears to be

9    an appeal that you submitted.  I'll just ask you to take

10   a look and tell me if that's what this document is?

11        A.    Correct.

12              (Thereupon, the document/item referred to was

13   marked for identification as Exhibit 13.)

14        Q.    Okay.  And it says under "Reason for Appeal"

15   on the first page.  It says "Failure to pass the

16   NBME" -- I'm sorry.

17              It says "Check the reasons you were

18   dismissed:"  And that says "Failure to pass the NBME

19   CBSE in three or more attempts", correct?

20        A.    Correct.

21        Q.    And when we turn to your statement, your

22   statement talks about financial stress or financial

23   issues that you are experiencing at that time, is that

24   correct?

25        A.    The document says that.

Page 206

1    stuff.  This is the only thing that would kind of make

2    this make sense as to why I was doing so many things.

3         Q.     There is no reference to ADHD in this, right?

4         A.     No, there is not.

5         Q.     And there is no mention of needing additional

6    testing time, right?

7         A.     No, because I didn't know that this was an

8    ADHD thing.  But now looking at it, it had to -- I

9    didn't know that this behavior was because of ADHD.

10   This is -- this is classic -- not only was I driving, I

11   was still studying and I put a tablet in my car to study

12   while I drive.  That's just too much going on.  It's --

13   it's -- that's just not concentrating on something.

14        Q.     All right.  Your appeal to be reinstated to

15   Ross after the failing the fourth time was granted,

16   right?  You were permitted to re-enroll at Ross?

17        A.     Yes.

18        Q.     And you were permitted to take the CBSE exam

19   for a fifth attempt, correct?

20        A.     Yes.

21        Q.     Do you recall you mentioned that there was

22   some sort of a review course that you took.

23               Do you recall a six-week review course?

24        A.     I'm sorry.  Can you repeat that?

25        Q.     Do you recall a six-week review course that

Page 207

1   you took prior to the fifth attempt?

2        A.    Vaguely.  I remember -- vaguely.  I remember

3   certain events around that time.  I definitely enrolled

4   and paid for a class, a review course.  I think that was

5   one of the conditions or something like that.  I think

6   it was Becker or something like that.  I can't -- I

7   can't remember.

8        Q.    The fifth time you took the CBSE exam, you

9   did not obtain a passing score, correct?

10       A.    No.

11       Q.    And you were then dismissed from Ross

12  University School of Medicine, is that correct?

13       A.    Yes.

14       Q.    You appealed that decision, correct?

15       A.    Ross used inconsistent language.  I don't

16  know if they considered it recommended for dismissal or

17  if it's dismissed at that moment.  So I -- I don't know

18  when they consider you actually dismissed.  I'm assuming

19  it's when it's finalized.

20       Q.    You submitted a document that's called an

21  "Academic Dismissal Appeal", correct?

22       A.    Yes.

23       Q.    All right.  We'll mark this one as the next

24  Exhibit 14.

25             Can I check if that one has any highlighting

Page 209

1    over the word limit that I was allowed.  So I had to

2    somehow take sentences out of this appeal.

3         Q.    Okay.  You'll agree anything you removed Ross

4    would not have seen, right?

5         A.    Would not have seen.

6         Q.    If you deleted it, it would not have gone,

7    that portion you deleted would not have gone to Ross to

8    review, right?

9         A.    Right.

10        Q.    So what they got, what they saw is the

11   information that's contained in Awodiya 14, right?

12        A.    Right.

13        Q.    So why don't we take a look then at the

14   written statement that starts at the bottom of the first

15   page and then continues on to the next page.

16              Do you want to take a moment to review that?

17        A.    Okay.  I read it.

18        Q.    There is no mention of extra testing time in

19   this submissions, right?

20        A.    No.

21        Q.    And you drafted this written statement,

22   right?

23        A.    Yes.

24        Q.    What is the isotretinoin?  It looks like a

25   medication that's referenced.

Page 211

1   administered those sessions that you reference here?

2       A.    I think -- I actually technically don't know

3   what they label as cognitive behavior therapy, but I

4   think I was referencing just general mental health

5   meetings.  But I don't know technically like

6   cognitive -- it's therapy.  But it's like mental therapy

7   for like behavioral.  It's -- I don't know.  That type

8   of thing.  It's just like therapy.  So I think I was

9   referencing just psychiatric mental health like

10  appointments.

11      Q.    Would that have been Dr. Mauricio and

12  Dr. Unterman at that point in time?

13      A.    I think that would fall under that.  But

14  technically it's -- it's -- I don't know if everyone

15  would label it the same.

16      Q.    I guess my question is, is there any other

17  doctor that these sessions would be a reference to other

18  than?

19      A.    No.

20      Q.    In response to this appeal that we just

21  looked at, the school did not allow you to be readmitted

22  at that time, correct?

23      A.    No.

24      Q.    They upheld the dismissal, is that right?

25      A.    The Promotions Committee?

Page 212

1          Q.      Correct.

2          A.      Yes.

3          Q.      And you were notified of that decision,

4     correct?

5          A.      Yes, yes.

6          Q.      I'll mark next as Exhibit 15?

7                  I believe this is a document that you showed

8     to Dr. Owen yesterday.  It appears to be your appeal

9     letter to Dr. Owen following the decision of the

10    promotion committee?

11         A.      I'm sorry.  Can you repeat that?

12                 (Thereupon, the document/item referred to was

13    marked for identification as Exhibit 15.)

14         Q.      Yes.  This appears to be an appeal letter

15    that you submitted to Dean Owen following your receipt

16    of the student Promotion Committee's letter upholding

17    your dismissal.

18                 Does that appear to be what this is?

19         A.      This is not an appeal letter.  This is not

20    even my e-mail.  This is a e-mail from the student

21    service center -- Student Services to me telling me they

22    had received it.

23         Q.      If you go midway down the page, does that

24    appear to be forwarding an e-mail from you to Dean Owen?

25         A.      Why can't we just use the original e-mail?

Page 242

1    marked for identification as Exhibit 21.)

2         Q.    Yes.   It looks like it's the remainder after

3    the prior exhibit, which only goes through Spring 2012?

4         A.    Okay.   I would like to label this

5    confidential.   It has my Social Security number on it.

6         Q.    Sure.

7               Does that appear --

8               The GPA 3.45, does that seem to be what your

9    recollection is as to your GPA from undergrad?

10        A.    Yeah.

11              MR. ROMAN:   All right.   Thank you very much

12        for your time, Mr. Awodiya.   I don't have anymore

13        questions for you at this time and thank you very

14        much.   Have a great day.

15              THE WITNESS:   Thank you.

16              MR. ROMAN:   All right.   We'll go off the

17        record.

18              THE VIDEOGRAPHER:   We're now going off the

19        video record.   It's 6:23.

20         (This deposition was concluded at 6:23 P.M.)

21

22

23

24

25

# TAB 119-20

# EXHIBIT 19



# *STUDENT HANDBOOK*

# **2015 – 2016**

**January 1, 2016**

© 2016 Ross University School of Medicine.  All rights reserved.

RUSM 000326

Students are required to complete all exams as scheduled. There are no make-up exams. A student may be excused from one mid-term examination per semester in an emergency. In the case of a single approved absence from a mid-term examination, the student's score on their Final exam will be substituted for the missed mid-term exam. In cases where there are multiple sections on the Final exam, the student's score on the entire Final exam will be substituted. Students who are unable to complete all mid-term exams, with the exception of a single approved absence, may be administratively withdrawn. The student will receive a grade at the time of withdrawal which is based on a percentage of the weighted exams which the student has completed before withdrawal. Students with a cumulative weighted score of 70%, or higher, will receive a WP. Below 70% will receive a WF. RUSM will not modify exam group assignments, for either written or clinical exams, to accommodate a student's travel off the island. Do not book a flight on the same day as your exam.

In order to be excused from a mid-term examination, the student must present valid documentation prior to the exam describing the nature of the emergency to the Associate Dean of Student Affairs, or his/her designee, and must include appropriate supporting documentation. Approval is at the discretion of the Associate Dean, or his/her designee. A mid-term examination missed without prior approval will be assigned a grade of zero. (See exceptions in **Attendance** section)

Final examinations must be taken on schedule; failure to do so could result in a failing grade for the course.  On the rare occasion a student is excused from taking a final examination, a grade of I will be assigned and the exam must be taken at the end of the following semester. The I grade will revert to an F if the incomplete exam is not made up by the end of the following semester. The student will not be eligible for promotion until after the incomplete has been rectified.

**NBME CBSE**
The NBME CBSE or "COMP" exam has proven to be a good predictor of student performance on the USMLE Step 1 exam. In an effort to assess the readiness of RUSM students to pass the Step 1 on their 'first attempt', RUSM requires that students first pass the NBME CBSE. Students are required to take the CBSE at the end of their final Foundations of Medicine semester. Students must obtain a passing score, as determined by the Dean, prior to being certified to take USMLE Step 1. Students are given three opportunities to obtain a passing grade on the NBME CBSE and must pass: (1) within no more than three consecutive attempts, (attempt dates are pre-established by the Office of the Registrar and are determined based on the date of the first attempt, a scheduled exam that a student does not take is considered an attempt) and (2) within six months of becoming eligible. Any student failing to pass the CBSE within three attempts is subject to review by the Promotions Committee-Foundations of Medicine. The Promotions Committee-Foundations of Medicine will then conduct a careful review of the student's entire academic record, and either grant a student an additional opportunity to take the NBME CBSE.

***Clinical Sciences Exams***

**NBME SCE**
Students must pass the SCE at the conclusion of each core clerkship.  (See the SCE policy in the **Policies and Administrative Procedures** section)  Scores of 75 or above on SCE will be noted on the MSPE.

A student must pass at least five (5) subject clerkship examinations to be eligible to sit for the NBME CCSE. Students will not be scheduled for the NBME CCSE until successful completion of five (5) core clerkships, including passing each SCE exam.

Please refer to page 126 regarding the SCE policy for core clerkships.

RUSM 000354

## ACCOMMODATIONS FOR STUDENTS WITH DISABILITIES

The RUSM curriculum represents a core curriculum essential to all physicians. Therefore, RUSM expects that each student admitted will be capable of completing the full curriculum of required courses, clerkships, and electives under the established RUSM policies within seven (7) years of matriculation. All students and applicants must be capable of meeting the RUSM Technical Standards (as outlined in the **Professionalism and Conduct** section) with or without reasonable accommodation, at each stage of their medical education. Our goal at RUSM is to provide equal opportunity without undermining the integrity of any course, clerkship, or program. Requests for accommodation should be made as soon as the need is known and within the guidelines described here. Requests are processed in Foundations of Medicine and Clinical Sciences by the appropriate Accommodation Coordinator in the Office for Student Affairs.

### Application

*Foundations of Medicine* Requests for accommodation during the foundational science portion of the curriculum should be submitted in writing to the Accommodations Coordinator for Foundations of Medicine.

*Internal Medicine Foundations (IMF)*
It is the student's responsibility to ensure that all accommodation requests and materials are up to date prior to commencing IMF and/or Clinical Sciences. Requests for accommodation during the clinical portion of the curriculum should be submitted to the Director of Office of Consultation and Support Services for IMF/Clinical Sciences. Accommodations that were received during the Foundations of Medicine curriculum will be taken into consideration but cannot ensure similar accommodations in the Clinical Sciences curriculum (see **Clinical Sciences section**).

*Clinical Sciences*
Although RUSM may have granted a student's request for accommodations during the Foundations of Medicine curriculum, this in no way assures that the same accommodations requested will be deemed reasonable in the context of IMF/Clinical Sciences. The Director of Office of Consultation and Support Services is available to advise and assist RUSM students with the accommodation request processes of the clinical training institutions, but has no role in the outcome of such requests.

### Timeframe

For recently-admitted students, requests for accommodation should be submitted within 30 days of acceptance. When the need for an accommodation arises after a student has begun medical studies, please allow at least four (4) weeks once all documentation has been received by the Accommodations Coordinator for Foundations of Medicine or the Director of Office of Consultation and Support Services for IMF/Clinical Sciences to allow time for an evaluation of the request and documentation. RUSM will make all reasonable efforts to review such requests in a timely manner, but cannot guarantee the disposition of requests prior to any specific examination or phase of the curriculum.

### Responsibility

To qualify for accommodation, a student must identify him/herself to the Accommodation Coordinator for Foundations of Medicine or the Director of Office of Consultation and Support Services for IMF/Clinical Sciences, declare the disability or suspected disability in writing, and request accommodation. It is also the student's responsibility to obtain a thorough written evaluation from an appropriate professional, documenting the presence, extent, and ramifications of the disability. In addition, the documentation should explain what specific types of accommodation the evaluator believes might be most helpful in offsetting the effects of the disability to an acceptable extent (in a medical school environment, if possible). Responsibility for the timely submission of requests and supporting documentation rests upon the student seeking the accommodation. Our goal at RUSM is to provide equal opportunity without undermining the integrity of any course, clerkship or program. Requests not

RUSM 000371

==highlight start==
submitted with at least four (4) weeks or not accompanied by sufficient supporting documentation will impede
RUSM's ability to respond in a timely manner.
==highlight end==

**Confidentiality**

RUSM keeps all accommodation requests confidential to the extent necessary to consider the request and
implement the accommodations upon approval. RUSM reviews requests to determine whether they are supported
by adequate and appropriate documentation. After careful review in consultation with appropriate professionals,
the Accommodation Coordinator for Foundations of Medicine or the Director of Office of Consultation and Support
Services for IMF/Clinical Sciences will make a recommendation to the Associate Dean, Student Affairs or the Senior
Associate Dean, Student Affairs. The decision of the Associate Dean, Senior Associate Dean of Student Affairs or
his/her designee will then be communicated in writing to the student.

**Propriety**

All accommodations will be reasonable and appropriate to the circumstances, allowing equal opportunity for
students with disabilities. Accommodations must not infringe on, or fundamentally alter, the essential
requirements of the medical education program, as outlined in the RUSM Technical Standards.

**Accommodations and USMLE/NBME Testing**

If a student with a disability requires an accommodation for any phase of the USMLE testing, it is the student's
responsibility to seek that accommodation directly from the NBME and/or the Federation of State Medical Boards
(FSMB) in compliance with their policies. Although RUSM previously may have granted accommodation requests
for the student, disability accommodations for these examinations are determined solely by the policies or
processes of the NBME or FSMB. The Accommodations Coordinator for Foundations of Medicine or the Director of
Office of Consultation and Support Services for IMF/Clinical Sciences is available to assist students with the process
governing requests for an accommodation for the USMLE, but RUSM has no role in the outcome of these requests.
Please note that NBME's review for accommodations takes a minimum of 90 days, so please apply in time to allow
adequate review.  Students seeking accommodation through the NBME must adhere to the curricular and
administrative deadlines for sitting for USMLE Step examinations.

**External Facilities**

RUSM makes no guarantee that any facility outside of its campuses, including housing and other establishments,
will provide accommodations for individuals with disabilities.

## APPEALS

**Initiation and Scope**

Parties may appeal the outcome of formal academic and non-academic disciplinary actions. These appeals must be submitted in their proper form within *15 calendar days* of notification of the decision of the Senior Associate Dean of Student Affairs or his/her designee. Appeals are considered only when it is clearly established by the appealing party, in a concise written statement, that one of the following occurred:

- **The decision was unreasonable** based on the information presented at the hearing and/or based on the alleged violation;
- **The sanction was unreasonable** based on the information presented at the hearing and/or based on the violation;
- **There was a misinterpretation** of the Code of Conduct or other policies, by the Grievance Committee, Honor Council or administrator during the adjudication of the case;
- **A procedural error occurred** that resulted in an unfair hearing; or
- **Relevant information was not brought out** in the initial hearing that may have been sufficient to alter a decision, because such information was not known to the person appealing at the time of the original hearing.

The specific basis or bases for the appeal must be identified by the appealing party in the written appeal.

**Administrative Response**

Neither the Complainant nor Respondent will attend Appeal hearings. With the exception of appeals involving new information not known at the time of the original hearing or informal resolution, the Dean, or designee's, review will be limited to the written appeal, documents and evidence originally presented at the hearing or informal resolution, and the official record of the hearing. The Dean, or his/her designee, may:

- Uphold the original finding and outcome;
- Require a (new) hearing;
- Send the appeal back to the Associate Dean for Student Affairs, Grievance Committee or Honor Council for review of the decision or sanctions;
- Reverse the original decision by finding that a violation or no violation of the Code of Conduct occurred; or
- Amend sanctions where the original sanctions imposed are found to be unreasonable.

**Notification**

The Dean, Senior Associate Dean of Student Affairs, or their designee, will notify the parties of the appeal decision within *15 calendar days* of the Dean's receipt of the written appeal.

# TAB 119-24

# EXHIBIT 23

# NBME National Board of Medical Examiners

## Subject Examination Program

### Examinee Performance Profile

#### Comprehensive Basic Science

#### 305010 - Ross University School of Medicine

ID: ▮▮▮▮▮▮▮

Name: Awodiya Oluwamuyiwa

Test Date(s): 03/30/2017

Total Scaled Score: 60

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test of USMLE® Step 1. (See NOTE on Page 1.)

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀❙❙❙ or ❙❙❙▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSE is designed to be integrative, many items contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

Additional information about the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* at www.usmle.org. An explanation of your score along with a table of approximate USMLE Step 1 performance equivalents for CBSE scores is included in the *Score Interpretation Guide for Students*.

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **Discipline** | | | |
| Behavioral Sciences | ◀❙❙❙▬▬▬▬▬ | | |
| Biochemistry | | ▬▬▬▬▬▬ | |
| Gross Anatomy & Embryology | ▬▬▬▬▬ | | |
| Histology & Cell Biology | ◀❙❙❙▬▬▬▬ | | |
| Microbiology & Immunology | | ▬▬▬▬▬▬▬ | |
| Pathology | ▬▬▬▬▬ | | |
| Pharmacology | ▬▬▬▬▬▬ | | |
| Physiology | ◀❙❙❙▬▬▬▬ | | |
| **System** | | | |
| General Principles of Foundational Science | ▬▬▬▬▬▬ | | |
| Behavioral Health and Nervous Systems/Special Senses | | | ▬▬▬▬▬▬▬ |
| Musculoskeletal, Skin, & Subcutaneous Tissue | ◀❙❙❙▬▬▬▬ | | |
| Cardiovascular System | ◀❙❙❙▬▬ | | |
| Respiratory System | ◀❙❙❙▬▬▬▬ | | |
| Gastrointestinal System | ▬▬▬▬▬▬ | | |
| Renal/Urinary System | ◀❙❙❙▬▬▬ | | |
| Multisystem Processes & Disorders | ▬▬▬▬▬▬ | | |

RUSM 000046

# NBME National Board of Medical Examiners

## Subject Examination Program

### Examinee Performance Profile

#### Comprehensive Basic Science

#### 305010 - Ross University School of Medicine

ID: ████████

Name: Awodiya Oluwamuyiwa

Test Date(s): 10/22/2016

Total Scaled Score: 61

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test of USMLE® Step 1. (See NOTE on Page 1.)

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◄|| or ||► symbol indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSE is designed to be integrative, many items contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

Additional information about the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* at www.usmle.org. An explanation of your score along with a table of approximate USMLE Step 1 performance equivalents for CBSE scores is included in the *Score Interpretation Guide for Students*.

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **Discipline** | | | |
| Behavioral Sciences | ◄|| ▒▒▒▒▒▒▒▒ | | |
| Biochemistry | ◄|| | | |
| Gross Anatomy & Embryology | | ▒▒▒▒▒▒▒▒▒▒ | |
| Histology & Cell Biology | ◄|| ▒▒▒▒▒▒ | | |
| Microbiology & Immunology | | ▒▒▒▒▒▒▒▒▒▒ | |
| Pathology | ◄|| | | |
| Pharmacology | | ▒▒▒▒▒▒▒▒ | |
| Physiology | ◄|| ▒▒▒ | | |
| **System** | | | |
| General Principles of Foundational Science | | ▒▒▒▒▒▒▒▒▒▒ | |
| Behavioral Health and Nervous Systems/Special Senses | | ▒▒▒▒▒▒▒▒▒▒ | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | ◄|| ▒▒ | | |
| Cardiovascular System | ◄|| ▒▒▒▒▒ | | |
| Respiratory System | | ▒▒▒▒▒▒▒▒ | |
| Gastrointestinal System | ◄|| ▒▒▒▒ | | |
| Renal/Urinary System | ◄|| ▒▒▒ | | |
| Multisystem Processes & Disorders | | ▒▒▒▒▒▒▒▒ | |

RUSM 000047

Case 0:18-cv-60482-RKA   Document 119-24   Entered on FLSD Docket 01/04/2019   Page 4 of 6
USCA11 Case: 18-12832   Document: 22-1   Date Filed: 10/16/2019   Page: 193 of 212

NBME **National Board of Medical Examiners**

## Subject Examination Program

### Examinee Performance Profile

**Comprehensive Basic Science**

**305010 - Ross University School of Medicine**

ID: ▓▓▓▓▓

Name: Awodiya Oluwamuyiwa

Test Date(s): 08/26/2016

Total Scaled Score: 67

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test of USMLE® Step 1. (See NOTE on Page 1.)

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀▌▌ or ▌▌▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSE is designed to be integrative, many items contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

Additional information about the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* at www.usmle.org. An explanation of your score along with a table of approximate USMLE Step 1 performance equivalents for CBSE scores is included in the *Score Interpretation Guide for Students.*



RUSM 000048

# NBME National Board of Medical Examiners
## Subject Examination Program

### Examinee Performance Profile

**Comprehensive Basic Science**

**305010 - Ross University School of Medicine**

ID: ▮▮▮▮▮▮▮▮

Name: Awodiya Oluwamuyiwa

Test Date(s): 07/02/2016
Total Scaled Score: 64

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test of USMLE® Step 1. (See NOTE on Page 1.)

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀▌▌ or ▌▌▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSE is designed to be integrative, many items contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

Additional information about the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* at www.usmle.org. An explanation of your score along with a table of approximate USMLE Step 1 performance equivalents for CBSE scores is included in the *Score Interpretation Guide for Students.*



RUSM 000049

# NBME   National Board of Medical Examiners

## Subject Examination Program

### Examinee Performance Profile

### Comprehensive Basic Science

### 305010 - Ross University School of Medicine

ID: ▓▓▓▓▓▓▓                                    Test Date(s): 04/22/2016
Name: Awodiya Oluwamuyiwa                       Total Scaled Score: 58

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test of USMLE® Step 1. (See NOTE on Page 1.)

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◄▓ or ▓► symbol indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSE is designed to be integrative, many items contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

Additional information about the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* at www.usmle.org. An explanation of your score along with a table of approximate USMLE Step 1 performance equivalents for CBSE scores is included in the *Score Interpretation Guide for Students*.

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **Discipline** | | | |
| Behavioral Sciences | ◄▓▓▓▓▓▓▓▓▓▓▓▓ | | |
| Biochemistry | ◄▓▓▓▓▓▓▓▓▓ | | |
| Gross Anatomy & Embryology | ◄▓▓▓▓ | | |
| Histology & Cell Biology | ◄▓▓ | | |
| Microbiology & Immunology | | ▓▓▓▓▓▓▓▓▓▓▓▓ | |
| Pathology | ▓▓▓▓▓▓▓▓▓▓▓ | | |
| Pharmacology | ◄▓▓▓▓▓▓▓▓▓ | | |
| Physiology | ◄▓▓▓▓▓▓▓▓▓ | | |
| **System** | | | |
| General Principles of Foundational Science | ◄▓▓▓▓▓▓▓ | | |
| Behavioral Health and Nervous Systems/Special Senses | | ▓▓▓▓▓▓▓▓▓ | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | ◄▓▓▓▓▓ | | |
| Cardiovascular System | ◄▓▓▓▓▓▓▓▓ | | |
| Respiratory System | | ▓▓▓▓▓▓▓▓▓▓▓▓ | |
| Gastrointestinal System | ▓▓▓▓▓▓▓▓ | | |
| Renal/Urinary System | ◄▓▓▓▓▓ | | |
| Multisystem Processes & Disorders | ◄▓▓▓▓▓▓▓ | | |

RUSM 000050

# TAB 119-25

# EXHIBIT 24



**ROSS UNIVERSITY**
SCHOOL OF MEDICINE

# Academic Dismissal Appeal

Students dismissed for failing to meet the standards of academic progress may appeal the dismissal by submitting this form and supporting documents to PromotionAppeals@RossU.edu and the Office of the Registrar (Registrar@RossU.edu ) within 15 calendar days of the date on the dismissal notification letter. Appeals are considered only when it is clearly established in a concise written statement by the appealing party. Please refer to the RUSM Student Handbook for additional information regarding the appeals process.

## SECTION A: STUDENT INFORMATION

Name: Oluwamuyiwa Awodiya                    Student ID#: ▇▇▇▇▇▇▇

Email Address: oluwamuyiwaawodiya                    @rossu.edu Phone Number: 2406021836

## SECTION B: LEVEL OF APPEAL

To whom are you directing your appeal?

✓ Student Promotions Committee                    ✓ Dean (after Promotions Committee appeal)

## SECTION C: REASON FOR APPEAL

Check the reason (s) you were dismissed:

___ Failure of any course or semester after two attempts;
___ Failure of a remedial course;
___ Failure to achieve a cumulative GPA of 2.00 or above;
✓ Failure to pass the NBME CBSE in three or more attempts;
___ Failure to pass the USMLE Step 1 or Step 2 CK or CS in six (6) attempts;
___ Failure to pass any SCE in four (4) attempts;
___ Failure of two clinical clerkships (including IMF);
___ Failure of a clinical clerkship where a grade of R was awarded for the same clerkship;
___ Failure to abide by RUSM policies;
___ Student demonstrates the inability to meet the RUSM's technical standards;
___ Failure to meet the conditions of reinstatement on appeal; or
___ Failure to complete all required degree requirements within seven (7) years of matriculation or as otherwise noted on reacceptance or reinstatement.

## SECTION D: WRITTEN STATEMENT clearly and concisely explain the circumstances that led to your dismissal below. Please
explain how you have adequately identified and resolved the issues that resulted in poor academic performance or breach of professional standards. Provide an overview of how your circumstances have changes or will be different so that you can continue to make satisfactory academic progress and/or professional progress toward completing your academic program if you are permitted to continue your coursework and/or clinical training. Supplemental documentation may be added but is rarely necessary. Please note any documentation submitted after the appeal deadline will not be accepted.

*Appeal statements should not exceed 300 words.*

Hello promotion committee. I had a version that could not meet the 300 word limit so this version that I am officially submitting is the condensed version. I sincerely hope it will suffice.

In the big picture of things, my COMP score was increasing to where I failed by 1 point. This was in June 2016.

In August 2016, I began a prescribed medication called Claravis (isotretinoin) also known as Accutane. Some greatly stressed side effects of this medication, especially to people susceptible to behavioral health issues, are "depressed mood, trouble concentrating, sleep problems, crying spells, aggression or agitation, changes in behavior, hallucinations, thoughts of suicide or hurting yourself."

Over the next 6 months I experienced a significant decline in my mental performance and very erratic emotional and behavior changes because of the medication side effects in combination with my susceptibility to anxiety and depression.

In March 2017 (3 weeks before my COMP exam) I was diagnosed with "adjustment disorder with mixed anxiety and depressed mood." Basically, a lot of focus shifted to getting myself back to baseline.

A couple weeks later (1 week before COMP) I was instructed to immediately stop taking isotretinoin.

In April 2017 I was diagnosed with Obsessive Compulsive Disorder and trichotillomania (I pull my eyelashes out to decrease my anxiety).

In mid-April 2017 I began cognitive behavioral therapy (CBT). After about 3 CBT sessions, my UWorld scores went from an average of 58.6% (10 exams ~400 questions) to 73.4% (10 exams ~400 questions) and every day I am improving. In summary, I will likely pass any future exam, specifically COMP with a full-on attack of my OCD, anxiety, and depression with the continuing cognitive behavioral therapy as well as with the cessation and withdrawal of isotretinoin and its side effects.

**FOR OFFICE USE ONLY**

Appeal Decision:    ☐   Granted

☐   Denied

_____Date:_____
Senior Associate Dean of Academic and Student Affairs Signature

RUSM 000052

# TAB 119-26

# EXHIBIT 25

# UNITED STATES DISTRICT COURT

for the
Southern District of Florida

| | |
|---|---|
| OLUWAMUYIWA AWODIYA, | ) |
| *Plaintiff,* | ) |
| | ) |
| **-v-** | ) |
| | ) |
| ROSS UNIVERSITY SCHOOL OF | ) |
| MEDICINE, SCHOOL OF | ) |
| VETERINARY MEDICINE LIMITED | ) |
| *Defendant.* | ) |

Case No.   0:18-cv-60482-KMM

Hon. Chief Judge: K. Michael Moore
Magistrate Judge: Barry S. Seltzer

## PLAINTIFF'S AMENDED RESPONSES AND OBJECTIONS

## TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff Oluwamuyiwa Awodiya ("Plaintiff"), in proper person, hereby serves his

responses and objections to Defendant's First Set of Interrogatories filed by Ross University

School of Medicine, School of Veterinary Medicine Limited ("RUSM" or "Defendant").

## PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action. These responses are

subject to all applicable objections as to competence, relevance, materiality, and admissibility, as

well as to any and all other objections on any grounds that would require the exclusion of any

statement herein if this document was introduced in Court. All objections and grounds for such

objections are expressly reserved and may be interposed at the time of any motion, hearing or

trial.

The following responses are given without prejudice to Plaintiff's right to produce or rely

on subsequently discovered information, facts, or documents. The responses contained herein are

made in a good faith effort to comply with the provisions of the Federal Rules of Civil Procedure

1

but are in no way deemed to prejudice Plaintiff with respect to further discovery, research, and analysis.

Plaintiff reserves the right to provide information or documents that may come to his attention and become available in the future and to use such information or documents at any hearing or proceeding related to this action. Plaintiff further reserves the right to submit any information and documentation provided by RUSM. Plaintiff also reserves the right to amend or supplement these responses in the event that RUSM later asserts a different interpretation of an Interrogatory which is accepted by Plaintiff.

## OBJECTIONS TO DEFINITIONS

Plaintiff objects to Definition 1 as overbroad to the extent it requests information not within his possession, custody or control. Plaintiff responds on his own behalf and will only information or documents in his possession, custody or control.

Plaintiff objects to Definition 3 as overbroad in substance, not relevant to Plaintiff's claims or Defendant's defenses, and ask for privileged information. Plaintiff will only interpret the term "mental impairments" to mean (i) Attention Deficit Disorder Without Mention of Hyperactivity, (ii) Anxiety State, Unspecified, and (iii) Obsessive Compulsive Disorder.

## SPECIFIC RESPONSES AND OBJECTIONS

### Interrogatory No. 1:

State the name, address, telephone number, place of employment, and job title of any person who has, claims to have, or whom you believe may have knowledge or information pertaining to any fact, defense, or injury alleged in any pleading filed in this proceeding or that you intend to file in this proceeding. In your response, please state the specific nature and substance of the knowledge that you believe the person(s) identified in your response may have.

2

**RESPONSE**: Plaintiff states the following individuals have knowledge of facts relevant to Plaintiff's claims and Defendant's defenses:

Plaintiff: his request for accommodations for his disabilities from RUSM, the information he relied upon when enrolling into RUSM, his interactions and communications with RUSM, and his mitigation efforts, as well as the other information found in his Complaint.

Denise H. Unterman, LCSW-C: Plaintiff's OCD, anxiety impairment, and emotional distress caused by both RUSM's dismissal and failure to accommodate his disabilities. Adult psychotherapist at Kaiser Permanente located in Largo, MD.

Earl John Mauricio, M.D: Plaintiff's ADHD. Adult psychiatrist at Kaiser Permanente located in Largo, MD.

RUSM employees and all other people previously disclosed in this action.

**Interrogatory No. 2:**

Please identify all communications, whether oral or written, that you, or anyone acting on your behalf, have had with RUSM or any of its employees, agents, members, managers, or owners regarding the subject matter of your Third Amended Complaint, and describe in detail the content of each such communication. In your response, please include the date(s) these communications occurred, the location(s) of these communications, the substance of such communications and the name of any individuals with knowledge of same.

**RESPONSE**: Plaintiff refers RUSM to the documents produced in response to Defendant's First Request for Production, to the documents produced in response to Plaintiff's Request for Production of Documents, and to ECF No. 59.

**Interrogatory No. 3:**

Please identify any doctors, counselors or other treating physicians who you have visited during the relevant time period and anyone who has diagnosed and/or treated you for any mental impairment. In your answer, please include the name, address and contact information for anyone with knowledge of same.

**RESPONSE**: *See* Plaintiff's Response to Interrogatories Nos. 1 and 2.

**Interrogatory No. 4:**

Please identify all mental impairments or any other illness, impairment or disability that you are alleging is relevant to the claims in this action, including in your answer (i) the date on which a diagnosis was made regarding that impairment, illness or disability, (ii) the identity of the person that made the diagnosis, (iii) when you first began experiencing symptoms pertaining to that impairment, illness or disability, (iv) the date on which you ceased experiencing any of those symptoms, (v) any medication you take for each impairment, illness or disability (whether prescribed or otherwise), (vi) the dosage of each such medication, and (vii) the date on which you took each medication.

**RESPONSE**: Plaintiff's mental impairments consist of both attention/concentration impairments and anxiety disorders. Plaintiff's attention impairment was diagnosed as Attention Deficit Disorder Without Mention of Hyperactivity by Mr. Cuffy of RUSM on January 18, 2016. Dr. Mauricio also diagnosed Plaintiff with ADHD in 2016. Plaintiff's anxiety disorder was first diagnosed as "Anxiety State, Unspecified" by Mr. Cuffy on February 17, 2016. Plaintiff's anxiety disorder was diagnosed again but as Obsessive-Compulsive Disorder by Ms. Unterman on April 18, 2017. Plaintiff does not know when he "first began experiencing symptoms" per se. Plaintiff continues to experience symptoms of said disabilities which are active and ongoing. In regard to medication, Plaintiff objects to the rest of the subparts of Interrogatory No. 4 as they

4

are unduly burdensome, not proportional to the needs of the case, overbroad in substance, not relevant to Plaintiff's claims or Defendant's defenses, and seeks information that is not reasonably calculated to lead to the discovery of admissible evidence because "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." 42 U.S.C. § 12102(4)(E)(i).

**Interrogatory No. 5:**

Regardless of time period, please identify each medical school or other institution you have applied to, including in your answer the date on which you applied, the date on which you received a response from the school and the outcome of the application process. Please include in your response all schools you applied to both prior to your enrollment at RUSM and after your dismissal from RUSM.

**RESPONSE**: Plaintiff objects to this Interrogatory to the extent that it calls for information outside the relevant time period and is unduly burdensome to the extent that it calls for "all schools" regardless of time period. Subject to and without waiving these objections, Plaintiff identifies the following medical schools that he applied to or tried to apply to after his dismissal from RUSM:

- University of Maryland School of Medicine; Plaintiff was ineligible because "[y]ou must also be in good standing and eligible for promotion at your medical school [RUSM]."

- George Washington University Medical School; "Must be in good standing and be eligible to reenter medical school, if your education has been interrupted."

- Howard University College of Medicine; Plaintiff was ineligible because this school required that he be in "good standing" at previous medical school.

5

- Eastern Virginia Medical School; Plaintiff was ineligible because only applicants "in good standing can be considered."

- Florida State University College of Medicine; Will only consider "students in good standing" at previous medical school.

- University of South Florida College of Medicine; "An applicant who is, for any reason, on probation or not in good academic standing at the school from which transfer is sought will not be accepted for transfer to our college."

- Xavier University School of Medicine; School refused to respond to Plaintiff after his many attempts to contact their admissions department.

- Saint James School of Medicine; "The applicant must be in good academic standing" at previous medical school.

- Saba University School of Medicine; Plaintiff was ineligible because Plaintiff "must be in good academic standing" at previous medical school.

- Medical University of the Americas; Plaintiff was ineligible because Plaintiff "must be in good academic standing" at previous medical school.

- Windsor University School of Medicine; Plaintiff's conditional acceptance was cancelled because a "[l]etter of good standing is required from the previous school [RUSM]."

- St. George's University; "Unfortunately based on your dismissal by another medical school there are no options available to you at SGU."

**Interrogatory No. 6:**

Describe all efforts you have made to obtain employment or other work for compensation since your dismissal from RUSM, including in your answer (i) the name of each employer you

6

contacted, (ii) the employer's contact information, including address, (iii) the date on which you contacted the employer, (iv) whether you were offered a position with the employer, (v) the salary or hourly wage offered, (vi) the approximate number of hours per week you would be expected to work (if hourly), and (vii) any other benefits, including but not limited to paid vacation time, health benefits, stock options or other benefits offered as part of the employment. For all jobs identified in your response, please state whether you accepted employment with that employer and, if so, the dates of employment, your job title(s), and the actual salary and benefits received by you.

**RESPONSE**: Plaintiff refers RUSM to the documents produced in response to Defendant's First Request for Production.

**Interrogatory No. 7:**

For each impairment, illness or disability identified in response to Interrogatory No. 4, above, please state whether you requested an accommodation for that impairment, illness or disability from RUSM, including in your response (i) the name of the RUSM employee, officer or agent from whom you requested the accommodation, (ii) the location where the request was made, (iii) the precise nature of the accommodation you requested, (iv) the date on which you requested the accommodation, (v) the name of any other individual who has personal knowledge of your request, (vi) and the outcome of the request for accommodation.

**RESPONSE**: Plaintiff objects to Interrogatory No. 7 to the extent that it calls for a legal conclusion. Plaintiff refers RUSM to the documents produced in response to Defendant's First Request for Production and to documents at ECF No. 59.

**Interrogatory No. 8:**

Please identify all communications, whether oral or written, that you, or anyone acting on your behalf, have had with the National Board of Medical Examiners or any of its employees, agents, members, managers, or owners. In your response, please include the date(s) these communications occurred, the location(s) of these communications, the substance of such communications and the name of any individuals with knowledge of same.

**RESPONSE**: Plaintiff objects to RUSM's Interrogatory No. 8 on the grounds that it does not identify the information to be produced with reasonable particularity. Plaintiff is willing to discuss an appropriate narrowing of this Interrogatory with RUSM. Plaintiff further objects to the extent that it calls for privileged work product information.

**Interrogatory No. 9:**

Please describe in detail all of the damages you are seeking in this action. In your response, please include the manner in which the category of damages is calculated and the name and contact information of any individual with knowledge of same.

**RESPONSE**: Plaintiff objects to this Interrogatory on the grounds that it is vague and ambiguous as to the term "in detail." Plaintiff also notes that if "physical damages" means non-mental, non-emotional, non-monetary bodily harm, for example a broken leg, then Plaintiff is not seeking damages for this type of "physical damages." Subject to and without waiving the objection, Plaintiff provides the following categories of damages:

- **Lost Earning Capacity:**
  - Average salary with bachelor's degree: <u>$63,342</u>. Bureau of Labor Statistics Data, U.S. Bureau of Labor Statistics, https://data.bls.gov/timeseries/LEU0252919100 (Accessed on October 23, 2018).

8

- o Annual wage for a physician: <u>$211,390</u>. 29-1069 Physicians and
  Surgeons, All Other, U.S. Department of Labor, Bureau of Labor
  Statistics, https://www.bls.gov/oes/current/oes291069.htm (Last Modified
  March 30, 2018).
- o For a 26-year-old male, his expected years to work are <u>41 years</u>.
  Retirement & Survivors Benefits: Life Expectancy Calculator, Social
  Security, https://www.ssa.gov/cgi-bin/longevity.cgi (Accessed on October
  23, 2018).

Total lost earning capacity: 41 x ($211,390 - $63,342) = **<u>$6,069,968.00</u>**

- **Emotional Distress as Compensatory Damages:**
  Half the total lost earning capacity = **<u>$3,034,984</u>**

- **Loans Purposed for RUSM's Cost of Attendance:**
  Calculated from Award History in myRoss = **<u>$207,917</u>**

- **Punitive Damages for Fraud/Misrepresentation Claims:**
  **<u>1% of Adtalem's net worth</u>** based on its reported cash equivalent of its total
  assets.

- **Punitive Damages for Breach of Fiduciary Duty Claim:**
  **<u>1% of Adtalem's net worth</u>** based on its reported cash equivalent of its total
  assets.

**<u>Interrogatory No. 10:</u>**

Describe all income, including but not limited to, wages, salaries, loan proceeds and
welfare or disability benefits that you have received since your dismissal from RUSM. In your
response, please provide the amounts received for each source of income, the date on which the

9

amounts were received, the name of each source of income, and the time period during which you received the income from each source. Also, please provide the name and contact information of any individual with knowledge of same.

**RESPONSE**: *See* Plaintiff's Response to Interrogatory No. 6.

**<u>Interrogatory No. 11:</u>**

Please describe with specificity how much you have paid in tuition, fees or other monies as a result of your enrollment at RUSM. In your response, please provide (i) subtotals for each category, (ii) state how much you borrowed, (iii) state how much is due and owing to RUSM or any loan provider or other source of funding, (iv) state how much interest paid to date, and (v) state how much interest is still owed. Also, please provide the name and contact information of any individual with knowledge of same.

**RESPONSE**: Plaintiff refers RUSM to the documents produced in response to Defendant's First Request for Production.

## CERTIFICATION

I certify that the foregoing statements made by me are true and correct based upon my personal knowledge and belief. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED this 25th day of October, 2018:

Respectfully submitted,

*/s/Oluwamuyiwa Awodiya*
By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

## CERTIFICATE OF SERVICE

I do hereby certify that on this 25th day of October, 2018, I have caused a true and correct copy of the foregoing by emailing a copy to:

Ryan Roman
Akerman Senterfitt
Suntrust International Center
1 SE 3rd Avenue
25th Floor
Miami, FL 33131-1714
305-374-5600
Fax: 305-374-5095
Email: ryan.roman@akerman.com

*/s/Oluwamuyiwa Awodiya*
By: Oluwamuyiwa Awodiya, *pro se* litigant

11