IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

USCA Case No. 19-12832-D
United States District Court, Southern District of Florida
Case No.:  0:18-cv-60482-RKA

OLUWAMUYIWA AWODIYA

Plaintiff/Appellant,

v.

ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE LIMITED

Defendant/Appellee.

## SUPPLEMENTAL APPENDIX TO ANSWER BRIEF OF APPELLEE ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE LIMITED

## VOLUME II OF II

MICHAEL C. MARSH
RYAN ROMAN
DONNIE M. KING
OCTAVIA M. GREEN
AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, Florida 33131
Tel: (305) 374-5600
Fax: (305) 374-5095

ATTORNEYS FOR APPELLEE

**INDEX TO SUPPLEMENTAL APPENDIX TO ANSWER BRIEF OF
APPELLEE ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF
<u>VETERINARY MEDICINE LIMITED</u>**

| <u>Description</u> | **Docket / Tab** |
|---|---|
| Plaintiff's Response to the Court's May 16, 2019 Order [DE 191] See FRAP 30(a)(2) | 192 |
| Transcript of Calendar Call and Motion Hearing before the Honorable Roy K. Altman, United States District Judge, on June 11, 2019 | 216 |
| Certificate of Service | Final Page |

# TAB 192

FILED BY ⟨RK⟩ D.C.

MAY 22 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| OLUWAMUYIWA AWODIYA, | ) | Case No.   0:18-cv-60482-RKA |
| *Plaintiff*, | ) | |
| | ) | |
| -v- | ) | Hon. Judge: Roy K. Altman |
| | ) | Magistrate Judge: Patrick M. Hunt |
| ROSS UNIVERSITY SCHOOL OF | ) | |
| MEDICINE, SCHOOL OF | ) | |
| VETERINARY MEDICINE LIMITED, | ) | |
| *Defendant*. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO THE COURT'S MAY 16, 2019 ORDER [ECF NO. 191]

*Pro se* plaintiff Oluwamuyiwa Awodiya ("Plaintiff") hereby files his response to the Court's May 16, 2019 Order [ECF No. 191].

### I.   INTRODUCTION

Regarding a private, for-profit, postgraduate institution of higher education, engaged in the commerce of Federal financial assistance, the United States Congress, as evidenced by the statutes and Federal regulations, has indicated extraterritorial effect of the antidiscrimination statutes.

### II.   FACTUAL BACKGROUND

Defendant Ross University School of Medicine, School of Veterinary Medicine Limited ("RUSM") is a private school that operates for profit. *See* Defendant's Answer to Third Amended Complaint ¶ 2 [ECF No. 58]. Since 2014, the United States has disbursed over $850 million of taxpayers' money to RUSM for its medical program. *See* true and correct excerpts of Title IV Program Volume Reports, attached hereto as Exhibit 1. In order to receives these funds, RUSM executed a Foreign School Program Participation Agreement ("PPA") with the United States Secretary of Education. *See* PPA at 1–2, Exhibit B to [ECF No. 89-1]. The United States allows

RUSM to receive Federal financial assistance "in order to provide U.S. students with access to financial assistance to receive postsecondary education outside of the United States." *Id*. at 2.

RUSM administration testified that the university does not require its employees and faculties to comply with the ADA and the Rehabilitation Act. *See* Hayse Dep. 14:11–18, Ex. RJ-04 [ECF No. 138]. RUSM administration further testified that RUSM faculty was not provided with "any guidance," "any policy" or "any rules" on how to comply with requests for accommodations. *See* Hayse Dep. 33:11–16.

## III.    ARGUMENT

RUSM's reliance on a "Not for Publication" opinion from *Archut v. Ross Univ. Sch. of Veterinary Med.*, CIVIL ACTION NO. 10-1681 (MLC) (D.N.J. Nov. 19, 2012), is inappropriate because it is no longer good law. In its ruling, the *Archut* court stated that: "Examining each of these sections [of the statutes] reveals that there is no clear statement that this law applies abroad.... Without an express extension of the statute to foreign institutions receiving federal financial aid, it cannot be implied that Congress actually intended such extraterritorial application." *Id*. at *22–24 (internal quotation mark omitted). The *Archut* court's constricted interpretation of extraterritoriality was recently overruled by the Supreme Court of the United States.

"The presumption against extraterritoriality does not require us to adopt such a constricted interpretation. While the presumption can be overcome only by a clear indication of extraterritorial effect, **an express statement of extraterritoriality is not essential**," and "context can be consulted as well." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2102 (2016) (emphasis added) (citing *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 265 (2010)).

For example, in *RJR Nabisco*, the Supreme Court found that "[t]he most obvious textual clue is that RICO defines racketeering activity to include a number of predicates that plainly apply to at least some foreign conduct." *RJR Nabisco*, 136 S. Ct. at 2101. Here, the Rehabilitation Act

2

defines institutions of higher education to include institutions outside of the United States—and Title III of the ADA defines private entities to include ones affecting commerce between any foreign country and the United States. "The scope of an extraterritorial statute thus turns on the limits Congress has (or has not) imposed on the statute's foreign application, and not on the statute's 'focus.'" *RJR Nabisco*, 136 S. Ct. at 2101. Here, Congress enacted that nothing should be construed to limit the rights and responsibilities under the Rehabilitation Act and the ADA for programs under the Higher Education Act.

### A.   The Statutes Indicate Extraterritorially

#### i.   Indications of Congressional Intent Regarding Antidiscrimination

Congress enacted the Rehabilitation Act under 29 U.S.C. Chapter 16 (the "Rehabilitation Act"). The purpose of the Rehabilitation Act is to prevent discrimination against American citizens with disabilities. *See* 29 U.S.C. § 701(a) ("Congress finds that — (1) millions of Americans have one or more physical or mental disabilities and the number of Americans with such disabilities is increasing" and "(6) the goals of the Nation properly include the goal of providing individuals with disabilities with the tools necessary to … achieve equality of opportunity, full inclusion and integration in society, employment, independent living, and economic and social self-sufficiency, for such individuals.").

Congress stated that "[t]he purposes of this chapter are … to maximize opportunities for individuals with disabilities" and "to ensure, to the greatest extent possible, that youth with disabilities and students with disabilities … under section 794 of this title have opportunities for postsecondary success." 29 U.S.C. §§ 701(b)(2), (5). "It is the policy of the United States that **all programs, projects, and activities receiving assistance** under this chapter shall be carried out in a manner consistent with the principles of … inclusion, integration, and full participation of the individuals." 29 U.S.C. § 701(c)(3) (emphasis added).

Under the Americans with Disabilities Act (the "ADA"), Congress also found that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(7). A purpose of this chapter is "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities" and "to invoke the sweep of congressional authority … and to regulate commerce." 42 U.S.C. §§ 12101(b)(2), (4).

The ADA provides that "nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) or the regulations issued by Federal agencies pursuant to such title." 42 U.S.C. § 12201(a). "Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter." 42 U.S.C. § 12201(b). "Because the same standards govern discrimination claims under the Rehabilitation Act and the ADA, we discuss those claims together and rely on cases construing those statutes interchangeably." *Allmond v. Akal Security, Inc.*, 558 F.3d 1312, 1316 n.3 (11th Cir. 2009).

      ii.   Indications of Congressional Intent Regarding Institutions Outside of the United States

Title III of the ADA prohibits discrimination in "any place of public accommodation." 42 U.S.C. § 12182(a). Congress enacted that "private entities are considered public accommodations … if the operations of such entities affect commerce." 42 U.S.C. § 12181(7). Under Title III of the ADA, Congress enacted that "[t]he term 'commerce' means travel, **trade**, traffic, **commerce**, transportation, or communication … between any **foreign country** or any territory or possession and any State." 42 U.S.C. § 12181(1)(B) (emphasis added). This includes "postgraduate private

4

school[s]." 42 U.S.C. § 12181(7)(J). The United States allows RUSM to receive Federal financial assistance "in order to provide U.S. students with access to financial assistance to receive postsecondary education outside of the United States." *See* Factual Background *supra* Part II.

The General Provisions of the Rehabilitation Act provides that it applies to "all programs, projects, and activities receiving assistance." 29 U.S.C. § 701(c). The General Provisions of the Rehabilitation Act also states: "For the purposes of this chapter ... [t]he term 'institution of higher education' has the meaning given the term in section 1002 of title 20." 29 U.S.C. § 705(23). Section 1002 of title 20 pertains to institutions of higher education that receive Federal financial assistance under the Higher Education Act of 1965 (the "HEA"), enacted by Congress. *See* 20 U.S. Code Chapter 28.

In order to determine the applicability of the Rehabilitation Act and the ADA, Congress tells us that we must turn to its HEA definitions of an "institution" of higher education. 29 U.S.C. § 705(23). Thus, within the meaning of the Rehabilitation Act, Congress expressly defined "institutions" of higher education to include "institutions outside the United States." 20 U.S.C. § 1002(a)(2); *accord* 20 U.S.C. § 1002(a)(1)(C) (same). Like RUSM, Congress expressly includes "graduate medical school[s] located outside the United States." 20 U.S.C. § 1002(a)(2)(A)(i). Congress further enacted that "**Nothing in this chapter shall be construed to limit the rights or responsibilities of any individual under the Americans with Disabilities Act** of 1990 [42 U.S.C. 12101 et seq.], **the Rehabilitation Act** of 1973 [29 U.S.C. 701 et seq.], or any other law." 20 U.S.C. § 1011 (brackets in original; bold added).

iii.   Further Indications of Congressional Intent by Statutory Nexus of Connections Between Foreign Countries (Institutions) and the United States

In *Comparelli v. Republica Bolivariana De Venez., , S.A., an Agency Or Instrumentality of the Bolivarian Republic of Venez., Int'l Petrochemical Sales, Ltd.*, 891 F.3d 1311, 1324 (11th Cir.

5

2018), the defendant argued that a "[statute] does not have extraterritorial effect if there is no connection whatsoever to the United States." The Eleventh Circuit held, "but the argument ignores that the [statute] contains a nexus requirement providing a requisite connection to the United States sufficient to allow extraterritorial application." *Id.*

Here, under Title III of the ADA, Congress enacted that "[t]he term 'commerce' means travel, **trade**, traffic, **commerce**, transportation, or communication ... between any **foreign country** or any territory or possession and any State." 42 U.S.C. § 12181(1)(B) (emphasis added). Similarly, under the Rehabilitation Act, Congress expressly defined "institutions" of higher education to include "institutions outside the United States." 20 U.S.C. §§ 1002(a)(2), (a)(1)(C); 29 U.S.C. § 705(23).

Back to *Comparelli*, the Eleventh Circuit held: "That nexus requirement was enough to rebut the presumption against extraterritoriality in *RJR Nabisco*, and we hold that the nexus requirement of [a statute] similarly rebuts that presumption here." 891 F.3d 1311, 1324.

**B.      The Federal Regulations are Controlling Authority and They Indicate Extraterritorially**

Even assuming, *arguendo*, that Congressional intent is still not clear, the Federal regulations are controlling law in this case.

i.      Controlling Authority

"Where Congress has not merely failed to address a precise question, but has given an 'express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' the agency's 'legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1319 (11th Cir. 2006) (quoting *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 843-44 (1984)).

6

Title V of the Rehabilitation Act expressly states that "The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation ... Act." 29 U.S.C. § 794. The Secretary "means the Secretary of Education." 29 U.S.C. § 705(33)(a). "The Secretary, in order to carry out functions otherwise vested in the Secretary by law or by delegation of authority pursuant to law, and subject to limitations as may be otherwise imposed by law, is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." 20 U.S.C. § 1221e–3.

The ADA provides that "nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) or the regulations issued by Federal agencies pursuant to such title." 42 U.S.C. § 12201(a).

      ii.    <u>Congressional Intent Indicated by Delegated Authority</u>

As stated above, within the meaning of the antidiscrimination statutes, Congress expressly defined "institutions" of higher education to include "institutions outside the United States." 20 U.S.C. §§ 1002(a)(2), (a)(1)(C); 29 U.S.C. § 705(23); 42 U.S.C. §§ 12181(1)(B), (7), (7)(J). Regarding these institutions located outside of the United States, Congress further enacted that "[t]he Secretary may ... issue proposed regulations establishing criteria for the eligibility of graduate medical schools described in such subclause to participate in the loan programs" and "issue final regulations establishing such criteria for eligibility." 20 U.S.C. §§ 1002(a)(2)(B)(iii)(IV)(aa)–(bb). "The Secretary shall promulgate regulations regarding the recertification requirements applicable to an institution of higher education outside of the United States ...." 20 U.S.C. § 1099c(g)(3).

The Federal regulations set forth that "[a] foreign institution must comply with all requirements for eligible and participating institutions." 34 C.F.R. § 600.51(c)(1). "Covered

institution: Any institution of higher education, proprietary institution of higher education, postsecondary vocational institution, or institution outside the United States, as these terms are defined in 34 CFR part 600, that receives any Federal funding or assistance." 34 C.F.R. § 601.2(b); *accord* 20 U.S.C. § 1019(2). "An institution may participate in any Title IV, HEA program ... only if the institution enters into a written program participation agreement with the Secretary, on a form approved by the Secretary." 34 C.F.R. § 668.14(a)(1); *accord* 20 U.S.C. § 1094(a). By entering into a program participation agreement, "[i]t will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA." 34 C.F.R. § 668.14(b)(1).

The Federal regulations further provide that "[n]o qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal financial assistance." 34 C.F.R. § 104.4. "The purpose of this part is to effectuate section 504 of the Rehabilitation Act of 1973, which is designed to eliminate discrimination on the basis of handicap in any program or activity receiving Federal financial assistance." 34 C.F.R. § 104.1. "This part applies to each recipient of Federal financial assistance from the Department of Education and to the program or activity that receives such assistance." 34 C.F.R. § 104.2; 34 C.F.R. § 104.41.

## C.    The Impact on Plaintiff's Claims

### i.    Claims Under the ADA and the Rehabilitation Act in Counts I and II

Because the issue of extraterritorially was irrelevant to the parties' motions for summary judgment concerning the failure to accommodate claims, the evidence offered may have miscommunicated to the Court the location of the acts in this case, some of which occurred in Dominica—most of which occurred in the United States or produced effects within the United

8

States. This may explain why RUSM omitted certain arguments—because RUSM's omitted argument would fail under the "two-step framework for analyzing extraterritoriality issues." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). However, as the Court has pointed out, after the recent position that RUSM has taken in its Motion for Leave [ECF No. 175], the ADA and Rehabilitation Act claims conflate with the fraud claims and thus the question of extraterritorially must be answered.

"If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.'" *RJR Nabisco*, 136 S. Ct. at 2101. "Because a finding of extraterritoriality at step one will obviate step two's 'focus' inquiry, it will usually be preferable for courts to proceed in the sequence that we have set forth." *Id.* at 2101 n.5.

In the Order, the Court limited the parties' briefs to ten pages. S. D. FLA. L. R. 7.1(c)(2) provides that the title page is not counted toward the length of pleadings. If the Court finds that an answer to "step two" is warranted, Plaintiff needs an estimated five additional pages to fully brief the depth of the mix questions of fact and law regarding the second step of the two-step framework for analyzing extraterritoriality issues. At this stage, the record evidence before the Court is not developed to answer, "step two." Moreover, it is unclear who bears the burden under Fed. R. Civ. P. 56(f)(3) as there is no "movant" on the issue before us. Plaintiff disputes that all the events in this case—or the effects of those events—took place in Dominica. *See, i.e.*, Defendant's Answer to Third Amended Complaint ¶ 23 (RUSM admitting that Plaintiff took his exams in both Dominica and the United States) [ECF No. 58]; Plaintiff's Request for Admission No. 18 (RUSM admitting that it is solely RUSM's decision to provide accommodations on those exam) [ECF No. 113 at 109].

    ii.    <u>Claims Under Fraudulent and Negligent Misrepresentation in the Inducement in Counts VIII and IX</u>

In this case, Plaintiff claims that RUSM fraudulently induced prospective students into enrolling at the university. Plaintiff made two claims under fraudulent misrepresentation in the inducement: (1) for fraud by commission of a false statement regarding a material fact; and (2) for fraud by omission of a material fact. *See* Third Amended Complaint ¶ 109 ("In addition to making a false statement, RUSM also committed fraud by omission ....") [ECF No. 47]. RUSM advertised a false statement in the Admissions Requirements section of its website claiming that the university had a policy requiring its faculty to comply with the Americans with Disabilities Act in Dominica. And even if it wasn't false—to be clear, the statement is false—then RUSM omitted a material truth about the advertised statement.

    1.    Fraud by Commission of a False Statement

Under Florida law, "[t]he requirements for a claim of fraud or fraudulent inducement are: (1) a false statement regarding a material fact; (2) the statement maker's knowledge that the representation is false [or should have known to be false]; (3) intent that the representation induces another's reliance; and (4) consequent injury to the party acting in reliance." *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1315 (11th Cir. 2007); *White Holding Co. v. Martin Marietta*, 423 Fed. Appx. 943, 945 (11th Cir. 2011) ("or should have known of the falsity").

"[T]o maintain a fraudulent-inducement claim" "in the context of fraud, demonstrating 'justifiable reliance' is not necessary." *Dem. Rep. Congo v. Air Capital Grp., LLC*, CASE NO. 12-20607-CIV-ROSENBAUM/SELTZER, at *10 (S.D. Fla. Jun. 24, 2013) (citing *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010)); *accord Bank of Am., N.A. v. Grec Homes IX, LLC*, CASE NO. 13-21718-CIV-ALTONAGA/Simonton, at *11 (S.D. Fla. Jan. 23, 2014) (Noting that *Butler* clarified justifiable reliance, "a claim for fraudulent inducement pursuant to Florida law" only

requires "consequent injury to the party acting in reliance."); *G Barrett LLC v. Ginn Co.*, Case No. 5:09-cv-374-Oc-10TBS, at *8–9 (M.D. Fla. Dec. 23, 2011) (applying *Butler*, "for a claim of fraudulent misrepresentation/inducement ... consequent injury by the party acting in reliance").

2.    Fraud by Omission of a Material Fact

"And then, of course, there can be concealment or omission with no statement at all ... In either circumstance, it would be inaccurate to instruct a jury to look for reliance on a statement to fulfill the obligation of proof because no statement was made." *Philip Morris USA, Inc. v. Duignan*, 243 So. 3d 426, 440–441 (Fla. Dist. Ct. App. 2017).

Even if a statement is true, the omission of a material fact is tantamount to fraud by omission. "Florida law recognizes that fraud can occur by omission, and places a duty on one who undertakes to disclose material information to disclose that information fully." *ZC Insurance Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. Dist. Ct. App. 2003) (Holding that "providing [plaintiff] with documents that define coverage while failing to provide documents that set forth the exclusions to that coverage is tantamount to fraud by omission."); *see also Woods v. On Baldwin Pond, LLC*, No. 15-13082, at *4 (11th Cir. 2015) ("Florida law does not recognize a stark distinction between fraud by commission and fraud by omission."); *Philip Morris USA, Inc. v. Duignan*, 243 So. 3d 426, 440 (Fla. Dist. Ct. App. 2017) ("Although the seller's statement was true, the plaintiff might still claim fraud on the theory that having chosen to speak about the condition of the transmission, the seller had a duty to disclose the transmission defect that had not yet manifested itself to the buyer.... The buyer here was not misled by the content of a statement; he was misled regarding an unstated truth the seller became obligated to disclose by virtue of having decided to speak.").

Thus, Plaintiff's claims for fraud by omission would survive in any scenario.

11

DATED this 19th day of May, 2019:

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

## CERTIFICATE OF SERVICE

I do hereby certify that on this 20th day of May, 2019, I have caused a true and correct

copy of the foregoing by mailing a copy to the Court, where the Court's CM/ECF system will send

notification to the following:

| | |
|---|---|
| **Ryan Roman** | **Octavia Monique Green** |
| Akerman Senterfitt | Akerman LLP |
| Suntrust International Center | Three Brickell City Centre |
| 1 SE 3rd Avenue | 98 Southeast Seventh Street |
| 25th Floor | Suite 1100 |
| Miami, FL 33131-1714 | Miami, FL 33131 |
| 305-374-5600 | (305) 982-5670 |
| Fax: 305-374-5095 | Email: |
| Email: | octavia.green@akerman.com |
| ryan.roman@akerman.com | |

By: Oluwamuyiwa Awodiya, *pro se* litigant

# Exhibit 1

**Volume by School**
quarter ending 6/30/2015

| OPE ID | School | State | Zip Code | School Type | Recipients | # of Loans Originated | $ of Loans Originated | # of Disbursements | $ of Disbursements |
|---|---|---|---|---|---|---|---|---|---|
| 02242400 | HENRICO COUNTY-SAINT MARY'S HOSPITAL SCHOOL OF PRACTICAL NURSI | VA | 232944201 | Public | - | - | $ - | - | $ - |
| 02242500 | BASTYR UNIVERSITY | WA | 980284966 | Private-Nonprofit | 709 | 1,550 | $ 28,200,126.00 | 4,257 | $ 28,200,126.00 |
| 02242700 | BERKELEY CITY COLLEGE | CA | 947041183 | Public | - | - | $ - | - | $ - |
| 02242900 | UNITED TRIBES TECHNICAL COLLEGE | ND | 585047596 | Private-Nonprofit | - | - | $ - | - | $ - |
| 02244300 | ACADEMY OF HAIR DESIGN #3 | MS | 392045008 | Proprietary | - | - | $ - | - | $ - |
| 02244400 | AMERICAN UNIVERSITY OF THE CARIBBEAN | | 061189980 | Foreign-For-Profit | 1,535 | 2,208 | $ 50,410,630.00 | 2,984 | $ 50,559,380.00 |
| 02244900 | GOODWIN COLLEGE | CT | 094531513 | Private-Nonprofit | - | - | $ - | - | $ - |
| 02245400 | KEENE BEAUTY ACADEMY | NH | 027384679 | Proprietary | - | - | $ - | - | $ - |
| 02245500 | FORTIS COLLEGE | FL | | Proprietary | - | - | $ - | - | $ - |
| 02245600 | WARREN COUNTY CAREER CENTER | OH | 450361099 | Public | - | - | $ - | - | $ - |
| 02246000 | ROSS UNIVERSITY SCHOOL OF MEDICINE | OH | 432463317 | Foreign-For-Profit | 3,004 | 5,969 | $ 65,763,715.00 | 6,481 | $ 65,577,315.00 |
| 02246300 | ROSS MEDICAL EDUCATION CENTER | OH | 430361099 | Proprietary | - | - | $ - | - | $ - |
| 02247000 | NEW ENGLAND SCHOOL OF HAIR DESIGN | NH | 037042005 | Proprietary | - | - | $ - | - | $ - |
| 02248200 | MILAN INSTITUTE OF COSMETOLOGY | TX | 791034506 | Proprietary | - | - | $ - | - | $ - |
| 02248600 | COOPER HEALTH SYSTEM THE - CENTER FOR ALLIED HEALTH EDUCATION | NJ | 081031489 | Private-Nonprofit | 6 | 6 | $ 106,500.00 | 12 | $ 106,500.00 |
| 02250000 | EVEREST COLLEGE | MO | 636077446 | Private-Nonprofit | - | - | $ - | - | $ - |
| 02251200 | SCHUYLKILL TECHNOLOGY CENTERS | PA | 179812100 | Public | - | - | $ - | - | $ - |
| 02251500 | TREND SETTERS ACADEMY OF BEAUTY CULTURE | KY | 402585755 | Proprietary | - | - | $ - | - | $ - |
| 02251600 | ACADEMY OF HAIR DESIGN #6 (THE) | MS | 394017581 | Proprietary | - | - | $ - | - | $ - |
| 02251700 | FOSTER'S COSMETOLOGY COLLEGE | MS | 386630066 | Proprietary | - | - | $ - | - | $ - |
| 02253700 | INTELLITEC COLLEGE | CO | 809096096 | Proprietary | - | - | $ - | - | $ - |

Award Year Summary

Excerpt of Direct Loan Program "AY 2014–2015 Q4," Title IV Program Volume Reports, available at

https://studentaid.ed.gov/sa/about/data-center/student/title-iv [Bates AWOD005361].

| OPE ID | School | State | Zip Code | School Type | $ of Disbursements | Recipients | # of Loans Originated | $ of Loans Originated | # of Disbursements | $ of Disbursements |
|---|---|---|---|---|---|---|---|---|---|---|
| 0243400 | HENRICO COUNTY-SAINT MARY'S HOSPITAL SCHOOL OF PRACTICAL NURSING | VA | 232041201 | Public | - | | | | | - |
| 0242500 | BASTYR UNIVERSITY | WA | 980284966 | Private-Nonprofit | 534,939.00 | 466 | 580 | 15,712,915.00 | 1,733 | 15,712,915.00 |
| 0242700 | BERKELEY CITY COLLEGE | CA | 947041183 | Public | 2,652.00 | - | - | - | - | - |
| 0242900 | UNITED TRIBES TECHNICAL COLLEGE | ND | 585047996 | Private-Nonprofit | - | | | | | - |
| 0244300 | ACADEMY OF HAIR DESIGN #5 | MS | 392045008 | Proprietary | - | | | | | - |
| 0244400 | AMERICAN UNIVERSITY OF THE CARIBBEAN | | | Foreign-For-Profit | - | 1,535 | 2,225 | 68,587,681.00 | 2,995 | 68,458,531.00 |
| 0244900 | GOODWIN COLLEGE | CT | 061189980 | Private-Nonprofit | 726,056.00 | | | | | - |
| 0245400 | KEENE BEAUTY ACADEMY | NH | 034311513 | Proprietary | 57,650.00 | | | | | - |
| 0245500 | FORTIS COLLEGE | FL | 327894679 | Proprietary | - | | | | | - |
| 0245600 | WARREN COUNTY CAREER CENTER | OH | 450061099 | Public | 54,946.00 | | | | | - |
| 0246000 | ROSS UNIVERSITY SCHOOL OF MEDICINE | | | Foreign-For-Profit | - | 3,024 | 4,056 | 142,524,728.00 | 7,205 | 141,963,207.00 |
| 0246300 | ROSS MEDICAL EDUCATION CENTER | OH | 452483317 | Proprietary | 27,113.00 | | | | | - |
| 0247000 | NEW ENGLAND SCHOOL OF HAIR DESIGN | NH | 037842003 | Proprietary | 9,500.00 | | | | | - |
| 0248200 | MILAN INSTITUTE OF COSMETOLOGY | TX | 791094306 | Proprietary | 91,746.00 | | | | | - |
| 0248600 | COOPER HEALTH SYSTEM THE - CENTER FOR ALLIED HEALTH EDUCATION | NJ | 081031489 | Private-Nonprofit | - | | | | | - |
| 0250600 | EVEREST COLLEGE | MO | 630072446 | Private-Nonprofit | 29,466.00 | | | | | - |
| 0251200 | SCHUYLKILL TECHNOLOGY CENTERS | PA | 179512100 | Public | 8,076.00 | | | | | - |
| 0251500 | TREND SETTERS ACADEMY OF BEAUTY CULTURE | KY | 402585755 | Proprietary | - | | | | | - |
| 0251600 | ACADEMY OF HAIR DESIGN #6 (THE) | MS | 394017581 | Proprietary | - | | | | | - |
| 0251700 | FOSTER'S COSMETOLOGY COLLEGE | MS | 386550066 | Proprietary | - | | | | | - |
| 0251700 | INTELLITEC COLLEGE | CO | 809096096 | Proprietary | 132,241.00 | | | | | - |

Award Year Summary

Excerpt of Direct Loan Program "AY 2014–2015 Q4," Title IV Program Volume Reports, available at

https://studentaid.ed.gov/sa/about/data-center/student/title-iv [Bates AWOD005361].

**Direct Loan Volume by School**

entry through Quarter ending 6/30/2016

Thru 4/1/2018

| OPE ID | School | State | Zip Code | School Type | $ of Disbursements | Recipients | # of Loans Originated | $ of Loans Originated | # of Disbursements | $ of Disbursements |
|---|---|---|---|---|---|---|---|---|---|---|
| 02245900 | GOODWIN COLLEGE | CT | 06118-0990 | Private-Nonprofit | $ 18,796,738.00 | - | - | $ - | - | $ - |
| 02245400 | KEENE BEAUTY ACADEMY | NH | 03431-3513 | Proprietary | $ 155,743.00 | - | - | $ - | - | $ - |
| 02245500 | FORTIS COLLEGE | FL | 32789-4679 | Proprietary | $ 3,255,765.00 | - | - | $ - | - | $ - |
| 02245600 | WARREN COUNTY CAREER CENTER | OH | 45036-1099 | Public | $ 431,156.00 | - | - | $ - | - | $ - |
| 02246000 | ROSS UNIVERSITY SCHOOL OF MEDICINE | | | Foreign-For-Profit | $ - | 2,889 | 3,826 | $ 68,412,189.00 | 6,747 | $ 68,412,189.00 |
| 02246500 | ROSS MEDICAL EDUCATION CENTER | OH | 45246-3517 | Proprietary | $ 3,661,322.00 | - | - | $ - | - | $ - |
| 02247000 | NEW ENGLAND SCHOOL OF HAIR DESIGN | NH | 03784-3009 | Proprietary | $ 89,902.00 | - | - | $ - | - | $ - |
| 02248200 | MILAN INSTITUTE OF COSMETOLOGY | NV | 89502-2177 | Proprietary | $ 4,105,871.00 | - | - | $ - | - | $ - |
| 02248600 | COOPER HEALTH SYSTEM THE - CENTER FOR ALLIED HEALTH EDUCATION | NJ | 08103-1489 | Private-Nonprofit | $ 24,500.00 | - | - | $ - | - | $ - |
| 02249900 | DELTA BEAUTY COLLEGE | MS | 38701-4501 | Proprietary | $ 66,000.00 | - | - | $ - | - | $ - |
| 02250600 | EVEREST COLLEGE | MO | 63807-2446 | Private-Nonprofit | $ 473,412.00 | - | - | $ - | - | $ - |
| 02251200 | SCHUYLKILL TECHNOLOGY CENTERS | PA | 17953-2100 | Public | $ 261,279.00 | - | - | $ - | - | $ - |
| 02251500 | TREND SETTERS' ACADEMY OF BEAUTY CULTURE | KY | 40258-3756 | Proprietary | $ 229,005.00 | - | - | $ - | - | $ - |
| 02251600 | ACADEMY OF HAIR DESIGN #6 (THE) | MS | 39401-7561 | Proprietary | $ 81,685.00 | - | - | $ - | - | $ - |
| 02251700 | FOSTER'S COSMETOLOGY COLLEGE | MS | 38655-3066 | Proprietary | $ 127,890.00 | - | - | $ - | - | $ - |
| 02253700 | INTELLITEC COLLEGE | CO | 80909-6066 | Proprietary | $ 1,797,514.00 | - | - | $ - | - | $ - |
| 02255800 | BERKS TECHNICAL INSTITUTE | PA | 19610-1168 | Proprietary | $ 9,121,014.00 | - | - | $ - | - | $ - |
| 02254000 | NEW ENGLAND CULINARY INSTITUTE | VT | 05602-3115 | Proprietary | $ 1,099,076.00 | - | - | $ - | - | $ - |

**Award Year Summary**

Excerpt of Direct Loan Program "AY 2015–2016 Q4," Title IV Program Volume Reports, available at

https://studentaid.ed.gov/sa/about/data-center/student/title-iv [Bates AWOD005362].

| OPE ID | School | State | Zip Code | School Type | Recipients | # of Loans Originated | $ of Loans Originated | # of Disbursements | $ of Disbursements |
|---|---|---|---|---|---|---|---|---|---|
| 02244900 | GOODWIN COLLEGE | CT | 061189960 | Private-Nonprofit | - | - | $ - | - | $ - |
| 02245400 | KEENE BEAUTY ACADEMY | NH | 034311513 | Proprietary | - | - | $ - | - | $ - |
| 02245500 | FORTIS COLLEGE | FL | 327894679 | Proprietary | - | - | $ - | - | $ - |
| 02245600 | WARREN COUNTY CAREER CENTER | OH | 450361099 | Public | - | - | $ - | - | $ - |
| 02246000 | ROSS UNIVERSITY SCHOOL OF MEDICINE | | | Foreign-For-Profit | 2,928 | 3,917 | $157,987,187.00 | 7,777 | $157,987,187.00 |
| 02246300 | ROSS MEDICAL EDUCATION CENTER | OH | 452463317 | Proprietary | - | - | $ - | - | $ - |
| 02247000 | NEW ENGLAND SCHOOL OF HAIR DESIGN | NH | 037842003 | Proprietary | - | - | $ - | - | $ - |
| 02248200 | MILAN INSTITUTE OF COSMETOLOGY | NV | 895022177 | Proprietary | - | - | $ - | - | $ - |
| 02248600 | COOPER HEALTH SYSTEM THE - CENTER FOR ALLIED HEALTH EDUCATION | NJ | 081051489 | Private-Nonprofit | - | - | $ - | - | $ - |
| 02249900 | DELTA BEAUTY COLLEGE | MS | 387014501 | Proprietary | - | - | $ - | - | $ - |
| 02250600 | EVEREST COLLEGE | MO | 658072446 | Private-Nonprofit | - | - | $ - | - | $ - |
| 02251200 | SCHUYLKILL TECHNOLOGY CENTERS | PA | 179312100 | Public | - | - | $ - | - | $ - |
| 02251500 | TREND SETTERS ACADEMY OF BEAUTY CULTURE | KY | 402583755 | Proprietary | - | - | $ - | - | $ - |
| 02251600 | ACADEMY OF HAIR DESIGN #6 (THE) | MS | 394017581 | Proprietary | - | - | $ - | - | $ - |
| 02251700 | FOSTER'S COSMETOLOGY COLLEGE | MS | 386650066 | Proprietary | - | - | $ - | - | $ - |
| 02253700 | INTELLITEC COLLEGE | CO | 805096096 | Proprietary | - | - | $ - | - | $ - |
| 02253900 | BERKS TECHNICAL INSTITUTE | PA | 196101168 | Proprietary | - | - | $ - | - | $ - |
| 02254000 | NEW ENGLAND CULINARY INSTITUTE | VT | 056023115 | Proprietary | - | - | $ - | - | $ - |

**Award Year Summary**

Excerpt of Direct Loan Program "AY 2015–2016 Q4," Title IV Program Volume Reports, available at

https://studentaid.ed.gov/sa/about/data-center/student/title-iv [Bates AWOD005362].

| | | | | | Volume by School | | | | |
| | | | | | enter ending 6/30/2017 | | | | |
| OPE ID | School | State | Zip Code | School Type | Recipients | # of Loans Originated | $ of Loans Originated | # of Disbursements | $ of Disbursements |
|---|---|---|---|---|---|---|---|---|---|
| 02242700 | BERKELEY CITY COLLEGE | CA | 947041183 | Public | - | - | $ - | - | $ - |
| 02244300 | Mississippi Barber Academy | MS | 392114052 | Proprietary | - | - | $ - | - | $ - |
| 02244400 | AMERICAN UNIVERSITY OF THE CARIBBEAN | | | Foreign-Nonprofit | 1,296 | 1,776 | $ 30,171,615.00 | 2,993 | $ 30,171,615.00 |
| 02244900 | GOODWIN COLLEGE | CT | 0611189980 | Private-Nonprofit | - | - | $ - | - | $ - |
| 02245400 | KEENE BEAUTY ACADEMY | NH | 034311513 | Proprietary | - | - | $ - | - | $ - |
| 02245500 | FORTIS COLLEGE | FL | 327894679 | Proprietary | - | - | $ - | - | $ - |
| 02245600 | WARREN COUNTY CAREER CENTER | OH | 450361099 | Public | - | - | $ - | - | $ - |
| 02246000 | ROSS UNIVERSITY SCHOOL OF MEDICINE | | | Foreign-For-Profit | 2,492 | 3,162 | $ 59,004,979.00 | 5,832 | $ 58,994,729.00 |
| 02246300 | ROSS MEDICAL EDUCATION CENTER | OH | 452463317 | Proprietary | - | - | $ - | - | $ - |
| 02247000 | NEW ENGLAND SCHOOL OF HAIR DESIGN | NH | 037043003 | Proprietary | - | - | $ - | - | $ - |
| 02248200 | MILAN INSTITUTE OF COSMETOLOGY | NV | 895022177 | Proprietary | - | - | $ - | - | $ - |
| 02249900 | DELTA BEAUTY COLLEGE | MS | 387014501 | Proprietary | - | - | $ - | - | $ - |
| 02250600 | EVEREST COLLEGE | MO | 658072446 | Private-Nonprofit | - | - | $ - | - | $ - |
| 02251200 | SCHUYLKILL TECHNOLOGY CENTERS | PA | 179312100 | Public | - | - | $ - | - | $ - |
| 02251500 | TREND SETTERS' ACADEMY OF BEAUTY CULTURE | KY | 402583755 | Proprietary | - | - | $ - | - | $ - |

Award Year Summary    Field Definitions

Excerpt of Direct Loan Program "AY 2016–2017 Q4," Title IV Program Volume Reports, available at

https://studentaid.ed.gov/sa/about/data-center/student/title-iv [Bates AWOD005363].

| OPE ID | School | State | Zip Code | School Type | Recipients | # of Loans Originated | $ of Loans Originated | # of Disbursements | $ of Disbursements |
|---|---|---|---|---|---|---|---|---|---|
| 02242700 | BERKELEY CITY COLLEGE | CA | 947041183 | Public | - | - | $ - | - | $ - |
| 02244300 | Mississippi Barber Academy | MS | 392114052 | Proprietary | - | - | $ - | - | $ - |
| 02244400 | AMERICAN UNIVERSITY OF THE CARIBBEAN | | 06118S980 | Foreign-For-Profit | 1,319 | 1,807 | $ 68,715,564.00 | 3,021 | $ 68,715,564.00 |
| 02244900 | GOODWIN COLLEGE | CT | 06118S980 | Private-Nonprofit | - | - | $ - | - | $ - |
| 02245400 | KEENE BEAUTY ACADEMY | NH | 034311513 | Proprietary | - | - | $ - | - | $ - |
| 02245500 | FORTIS COLLEGE | FL | 327834679 | Proprietary | - | - | $ - | - | $ - |
| 02245600 | WARREN COUNTY CAREER CENTER | OH | 450361059 | Public | - | - | $ - | - | $ - |
| 02246000 | ROSS UNIVERSITY SCHOOL OF MEDICINE | | | Foreign-For-Profit | 2,519 | 3,233 | $ 146,401,632.00 | 6,984 | $ 146,375,402.00 |
| 02246300 | ROSS MEDICAL EDUCATION CENTER | OH | 453463317 | Proprietary | - | - | $ - | - | $ - |
| 02247000 | NEW ENGLAND SCHOOL OF HAIR DESIGN | NH | 037842003 | Proprietary | - | - | $ - | - | $ - |
| 02248200 | MILAN INSTITUTE OF COSMETOLOGY | NV | 895022177 | Proprietary | - | - | $ - | - | $ - |
| 02249900 | DELTA BEAUTY COLLEGE | MS | 387014501 | Proprietary | - | - | $ - | - | $ - |
| 02250600 | EVEREST COLLEGE | MO | 658072446 | Private-Nonprofit | - | - | $ - | - | $ - |
| 02251200 | SCHUYLKILL TECHNOLOGY CENTERS | PA | 179312100 | Public | - | - | $ - | - | $ - |
| 02251500 | TREND SETTERS' ACADEMY OF BEAUTY CULTURE | KY | 402363755 | Proprietary | - | - | $ - | - | $ - |

**Award Year Summary**

Excerpt of Direct Loan Program "AY 2016–2017 Q4," Title IV Program Volume Reports, available at

https://studentaid.ed.gov/sa/about/data-center/student/title-iv [Bates AWOD005363].

**oan Volume by School**
th Quarter ending 6/30/2018

| OPE ID | School | State | Zip Code | School Type | Recipients | # of Loans Originated | $ of Loans Originated | # of Disbursements | $ of Disbursements |
|---|---|---|---|---|---|---|---|---|---|
| 02242500 | BASTYR UNIVERSITY | WA | 980284966 | Private-Nonprofit | 747 | 1,555 | $ 28,786,356.00 | 4,267 | $ 28,613,034.00 |
| 02242700 | BERKELEY CITY COLLEGE | CA | 947041183 | Public | - | - | $ - | - | $ - |
| 02244300 | Mississippi Barber Academy | MS | 392114052 | Proprietary | - | - | $ - | - | $ - |
| 02244400 | AMERICAN UNIVERSITY OF THE CARIBBEAN | | | Foreign-For-Profit | 1,214 | 1,727 | $ 29,831,971.00 | 2,957 | $ 29,659,549.00 |
| 02244900 | GOODWIN COLLEGE | CT | 061185980 | Private-Nonprofit | 18 | 27 | $ 240,813.00 | 44 | $ 240,813.00 |
| 02245400 | KEENE BEAUTY ACADEMY | NH | 034311513 | Proprietary | - | - | $ - | - | $ - |
| 02245600 | WARREN COUNTY CAREER CENTER | OH | 450361099 | Public | - | - | $ - | - | $ - |
| 02246000 | ROSS UNIVERSITY SCHOOL OF MEDICINE | | | Foreign-For-Profit | 2,524 | 3,500 | $ 63,790,575.00 | 6,301 | $ 64,284,314.00 |
| 02246300 | ROSS MEDICAL EDUCATION CENTER | OH | 452463317 | Proprietary | - | - | $ - | - | $ - |
| 02247000 | NEW ENGLAND SCHOOL OF HAIR DESIGN | NH | 037842003 | Proprietary | - | - | $ - | - | $ - |
| 02248200 | MILAN INSTITUTE OF COSMETOLOGY | NV | 895022177 | Proprietary | - | - | $ - | - | $ - |
| 02249900 | DELTA BEAUTY COLLEGE | MS | 387014501 | Proprietary | - | - | $ - | - | $ - |
| 02251200 | SCHUYLKILL TECHNOLOGY CENTERS | PA | 179312100 | Public | - | - | $ - | - | $ - |
| 02251500 | TREND SETTERS' ACADEMY OF BEAUTY CULTURE | KY | 402583755 | Proprietary | - | - | $ - | - | $ - |
| 02251600 | ACADEMY OF HAIR DESIGN #6 (THE) | MS | 394017581 | Proprietary | - | - | $ - | - | $ - |

Award Year Summary

Excerpt of Direct Loan Program "AY 2017–2018 Q4," Title IV Program Volume Reports, available at

https://studentaid.ed.gov/sa/about/data-center/student/title-iv [Bates AWOD005364].

| OPE ID | School | State | Zip Code | School Type | Recipients | # of Loans Originated | $ of Loans Originated | # of Disbursements | $ of Disbursements |
|---|---|---|---|---|---|---|---|---|---|
| 02242500 | BASTYR UNIVERSITY | WA | 980284966 | Private-Nonprofit | 564 | 728 | $ 18,746,972.00 | 2,175 | $ 18,643,830.00 |
| 02242700 | BERKELEY CITY COLLEGE | CA | 947041183 | Public | - | - | $ - | - | $ - |
| 02244300 | Mississippi Barber Academy | MS | 392114052 | Proprietary | - | - | $ - | - | $ - |
| 02244400 | AMERICAN UNIVERSITY OF THE CARIBBEAN | | | Foreign-For-Profit | 1,246 | 1,771 | $ 64,065,298.00 | 3,563 | $ 63,719,437.00 |
| 02244900 | GOODWIN COLLEGE | CT | 061185980 | Private-Nonprofit | - | - | $ - | - | $ - |
| 02245400 | KEENE BEAUTY ACADEMY | NH | 034311513 | Proprietary | - | - | $ - | - | $ - |
| 02245600 | WARREN COUNTY CAREER CENTER | OH | 450361099 | Public | - | - | $ - | - | $ - |
| 02246000 | ROSS UNIVERSITY SCHOOL OF MEDICINE | | | Foreign-For-Profit | 2,554 | 3,910 | $ 152,861,359.00 | 8,594 | $ 148,552,990.00 |
| 02246300 | ROSS MEDICAL EDUCATION CENTER | OH | 452463317 | Proprietary | - | - | $ - | - | $ - |
| 02247000 | NEW ENGLAND SCHOOL OF HAIR DESIGN | NH | 037842003 | Proprietary | - | - | $ - | - | $ - |
| 02248200 | MILAN INSTITUTE OF COSMETOLOGY | NV | 895022177 | Proprietary | - | - | $ - | - | $ - |
| 02249900 | DELTA BEAUTY COLLEGE | MS | 387014501 | Proprietary | - | - | $ - | - | $ - |
| 02251200 | SCHUYLKILL TECHNOLOGY CENTERS | PA | 179312100 | Public | - | - | $ - | - | $ - |
| 02251500 | TREND SETTERS' ACADEMY OF BEAUTY CULTURE | KY | 402583755 | Proprietary | - | - | $ - | - | $ - |
| 02251600 | ACADEMY OF HAIR DESIGN #5 (THE) | MS | 394017581 | Proprietary | - | - | $ - | - | $ - |

Award Year Summary

Excerpt of Direct Loan Program "AY 2017–2018 Q4," Title IV Program Volume Reports, available at

https://studentaid.ed.gov/sa/about/data-center/student/title-iv [Bates AWOD005364].

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE
POSTAGE REQUIRED

UNITED STATES
POSTAL SERVICE
Retail

P

**US POSTAGE PAID**

**$7.35**

Origin: 20716
05/20/19
2308370716-06

**PRIORITY MAIL 2-Day ®**

0 Lb 6.40 Oz

1006

EXPECTED DELIVERY DAY: 05/22/19

C019

SHIP
TO:
299 E BROWARD BLVD
STE 108
FORT LAUDERDALE FL 33301-1922

**USPS TRACKING NUMBER**



9505 5105 6956 9140 3354 96

P S00001000014

EP14F Oct 2018
OD: 12 1/2 x 9 1/2

U.S. Marshal Service
Contents X-RAYED
POST ?

To schedule free
Package Pickup,
scan the QR code.



USPS.COM/PICKUP

**PRIORITY**
★ MAIL ★

UNITED STATES
POSTAL SERVICE

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM:
Oluwamuyiwa Awodiya
15005 Dahlia Dr.
Bowie, MD 20721

**TO:**
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Room 108
Fort Lauderdale, FL 33301

Label 228, March 2016

FOR DOMESTIC AND INTERNATIONAL USE

★ Domestic only.   ★ For Domestic shipments, the maximum weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.

# TAB 216

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 18-60482-CIV-RKA

OLUWAMUYIWA AWODIYA,                    .
                                        .
                Plaintiff,              . Fort Lauderdale, Florida
                                        . June 11, 2019
                v.                      . 2:32 p.m.
                                        .
ROSS UNIVERSITY SCHOOL OF               .
MEDICINE,                               .
                                        .
                Defendant.              .
. . . . . . . . . . . . . . . . .

                        -   -   -   -   -

        Transcript of Calendar Call and Motion Hearing had

            before the Honorable Roy K. Altman,

                United States District Judge.

                        -   -   -   -   -

Proceedings recorded by mechanical stenography, transcript
produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

**APPEARANCES:**

For the Plaintiff:    Oluwamuyiwa Awodiya, Pro Se
                                    15005 Dahlia Drive
                                    Bowie, Maryland  20721

For the Defendant:    Ryan Roman, Esq.
                                      Michael R. Marsh, Esq.
                                      Donnie M. King, Esq.
                                      Octavia M. Green, Esq.
                                      Akerman LLP
                                      Three Brickell City Centre
                                      98 Southeast Seventh Street
                                      Suite 1100
                                      Miami, Florida  33131

Court Reporter:      Francine C. Salopek, RMR, CRR
                                    Official Court Reporter
                                    United States District Court
                                    299 E. Broward Blvd., Room 207B
                                    Fort Lauderdale, Florida 33301
                                    (954)769-5686/mjsfcs@aol.com

                                 -  -  -  -  -

1          <u>**TUESDAY, JUNE 11, 2019, 2:32 P.M.**</u>

2                *(The Judge entered the courtroom)*

3          THE COURT:  Good afternoon.  Please be seated.

4          MR. ROMAN:  Good afternoon, your Honor.

5          MR. AWODIYA:  Good afternoon, your Honor.

6          ROOM CLERK:  Calling Case Number 18-60482-Civil,

7   Awodiya vs. Ross University School of Medicine.

8          Counsel, please state your appearances for the record.

9          MR. AWODIYA:  Pro se plaintiff, Oluwamuyiwa Awodiya.

10         THE COURT:  Good afternoon, sir.

11         MR. AWODIYA:  Good afternoon.

12         MR. ROMAN:  And, good afternoon, your Honor.  Ryan

13  Roman of Akerman.  And with me is Michael Marsh, Octavia Green,

14  and Donnie King, also with Akerman, on behalf of Ross

15  University.

16         THE COURT:  Good afternoon to all of you.

17         MR. ROMAN:  Good afternoon.

18         THE COURT:  So, we are here for two reasons -- well,

19  really three reasons.  The first is we're having a calendar

20  call.  The second is a number of you -- both of you have filed

21  motions in limine, and we're going to resolve those.  And the

22  third reason is that I asked you all to brief the question of

23  the applicability of the ADA and the RA in Dominica, that is to

24  say, extraterritorially, and both of you responded with what I

25  thought was good briefing, and I'm prepared, I think, to hear

```
 1   limited argument on that point.

 2           So, Mr. Awodiya -- is it Awodiya?

 3           MR. AWODIYA:  Awodiya.

 4           THE COURT:  Awodiya.

 5           MR. AWODIYA:  Yes.

 6           THE COURT:  Why don't you come up to the podium.  Do

 7   you want to make argument on this issue?

 8           MR. AWODIYA:  I mean it's a very simple -- I mean --

 9           THE COURT:  Why don't you come up to the podium.

10           MR. AWODIYA:  Yes, your Honor.

11           I mean it's pretty straightforward.  I think in the

12   previous case against Ross University's sister school, they

13   made no mention of how an institution was actually defined

14   within the Rehabilitation Act.

15           And one trouble that I had in my research is, I know

16   how to find statutes, and I know how to find case law, but I

17   don't know how to find when they changed.  So, I don't even

18   know if the law was like that when -- in 2012, when the Archut

19   Court was considering that, but it's definitely clear now that

20   it states that an institution within the Rehabilitation Act is

21   defined as institutions outside of the United States, as well

22   as inside of the United States.

23           THE COURT:  Where is it defined that way?

24           MR. AWODIYA:  In....

25           THE COURT:  Let's talk first about the ADA.
```

 1          The ADA does not include foreign educational

 2   institutions among its list of entities considered public

 3   accommodations in Section 3, which is the section that's

 4   applicable here, is that correct?

 5          MR. AWODIYA:  That one -- in that section -- that

 6   section is because of -- there's multiple things with that one.

 7   First, the one that's mostly guiding this one is the Supreme

 8   Court's decision in the --

 9          THE COURT:  *Nabisco*?

10          MR. AWODIYA:  Yeah, in the *Nabisco* case, where they

11   state that where a statute --

12          THE COURT:  I read your position on *Nabisco*, and

13   respectfully I disagree with your position.  *Nabisco* did not

14   overrule *Archut*, or however that case is pronounced, to the

15   effect that a statute like the ADA or the RA that does not

16   expressly apply extraterritorially does apply

17   extraterritorially.  What *Nabisco* had to do with was, under the

18   RICO Act, the racketeering statutes, there are certain

19   predicate offenses to a racketeering offense.  Those predicate

20   offenses include, for example, robbery or carjacking or drug

21   dealing or money laundering, or, as relevant here, the

22   assassination of government employees.  And some of those

23   predicate acts in the RICO statute actually very clearly and

24   expressly apply extraterritorially.  And what the Supreme Court

25   of the United States said in *Nabisco* was, given that clear and

1   express extraterritorial application among the predicate acts,

2   it's clear that Congress intended for the reach of the RICO Act

3   to apply extraterritorially.

4           But they did not say anything about either the ADA or

5   the RA or *Archut*, which is the case that the defendants have

6   cited.   And, more importantly, they did not say that a statute

7   that does not make it clear that Congress intended for its

8   provisions to apply abroad somehow therefore does apply abroad.

9   That's not what *Nabisco* held.

10          So, I disagree with you about your reading in *Nabisco*.

11  My question to you, though, was:   Is there anything in

12  Section 3 of the ADA that makes clear, as with the RICO Act,

13  which was at issue in *Nabisco*, that Congress intended for it to

14  apply to foreign educational institutions as opposed to

15  domestic institutions?

16          MR. AWODIYA:   I think Title III intended it to apply

17  the same standards as Section 504 of the Rehabilitation Act.

18  And that -- there, they expressly state that those standards --

19  it should be held to no less standard than the Rehabilitation

20  Act, when the Rehabilitation Act expressly states that an

21  institution is defined as one that's outside of the United

22  States.

23          THE COURT:   Where does it say that?

24          MR. AWODIYA:   In 29 U.S.C., Section 705(23).

25          And I would also like to point out that the section

1    that they refer to, 20 U.S.C., Section 1002, there's a

2    different definition that is solely for institution inside of

3    the United States.  And I believe that is Section 1001.  So, if

4    they meant it for it to be in the United States, it would have

5    been clear that they would have assigned it to that definition.

6    Instead, they actually changed it from 1001 to 1002.  I just

7    don't know when they changed it.

8           THE COURT:  Doesn't the RA specifically limit its

9    ambit to acts within the United States?

10           MR. AWODIYA:  No.  It doesn't say that.

11           THE COURT:  Doesn't it say in 29 U.S.C.,

12    Section 794(a) that the statute expressly limits its own scope

13    to, quote, "individuals with a disability in the United

14    States"?

15           MR. AWODIYA:  No.  That is misinterpreted as -- one of

16    the Court's -- one of the cases discussed in *Archut* addressed

17    that.  It was more of American citizens, when they cited I

18    think a congressman, where he explained that language.  It was

19    more of American citizens who have a disability.  Because the

20    Rehabilitation Act expressly states that only American citizens

21    can receive financial aid.

22           It also states in Ross' program participation

23    agreement that only American citizens at their school can

24    receive financial aid.  It is all about the United States'

25    financial backing of American citizens' education regardless of

1    where they send them, as expressly stated in Ross' program

2    participation agreement with the United States Department --

3    Secretary of Education.

4          And then the Higher Education Act, it says that

5    nothing should be construed to limit five -- the Rehabilitation

6    Act and the ADA.

7          Now, in Section 504 specifically it expressly gives --

8    it delegates authority to the head of the agencies.  But, more

9    importantly, further down in there -- I don't have the section,

10   but down there they define that it applies to all activities

11   of -- then they define the institutions, higher -- post

12   graduate -- institutions of higher education.  Which then, if

13   we look up the definition, they changed it from 1001 to 1002,

14   where it included institutions outside of the United States.

15         THE COURT:  Institutions created by the federal

16   government in locations outside of the United States, right?

17         MR. AWODIYA:  No, not institutions -- the program is

18   the Title IV program, the financial aid program.  It has

19   nothing to do with the actual -- because Title IV doesn't

20   extend to only programs that were created by the United States.

21   It can be a private company, it can be public.  It doesn't have

22   to be a government-sanctioned program.  Only the Title IV

23   program is what they were referring to.

24         THE COURT:  Why don't you talk to me about your fraud

25   claims.

```
 1              MR. AWODIYA:  My fraud claims.  My fraud claims are
 2    based on Ross' statement that they have a policy, that the
 3    university has a policy that the university will comply with
 4    the ADA as applicable in Dominica.
 5              THE COURT:  It doesn't say that.  It says as
 6    applicable and practicable.
 7              MR. AWODIYA:  Well --
 8              THE COURT:  Correct?
 9              MR. AWODIYA:  Yes, correct.  I don't know if Ross has
10    raised any issues with the practical part.
11              THE COURT:  They have.  They've said -- in their
12    response to my order for additional briefing, they've said that
13    the fact that they have said "as applicable and practicable"
14    means that they couldn't have, as a matter of law, made a false
15    statement, because it's always within their discretion,
16    presumably, to decide in each case whether it's practicable or
17    not.  And so, if they decide that a particular accommodation is
18    impracticable, then they can do that and still be telling the
19    truth, when, on their website, they say they will conform to
20    the ADA and the RA, so long as it's applicable and practicable.
21    That's one.
22              And the second argument they make is, by saying "as
23    applicable," they also are precluding themselves from making a
24    false statement, because they're saying the RA and ADA are not
25    applicable in Dominica.  So, how could that possibly be a false
```

1   statement?

2            MR. AWODIYA:   There's testimony from their

3   administrators that they are not required to comply with the

4   ADA, and they -- there's no evidence -- they may make an

5   argument like that, but there's no evidence backing that

6   argument.   There -- multiple faculty at the institution just

7   straight up said, They're not required to comply.   They didn't

8   say in some scenarios, in limited scenarios, in no scenarios.

9   The evidence shows that they are not required to comply at all.

10           THE COURT:   And that's what they're saying.   They're

11  saying that -- it's something of a clever argument -- they're

12  saying because they told you, We will comply with the ADA as

13  applicable and practicable, and because the ADA doesn't

14  actually apply in Dominica, that statement can still be true,

15  while at the same time they don't ever have to comply with the

16  ADA, because they said "as applicable."   Now, that may be

17  sneaky, and we may not like that, but that's their argument.

18           MR. AWODIYA:   So, then my next question goes to, they

19  put in an admissions requirement section for students to see in

20  the admissions requirement section part of their website.   If

21  it is not applicable or practicable in Dominica, then why would

22  they make that statement to those prospective students?   They

23  omitted a material fact of -- whatever argument they're trying

24  to make now, they omitted that fact to these students, who may

25  have relied and said that they maybe wanted some type of

1    connection from a Dominican school, where their financial aid

2    is going, to the United States.  Some type of -- I mean it's a

3    school in a whole different --

4           THE COURT:  I think that's a pretty good argument.

5           Let me ask you one question.  What aspect of your ADA

6    and RA claims took place in the United States as opposed to in

7    Dominica, other than your taking of the second, third, fourth,

8    and fifth iterations of the comp. exams?

9           MR. AWODIYA:  Okay.  Ross is trying to prevent --

10   first, they submitted a response, and they typically do this

11   when they know that I can't --

12          THE COURT:  Hold on a second.  You got to speak a

13   little slowly, because she's writing down everything that

14   you're saying.

15          MR. AWODIYA:  Oh, sorry.  I wasn't aware.

16          THE COURT:  So, she's typing everything you say, so

17   you got to speak a little slowly.

18          MR. AWODIYA:  Okay.

19          THE COURT:  And I know that this is personal for you,

20   but you're going to have to try to make it impersonal as much

21   as possible in your argument in this court.  Okay?

22          MR. AWODIYA:  Yes, your Honor.

23          THE COURT:  So, let's not cast aspersions on the

24   lawyers.  Just answer my question.  Other than the four

25   iterations of the comp. exam -- it's two, three, four, and

```
1    five, which I understand you took those four in the United

2    States.

3              MR. AWODIYA:  Yes.

4              THE COURT:  Other than those four instances, what else

5    about either your request for an accommodation or their

6    rejection of your accommodation took place in the United

7    States?

8              MR. AWODIYA:  If the Court -- if plaintiff -- if I had

9    been given a chance to provide the Court with all the evidence

10   regarding that question, it would show that it's much more

11   complicated than that.

12             First, Ross orders the exam each time.  You don't --

13   they don't order five attempts.  They order the exam each time.

14   So, wherever their administrators are, regardless, it's -- when

15   I took it in Dominica, they ordered it.  They ordered the exam.

16             In the process of ordering the exam, they are the ones

17   who says that, Hey, this student should have extra time on this

18   exam.  Therefore, the failure, which would be the focus, the

19   failure to provide the accommodation would be when they

20   actually ordered each exam, regardless of where they're at.

21   Especially if I --

22             THE COURT:  Hold on.

23             When they ordered -- "they" is Ross, right?

24             MR. AWODIYA:  Yes.

25             THE COURT:  When they ordered the exam, where were
```

```
 1   they?

 2          MR. AWODIYA:   (No response)

 3          THE COURT:  They're in Dominica, correct?

 4          MR. AWODIYA:  No.  Two, 3, 4, 5, they ordered the exam

 5   expressly from the United States.  The first one --

 6          THE COURT:  Hold on a second.

 7          The Ross employee who ordered the exam was where?

 8          MR. AWODIYA:  In the United States for the second,

 9   third, fourth, and fifth.  For the first one, I have to review

10   the evidence as to which campus requests -- who orders the exam

11   for the first attempt.

12          THE COURT:  But for the next four, you're saying that

13   the evidence showed that the Ross employee was in the United

14   States --

15          MR. AWODIYA:  Yes.  There's clear evidence.  Because

16   they have a campus --

17          THE COURT:  Where is that evidence?

18          MR. AWODIYA:  I can go to my laptop and get it.

19          THE COURT:  Is that in the deposition or where was

20   that?

21          MR. AWODIYA:  It's in a document that they submitted

22   to me, uhm -- it was in one of the times -- I think after I

23   failed the first one, they sent a process as how it would go as

24   to them reordering the second one.  And so, they said that it

25   will be reordered from the Miramar, Florida, campus.  That is
```

```
 1    from their documents that they gave to me.

 2              THE COURT:  Understood.  I'll ask them about that.

 3              So, that's one.

 4              Second question is:  When you went to ask for an

 5    accommodation, your complaint says you did that in person.

 6              MR. AWODIYA:  In....

 7              THE COURT:  When you asked for an accommodation in

 8    2017 --

 9              MR. AWODIYA:  Um-hum.

10              THE COURT:  -- your complaint says you went and did

11    that in person, correct?

12              MR. AWODIYA:  It depends on which request --

13              THE COURT:  Listen to my question.  You asked for an

14    accommodation in 2017.  Correct?

15              MR. AWODIYA:  Yes.

16              THE COURT:  And you went and did that in person.

17              MR. AWODIYA:  That was not in person.  It was through

18    my appeal letter.  If you -- 2017, I believe that's when I

19    was --

20              THE COURT:  When was the first time you asked for an

21    accommodation?

22              MR. AWODIYA:  The first time I asked for an

23    accommodation was in Dominica.

24              THE COURT:  Okay.  That's what I'm asking.  When you

25    asked for the accommodation, you were in Dominica.  Correct?
```

Case 0:18-cv-60482-RKA   Document 216   Entered on FLSD Docket 07/02/2019   Page 15 of 90
USCA11 Case: 19-12832   Document: 22-2   Date Filed: 10/16/2019   Page: 41 of 117

15

```
 1              MR. AWODIYA:  The first time I asked.

 2              THE COURT:  Correct.  Right?

 3              MR. AWODIYA:  (Nodding head affirmatively)

 4              THE COURT:  Is that yes?

 5              MR. AWODIYA:  Yes.

 6              THE COURT:  And then they rejected that request for an

 7    accommodation, correct?

 8              MR. AWODIYA:  They failed to provide an accommodation.

 9    "Reject" is too stringent.  I mean it -- the elements are that

10    they discriminated by failing to provide an accommodation.

11    They don't have to sit there and tell me, "We reject your

12    request."  That's not -- it is not up to that high of a

13    standard to satisfy.

14              And this is particularly important when it comes to

15    compensatory damages, where I'm allowed to prove with

16    deliberate indifference, which means the simple failure to act

17    will open up compensatory damages for failure to provide an

18    accommodation.

19              THE COURT:  You allege in your complaint at 56 --

20    sorry -- at paragraph 16 to 17, 26, 32, and 34, the following

21    facts:  That Ross is the entity that was empowered to grant or

22    deny your extended testing time; that you authorized the Ross

23    counseling center in Dominica to discuss your confidential

24    information with Ross' administration for the purpose of

25    deciding whether an accommodation was appropriate or not; that
```

1  you verbally asked Dr. Sharma and Mr. Cuffy to tell the Ross

2  administration that you needed extended testing time; that

3  while you were in Dominica, you went in person to provide the

4  Ross counseling center with a medical assessment that had been

5  performed by a doctor in the United States; and, fifth, that

6  Dr. Hayse, H-A-Y-S-E, Ross' associate dean of student affairs,

7  who lives and works in Dominica, made the final decision with

8  respect to your request for accommodation and oversaw the

9  academic accommodations process.

10         Are those allegations which you made in your complaint

11  true?

12         MR. AWODIYA:  Those allegations were written when I

13  had limited knowledge of all the evidence, and when I had

14  basically zero knowledge of the law as to what I have --

15  compared to what I have now.  I never been to law -- never been

16  to law school.  I didn't even know what a statute was.

17         THE COURT:  It doesn't matter.  The question is

18  whether those allegations are true.  You made those

19  allegations.

20         MR. AWODIYA:  Those allegations that you stated in

21  there?

22         THE COURT:  Yeah.

23         MR. AWODIYA:  Yes, but the nitpicks of who's Ross

24  administration and to -- and other facts that aren't expressly

25  in the allegation are also relevant.

1              THE COURT:  Okay.

2              All right.  Let me hear from Ross.

3              Thank you very much, sir.

4              MR. AWODIYA:  Thank you, your Honor.

5              MR. ROMAN:  Good afternoon, your Honor.

6              THE COURT:  Good afternoon.

7              Why don't we start with the plaintiff's claim that

8    under 29 U.S.C., Section 705, paragraph 23, that the -- either

9    the ADA and/or the RA expressly applies extraterritorially.

10             MR. ROMAN:  Thank you, your Honor.

11             With respect to that issue, I do think that the *Archut*

12   case actually has a very detailed consideration of these

13   statutory issues.  And I don't think I could summarize them

14   better than *Archut*, but what *Archut* references is that Title I

15   and Title VII of the ADA have explicit -- or more explicit

16   language regarding extraterritoriality.  And therefore, from

17   that, you can infer that Title III is not meant to apply

18   extraterritorially.

19             And then in February of this year, so just a few

20   months ago, in the *Galligan* case, *Galligan* again applies

21   *Archut*, it again involves the sister campus of Ross, the

22   veterinary school, and it reaches the same conclusion.  So,

23   when Mr. Awodiya says that he doesn't know if the statutory

24   regime has changed since *Archut*, what *Galligan* tells us -- and,

25   again, *Galligan* references *Nabisco*, which, you know, I agree

1   with your Honor's interpretation that *Nabisco* does not overturn

2   *Morrison*, does not overturn *Archut*, and *Galligan* recognizes how

3   those two cases can be read together.

4       THE COURT:  In fairness to the plaintiff, his argument

5   was the converse, that he's not sure if at the time that these

6   events took place, the statute was different and was

7   subsequently changed.  That's how I understood his argument.

8       MR. ROMAN:  Okay.  I appreciate that, your Honor.  And

9   I don't think it has because of the time frame.  When you're

10  looking at *Archut*, which is in 2012, before the conduct in

11  question, and then when you look at the *Galligan* case in 2019,

12  which is after the conduct in question, the analysis remains

13  the same, and the courts reached the same conclusion that

14  neither the ADA nor the RA apply extraterritorially.

15      THE COURT:  So, what do you make of the plaintiff's

16  citation, the 29 U.S.C., Section 705(23)?  Is that a Title I or

17  Title VII section as opposed to a Title III section?

18      MR. ROMAN:  Well, I don't read that as explicitly

19  applying Title III of the ADA outside of the context of

20  U.S.-based institutions and U.S. schools.

21      Let me pull up that language.

22      THE COURT:  Well, it says:

23      "The term 'institution of higher education' has

24      the meaning given to that term in Section 1002 of

25      Title 20."

1          MR. ROMAN:  Correct, your Honor.  Let's see.

2          I apologize, your Honor.

3          THE COURT:  And then if you go to Section 1002 of

4  Title 20, in (2), it describes institutions outside the United

5  States.

6          MR. ROMAN:  Right.  It does.  And it says:

7          "Except a graduate medical school, nursing

8      school, or veterinary school" -- sorry -- "located

9      out of the United States shall not be required to

10      meet the requirements of Section 1001(a)(4) of this

11      title."

12          Let's see... I will note, your Honor, I do believe

13  this statutory regime is the same statutory regime that was

14  analyzed by *Archut*, and *Archut* did conclude that that did not

15  apply extraterritorially.

16          THE COURT:  That's all true, but the plaintiff's point

17  is *Archut* is not binding, and it could be -- the plaintiff's

18  point -- it's not binding, and it could be wrong.

19          MR. ROMAN:  Yes, your Honor.  And I don't think that

20  this has been explicitly tied to Title III, and I do not see

21  how it interplays with Title III.  If you give me a moment, let

22  me take a look.

23          *(Pause)*

24          MR. ROMAN:  Your Honor, you know, I don't have exactly

25  which title this applies to.  My understanding is -- and, also,

1    I would note that *Archut* was ultimately affirmed by the Third

2    Circuit.  And I think absent a decision of the Eleventh

3    Circuit, that that would have some authority with respect to

4    this issue as well, your Honor.  And I think in the Third

5    Circuit decision, the Court actually complimented the analysis

6    in *Archut* and adopted it in full.

7            THE COURT:  I think the answer appears to be that that

8    section of the RA, of the Rehabilitation Act, prohibits

9    discriminatory conduct at institutions of higher education that

10   receive federal grants, which includes graduate medical schools

11   located outside the United States, but is a discrimination

12   provision of the RA, and it refers to colleges, universities,

13   or other post-secondary institutions or a public system of

14   higher education.

15           But there is no reference in that provision to

16   institutions of higher education or to graduate medical schools

17   located outside of the United States within the meaning of

18   Section 794(a).  In other words, the definition of institutions

19   of higher education on which I think the plaintiff is relying

20   appears to refer to some other nonrelevant provisions of the

21   Rehabilitation Act.  But that's just my reading of it here.

22           MR. ROMAN:  Your Honor, that would be consistent with

23   *Archut*, where the Court specifically found that the receipt of

24   federal funding was not sufficient.  So, that would be

25   consistent with what you're describing.

1          THE COURT:  Okay.  Talk to me about where the events

2     that are at issue here took place.

3          MR. ROMAN:  Yes, your Honor.

4          As you noted, the administration of comp. exams 2, 3,

5     4, and 5 occurred in -- through a third-party vendor called

6     Prometric.

7          THE COURT:  In the United States.

8          MR. ROMAN:  In the United States.

9          THE COURT:  And the plaintiff's psychological

10    examination took place in the United States.

11         MR. ROMAN:  Your Honor, all of the counseling sessions

12    with the Ross University counseling center, which included his

13    diagnosis on January 18th, 2016, for ADHD, occurred in

14    Dominica.

15         THE COURT:  Yeah, but the examination that he used in

16    his request for an accommodation took place in the United

17    States, correct?

18         MR. ROMAN:  That's not correct, your Honor, because he

19    never requested an accommodation.  The information he is

20    claiming should have been released to the administration, had

21    he requested it, is the counseling documentation from the Ross

22    counseling center.

23         THE COURT:  That's not my question.  Assuming that I

24    find that he made a request for an accommodation, or even if he

25    didn't make a request for an accommodation, his allegation that

1   he made a request for an accommodation was based on an exam

2   that he underwent in the United States, is that not true?

3          MR. ROMAN:  That's not true, your Honor.  The exam was

4   done in Dominica by Dr. Sharma.  He did have meetings with

5   Kaiser Permanente on his own.  This is his own private

6   psychologist or psychotherapist that he saw.  But those doctors

7   did not make the diagnosis of ADHD.  And those doctors, I

8   believe, are the ones who diagnosed him with OCD in 2017, but

9   that was after he had already been dismissed.  So, that doesn't

10  have to do with the accommodation request.

11         What -- the accommodation request, that's based on an

12  ADHD diagnosis by Dr. Sharma, who is a Ross University employee

13  in Dominica.

14         THE COURT:  What about the fact that the exams on

15  which the accommodation, if it had been granted, would have

16  been relevant, that those exams took place in the United

17  States?  I think the plaintiff's argument is, I had to sit for

18  those exams in the United States, I had to be subjected to a

19  certain time line for those exams in the United States, and had

20  an accommodation been granted, I would have been allowed to

21  have a different longer time line, I guess, while taking those

22  exams in the United States.  And so, the salient portions of my

23  claim took place in the United States.  What do you make of

24  that argument?

25         MR. ROMAN:  Your Honor, the comp. exams are not the

```
 1   specific exams for which an accommodation was requested.  The

 2   plaintiff requested, according to his allegations, an

 3   accommodation with respect to testing.  There are many tests --

 4   actually, the majority of tests -- which would occur in

 5   Dominica as part of the curriculum.  He had actually failed a

 6   semester at Ross.  He retook that semester.  The requests for

 7   accommodations, including extended testing time, were not

 8   specific to the comp. exam.

 9         THE COURT:  But they would include the comp. exam,

10   correct?

11         MR. ROMAN:  They would include the comp. exam.  And

12   that was the basis that he was ultimately dismissed on, is that

13   he failed the comp. exams.

14         THE COURT:  The comp. exam is important.  You

15   dismissed him because of the failed comp. exams, correct?

16         MR. ROMAN:  That's correct, your Honor.

17         THE COURT:  So, let's talk about the comp. exams.

18         The comp. exams occurred here in the United States.

19   Any accommodation for the comp. exams would have occurred here

20   in the United States.  And his allegation is the failure to

21   grant an accommodation with respect to the comp. exams -- I

22   understand the decision may have been made in Dominica, is that

23   your position?

24         MR. ROMAN:  Yes.

25         THE COURT:  But the practical effects of that
```

1    decision, the circumscribed time line for the taking of the

2    exams took place or had its effects here in the United States.

3    Do you agree with that?

4         MR. ROMAN:  Your Honor, the exams, which were

5    administered by this third-party vendor, Prometric, Ross would

6    have sent a list that says, These are the students that should

7    have extended testing time.

8         THE COURT:  So, why -- even if the ADA and RA don't

9    apply in Dominica, why isn't this a case that arises from a

10   lack of accommodation that took place for tests that occurred

11   in the United States?

12        MR. ROMAN:  It's our position it's because the

13   accommodation request was general to all testing, that this was

14   not a specific request as to a U.S.-based test, and the

15   decision-making all occurred in Dominica.

16        And so, whether or not that accommodation, which could

17   support, for example, the USMLE Step 1 exam, that could be

18   forwarded as support for the USMLE Step 1 exam.  But then,

19   again, that's another third party that administers an exam.

20   And so, we believe that because the decision was made in

21   Dominica for testing -- overwhelmingly that would have taken

22   place in Dominica, all of the exams during your course of study

23   there -- that that excludes it from being applied in this case,

24   your Honor.

25        THE COURT:  Why didn't you file a motion either to

1    dismiss or for summary judgment on the ADA and RA claims lack

2    of extraterritorial application before I prodded you to it?

3         MR. ROMAN:  It's -- your Honor, I think what we

4    thought of it as, originally, was more to do with the fraud and

5    misrepresentation.  We did try to raise that, but did so after

6    the time when it was permitted.  So, your Honor denied that

7    motion as untimely and then asked us to brief these additional

8    issues.

9         THE COURT:  Right.  But my question has to do with

10   these additional issues.

11        MR. ROMAN:  Sure.

12        THE COURT:  You guys are a very sophisticated firm.

13   What am I missing?  Why did you not file a motion to dismiss

14   these charges on the grounds that these statutes don't apply

15   extraterritorially until I looked into it and told you that

16   that's a concern of mine?

17        MR. ROMAN:  I don't know that I have a great answer

18   for your Honor.  I would say, we were not counseled at the very

19   beginning of the case.  However, that's not an excuse.  We

20   could have raised it on a summary judgment motion, and we did

21   not.  So, I don't have a great answer for that.  And so, in

22   that regard, your Honor, I can't give you a specific reason why

23   that would be true.

24        THE COURT:  Let's talk about the fraud counts.

25        Let's assume that I agree the ADA and RA don't apply

```
 1    extraterritorially.  And I think a closer question is whether
 2    the acts that the claims are based on occurred here or in
 3    Dominica.  But let's assume that I agree with you that they
 4    occurred principally in Dominica, and that the ADA and RA
 5    claims are dismissed.
 6         What about your argument, clever as it is, with
 7    respect to the fraud claims, and the plaintiff's response,
 8    which is that's too clever by half?  You put that statement in
 9    to your website precisely to induce people like the plaintiff
10    to come and apply to your school, to make them feel
11    comfortable, to make them feel that American law governed at
12    the school, that it would be an environment that they would be
13    familiar with because it resembles the United States, it's not
14    so scary out here, you see, after all.  And your argument is,
15    Well, we basically gave you a meaningless statement.  And your
16    argument is, since it was meaningless, it couldn't have been
17    fraudulent.  But isn't that problematic in itself?
18         MR. ROMAN:  Your Honor, I don't believe the facts as
19    they apply here are problematic.  We have at Ross University in
20    Dominica an accommodations office.  We have an accommodations
21    coordinator.  And we have a policy that's set forth in the
22    student handbook that Mr. Awodiya acknowledged and received
23    every semester, that if you make a request for accommodations
24    pursuant to that policy, which involves providing
25    documentation, which we never received from Mr. Awodiya,
```

```
 1   filling out a form that we never received for Mr. Awodiya, we

 2   will consider that request, and, where appropriate, we'll grant

 3   it.  And our history is that we grant those requests when they

 4   are made to us.

 5          In this particular instance, Mr. Awodiya did not

 6   request an accommodation.  So, I don't believe that we're being

 7   sly here to say that as a legal matter, the ADA does not apply

 8   in Dominica.  However, we -- and all of our witnesses testified

 9   to this -- we apply the ADA in spirit.  Because we do want to

10   extend those types of protections to students where

11   applicable -- where practical.

12          THE COURT:  And is there evidence in the record on

13   that point?

14          MR. ROMAN:  I believe our witnesses -- Matthew

15   Stewart-Fulton in particular was deposed in this case.  He'll

16   be a witness here, a live witness.  And I would have to check

17   the transcript of his deposition, but I would suspect that he

18   did state that other students do receive accommodations.

19          THE COURT:  I don't remember seeing that in your

20   pleading or in your papers on this issue.

21          MR. ROMAN:  I don't believe we would have referenced

22   that particularly in our papers, but --

23          THE COURT:  But isn't that important because --

24   wouldn't you agree with me that if Ross had said, "We apply the

25   ADA as applicable and practicable," and at the time they made
```

1   that statement on the website, they kind of giggled to

2   themselves and said, Isn't that pretty funny, that's a

3   meaningless statement, we know it's not applicable, and so it

4   will never be practicable, and we will never apply it here in

5   Dominica, and if you didn't develop any evidence that you ever

6   do make accommodations like that, then there would be really, I

7   think, a genuine issue of material fact as to whether that

8   statement was false when it was made?

9          MR. ROMAN:  I do know our briefing does state that our

10  witnesses said they applied the ADA in spirit.

11         THE COURT:  So, your position in the papers was that

12  as a matter of law, a statement with the qualifications "as

13  applicable and practicable" cannot be a falsehood.

14         MR. ROMAN:  Correct.  As a legal matter -- and I

15  understand that your Honor views that maybe that's a cold

16  position.  However, as it was applied here, it's not.  I know

17  we state -- not just in this briefing, but in our first motion

18  for summary judgment in this matter, we do reflect the record

19  in that regard, what our witnesses said with respect to how it

20  actually plays out in practice.

21         It is not a system where students are -- we have an

22  entire office for this.  We have employees in Dominica

23  dedicated to this.  And that was actually fleshed out in the

24  record on the first summary judgment brief.

25         THE COURT:  Where is that?

1          MR. ROMAN:  Let me see, your Honor, if we have a copy

2    of the initial summary judgment motion with us.

3          THE COURT:  Well, I actually have another hearing.

4    So, why don't you file a notice later today --

5          MR. ROMAN:  Yes, your Honor.

6          THE COURT:  -- or -- yeah, I want you to file it

7    today, if you can.

8          MR. ROMAN:  Yes, sir.

9          THE COURT:  A notice of authority citing -- no more

10   than a page -- specific places in the record where there is

11   evidence in the record that Ross actually does make attempts to

12   live up to the requirements of the ADA and the RA.

13         MR. ROMAN:  Okay.  Absolutely, your Honor.

14         THE COURT:  All right.  So that's it for the issues in

15   the motions.

16         There are also the motions in limine.  Unfortunately,

17   I have another hearing right now.  And I hate to do this to you

18   all, because I know in particular that you guys are probably

19   billing by the hour, but I'm gonna ask you to have a seat in

20   the back.  And I know that it was Mr. Awodiya who was a little

21   late.  But he is pro se, and I think we have to make special

22   accommodations, to use a term of art.  And so, I'm going to ask

23   you to sit in the back for a few minutes while I resolve the

24   next hearing, and then I'll recall you.  Is that okay?

25         MR. ROMAN:  Absolutely, your Honor.  Thank you.

1          THE COURT:  All right.  Thank you very much.

2          MR. AWODIYA:  Thank you, your Honor.

3          *(Recess taken at 3:11 p.m. until 3:47 p.m.)*

4          THE COURT:  Mr. Awodiya.

5          Oh, here you go.  That's for ToniAnn.

6          This is me just trying to get you guys to settle, tire

7    you out.

8          MR. MARSH:  Sometimes it works.

9          *(Discussion had off the record between the Court and*

10   *law clerk)*

11         ROOM CLERK:  Recalling Case Number 18-60482-Civil,

12   Awodiya vs. Ross University School of Medicine.

13         Counsel, please state your appearances for the record.

14         MR. AWODIYA:  Pro se Plaintiff Oluwamuyiwa Awodiya.

15         MR. ROMAN:  Ryan Roman, Michael Marsh, Octavia Green,

16   and Donnie King for Ross University.

17         THE COURT:  Good afternoon, everyone.

18         MR. ROMAN:  Good afternoon, your Honor.

19         THE COURT:  Okay.  Thank you for your arguments on

20   the, I guess, failure to state a claim issues that we discussed

21   earlier.

22         I just want to reiterate, I would like a filing today

23   on specific references in the record where people talk about

24   how it was a policy and practice of Ross to actually comply

25   with the ADA and the RA.

1          MR. ROMAN:  And, your Honor, in the interim, I was

2     able to identify the statements I was thinking of.  I could

3     quickly reference where to find those in the record for your

4     Honor, if you would like, at this time.

5          THE COURT:  Sure.  Go ahead.

6          MR. ROMAN:  Thank you, your Honor.

7          Your Honor, if your Honor looks to Docket Entry 107-2,

8     this is -- these are the exhibits to the statement of facts

9     filed by Ross University in opposition to Mr. Awodiya's motion

10    for summary judgment.  And in particular, in Exhibit 5, which

11    are deposition excerpts from Matthew Stewart-Fulton, who's the

12    accommodations coordinator, page 32, lines 1 through 10, where

13    Mr. Stewart-Fulton states that Ross abided by the spirit of the

14    ADA and the Rehabilitation Act to provide appropriate

15    accommodations pursuant to the process set forth in the student

16    handbook.  And then his direct supervisor, Dr. Hayse, who's the

17    individual that Mr. Awodiya in his complaint says is the final

18    decision-maker, and that's Exhibit 7 to Docket Entry 107-2, and

19    page 10, lines 2 through 17, where he makes similar statements

20    to the effect that the school does, in fact, apply the ADA as a

21    guideline for their policies and procedures.

22         THE COURT:  Thank you very much.

23         To the extent there's anything else similar to that in

24    the record that you'd like me to look at, I'll ask you to file

25    that by today.

```
 1              MR. ROMAN:  Thank you, your Honor.

 2              MR. AWODIYA:  Request to be heard, your Honor, in

 3    response to that statement that he just --

 4              THE COURT:  Very briefly.

 5              MR. AWODIYA:  Even if it was -- there seems to be

 6    confusion with Mr. Fulton as in a request for an accommodation

 7    and faculty administration complying.  Even if they were to

 8    find anything like that, it would be -- merely be a disputed

 9    fact, because the administration testified, said that Ross

10    University -- Ross faculty was not given any guidance, rules,

11    or policies on how to comply with the request for

12    accommodations.  So, that's merely -- yeah, it would -- because

13    the administration clearly testify (sic) that faculty was not

14    giving -- the head, Dr. Hayse, was giving -- he testified to

15    that fact, that they weren't giving any -- if a student does

16    request an accommodation pursuant to the student handbook,

17    which is not an ADA element, then comes in, well, do they have

18    to apply or can they just sit back and ignore or fail to act?

19              So, the mere fact that one employee states that he

20    may -- that -- claims that he would use it as a guideline does

21    not speak to the university as a whole, and it does not speak

22    as to whether they actually do give any type of indication that

23    they should comply when applicable or when practicable.  They

24    just plainly said not --

25              THE COURT:  But he's saying that this man,
```

 1    Mr. Hayse -- or Dr. Hayse, who you've alleged is the final

 2    decision-maker on accommodation issues --

 3              MR. AWODIYA:  That would be incorrect.

 4              THE COURT:  Excuse me?

 5              MR. AWODIYA:  My interpretation of who makes the final

 6    decision was incorrect.  After going through all of their

 7    policies, the student handbooks, going through all of

 8    discovery, Dr. Hayse is multiple people who have the final

 9    decision.  There's multiple people who can initiate the

10    accommodation process.

11              THE COURT:  But Dr. Hayse is one of those people.

12              MR. AWODIYA:  He is one of those people, yes.

13              THE COURT:  Okay.  So, isn't it fair to say that to

14    the extent Dr. Hayse has authority over accommodation issues at

15    the school, that Dr. Hayse's statement that he makes every

16    effort to accommodate in as many circumstances as he can

17    actually supports the view that "as applicable and practicable"

18    was not a false statement?  I may not disagree with you that it

19    doesn't necessarily mean that other professors and other

20    administrators are doing that, but as far as he's concerned --

21    and I haven't reviewed that deposition, I've got to go back and

22    read it now -- but assuming that he says something like that,

23    at least with respect to him, he is a guy who has that

24    authority at the school, correct?

25              MR. AWODIYA:  Yes.

```
 1              THE COURT:  One of the guys.

 2              MR. AWODIYA:  It would just be, I guess,

 3    self-conflicting testimony --

 4              THE COURT:  Is there other testimony that conflicts

 5    with that testimony?

 6              MR. AWODIYA:  Yes.  The ones that I cited in the

 7    actual -- the extra -- the briefing on --

 8              THE COURT:  To the point where they said, It's just

 9    not applicable, so we don't do it.

10              MR. AWODIYA:  And that he doesn't give any rules,

11    guidance, or any policy to faculty.  So --

12              THE COURT:  And who was that?  What was his name?

13              MR. AWODIYA:  Dr. Hayse, the same guy.  He's -- I've

14    been talking about him -- at this whole point, I've never

15    mentioned any testimony from --

16              THE COURT:  Fulton.

17              MR. AWODIYA:  Fulton, yeah.  Even though he clearly

18    says, as well, they're not required to comply.  And he

19    specifically says when I was there.  There may also be a

20    disputed fact as to when, because they moved out of Dominica

21    after I was ultimately dismissed.  So, because of the time

22    frame, I -- and because I can't redeposition him, we can't

23    really know what time period he's talking about.  But when he

24    does specify a time period, he says, When you were enrolled, we

25    were not required to comply with the ADA.
```

1            THE COURT:  Thank you very much.

2            MR. AWODIYA:  Yes.

3            THE COURT:  All right.  So, the next thing is the

4  motions in limine.  The first thing -- the first motion that

5  was filed is Docket Entry 160.  It's the defendant's motion

6  in limine to exclude new theories of liability.  The defendant

7  responded -- sorry -- the plaintiff responded and the defendant

8  replied.

9            Let me hear you for a moment on this motion.

10            MR. ROMAN:  Ms. Green is going to address this motion.

11  Thank you, your Honor.

12            THE COURT:  Oh, Ms. Green.

13            My understanding is this motion deals only with two

14  theories that the plaintiff has raised anew with respect to the

15  ADA and RA claims, correct?

16            MS. GREEN:  Yes, your Honor.

17            THE COURT:  So, if I dismiss the ADA and RA claims,

18  this motion should be denied as moot, correct?

19            MS. GREEN:  Yes, your Honor.

20            THE COURT:  You tell me that the plaintiff never

21  raised these motions... until his pretrial stipulation,

22  correct?

23            MS. GREEN:  Yes, your Honor.

24            THE COURT:  Okay.  Those are the only questions I have

25  for you.  Thank you.

1            MS. GREEN:  Thank you, your Honor.

2            THE COURT:  That was easy, wasn't it?

3            MS. GREEN:  It was.

4            *(Laughter)*

5            THE COURT:  Now you can say you got that under your

6     belt.  Hopefully it helps you to become partner.

7            *(Laughter)*

8            THE COURT:  All right.  I'm going to take that motion

9     under advisement.

10           On to the next motion, which is 194, Mr. Awodiya's

11    motion to preclude prejudicial -- sorry -- before we get to

12    194, there's actually another one, which is Docket Entry 165,

13    which is Mr. Awodiya's motion for an order to designate the

14    method of damage calculations.

15           Mr. Awodiya, very briefly, I've read the Supreme

16    Court's case on -- in *Monessen*, and I tend to agree with the

17    defendants that it specifically makes clear that if I were to

18    dismiss the ADA claims, and this were no longer a federal

19    question case, that *Culver* wouldn't apply.  And there's

20    actually a subsequent Eleventh Circuit opinion from 1988 called

21    *Ageloff*, A-G-E-L-O-F-F, *vs. Delta Air Lines*, 860 F.2d 379,

22    which says, and I quote:

23           "Likewise, this leads us to defer addressing

24       Delta's contentions on the proper Florida standard on

25       the method or methods to be employed in discounting

```
 1          to present value.  We determine now that the

 2     Fifth/Eleventh Circuit decision in Culver relates to

 3     damage recoveries under federal law and not to

 4     diversity cases.  Neither that case nor the Supreme

 5     Court's recent decision in Monessen,"

 6     M-O-N-E-S-S-E-N, "requires that determining the

 7     discount rate must be performed by use of the

 8     below-market discount method, rather than by the

 9     case-by-case method or the total offset method."

10          Did you read that case?

11          MR. AWODIYA:  Yes, I did.

12          THE COURT:  What's your position on that?

13          MR. AWODIYA:  Well, I don't understand the question.

14          THE COURT:  The question is, it seems to me that to

15     the extent Culver suggested that the discount method -- the

16     below-market discount method is the required method for me to

17     instruct the jury on, that the Eleventh Circuit has made clear

18     that that's not correct.

19          MR. AWODIYA:  No.  But I wasn't -- it wasn't that part

20     of the question.  It was part of the question where I think you

21     started with saying -- I'm paraphrasing -- if the ADA claims

22     were dismissed and therefore became a state --

23          THE COURT:  Well, let me ask you this.  What is it

24     that you want me to do?  Because I was also confused, because I

25     got the sense that between your motion and then your reply, you
```

1   had two different positions.  One, I thought in your motion,

2   you wanted me to instruct the jury that they were to use only

3   the below-market discount rate method in calculating lost

4   future earnings as opposed to the case-by-case or any other

5   method.  And then in your reply, you were distinguishing what

6   you wanted as a difference between the discount rate to apply

7   versus the discount method to apply.  And I was a little

8   confused about that.

9            MR. AWODIYA:  Okay.  The Supreme Court prohibits a

10   district court from instructing the jury to apply a discount

11   rate.

12            THE COURT:  And I don't want to do that.  So, we're

13   agreed on that.

14            MR. AWODIYA:  Right.

15            THE COURT:  So, what about on this separate question,

16   which is I think what your motion is about, which is that you

17   want me to tell them what method they have to apply?

18            MR. AWODIYA:  No, not what method.  It states that we

19   can -- you can instruct the jury on special interrogatories.

20   My order was for the Court to designate for the record, I

21   guess, the method.  But my actual instructions to the jury --

22            THE COURT:  Hold on.  Just to back up.  What you just

23   said.  You want me to designate the method.  But what I'm

24   suggesting to you is, I think the Eleventh Circuit has said

25   that I'm not to designate the specific method.

1          MR. AWODIYA:  The Supreme Court in *Monessen*, which I

2     guess both the Eleventh Circuits are -- well, both the Eleventh

3     Circuits aren't talking about, which is relevant, the *Monessen*

4     case Supreme Court states that it is within your discretion to

5     instruct the jury on a method.  And you have complete

6     discretion -- well, you will be afforded great discretion in an

7     appellate review.

8          The only difference here is that it's not more of a

9     you are required to do it in every scenario, but when we have

10    not stipulated, and when someone requests special

11    interrogatories, that the special interrogatories must be in

12    line somehow with whatever method is designated.  So, my --

13    that was what my motion was for, was to designate an order so

14    that the interrogatories make sense.  I don't know if you saw

15    the interrogatories.

16         THE COURT:  Just so I understand -- and I did see the

17    interrogatories.  My question to you is:  You're not asking me

18    to instruct them on a particular discount rate, which is what

19    *Monessen* had to do with.  And you're not asking -- telling me

20    that I have to find that the below-market discount rate is

21    the -- sorry -- the below-market discount method is the method

22    that they should use, you're just telling me it's within my

23    discretion to pick one of those three methods, and you'd like

24    me to pick the below-market discount method.

25         MR. AWODIYA:  Perfect, your Honor.  That's exactly --

1      THE COURT:  Okay.  Now that I understand your

2  position, let me ask counsel for the defense why you think that

3  that's not the appropriate method to use in this case, assuming

4  the ADA claims went forward.

5      MR. ROMAN:  Yes, your Honor.

6      Well -- may I approach the lectern?

7      THE COURT:  Sure.

8      MR. ROMAN:  Thank you, your Honor.

9      In both *Ageloff* and in this *Beltran vs. NCL* case,

10  which is a Southern District of Florida case, it's 2017 Westlaw

11  4270618, which we cite to in our papers, in *Beltran* -- well,

12  both those cases involved expert witness testimony as to the

13  appropriate method for determining damages in a lost earning

14  capacity context.

15      THE COURT:  And he's not going to have an expert, as I

16  understand it, correct?

17      MR. ROMAN:  Correct, your Honor.

18      THE COURT:  But you are.

19      MR. ROMAN:  Well, we have an expert that we've

20  designated.  It is a rebuttal expert.  Because plaintiff

21  submitted a calculation of damages that we believe is an

22  improper attempt to put expert testimony in front of the jurors

23  without having an expert.

24      We believe he has missed his opportunity to have an

25  expert witness explain his damages theory to the jurors in a

1    way in which they can apply it and understand.  And, therefore,

2    we feel that this request is meant to correct that error in a

3    way that the Court has now said should not be done.

4             THE COURT:  And that's in -- just to go back.  Your

5    position is that Chief Judge Moore's decision in Docket

6    Entry 154 precluding him from providing what would otherwise be

7    technical expert testimony on the question of the calculation

8    of his lost profits precludes him from making any argument

9    about this calculation, and thus would obviate the need for you

10   to call your rebuttal expert, because that wouldn't come in,

11   and then you wouldn't have your expert, is that correct?

12            MR. ROMAN:  That's correct, your Honor.  And during

13   the hearing before Judge Moore, he did advise the plaintiff

14   that he felt that damages were unduly speculative, and that

15   that was going to be an issue facing the plaintiff in proving

16   his case.

17            I don't believe there's anything since that time in

18   the record that would assist the plaintiff in being able to

19   establish his damages as for the lost earning capacity.  There

20   are other categories of damages, for example, his tuition

21   expenses, that are a different category that I wouldn't say

22   this argument applies to.

23            THE COURT:  And he has a claim for emotional distress.

24            MR. ROMAN:  Correct, your Honor.  Although that is

25   based on a percentage of his lost earning damages.  So, if the

```
 1   lost earning damages aren't established, I don't know how he'll
 2   be able to establish those damages either.
 3            THE COURT:  Well, he could get up in front of the jury
 4   and say, I'm very distressed, and you should give me some money
 5   for that, couldn't he?
 6            MR. ROMAN:  I think he could make that statement, your
 7   Honor, but if it comes to suggesting a methodology, I believe
 8   there, there may be some issues with respect to his ability to
 9   establish that methodology.
10            THE COURT:  Well, I mean only if that methodology were
11   tied to a methodology that didn't come in.
12            MR. ROMAN:  Correct, your Honor.
13            THE COURT:  He could say, you know, this is -- a
14   hundred thousand dollars is enough for happiness, I guess.  I
15   don't know.  He could theoretically come up with some other
16   method.  I'm not making a judgment on what that method would
17   look like, but I take your point.
18            Let me ask you a more important question.  If I
19   dismissed the ADA and RA claim and went forward only on the
20   fraud claims, what then would happen to the lost future profits
21   damages argument that he's making?
22            MR. ROMAN:  It's a good question, your Honor, because
23   I do not know whether that is truly a compensatory damage for
24   the fraud and negligent misrepresentation claims.  I believe
25   that the plaintiff would be entitled to seek compensatory
```

1    damages, but if the representation in the website turns out to

2    be false, I don't know that there's proximate causation as to

3    the loss of future earnings.  I do believe there's a claim that

4    might potentially reach the tuition expenses that he --

5         THE COURT:  I guess that's the question, is let's

6    assume the only claim is the fraud and negligent

7    misrepresentation claims.  There are two possibilities there

8    with respect to damages.  One is, Ross, if you had not made

9    this false statement, that is to say, if you had not told me

10   something that was false, then I wouldn't have applied to your

11   school, enrolled in your school, and the damages are thus room

12   and board, tuition, flights, and the three years of opportunity

13   costs of going to a school that he otherwise wouldn't have been

14   in, which may have resulted in him doing something else with

15   his life.

16        That's option A.  Obviously, that doesn't include the

17   lost profits calculation.

18        Option B I guess is, if you had -- if the statement is

19   false, then my damages are the world in which we would

20   hypothetically be living if the statement had turned out to be

21   true, in which case I suppose he'd have to prove that you

22   should have accommodated him; that with that accommodation, he

23   would have passed; that with that passage, he would have become

24   a doctor, and then -- and, you know, there is an attenuation

25   there, I suppose -- and then, under option 2, I guess, lost

```
1   future profits could become relevant.  Do you agree with that

2   dichotomy?

3             MR. ROMAN:  I agree with your analysis, your Honor,

4   subject to speculation.

5             THE COURT:  Which one of those is the gravamen of the

6   claim as you interpret it?

7             MR. ROMAN:  I believe what plaintiff is seeking is

8   option 2.  I believe what he's entitled to would be option 1,

9   because of both causation and the speculative nature of those

10  damages.

11            THE COURT:  Okay.

12            Mr. Awodiya, did you understand that last part of what

13  I was asking?

14            MR. AWODIYA:  To be honest, your Honor, I got lost

15  somewhere in there.

16            THE COURT:  No problem.  Why don't you come up to the

17  podium.

18            Assuming that the only claims that remain after today

19  are the fraud and negligent misrepresentation claims, okay,

20  then your argument is going to be to the jury, Folks, I

21  wouldn't have applied -- one of two of things -- either I

22  wouldn't have applied to Ross if I had known that they didn't

23  actually accommodate the ADA as they said, right?  That's

24  option 1.

25            Or, option 2, I would have gone, but they should have
```

1   followed through on the promise that they made to me, so that I

2   could have gotten an accommodation once I was there.

3           Do you understand the difference between one and two?

4           MR. AWODIYA:  A little bit.  I asked myself that

5   question when I was doing my verdict form.  And that's where it

6   caused me problems in how to word the questions.  So, I think

7   the best way to explain to you is the way that I interpret it.

8           My fraud claim is -- at the less element, it would be

9   like consequent injury, acting reliance.  So, I relied on the

10  statement, and then some type of consequent injury happened,

11  but the compensatory damages would be to -- I had the option to

12  affirm the contract.  So, to prove that compensatory --

13          THE COURT:  Okay.  One second.  So, it sounds like

14  what you're saying is that the injury you've suffered is that

15  they told you something that wasn't true, and had they told you

16  the truth, which is, We don't abide by the ADA or the RA, you

17  wouldn't have gone there.  Is that what you're saying?

18          MR. AWODIYA:  No.  I'm more saying if the statement

19  was true, and they were -- actually were required to comply by

20  law, then we would probably still have to go through the ADA

21  elements in some way.  Because that's where my question --

22  that's where my problem came in, is because the fraud kind of

23  leads to the ADA in the same capacity, as in if they're -- if

24  they're saying that they're not required to comply by law, and

25  they can do whatever they want to whenever they want to -- I

1   was saying -- I was saying if they had the... if they had

2   the -- we were talking about the verdict form.

3        THE COURT:  I think what you were saying, in fairness,

4   was that -- and I don't know that I agree with you, but I think

5   what you were saying is that if the fraud claim is allowed to

6   go forward, then the fraud claim necessarily implicates the

7   same elements as the ADA claim, because your position is, in

8   order to prove the fraud claim, that they didn't properly

9   accommodate you when you got there, you would have to show what

10  the ADA required and what they did, and that they're different.

11  And that is, of necessity, an ADA claim.  I think that's what

12  you were just saying.

13       MR. AWODIYA:  I think so, in a way, yes.  Because --

14  yeah.  I think that's in a way.  Yeah.

15       THE COURT:  Okay.  I think I've got your motion.

16  Sorry if you --

17       MR. AWODIYA:  And the other part, too, where I went

18  and applied -- if I never saw that statement, if I never saw

19  anything about it connected to the U.S., especially that one, I

20  wouldn't have even considered it because of the -- because of

21  the island that it was on, and --

22       THE COURT:  That was my original question to you.  Let

23  me go back to it.  Because that's an important point.

24       Is it your claim that if the website did not say, "We

25  comply with the ADA and RA," you would not have considered

```
 1   going there?

 2              MR. AWODIYA:  I would not have enrolled.

 3              THE COURT:  You would not have enrolled.

 4              MR. AWODIYA:  Yes.

 5              THE COURT:  You would not have applied.  You wouldn't

 6   have wasted all the money and time that you wasted at the

 7   school and flying back and forth and all of that, correct?

 8              MR. AWODIYA:  Yes.  I would not -- yeah, I would not

 9   have enrolled.  But that's a separate element.  That is my --

10              THE COURT:  So, it sounds like what your damages are

11   for the fraud claim is the room and board, the time that you

12   spent there, the tuition, the enrollment fees, all of that

13   piled into one.  Correct?

14              MR. AWODIYA:  That's not what I'm saying, your Honor.

15   I'm saying the law says that I have the option, not Ross -- it

16   says that I have the option.  It literally --

17              THE COURT:  Option to do what?

18              MR. AWODIYA:  To pick the remedy.  There's -- I have

19   not found any case law.  Every case law that I found that talks

20   about the compensatory damages in this fashion, where the legal

21   relationship is contractual, and a fraudulent inducement one,

22   you're allowed to affirm or -- the other type, I guess

23   restitution, I guess would be -- every time they say that the

24   person who is harmed, the victim, has the option to choose the

25   remedy.  I don't think it's black and white to say that I went
```

 1   through all of this, I've wasted my part of my life going

 2   through this.  I started in 2014; it is now 2019.  I would have

 3   passed these exams.  I've done all of this.  I would have had

 4   all of that.  I'm already in the program.  It's not as simple

 5   as he wouldn't have applied, so give him his money back.

 6          THE COURT:  I understand.  Thank you very much.

 7          So, the last motion is your motion in limine, 194,

 8   which the defendants actually haven't responded to yet.

 9          Let me ask the defendants about numbers 4 and 5 on his

10   list, his academic record at Morgan State, his undergraduate

11   academic transcripts.  Are you intending to introduce those?

12          MR. KING:  Yes, your Honor, potentially.  And we --

13          THE COURT:  Well, not potentially.  He's moved to

14   exclude them.  I'm inclined to exclude them.  Because I can't

15   think of a reason -- in fairness to you, you haven't had an

16   opportunity to respond, but I can't think of a reason why they

17   could be relevant to this case, whether it's an ADA case, but

18   especially if it's not an ADA case.  Do you agree that if --

19   let me put it to you this way.  If I dismiss the ADA and RA

20   claims, do you agree that 4 and 5 are not relevant anymore?

21          MR. KING:  Yes.

22          THE COURT:  Okay.  Why are they relevant if the ADA

23   and RA claims do not go away?

24          MR. KING:  Yes, your Honor.

25          We were planning to use the transcripts to rebut any

1    assertion by plaintiff that he needed an accommodation to pass.

2              THE COURT:  Why?  Did he do really well in college?

3              MR. KING:  Right.  He did very well in college, your

4    Honor.  He was able to pass those tests without additional

5    testing time.

6              THE COURT:  Understood.

7              Mr. Awodiya, in light of that, how are they not

8    relevant?

9              MR. AWODIYA:  That's very incorrect.  I completely

10   throughout *(sic)* summary judgment, so put in the record that I

11   received extended testing time before I was diagnosed.

12             But, more importantly, my basis for precluding it is

13   the fact that the -- again, this connects with the ADA and

14   everything -- the federal regulations are controlling law when

15   Congress expressly gives them delegated authority.  They say

16   that you cannot use my prior academic success to say that I'm

17   not disabled.  That's like saying, if I was blind, or if I was

18   deaf, like if I couldn't see the exam, but I got high grades at

19   Morgan State University, that I can't be substantially limited

20   because I'm blind, or I can't be substantially limited because

21   I'm deaf.  It has no judgment on my -- it has no -- it's --

22   well, simply put, there literally --

23             THE COURT:  I understand.

24             What's your position on that?

25             MR. KING:  Your Honor, I don't believe that's what the

1    case law says.  We believe that this evidence shows that

2    plaintiff had difficulty with the subject matter as opposed to

3    the time of the test.  And we think that we are able to show

4    not just his prior grades, but also potentially using scores at

5    the school to show times in which timing was not an issue.

6            THE COURT:  How much time do you think you need to

7    file a response?

8            MR. KING:  I can get a response on file by the end of

9    the week, your Honor.

10           THE COURT:  What's today, Tuesday?  How about

11   Thursday?

12           MR. KING:  Sure.

13           THE COURT:  All right.  You'll file a response by

14   Thursday to the motion in limine.

15           Let me ask you, also, with respect to numbers 9 and

16   10 -- again, assuming that the ADA and RA claims are out -- do

17   you have any reason to include those?  I'm asking you.

18           MR. KING:  You're asking me?

19           THE COURT:  Yeah.

20           MR. KING:  Nine and ten, which is the mitigation of

21   damages piece?

22           THE COURT:  Yeah.

23           MR. KING:  Your Honor, if -- yes, if plaintiff is

24   still seeking, which it sounds by his argument today that he

25   would still be, if he is still seeking a lost earning capacity

1   damages based on these claims, then we should be permitted to

2   show that he failed to mitigate his damages.

3            There's two very important pieces here, your Honor.

4   The first is that plaintiff's third-amended calculation of

5   damages assumes, improperly, that he would have been able to

6   become a doctor, and that he would have been able to find

7   equally as lucrative work.

8            Plaintiff, by his motion, is literally, I'm attempting

9   to prevent defendant from pointing out errors in his

10  calculation.

11           The opportunity costs of a practicing physician must

12  be measured against the next best application of plaintiff's

13  skills.  And individuals such as plaintiff, who was capable of

14  gaining admission into medical school and passing his first

15  four semesters of the medical school curriculum, has the

16  potential to be a superior performer in another field suitable

17  to individuals like him.

18           THE COURT:  But that doesn't mean that it has to be

19  money.  I mean, you may not know this, but my job is a pretty

20  high-performing job, and I don't get paid that much money.  And

21  the fact that I went from a private law job that paid me a lot

22  of money to this job which pays me very little money, I don't

23  think speaks at all to whether I'm any less of a performer.

24           MR. KING:  Your Honor, I don't believe that plaintiff

25  would be entitled to a loss earning capacity.  I don't believe

1    that plaintiff has lost any capacity to earn any type of money.

2    It's not a situation in which plaintiff suffered some kind of

3    catastrophic injury as a result of the university, and he's no

4    longer able -- has the capacity to make money.  Plaintiff is

5    able to go -- try to get into medical school, try to go into

6    law school.  He's a very capable individual.  He's a very smart

7    individual.  He is able to do any other type of equally as

8    lucrative work.  And we should be able to bring that type of

9    evidence in, your Honor, just because --

10          THE COURT:  What he's saying is, why should you be

11   allowed to come in and say to the jury, Hey, he had to have

12   gone and become a banker, or a private wealth manager, but it's

13   not okay for him to go volunteer at Kristi House or some other

14   public service job.

15          MR. KING:  Well, what he's seeking, your Honor, is

16   lost earning capacity.  And he hasn't lost any capacity to earn

17   money.  Certainly, he may not -- he may have lost -- and just

18   to be clear, your Honor, we've also -- Ross University has also

19   offered him readmission into the medical school itself.  And

20   he's declined readmission.  So, he hasn't lost any opportunity.

21   He may have chosen not to pursue the opportunities, but he

22   certainly hasn't lost any earning opportunity, any capacity to

23   earn more money.

24          THE COURT:  Mr. Awodiya, why did you reject that

25   opportunity to be readmitted?

1          MR. AWODIYA:  Because it wasn't reasonable.  There is

2    evidence in the record that that -- their offer is not

3    reasonable.  On a fundamental basis, there's evidence -- that

4    one won't -- I'm -- I'm free to let them -- that's why I didn't

5    move on that.  I could care less if they introduce that into

6    evidence, the re --

7          THE COURT:  Here's my question about nine and ten.  I

8    don't disagree with you, as a basic premise, that the fact that

9    someone decides to work in public service doesn't really mean

10   that they're not still performing at a high level in society.

11   But if they want to make that argument to the jury, why not let

12   them make that argument to the jury?  It seems like a

13   relatively silly argument, and you might be able to undercut

14   it.

15         MR. AWODIYA:  Under Florida law, he -- what Ross is

16   referring to as lost earning capacity is if someone lost an arm

17   or lost a limb.  But that's not the basis of the measure of the

18   lost earning capacity as set forth by *Sherick (phonetic)*.  The

19   relationship -- the legal relationship between me and the

20   school is a contractual one.  Under Florida law, the level of

21   education is a type of earning capacity, as designated by the

22   Supreme Court.  That's like -- what they're saying is, your

23   Honor --

24         THE COURT:  I understand what they're saying.  I

25   understand what they're saying.

 1            You're going to file a response to this motion

 2    in limine by Thursday, and I will take this motion under

 3    advisement.

 4            So, let's address the calendar call.

 5            Is everyone prepared to go forward with trial?

 6            MR. AWODIYA:  Yes, your Honor.  I would like to also

 7    note really quick -- I don't need to brief or anything -- I was

 8    able to look up when that law changed.  It was in 2014, where

 9    Congress changed the definition of an institution of higher

10    education from the U.S. definition to the one that includes the

11    institutions outside the U.S.  And they applied it to the

12    entire chapter, not a specific provision.  And it's a

13    definition.  So, anywhere where it mentions any type of

14    institution of higher education, we refer to how they defined

15    that.  And it says that it applies to the entire chapter.

16            So, I just wanted to note that.  And that was

17    reflected in some -- it was like law Cornell thing, which I

18    usually just Google, and that's the first thing -- they kind of

19    show when the amendments happened.  But it was around 2014,

20    your Honor, after the extensive order from *Archut*.

21            THE COURT:  Okay.  Thank you very much.

22            So, you're prepared to go to trial?

23            MR. AWODIYA:  Yes.

24            And I would like to move to dismiss the negligent

25    misrepresentation claim, or to voluntarily withdraw, however I

1    get that out.  Because I believe that it causes unnecessary

2    conflict with the fraud claim, and it brings in a very

3    complicated issue of the elements of that claim and the

4    elements of the fraud claim.  And since it's basically fraud

5    that I'm going for, there's no reason for the negligent

6    misrepresentation claim to be duplicative of that one.

7            THE COURT:  Any objection?

8            MR. ROMAN:  Your Honor, if it's with prejudice, we

9    have no objection.

10           THE COURT:  I assume it's --

11           MR. AWODIYA:  Without prejudice.  I have -- there's a

12   rule and procedure where I read that I can do that, and when I

13   do that, it's without prejudice.  That's -- I -- if you give me

14   a second to look it up --

15           THE COURT:  Look it up.

16           *(Pause)*

17           MR. AWODIYA:  Your Honor.

18           THE COURT:  Yes, sir.

19           MR. AWODIYA:  It is Federal Rules of Civil

20   Procedure 41, Section (a)(1)(B).  It says -- halfway into it,

21   it says, "The dismissal is without prejudice."  And this is

22   under "Dismissal of Actions, Voluntarily Dismissal, by the

23   plaintiff."

24           THE COURT:  What's your position on that?

25           MR. ROMAN:  Your Honor, that only pertains to a notice

1    of dismissal before the opposing party serves an answer or

2    motion for summary judgment, or upon a stipulation signed by

3    all parties, which isn't present here.  So, we don't believe

4    that's applicable.  We've come this far, your Honor.  We're on

5    the eve of trial.  We don't want a situation where he purports

6    to bring a claim, that he has now dismissed without prejudice,

7    after the trial if he's unsuccessful.

8          THE COURT:  If you look at 41(a)(2), Mr. Awodiya, that

9    is dismissal by Court order.  That's except as provided in

10   41(a)(1).  We're not in 41(a)(1) territory, because the

11   opposing party has served an answer already.  And because

12   they're not stipulating, we're in 41(a)(2).  And that's where a

13   Court order --

14         MR. AWODIYA:  I'm assuming the Court order would be

15   something as a result of like a motion to dismiss or anything,

16   because I don't see how any other way a plaintiff would

17   voluntarily dismiss a claim without -- you know, because what I

18   initially was going to do was just file a notice of voluntary

19   dismissal.  If it's because we're in here that I'm asking you,

20   if that's why I can't --

21         THE COURT:  No, it's not.  Let me explain.  The reason

22   that this is an issue is because if they've already answered,

23   then you can withdraw any claim without me intervening or them

24   agreeing.  Okay?

25         MR. AWODIYA:  Okay.

```
1          THE COURT:  But at a certain point, the case gets far
2     enough long, and they've expended enough money defending it,
3     that what the rules say is you shouldn't be allowed to, without
4     their agreement and my agreement, withdraw a case, see what
5     happens with this case, and hold this withdrawn case in reserve
6     as backup, and if you lose the first case, then say, Aha, I've
7     got a second bite at the apple, let me refile that, and let's
8     start it all over again.
9          The point is, for efficiency reasons, to make sure
10    that everything is brought together, that everything is
11    adjudicated one time, you get your one day in court, that I get
12    to decide whether it should be dismissed with or without
13    prejudice, given how late we are in the game.
14         Or they can agree to allow you to dismiss it without
15    prejudice.  But, in fairness to them, I'll tell you that it's
16    very rare this late in the game, under these circumstances, for
17    a defendant to agree to do it without prejudice.  And I think
18    you probably -- you're a very smart guy, so you understand why
19    they're afraid that what you're really doing is you're holding
20    it in reserve to hedge your bets, and if you lose on the claims
21    that are going forward, then you will refile that claim and
22    say, Let's start it all over again, boys, restart the clock.
23    Nobody wants that.
24         So, you either can go forward with everything
25    together, although it seems like you've made a pretty smart
```

```
 1    strategic decision about how confusing it might be to the

 2    jurors to have both of them together.  If that's your decision,

 3    you can ask me to dismiss it with prejudice, which means that

 4    you wouldn't be able to bring it again.

 5           MR. AWODIYA:  Your Honor, if that's what the rule

 6    states, then, yes, I would like to dismiss it with prejudice,

 7    the negligent misrepresentation claim.

 8           THE COURT:  All right.  And that motion will be

 9    granted.

10           So, we are set for trial for July the 8th.  I will let

11    you know -- let me just ask, that date still works for

12    everyone?

13           Mr. Awodiya?

14           MR. AWODIYA:  Yes, yes.

15           MR. ROMAN:  Yes, your Honor, July the 8th works for

16    us.

17           THE COURT:  Okay.  I'm glad that I asked that, because

18    now I'm going to tell you that it probably doesn't really work

19    for me, not in the sense that I'm going to be anywhere, it's

20    just that I have a number of other cases that are set for that

21    day.  However, as you know, criminal cases take precedence

22    because of the speedy trial clock.  I think it looks like all

23    of the cases that are on that day are either first time up

24    criminal cases, which means they can get moved, or they're

25    going to plead guilty, except for one.  So, I have one case
```

```
1   that I think might go that day, which is ahead of you.  I then
2   have another big civil case that's just behind you.
3        So, what I will do is I will be in touch with both of
4   you, both sides, to advise you on how my schedule looks like
5   it's working out.  If the criminal cases plea out, you're
6   first, and you will go July 8th.  If one of the criminal cases
7   or more stays, then I'm going to require you to be available,
8   and you'll go as soon as those cases are finished.  Okay?
9        MR. AWODIYA:  Yes, your Honor.  And I would just like
10  to state for the record that my case in chief will probably
11  take one or two days.
12       THE COURT:  Okay.
13       MR. ROMAN:  Your Honor, I suspect our case would take
14  no more than two days.
15       THE COURT:  So, Mr. Awodiya, do you know, generally
16  speaking, how a jury will get selected?
17       MR. AWODIYA:  No.  I don't even know how to pronounce
18  the voyeur (sic).
19       THE COURT:  It's pronounced voir dire.
20       MR. AWODIYA:  Voir dire?
21       THE COURT:  Yes.  And they are venire members before
22  they become a jury.  Venire, V-E-N-I-R-E, is the panel of
23  people that we will bring in.
24       MR. AWODIYA:  Okay.
25       THE COURT:  Let me explain to you briefly how I do
```

1   jury selection for both sides' benefit.

2         You're going to get six jurors, probably, and two

3   alternates.  That's eight total.  Each of you will have three

4   peremptory strikes.  You know what a "peremptory strike" is?

5         MR. AWODIYA:  No.

6         THE COURT:  A "peremptory strike" is a strike, a

7   challenge to kick a person off of the venire for any reason

8   that you want, except that it can't be because of the juror's

9   race, or because of the juror's gender, or because of the

10  juror's ethnicity or national origin.

11        MR. AWODIYA:  Do we have to state the reason?

12        THE COURT:  Only if the other -- you don't.  The

13  simple answer is no, unless the other side raises what's called

14  a *Batson* challenge, in which case I'm gonna ask you what your

15  reason is.  Okay?

16        MR. AWODIYA:  Okay.

17        THE COURT:  Now, they can do that to you, too.  Say

18  that you wanted a particular juror off the jury, and they think

19  there wasn't a good reason for it, and they suspect that you

20  struck the juror for an unconstitutional reason -- race,

21  religion, gender, or national origin -- they can raise a *Batson*

22  challenge, and I'll ask you.

23        You can do the same for them.  If they strike a juror,

24  say, that you think was struck for an unconstitutional reason,

25  you can stand up and say, "I raise a *Batson* challenge."  That

1    yields a three-part test.

2          You would have to make a prima facie showing that it

3    was a strike in violation of the Constitution, and you would

4    say, Hey -- for example, let's assume they struck the only male

5    in the panel, and you said, Look, I'm a male, they don't want

6    males because they think males are going to like me, and they

7    struck a male just because he was a man, they -- that man was

8    similarly situated to all these other women that they let stay

9    on, this is just an unconstitutional strike of a man.

10          Then the burden would shift to them to give me a

11   gender-neutral reason for the strike.  And if they did that,

12   say they said, When I was asking him questions, he was giving

13   me a face, and I didn't like his face, he was grimacing or

14   whatever, some gender-neutral reason, I would go back to you to

15   prove that the reason they gave was what we call pretextual,

16   basically that they're lying.

17          MR. AWODIYA:  Okay.

18          THE COURT:  That's the three-step process.

19          MR. AWODIYA:  Okay.

20          THE COURT:  But you don't have to do that every time.

21   You can, if you want to, but you do it when you think -- you

22   legitimately think that they're doing it for an

23   unconstitutional reason.

24          And that brings me to an important point.  Even though

25   you're pro se, I am going to hold you to the rules of our

```
 1   court, which require that you only make arguments that you

 2   think are true, and that you only make statements that you

 3   think are true.  And so, my point to you in that respect is, if

 4   you think they violated the Constitution, say so.  But if you

 5   don't think they violated the Constitution, don't just do it

 6   for points.  Does that make sense?

 7          MR. AWODIYA:  I see what you're saying.

 8          THE COURT:  So, we'll bring in a number of people.

 9   They'll sit here.  Number 1 will sit closest chair to Javier

10   here in the front, and it will be one through seven in the

11   front row.  And then the next seven will be in the second row,

12   and then the seven after that will be in the back row.  So,

13   there will be 21 people in here that are in the venire, okay?

14          MR. AWODIYA:  I reviewed the scheduling order just

15   briefly.  It said something about asking them one-on-one?

16          THE COURT:  Let me finish, and then you can ask me

17   questions, if you still have questions.

18          You're going to have 21 people here.  The reason

19   that's important is because we're picking eight, six jurors

20   plus two alternates, that's eight.  You're going to get three

21   strikes, he's going to get three strikes, plus you each get a

22   strike for alternates.  That's four strikes and four strikes,

23   so that's eight plus eight is 16.  So, we need at least 16.

24          Plus you get cause challenges, which is anytime

25   somebody says, "I don't speak English," or "I'm sick and can't
```

1    be here," or "I'm blind and can't see the exhibits," or "I have

2    a 100-year-old grandmother that I need to take care of, and so

3    please don't make me stay here," or "I hate people named

4    Awodiya or law firms named Akerman, and I can't be fair," under

5    any of those circumstances, I'm not going to make a person sit

6    there.  Those are what we call challenges for cause.  You can

7    get rid of people who either can't be here or can't be fair.

8    Okay?

9              So, my estimate is we usually get about ten of those.

10   So, 16 plus ten, I'll probably bring in 26, which means that

11   you've got 21 here and five in the first row behind you,

12   Mr. Awodiya.  Okay?

13             So, what we'll do is, I'm going to give them a short

14   questionnaire that asks them the background questions -- what's

15   their name, where do they work, how old they are, what does

16   their husband do, or wife, what do their children do, and a few

17   probing questions about whether they have any prejudices that

18   might make them unfair jurors in your case.

19             At that point, we'll get the questionnaires.  All of

20   you will read them with me while the jurors are still outside.

21   We'll go over them.  I'll give you ten or 15 minutes to take

22   notes on them.  We'll bring them in, and I will give them about

23   an hour or so of questions about the process, the system, and

24   specific questions in response to things I thought were

25   interesting that they said in their questionnaires.

```
 1          At that point, I'm going to turn it to the lawyers,

 2   and I'll give you a few minutes, probably no more than ten, to

 3   ask your own questions of the venire, the group, if you want

 4   to.

 5          Now, if there are jurors who say, "I have something

 6   really private to say, I don't want to say it in front of

 7   everybody," we'll allow those jurors to come in individually

 8   and raise their individualized concerns in private with us.

 9          So, once that's all done, the jurors go outside, and

10   then we go through the list of the 26 of them, and we'll start

11   with Juror Number 1.  Because you're the plaintiff,

12   Mr. Awodiya, you would go first.  And I would say, Juror

13   Number 1, Mr. Awodiya, accept or reject?  And at that point,

14   you have three options.  You can either accept the juror, you

15   could strike the juror for cause, which is the juror said she

16   can't be fair, or you can strike the juror peremptorily, which

17   is to say, I'm striking her for any reason I want, and I don't

18   want to tell you the reason.  Okay?  Remember, on the third

19   one, they can respond with a Batson challenge, which we talked

20   about before.

21          So, that's Juror Number 1.  Let's say you accept, we

22   go to the defense.  Let's say they accept, that person is our

23   Juror Number 1.  Then we go to Juror Number 2, it goes to the

24   defense to accept or reject and then to you.  And so on and so

25   forth until we have eight jurors.
```

```
 1              Does that make sense?

 2         MR. AWODIYA:  Yes.

 3         THE COURT:  Okay.  Anything else from you,

 4    Mr. Awodiya?

 5         MR. AWODIYA:  Two questions.  When -- if I do the

 6    third option, where I say I want do it for any reason, I --

 7         THE COURT:  We call it a peremptory.

 8         MR. AWODIYA:  Peremptory?

 9         THE COURT:  P-E-R-E-M-P-T-O-R-Y.  And you get three of

10    those, so you want to use them wisely.  You get an infinite

11    number of cause challenges.

12              But, remember, you're going to be obligated to tell me

13    things you only believe to be true.  And so, you can't raise a

14    cause challenge on everybody, because there will be jurors in

15    here who can be fair.  That's only for people who say they

16    can't be jurors.

17         MR. AWODIYA:  Okay.  So, my question is:  When they

18    want to challenge my unstated reason, does that argument occur

19    in front of the jury?

20         THE COURT:  It does not.  The jurors are outside when

21    we pick the jury.

22         MR. AWODIYA:  Okay.

23         THE COURT:  That's a good question.

24         MR. AWODIYA:  And my second question is:  Is this

25    process considered the first day of trial?
```

```
1          THE COURT:  That will happen on the first day of

2     trial, but that will be in the morning.  And then we'll break

3     for lunch probably, and opening statements will begin in the

4     afternoon.

5          MR. AWODIYA:  I understand.  I understand.

6          THE COURT:  Any questions from the defense?

7          MR. ROMAN:  Your Honor, I just have three very short

8     questions.  The first was, I understand from your instructions

9     regarding voir dire that there will be no backstriking, is that

10    correct?

11         THE COURT:  That's correct.

12         MR. ROMAN:  Okay.  During trial will we have

13    permission to move the podium around the well?

14         THE COURT:  Yes.  Two things about that.  One is I

15    don't want you to stray too far from the microphone, because

16    the acoustics in this courtroom are very difficult, and Fran

17    needs to hear everything you say.  So, I'm going to be

18    sensitive to that, and I'll warn you in advance.  But she

19    doesn't need me to be, because, as you'll see, she will pipe up

20    if she can't hear you.

21         Secondly, you can, though, move the microphone

22    around -- actually, they both have microphones, and they're

23    both movable.  However, they are tethered with monumentally

24    important cables to a system that I'm afraid will combust if

25    something happens.  So, just be careful when you move either or
```

1    both of them that you're not unplugging something important.

2              MR. ROMAN:  Thank you, your Honor.  And my last

3    question is:  Prior to trial is it okay if we contact your

4    chambers to see about our trial technician coming in to check

5    out the courtroom?

6              THE COURT:  Yeah, that's no problem.

7              Go ahead, Fran.

8              THE COURT REPORTER:  Have them call me.

9              THE COURT:  You can just call Fran, and she'll help

10   you out.

11             Mr. Awodiya, I'll give you the same opportunity.  If

12   you have any questions about how the equipment works, Fran will

13   help you out with it.

14             This thing right here is called the ELMO.  I don't

15   know why it's called that, but I'm sure there's a good reason.

16   The ELMO is tied to all the screens in the courtroom.

17             MR. AWODIYA:  Okay.

18             THE COURT:  And if you put a document -- including the

19   jurors' screens.

20             MR. AWODIYA:  Okay.

21             THE COURT:  If you put a document on the ELMO, then

22   everyone will be able to see it, if and when I allow it to be

23   published, and Fran clicks a button that allows all the screens

24   to see it.

25             Otherwise, there's a setting on the ELMO that allows

```
1    only for the witness and me to see the document while it's on

2    the ELMO.  The reason for that is because before you are able

3    to show the jurors an exhibit, you've got to get the exhibit

4    into evidence.  So, you can show it to me and the witness

5    through the ELMO, if it comes into evidence.  Then you can ask

6    Fran and me to publish it to the jury.  And if we agree with

7    that, then the different button will be pressed, and everybody

8    will be able to see it.  Does that make sense?

9              MR. AWODIYA:  That makes sense.

10             MR. ROMAN:  I'm sorry, your Honor, I had two more

11   questions that got passed to me.  What time -- your trial day,

12   I understand from the earlier conversation, may start at 9:30

13   typically?

14             THE COURT:  9:30.

15             MR. ROMAN:  And what time do you usually go until?

16             THE COURT:  Usually five or 5:30.

17             MR. ROMAN:  And, finally, your Honor, with respect to

18   sidebars, how do you typically handle those?

19             THE COURT:  Generally discouraged.  In criminal cases,

20   sometimes you can't do without them.  In civil cases, we really

21   shouldn't be doing very many sidebars.  If you need a sidebar,

22   just ask me for a sidebar, and we'll either take it here, which

23   is where my microphone is on my left, or if it's a more

24   involved issue, we'll wait for the next break, and we'll take

25   it up when the jurors are in the jury deliberation room.
```

```
 1              MR. ROMAN:  Thank you, your Honor.

 2              MR. AWODIYA:  Your Honor, I have --

 3              THE COURT:  This seems like a never-ending process.

 4    This is going to be your last turn.

 5              MR. AWODIYA:  Sorry.  I think I'm going to need --

 6    I've already contacted the Court last year --

 7              THE COURT:  I wasn't even a judge back then.

 8              MR. AWODIYA:  Oh, yes, I know, but it's important to

 9    my question.  I asked them for courtroom accommodations, and

10    they told me that since it's an ADA case, that I would need to

11    ask the judge presiding.

12              I saw something that I think would, like, really help

13    me, is if I need something that when people are speaking,

14    especially really lengthy, if I can kind of read at my own

15    pace, or if I like get lost, I can go back and read what they

16    said.  Because, quite honestly, I just might lose

17    concentration.  Like half the stuff they said there, I had

18    point in my head, and I just don't remember what I was going to

19    say against it.  So, to avoid that during trial -- they had

20    something called --

21              THE COURT:  It's called realtime, but you have to pay

22    for it.

23              MR. AWODIYA:  Then I strike that.  I don't think I

24    have the funds to pay for it.  So, I can't -- I will just leave

25    that alone.
```

```
 1              My next question is, I would like to see if I could --
 2    there are documents, there are evidence that under protective
 3    order, and Ross has labeled them that they wouldn't expect to
 4    offer those documents.  There are important redactions that
 5    need to be made, and Ross has made no effort to even show me
 6    what documents they plan to offer or what information within
 7    the documents, whatsoever.  And since they're under protective
 8    order, technically they can't offer them unless I -- there is a
 9    further order or I stipulate to how they are administered.
10    That's within the protective order.
11              THE COURT:  Okay.
12              MR. ROMAN:  Your Honor, we do not read the protective
13    order in that manner.  However, at trial, we would ask for
14    those documents that contain sensitive information, if it's not
15    relevant, we'll redact those.  If it is relevant, then we would
16    ask that you perhaps can close the courtroom for that portion
17    of the testimony, and we would seal the record.
18              THE COURT:  I'm not going to be inclined to close the
19    courtroom, because the people have a Sixth Amendment right to a
20    public trial.  But why don't you just show him the exhibits
21    that you are intending to introduce at trial.  I assume you
22    have them all ready.  And let him go through them and recommend
23    any redactions.  Try to work it out, and if you can't work it
24    out, let me know, and I will work it out.
25              MR. ROMAN:  Thank you, your Honor.
```

1           THE COURT:  Again, Mr. Awodiya, when they show you the

2    exhibits, I'll ask you to review those exhibits and only try to

3    redact the things that you think are absolutely necessary to

4    redact.

5           MR. AWODIYA:  Okay.

6           My third-to-last question --

7           THE COURT:  Third to last?

8           MR. AWODIYA:  Well, I only have four questions, so --

9           THE COURT:  Oh.

10          MR. AWODIYA:  I would like to -- now that I understand

11   the voir -- the voir dire --

12          THE COURT:  Voir dire.

13          MR. AWODIYA:  The voir dire, I would like to see if I

14   could have leave to -- leave before Friday to file with the

15   Court my questions.  I was first under the presumption that the

16   Court had like a standard thing for like ADA cases, but the

17   questions that you mentioned sound very general, and so I might

18   need to actually adapt something like that to an ADA case.

19          THE COURT:  I do ask specific questions relating to

20   the ADA.

21          MR. AWODIYA:  Okay.

22          THE COURT:  But I will permit you to submit proposed

23   voir dire questions.  No more than five per side.  You can file

24   them by Friday.

25          MR. AWODIYA:  Okay.  Okay.  Thank you.

Case 0:18-cv-60482-RKA   Document 216   Entered on FLSD Docket 07/02/2019   Page 72 of 90
USCA11 Case: 19-12832   Document: 22-2   Date Filed: 10/16/2019   Page: 98 of 117

72

1          THE COURT:  Just know that I may decide not to ask any

2     of those questions.

3          MR. AWODIYA:  Okay.  Perfectly fine.

4          MR. ROMAN:  Your Honor, if I may, with respect to that

5     instruction, we had filed voir dire questions with the Court

6     already.  However, we exceeded that limit of five.  Would you

7     like us to refile?

8          THE COURT:  Refile them by Friday and pick your best

9     five.

10         MR. ROMAN:  Thank you, your Honor.

11         MR. AWODIYA:  And my last one is:  I would like to

12    see -- seek leave to file for motion for sanctions, because I

13    read the minute order, and with respect to discovery, it said

14    that I should contact the magistrate judge before filing a

15    motion for sanctions, I think via email.  However, this is not

16    really a discovery matter, so I wanted to see if I could seek a

17    leave to file a motion for sanctions against Ross University

18    and its counsel for its conduct yesterday.

19         THE COURT:  What happened yesterday?

20         MR. AWODIYA:  I submitted my jury instructions to Ross

21    University I think June 4th.  They submitted theirs to me days

22    later.  And then what they submitted to me -- after a few more

23    days later, they submitted something that they -- what they put

24    in their notice, they said that here is a version of the

25    proposed jury instructions, where I did not create that

1    version.  And then in -- as -- they -- they cannot cherrypick

2    my submissions to them to mess with it however they want to,

3    and then claim that I had something to do with the version that

4    they submitted on my behalf, saying that plaintiff -- for

5    example -- and then I sent an email to them saying that do not

6    omit my objections, do not omit my instructions, do not change

7    the order, because they are really relevant, as I explained

8    with the fraud claim and the compensatory damages.  That's why

9    my things are in the order that they are.

10          And then on top of that, I sent them more objections

11   or alternate objections, and then I removed instructions from

12   mines *(sic)*, which are no longer requested by me.  And then I

13   also altered significantly certain instructions, like the

14   emotional distress ones.

15          THE COURT:  Here's what we're going to do.  Your

16   motion for leave to file a motion for sanctions is granted, and

17   your motion for sanctions is denied.  You're going to get

18   together by Friday, and you're going to work on one joint

19   proposed jury instructions that comports with my order on how

20   to file proposed jury instructions.  That doesn't mean that

21   each of you gets to file your own separate jury instructions.

22   There are specific instructions in my order, that are very

23   simple to follow, on how you are to designate three kinds of

24   instructions -- instructions on which you agree; instructions

25   on which the defendant is insisting, but with which the

1    plaintiff disagrees; and instructions on which the plaintiff is

2    insisting, but with which the defendant disagrees.  Those three

3    possible scenarios are all laid out very clearly in my order.

4    And you're to file one joint proposed set of jury instructions

5    that specifically delineates those three different kinds of

6    instructions by Friday.

7                MR. AWODIYA:  Thank you, your Honor.

8                And, as well, your -- the scheduling order doesn't

9    address the pretrial stipulations as well, because that one was

10   completely -- they made that version.  I never put something as

11   a stipulated fact.

12               THE COURT:  Then there's no stipulations.

13               MR. AWODIYA:  Exactly.  But my admission -- the

14   Rule 36 admissions and the Rule 8 admissions are considered

15   uncontested facts under the local rules.  So, therefore, I

16   shouldn't have to trial *(sic)* facts that they Rule 36 admitted.

17   That's literally prejudice, and I put that in one of the

18   pleadings.  So, if they admit to a fact, a Rule 36 admission,

19   or admit to an allegation within the complaint, that fact is

20   treated as proven for the case, as well as the Rule 56(g) facts

21   from --

22               THE COURT:  Well, that's true, but that's separate

23   from the pretrial stipulations.  Pretrial stipulations have to

24   do with things that you are agreeing separate and apart from

25   evidence that may or may not be contested.  So, if there are

1  stipulations that you have in place on things you agree, by all

2  means, file -- your stipulations should have been filed

3  already.  So, this is not really an issue of what's to be

4  filed.  If there are pieces of evidence that you say they

5  admitted or accepted in some way or manner during the course of

6  the litigation, then you'll be able to try to introduce that,

7  and they'll be able to object, if they disagree, and I will

8  rule on that objection at that time.

9          Have you filed an exhibit list?

10         MR. AWODIYA:  Yes.  I filed everything, your Honor.

11  The problem is, is that those admitted facts -- since Ross is

12  allowed to put stipulations in the jury instructions, I should

13  also be allowed to put admissions and established facts, facts

14  that are treated as proven already for this case.  So, it

15  would -- there's no way to present -- because I don't know if

16  the document itself, the request for admissions and established

17  facts are admissible, but it wouldn't make sense for me to have

18  to sit there and prove it to the jury.  They should already

19  know that these facts are proven.

20         THE COURT:  Well, if it's a statement of the party

21  opponent, it's not hearsay.  And if it's a request for

22  admission that was turned over to you in the course of this

23  litigation, then it's authenticated.  So, I don't see that as

24  being an admissibility problem.  There may be some other

25  objection to it.  I don't know what piece of evidence you're

1    talking about.

2          MR. AWODIYA:  Those -- how would those apply to the

3    rule -- the Rule 56(g) established facts?

4          THE COURT:  You mean the ones that you claim are

5    established facts in your summary judgment submissions?

6          MR. AWODIYA:  Yes.

7          THE COURT:  Well, those are your view of what's

8    established facts, not their view.

9          MR. AWODIYA:  I took them word for word from the

10   Court's order.

11         THE COURT:  Right.  So, the Court has to enter an

12   order on what facts are established and what facts are not

13   established.

14         MR. AWODIYA:  Your Honor, I respectfully disagree.  I

15   looked that case law up, because I was just making sure before

16   I did all of that, there was an exact case, something like

17   that, and I think it was either in this court or the Eleventh

18   Circuit, where they argue precisely that, whether the Court has

19   to say that this is a Rule 56(g) fact, and they ruled that, no,

20   it is within the rules of the civil procedure.  And then it's

21   there.  And I requested for it in my motion for summary

22   judgment.  It simply states that the judge --

23         THE COURT:  You mean your motion for summary judgment

24   in front of Judge Moore?

25         MR. AWODIYA:  Yes.

1          THE COURT:  And what was the ruling on that?

2          MR. AWODIYA:  He stated material facts that were not

3     subject to reasonable dispute -- reasonable -- reasonably --

4     reasonable dispute.

5          THE COURT:  Okay.  So that's that.

6          MR. AWODIYA:  Okay.  Well, just --

7          THE COURT:  Is there any dispute about that?

8          MR. ROMAN:  Yes, your Honor.  We actually don't read

9     the order the way that Mr. Awodiya does.  There are items he

10    requested be established that the Court rejected that he still

11    is trying to use in the stipulations.  So, we're gonna have

12    some disagreements, but I think those can be addressed, your

13    Honor, when those particular facts are introduced.

14         THE COURT:  Mr. Awodiya, this is the way litigation

15    goes.  You're going to say that a particular fact has been

16    ordered by the Court.  You're going to try to convince me that

17    that's true.  If they agree, then we can tell the jury that

18    fact.  If they disagree, they're going to point to me in the

19    record where they're going to say, Chief Judge Moore, in his

20    order, did not find that that was a fact about which there was

21    no genuine issue of dispute.  And I'll have to look at it and

22    make a decision, one way or the other.  If I agree with you,

23    then we'll instruct the jury that that's a fact that's not in

24    dispute.  If I agree with them, then it's a fact that you're

25    going to have to prove.

```
 1              MR. AWODIYA:  Okay.  I think we -- we'll just address
 2    it later, because I think I can't cover the amount of
 3    prejudices what happened.  Like, first, if we wait till that
 4    long, my entire exhibit list, entire case would change,
 5    literally.  It goes from my diagnosis to me informing Ross of
 6    that -- like, I've already submitted my exhibit list in
 7    compliance --
 8              THE COURT:  You'll get to amend your exhibit list.
 9    That's not a problem.  There will be naturally things in your
10    exhibit list that will not be admitted into evidence, and same
11    with the defense.  So, at the end of the case, you'll submit to
12    me an amended exhibit list.  But remember, the jurors don't see
13    the exhibit list, so it's not prejudicial to you.
14              MR. AWODIYA:  No, but they see the jury instructions.
15              THE COURT:  Yeah, but the jury instructions are not
16    done until the end of the case, once the evidence is put in.
17    So, it won't be prejudicial to you either, because the jurors
18    don't see the proposed jury instructions until we have our
19    charge conference all together, outside of their presence, and
20    decide exactly which instructions are going to go to the jury
21    and which are not.
22              MR. AWODIYA:  Do you give them any instruction before
23    we start trial?
24              THE COURT:  We give them the preliminary instructions,
25    which are standard.
```

```
 1              MR. AWODIYA:  I see.  And everything after that is
 2     after the trial.
 3              THE COURT:  After the evidence is in.  So, by then,
 4     we'll --
 5              MR. AWODIYA:  Okay.  That clears things up for me.
 6              THE COURT:  So, that clears everything up.  Okay.
 7              So, I hesitate to ask if there's anything else.  Let
 8     me say it this way.
 9              MR. AWODIYA:  That's it.
10              THE COURT:  We will see you on the 8th unless I let
11     you know that it will be at some point later than that.  Okay?
12              MR. AWODIYA:  Okay, your Honor.  And with regard to
13     that, I just ask for a little bit of spacing, because it's
14     harder for me to buy plane tickets and book hotels when I have
15     to buy them like a few days later or a week later.  Sometimes
16     money does become an issue.  So, if it is moved, I need just a
17     little bit of buffer just to make sure that the financial stuff
18     is --
19              THE COURT:  We will try to -- I understand that.  And
20     we will try to let you know as soon as we know whether it's
21     going on the 8th or sometime later.
22              MR. AWODIYA:  Thank you, your Honor.
23              (Discussion had off the record)
24              THE COURT:  We should know by July 2nd.
25              MR. AWODIYA:  Okay.  Thank you.
```

1          MR. ROMAN:  Thank you, your Honor.

2          THE COURT:  All right.  Thank you all very much.

3          MR. KING:  Thank you, Judge.

4          ROOM CLERK:  All rise.

5          *(The Judge exited the courtroom)*

6          *(Proceedings concluded at 5:01 p.m.)*

7                          -  -  -  -  -

8

9

10

11

12

13

14

15

16

17                     C E R T I F I C A T E

18      I hereby certify that pursuant to Section 753,

19   Title 28, United States Code, the foregoing is a true and

20   correct transcript from the record of proceedings in the

21   above-entitled matter.

22

23

    _____    7-2-2019_____
24   Francine C. Salopek, RMR-CRR                Date
     Official Court Reporter
25

**MR. AWODIYA: [144]**
**MR. KING: [13]** 48/11 48/20 48/23
49/2 49/24 50/7 50/11 50/17 50/19
50/22 51/23 52/14 80/2
**MR. MARSH: [1]** 30/7
**MR. ROMAN: [70]**
**MS. GREEN: [5]** 35/15 35/18 35/22
35/25 36/2
**ROOM CLERK: [3]** 3/5 30/10 80/3
**THE COURT REPORTER: [1]** 67/7
**THE COURT: [221]**

**'**
**'institution [1]** 18/23

**1**
**10 [3]** 31/12 31/19 50/16
**100-year-old [1]** 63/2
**1001 [4]** 7/3 7/6 8/13 19/10
**1002 [5]** 7/1 7/6 8/13 18/24 19/3
**11 [2]** 1/7 3/1
**1100 [1]** 2/7
**15 minutes [1]** 63/21
**15005 [1]** 2/2
**154 [1]** 41/6
**16 [4]** 15/20 62/23 62/23 63/10
**160 [1]** 35/5
**165 [1]** 36/12
**17 [2]** 15/20 31/19
**18-60482-CIV-RKA [1]** 1/4
**18th [1]** 21/13
**194 [3]** 36/10 36/12 48/7
**1988 [1]** 36/20

**2**
**20 [2]** 18/25 19/4
**20 U.S.C [1]** 7/1
**2012 [2]** 4/18 18/10
**2014 [3]** 48/2 54/8 54/19
**2016 [1]** 21/13
**2017 [5]** 14/8 14/14 14/18 22/8 40/10
**2019 [5]** 1/7 3/1 18/11 48/2 80/23
**20721 [1]** 2/3
**207B [1]** 2/10
**21 [3]** 62/13 62/18 63/11
**23 [3]** 6/24 17/8 18/16
**26 [3]** 15/20 63/10 64/10
**28 [1]** 80/19
**29 U.S.C [4]** 6/24 7/11 17/8 18/16
**299 [1]** 2/10
**2:32 [2]** 1/7 3/1
**2nd [1]** 79/24

**3**
**32 [2]** 15/20 31/12
**33131 [1]** 2/8
**33301 [1]** 2/11
**34 [1]** 15/20
**36 [3]** 74/14 74/16 74/18
**379 [1]** 36/21
**3:11 [1]** 30/3
**3:47 [1]** 30/3

**4**
**41 [5]** 55/20 56/8 56/10 56/10 56/12
**4270618 [1]** 40/11
**4th [1]** 72/21

**5**
**504 [2]** 6/17 8/7
**56 [4]** 15/19 74/20 76/3 76/19
**5:01 [1]** 80/6
**5:30 [1]** 68/16

**7**
**7-2-2019 [1]** 80/23
**705 [3]** 6/24 17/8 18/16
**753 [1]** 80/18
**769-5686/mjsfcs [1]** 2/11
**794 [2]** 7/12 20/18

**8**
**860 F.2d 379 [1]** 36/21
**8th [5]** 58/10 58/15 59/6 79/10 79/21

**9**
**954 [1]** 2/11
**98 [1]** 2/7
**9:30 [2]** 68/12 68/14

**A**
**A-G-E-L-O-F-F [1]** 36/21
**abide [1]** 45/16
**abided [1]** 31/13
**ability [1]** 42/8
**above [1]** 80/21
**above-entitled [1]** 80/21
**abroad [2]** 6/8 6/8
**absent [1]** 20/2
**absolutely [3]** 29/13 29/25 71/3
**academic [4]** 16/9 48/10 48/11 49/16
**accept [5]** 64/13 64/14 64/21 64/22
 64/24
**accepted [1]** 75/5
**accommodate [3]** 33/16 44/23 46/9
**accommodated [1]** 43/22
**accommodation [41]**
**accommodations [13]** 5/3 16/9 23/7
 26/20 26/20 26/23 27/18 28/6 29/22
 31/12 31/15 32/12 69/9
**according [1]** 23/2
**acknowledged [1]** 26/22
**acoustics [1]** 66/16
**act [16]** 4/14 4/20 5/18 6/2 6/12 6/17
 6/20 6/20 7/20 8/4 8/6 15/16 20/8
 20/21 31/14 32/18
**acting [1]** 45/9
**Actions [1]** 55/22
**activities [1]** 8/10
**acts [4]** 5/23 6/1 7/9 26/2
**ADA [57]**
**adapt [1]** 71/18
**address [4]** 35/10 54/4 74/9 78/1
**addressed [2]** 7/16 77/12
**addressing [1]** 36/23
**ADHD [2]** 21/13 22/7 22/12
**adjudicated [1]** 57/11

**administered [2]** 24/5 70/9
**administers [1]** 24/19
**administration [8]** 15/24 16/2 16/24
 21/4 21/20 32/7 32/9 32/13
**administrators [3]** 10/3 12/14 33/20
**admissibility [1]** 75/24
**admissible [1]** 75/17
**admission [4]** 51/14 74/13 74/18
 75/22
**admissions [6]** 10/19 10/20 74/14
 74/14 75/13 75/16
**admit [2]** 74/18 74/19
**admitted [4]** 74/16 75/5 75/11 78/10
**adopted [1]** 20/6
**advance [1]** 66/18
**advise [2]** 41/13 59/4
**advisement [2]** 36/9 54/3
**affairs [1]** 16/6
**affirm [2]** 45/12 47/22
**affirmatively [1]** 15/3
**affirmed [1]** 20/1
**afforded [1]** 39/6
**afraid [2]** 57/19 66/24
**afternoon [13]** 3/3 3/4 3/5 3/10 3/11
 3/12 3/16 3/17 17/5 17/6 30/17 30/18
 66/4
**Ageloff [2]** 36/21 40/9
**agencies [1]** 8/8
**agree [19]**
**agreement [4]** 7/23 8/2 57/4 57/4
**Aha [1]** 57/6
**aid [4]** 7/21 7/24 8/18 11/1
**Air [1]** 36/21
**Akerman [4]** 2/6 3/13 3/14 63/4
**allegation [4]** 16/25 21/25 23/20
 74/19
**allegations [6]** 16/10 16/12 16/18
 16/19 16/20 23/2
**allege [1]** 15/19
**alleged [1]** 33/1
**allow [3]** 57/14 64/7 67/22
**allowed [8]** 15/15 22/20 46/5 47/22
 52/11 57/3 75/12 75/13
**allows [2]** 67/23 67/25
**alone [1]** 69/25
**altered [1]** 73/13
**alternate [1]** 73/11
**alternates [3]** 60/3 62/20 62/22
**although [2]** 41/24 57/25
**Altman [1]** 1/14
**ambit [1]** 7/9
**amend [1]** 78/8
**amended [2]** 51/4 78/12
**Amendment [1]** 70/19
**amendments [1]** 54/19
**American [6]** 7/17 7/19 7/20 7/23
 7/25 26/11
**amount [1]** 78/2
**analysis [3]** 18/12 20/5 44/3
**analyzed [1]** 19/14
**and/or [1]** 17/9
**anew [1]** 35/14
**answer [7]** 11/24 20/7 25/17 25/21
 56/1 56/11 60/13

## A

**anymore [1]** 48/20
**anytime [1]** 62/24
**aol.com [1]** 2/11
**apologize [1]** 19/2
**appeal [1]** 14/18
**appearances [3]** 2/1 3/8 30/13
**appellate [1]** 39/7
**apple [1]** 57/7
**applicability [1]** 3/23
**applicable [18]**
**application [3]** 6/1 25/2 51/12
**applied [10]** 24/23 28/10 28/16 43/10 44/21 44/22 46/18 47/5 48/5 54/11
**applies [6]** 8/10 17/9 17/20 19/25 41/22 54/15
**apply [30]**
**applying [1]** 18/19
**appreciate [1]** 18/8
**approach [1]** 40/6
**Archut [18]**
**aren't [3]** 16/24 39/3 42/1
**argue [1]** 76/18
**argument [26]**
**arguments [2]** 30/19 62/1
**arises [1]** 24/9
**arm [1]** 53/16
**art [1]** 29/22
**aspect [1]** 11/5
**aspersions [1]** 11/23
**assassination [1]** 5/22
**assertion [1]** 49/1
**assessment [1]** 16/4
**assigned [1]** 7/5
**assist [1]** 41/18
**associate [1]** 16/6
**assume [6]** 25/25 26/3 43/6 55/10 61/4 70/21
**assumes [1]** 51/5
**assuming [6]** 21/23 33/22 40/3 44/18 50/16 56/14
**attempt [2]** 13/11 40/22
**attempting [1]** 51/8
**attempts [2]** 12/13 29/11
**attenuation [1]** 43/24
**authenticated [1]** 75/23
**authority [6]** 8/8 20/3 29/9 33/14 33/24 49/15
**authorized [1]** 15/22
**avoid [1]** 69/19
**aware [1]** 11/15
**AWODIYA [34]**
**Awodiya vs. Ross [2]** 3/7 30/12
**Awodiya's [3]** 31/9 36/10 36/13

## B

**background [1]** 63/14
**backing [2]** 7/25 10/5
**backstriking [1]** 66/9
**backup [1]** 57/6
**banker [1]** 52/12
**basic [1]** 53/8
**basis [4]** 23/12 49/12 53/3 53/17
**Batson [4]** 60/14 60/21 60/25 64/19

**begin [1]** 66/3
**beginning [1]** 25/19
**behind [2]** 59/2 63/11
**believe [24]**
**below [6]** 37/8 37/16 38/3 39/20 39/21 39/24
**below-market [6]** 37/8 37/16 38/3 39/20 39/21 39/24
**belt [1]** 36/6
**Beltran [2]** 40/9 40/11
**Beltran vs. NCL [1]** 40/9
**benefit [1]** 60/1
**bets [1]** 57/20
**billing [1]** 29/19
**binding [2]** 19/17 19/18
**bite [1]** 57/7
**black [1]** 47/25
**blind [3]** 49/17 49/20 63/1
**Blvd [1]** 2/10
**board [2]** 43/12 47/11
**book [1]** 79/14
**Bowie [1]** 2/3
**boys [1]** 57/22
**break [2]** 66/2 68/24
**Brickell [1]** 2/6
**brief [4]** 3/22 25/7 28/24 54/7
**briefing [5]** 3/25 9/12 28/9 28/17 34/7
**Broward [1]** 2/10
**buffer [1]** 79/17
**burden [1]** 61/10
**button [2]** 67/23 68/7
**buy [2]** 79/14 79/15

## C

**cables [1]** 66/24
**calculating [1]** 38/3
**calculation [6]** 40/21 41/7 41/9 43/17 51/4 51/10
**calculations [1]** 36/14
**calendar [1]** 1/13 3/19 54/4
**call [9]** 1/13 3/20 41/10 54/4 61/15 63/6 65/7 67/8 67/9
**called [7]** 21/5 36/20 60/13 67/14 67/15 69/20 69/21
**Calling [1]** 3/6
**campus [4]** 13/10 13/16 13/25 17/21
**capable [2]** 51/13 52/6
**capacity [13]** 40/14 41/19 45/23 50/25 51/25 52/1 52/4 52/16 52/16 52/22 53/16 53/18 53/21
**careful [1]** 66/25
**carjacking [1]** 5/20
**case-by-case [2]** 37/9 38/4
**cast [1]** 11/23
**catastrophic [1]** 37/2
**categories [1]** 41/20
**category [1]** 41/21
**causation [2]** 43/2 44/9
**cause [5]** 62/24 63/6 64/15 65/11 65/14
**caused [1]** 45/6
**causes [1]** 55/1
**center [4]** 15/23 16/4 21/12 21/22
**Centre [1]** 2/6

**certify [1]** 80/18
**chair [1]** 62/9
**challenge [7]** 60/7 60/14 60/22 60/25 64/19 65/14 65/18
**challenges [3]** 62/24 63/6 65/11
**chambers [1]** 67/4
**chance [1]** 12/9
**chapter [2]** 54/12 54/15
**charge [1]** 78/19
**charges [1]** 25/14
**check [2]** 27/16 67/4
**cherrypick [1]** 73/1
**chief [3]** 41/5 59/10 77/19
**children [1]** 63/16
**choose [1]** 47/24
**chosen [1]** 52/21
**Circuit [8]** 20/2 20/3 20/5 36/20 37/2 37/17 38/24 76/18
**Circuits [2]** 39/2 39/3
**circumscribed [1]** 24/1
**circumstances [3]** 33/16 57/16 63/5
**citation [1]** 18/16
**cite [1]** 40/11
**cited [3]** 6/6 7/17 34/6
**citing [1]** 29/9
**citizens [4]** 7/17 7/19 7/20 7/23
**citizens' [1]** 7/25
**City [1]** 2/6
**CIV [1]** 1/4
**civil [6]** 3/6 30/11 55/19 59/2 68/20 76/20
**claim [29]**
**claiming [1]** 21/20
**claims [24]**
**clear [10]** 4/19 5/25 6/2 6/7 6/12 7/5 13/15 36/17 37/17 52/18
**clears [2]** 79/5 79/6
**clerk [1]** 30/10
**clever [3]** 10/11 26/6 26/8
**clicks [1]** 67/23
**clock [2]** 57/22 58/22
**close [2]** 70/16 70/18
**closer [1]** 26/1
**closest [1]** 62/9
**Code [1]** 80/19
**cold [1]** 28/15
**college [2]** 49/2 49/3
**colleges [1]** 20/12
**combust [1]** 66/24
**comfortable [1]** 26/11
**company [1]** 8/21
**compared [1]** 16/15
**compensatory [8]** 15/15 15/17 42/23 42/25 45/11 45/12 47/20 73/8
**complaint [6]** 14/5 14/10 15/19 16/10 31/17 74/19
**complete [1]** 39/5
**compliance [1]** 78/7
**complicated [2]** 12/11 55/3
**complimented [1]** 20/5
**comply [14]** 9/3 10/3 10/7 10/9 10/12 10/15 30/24 32/11 32/23 34/18 34/25 45/19 45/24 46/25
**complying [1]** 32/7

**C**

**comports [1]** 73/19
**computer [1]** 1/25
**concentration [1]** 69/17
**concern [1]** 25/16
**concerned [1]** 33/20
**concerns [1]** 64/8
**conclude [1]** 19/14
**concluded [1]** 80/6
**conclusion [2]** 17/22 18/13
**conduct [4]** 18/10 18/12 20/9 72/18
**conference [1]** 78/19
**confidential [1]** 15/23
**conflict [1]** 55/2
**conflicting [1]** 34/3
**conflicts [1]** 34/4
**conform [1]** 9/19
**confused [2]** 37/24 38/8
**confusing [1]** 58/1
**confusion [1]** 32/6
**Congress [5]** 6/2 6/7 6/13 49/15 54/9
**congressman [1]** 7/18
**connected [1]** 46/19
**connection [1]** 11/1
**connects [1]** 49/13
**consequent [2]** 45/9 45/10
**consideration [1]** 17/12
**consistent [2]** 20/22 20/25
**Constitution [3]** 61/3 62/4 62/5
**construed [1]** 8/5
**contact [2]** 67/3 72/14
**contacted [1]** 69/6
**contain [1]** 70/14
**contentions [1]** 36/24
**contested [1]** 74/25
**context [2]** 18/19 40/14
**contract [1]** 45/12
**contractual [2]** 47/21 53/20
**controlling [1]** 49/14
**conversation [1]** 68/12
**converse [1]** 18/5
**convince [1]** 77/16
**coordinator [2]** 26/21 31/12
**copy [1]** 29/1
**Cornell [1]** 54/17
**counsel [4]** 3/8 30/13 40/2 72/18
**counseled [1]** 25/18
**counseling [6]** 15/23 16/4 21/11
 21/12 21/21 21/22
**counts [1]** 25/24
**court [34]**
**Court's [5]** 5/8 7/16 36/16 37/5 76/10
**courtroom [8]** 3/2 66/16 67/5 67/16
 69/9 70/16 70/19 80/5
**courts [1]** 18/13
**cover [1]** 78/2
**create [1]** 72/25
**created [2]** 8/15 8/20
**criminal [5]** 58/21 58/24 59/5 59/6
 68/19
**CRR [2]** 2/9 80/24
**Cuffy [1]** 16/1
**Culver [3]** 36/19 37/2 37/15
**curriculum [2]** 23/5 51/15

**D**

**Dahlia [1]** 2/2
**damage [3]** 36/14 37/3 42/23
**damages [25]**
**date [2]** 58/11 80/24
**deaf [2]** 49/18 49/21
**dean [1]** 16/6
**decide [5]** 9/16 9/17 57/12 72/1
 78/20
**decides [1]** 53/9
**decision [18]**
**decision-maker [2]** 31/18 33/2
**decision-making [1]** 24/15
**declined [1]** 52/20
**dedicated [1]** 28/23
**defendant [8]** 1/10 2/4 35/6 35/7 51/9
 57/17 73/25 74/2
**defendant's [1]** 35/5
**defendants [4]** 6/5 36/17 48/8 48/9
**defending [1]** 57/2
**defense [5]** 40/2 64/22 64/24 66/6
 78/11
**defer [1]** 36/23
**defined [5]** 4/13 4/21 4/23 6/21 54/14
**definition [7]** 7/2 7/5 8/13 20/18 54/9
 54/10 54/13
**delegated [1]** 49/15
**delegates [1]** 8/8
**deliberate [1]** 15/16
**deliberation [1]** 68/25
**delineates [1]** 74/5
**Delta [1]** 36/21
**Delta's [1]** 36/24
**denied [3]** 25/6 35/18 73/17
**deny [1]** 15/22
**Department [1]** 8/2
**depends [1]** 14/12
**deposed [1]** 27/15
**deposition [4]** 13/19 27/17 31/11
 33/21
**describes [1]** 19/4
**describing [1]** 20/25
**designate [2]** 36/13 38/20 38/23
 38/25 39/13 73/23
**designated [3]** 39/12 40/20 53/21
**detailed [1]** 17/12
**determine [1]** 37/1
**determining [2]** 37/6 40/13
**develop [1]** 28/5
**diagnosed [2]** 22/8 49/11
**diagnosis [4]** 21/13 22/7 22/12 78/5
**dichotomy [1]** 44/2
**difference [3]** 38/6 39/8 45/3
**difficult [1]** 66/16
**difficulty [1]** 50/2
**dire [8]** 59/19 59/20 66/9 71/11 71/12
 71/13 71/23 72/5
**direct [1]** 31/16
**disability [2]** 7/13 7/19
**disabled [1]** 49/17
**disagree [7]** 5/13 6/10 33/18 53/8
 75/7 76/14 77/18
**disagreements [1]** 77/12
**disagrees [2]** 74/1 74/2

**discount [12]** 37/7 37/8 37/15 37/16
 38/3 38/6 38/7 38/10 39/18 39/20
 39/21 39/24
**discounting [1]** 36/25
**discouraged [1]** 68/19
**discovery [3]** 33/8 72/13 72/16
**discretion [5]** 9/15 39/4 39/6 39/6
 39/23
**discriminated [1]** 15/10
**discrimination [1]** 20/11
**discriminatory [1]** 20/9
**discuss [1]** 15/23
**discussed [2]** 7/16 30/20
**Discussion [2]** 30/9 79/23
**dismiss [11]** 25/1 25/13 35/17 36/18
 48/19 54/24 56/15 56/17 57/14 58/3
 58/6
**dismissal [6]** 55/21 55/22 55/22 56/1
 56/9 56/19
**dismissed [9]** 22/9 23/12 23/15 26/5
 34/21 37/22 42/19 56/6 57/12
**dispute [5]** 77/3 77/4 77/7 77/21
 77/24
**disputed [2]** 32/8 34/20
**distinguishing [1]** 38/5
**distress [2]** 41/23 73/14
**distressed [1]** 42/4
**district [6]** 1/1 1/2 1/15 2/10 38/10
 40/10
**diversity [1]** 37/4
**DIVISION [1]** 1/3
**Docket [5]** 31/7 31/18 35/5 36/12
 41/5
**doctor [3]** 16/5 43/24 51/6
**doctors [2]** 22/6 22/7
**document [5]** 13/21 67/18 67/21 68/1
 75/16
**documentation [2]** 21/21 26/25
**documents [6]** 14/1 70/2 70/4 70/6
 70/7 70/14
**dollars [1]** 42/14
**domestic [1]** 6/15
**Dominica [29]**
**Dominican [1]** 11/1
**Donnie [3]** 2/5 3/14 30/16
**Dr. [12]** 16/1 16/6 22/4 22/12 31/16
 32/14 33/1 33/8 33/11 33/14 33/15
 34/13
**Dr. Hayse [8]** 16/6 31/16 32/14 33/1
 33/8 33/11 33/14 34/13
**Dr. Hayse's [1]** 33/15
**Dr. Sharma [3]** 16/1 22/4 22/12
**Drive [1]** 2/2
**drug [1]** 5/20
**duplicative [1]** 55/6

**E**

**earn [3]** 52/1 52/16 52/23
**earning [11]** 40/13 41/19 41/25 42/1
 50/25 51/25 52/16 52/22 53/16 53/18
 53/21
**earnings [2]** 38/4 43/3
**easy [1]** 36/2
**education [11]** 7/25 8/3 8/4 8/12 20/9

**E**

**education...** [6]  20/14 20/16 20/19 53/21 54/10 54/14
**education'** [1]  18/23
**educational** [2]  5/1 6/14
**effect** [2]  5/15 31/20
**effects** [2]  23/25 24/2
**efficiency** [1]  57/9
**effort** [2]  33/16 70/5
**eight** [6]  60/3 62/19 62/20 62/23 62/23 64/25
**element** [3]  32/17 45/8 47/9
**elements** [5]  15/9 45/21 46/7 55/3 55/4
**Eleventh** [8]  20/2 36/20 37/2 37/17 38/24 39/2 39/2 76/17
**ELMO** [6]  67/14 67/16 67/21 67/25 68/2 68/5
**email** [2]  72/15 73/5
**emotional** [2]  41/23 73/14
**employed** [1]  36/25
**employee** [4]  13/7 13/13 22/12 32/19
**employees** [2]  5/22 28/22
**empowered** [1]  15/21
**English** [1]  62/25
**enrolled** [5]  34/24 43/11 47/2 47/3 47/9
**enrollment** [1]  47/12
**enter** [1]  76/11
**entities** [1]  5/2
**entitled** [4]  42/25 44/8 51/25 80/21
**entity** [1]  15/21
**Entry** [5]  31/7 31/18 35/5 36/12 41/6
**Entry 107-2** [2]  31/7 31/18
**Entry 154** [1]  41/6
**Entry 160** [1]  35/5
**Entry 165** [1]  36/12
**environment** [1]  26/12
**equally** [2]  51/7 52/7
**equipment** [1]  67/12
**error** [1]  41/2
**errors** [1]  51/9
**especially** [4]  12/21 46/19 48/18 69/14
**Esq** [4]  2/4 2/4 2/5 2/5
**establish** [3]  41/19 42/2 42/9
**established** [9]  42/1 75/13 75/16 76/3 76/5 76/8 76/12 76/13 77/10
**estimate** [1]  63/9
**ethnicity** [1]  60/10
**eve** [1]  56/5
**events** [2]  18/6 21/1
**everybody** [1]  64/7 65/14 68/7
**everyone** [4]  30/17 54/5 58/12 67/22
**evidence** [26]
**exam** [21]
**examination** [2]  21/10 21/15
**exams** [19]
**exams 2** [1]  21/4
**exceeded** [1]  72/6
**excerpts** [1]  31/11
**exclude** [3]  35/6 48/14 48/14
**excludes** [1]  24/23
**excuse** [2]  25/19 33/4

**exhibit** [11]  31/10 31/18 68/3 68/3 75/9 78/4 78/6 78/8 78/10 78/12 78/13
**Exhibit 5** [1]  31/10
**Exhibit 7** [1]  31/18
**exhibits** [5]  31/8 63/1 70/20 71/2 71/2
**exited** [1]  80/5
**expect** [1]  70/3
**expended** [1]  57/2
**expenses** [2]  41/21 43/4
**expert** [10]  40/12 40/15 40/19 40/20 40/22 40/23 40/25 41/7 41/10 41/11
**explain** [4]  40/25 45/7 56/21 59/25
**explained** [2]  7/18 73/7
**explicit** [2]  17/15 17/15
**explicitly** [2]  18/18 19/20
**express** [1]  6/1
**expressly** [12]  5/16 5/24 6/18 6/20 7/12 7/20 8/1 8/7 13/5 16/24 17/9 49/15
**extend** [2]  8/20 27/10
**extended** [5]  15/22 16/2 23/7 24/7 49/11
**extensive** [1]  54/20
**extent** [3]  31/23 33/14 37/15
**extra** [2]  12/17 34/7
**extraterritorial** [2]  6/1 25/2
**extraterritoriality** [1]  17/16
**extraterritorially** [11]  3/24 5/16 5/17 5/24 6/3 17/9 17/18 18/14 19/15 25/15 26/1

**F**

**F.2d** [1]  36/21
**face** [2]  61/13 61/13
**facie** [1]  61/2
**facing** [1]  41/15
**fact** [22]
**facts** [19]
**faculty** [5]  10/6 32/7 32/10 32/13 34/11
**fail** [1]  32/18
**failed** [6]  13/23 15/8 23/5 23/13 23/15 51/2
**failing** [1]  15/10
**failure** [6]  12/18 12/19 15/16 15/17 23/20 30/20
**fairness** [4]  18/4 46/3 48/15 57/15
**false** [9]  9/14 9/24 9/25 28/8 33/18 43/2 43/9 43/10 43/19
**falsehood** [1]  28/13
**fashion** [1]  47/20
**February** [1]  17/19
**federal** [7]  8/15 20/10 20/24 36/18 37/3 49/14 55/19
**fees** [1]  47/12
**field** [1]  51/16
**fifth** [4]  11/8 13/9 16/5 37/2
**Fifth/Eleventh** [1]  37/2
**file** [19]
**filed** [8]  3/20 31/9 35/5 72/5 75/2 75/4 75/9 75/10
**filing** [2]  30/22 72/14

**filling** [1]  27/1
**final** [5]  16/7 31/17 33/1 33/5 33/8
**finally** [1]  68/17
**financial** [6]  7/21 7/24 7/25 8/18 11/1 79/17
**fine** [1]  72/3
**finish** [1]  62/16
**finished** [1]  59/8
**firm** [1]  25/12
**firms** [1]  63/4
**fleshed** [1]  28/23
**flights** [1]  43/12
**FLORIDA** [9]  1/2 1/6 2/8 2/11 13/25 36/24 40/10 53/15 53/20
**flying** [1]  47/7
**focus** [1]  12/18
**Folks** [1]  44/20
**foregoing** [1]  80/19
**foreign** [2]  5/1 6/14
**form** [3]  27/1 45/5 46/2
**FORT** [3]  1/3 1/6 2/11
**forwarded** [1]  24/18
**fourth** [2]  11/7 13/9
**frame** [2]  18/9 34/22
**Fran** [6]  66/16 67/7 67/9 67/12 67/23 68/6
**Francine** [2]  2/9 80/24
**fraud** [20]
**fraudulent** [2]  26/17 47/21
**free** [1]  53/4
**Friday** [5]  71/14 71/24 72/8 73/18 74/6
**front** [7]  40/22 42/3 62/10 62/11 64/6 65/19 76/24
**Fulton** [5]  27/15 31/11 31/13 32/6 34/16 34/17
**fundamental** [1]  53/3
**funding** [1]  20/24
**funds** [1]  69/24
**funny** [1]  28/2

**G**

**gaining** [1]  51/14
**Galligan** [6]  17/20 17/20 17/24 17/25 18/2 18/11
**game** [2]  57/13 57/16
**gender** [4]  60/9 60/21 61/11 61/14
**gender-neutral** [2]  61/11 61/14
**general** [2]  24/13 71/17
**genuine** [2]  28/7 77/21
**gets** [2]  57/1 73/21
**giggled** [1]  28/1
**gives** [2]  8/7 49/15
**glad** [1]  58/17
**gonna** [3]  29/19 60/14 77/11
**Google** [1]  54/18
**gotten** [1]  45/2
**governed** [1]  26/11
**government** [3]  5/22 8/16 8/22
**government-sanctioned** [1]  8/22
**grades** [2]  49/18 50/4
**graduate** [4]  8/12 19/7 20/10 20/16
**grandmother** [1]  63/2
**grant** [4]  15/21 23/21 27/2 27/3

**G**

granted [4]  22/15 22/20 58/9 73/16
grants [1]  20/10
gravamen [1]  44/5
great [3]  25/17 25/21 39/6
Green [5]  2/5 3/13 30/15 35/10 35/12
grimacing [1]  61/13
grounds [1]  25/14
group [1]  64/3
guidance [2]  32/10 34/11
guideline [1]  31/21 32/20
guiding [1]  5/7
guilty [1]  58/25

**H**

H-A-Y-S-E [1]  16/6
half [2]  26/8 69/17
halfway [1]  55/20
handbook [3]  26/22 31/16 32/16
handbooks [1]  33/7
handle [1]  68/18
happiness [1]  42/14
harder [1]  79/14
harmed [1]  47/24
hate [2]  29/17 63/3
Hayse [9]  16/6 31/16 32/14 33/1 33/1
33/8 33/11 33/14 34/13
Hayse's [1]  33/15
he'd [1]  43/21
he'll [2]  27/15 42/1
head [4]  8/8 15/3 32/14 69/18
hear [5]  3/25 17/2 35/9 66/17 66/20
heard [1]  32/2
hearing [5]  1/13 29/3 29/17 29/24
41/13
hearsay [1]  75/21
hedge [1]  57/20
help [3]  67/9 67/13 69/12
helps [1]  36/6
Here's [2]  53/7 73/15
hereby [1]  80/18
hesitate [1]  79/7
Hey [3]  12/17 52/11 61/4
high [4]  15/12 49/18 51/20 53/10
high-performing [1]  51/20
higher [10]  8/4 8/11 8/12 18/23 20/9
20/14 20/16 20/19 54/9 54/14
history [1]  27/3
hold [6]  11/12 12/22 13/6 38/22 57/5
61/25
holding [1]  57/19
honest [1]  44/14
honestly [1]  69/16
Honor [100]
Honor's [1]  18/1
Honorable [1]  1/14
Hopefully [1]  36/6
hotels [1]  79/14
hour [2]  29/19 63/23
House [1]  52/13
hum [1]  14/9
hundred [1]  42/14
husband [1]  63/16
hypothetically [1]  43/20

**I**

I'll [12]  14/2 29/24 31/24 57/15 60/22
63/10 63/21 64/2 66/18 67/11 71/2
77/21
I'm [45]
I've [10]  33/21 34/13 34/14 36/15
46/15 48/1 48/3 57/6 69/6 78/6
identify [1]  31/2
ignore [1]  32/18
III [6]  6/16 17/17 18/17 18/19 19/20
19/21
impersonal [1]  11/20
implicates [1]  46/6
impracticable [1]  9/18
improper [1]  40/22
improperly [1]  51/5
in limine [7]  3/21 29/16 35/4 35/6
48/7 50/14 54/2
inclined [1]  48/14 70/18
include [6]  5/1 5/20 23/9 23/11 43/16
50/17
included [2]  8/14 21/12
includes [2]  20/10 54/10
including [2]  23/7 67/18
incorrect [3]  33/3 33/6 49/9
indication [1]  32/22
indifference [1]  15/16
individual [3]  31/17 52/6 52/7
individualized [1]  64/8
individually [1]  64/7
individuals [3]  7/13 51/13 51/17
induce [1]  26/9
inducement [1]  47/21
infer [1]  17/17
infinite [1]  65/10
information [4]  15/24 21/19 70/6
70/14
informing [1]  78/5
initial [1]  29/2
initially [1]  56/18
initiate [1]  33/9
injury [4]  45/9 45/10 45/14 52/3
insisting [2]  75/23 74/2
instance [1]  27/5
instances [1]  12/4
Instead [1]  7/6
institution [7]  4/13 4/20 6/21 7/2 10/6
54/9 54/14
institutions [16]  4/21 5/2 6/14 6/15
8/11 8/12 8/14 8/15 8/17 18/20 19/4
20/9 20/13 20/16 20/18 54/11
instruct [6]  37/17 38/2 38/19 39/5
39/18 77/23
instructing [1]  38/10
instruction [2]  72/5 78/22
instructions [23]
intended [4]  6/2 6/7 6/13 6/16
intending [2]  48/11 70/21
interim [1]  31/1
interplays [1]  19/21
interpretation [2]  18/1 33/5
interrogatories [6]  38/19 39/11
39/11 39/14 39/15 39/17
intervening [1]  56/23

**I**

introduce [4]  48/11 53/5 70/21 75/6
introduced [1]  77/13
island [1]  46/21
issue [15]  4/7 6/13 17/11 20/4 21/2
27/20 28/7 41/15 50/5 55/3 56/22
68/24 75/3 77/21 79/16
issues [9]  9/10 17/13 25/8 25/10
29/14 30/20 33/2 33/14 42/8
items [1]  77/9
iterations [2]  11/8 11/25
IV [3]  8/18 8/19 8/22

**J**

January [1]  21/13
January 18th [1]  21/13
Javier [1]  62/9
job [5]  51/19 51/20 51/21 51/22
52/14
joint [2]  73/18 74/4
judge [12]  1/15 3/2 41/5 41/13 69/7
69/11 72/14 76/22 76/24 77/19 80/3
80/5
Judge Moore [3]  41/13 76/24 77/19
Judge Moore's [1]  41/5
judgment [13]  25/1 25/20 28/18
28/24 29/2 31/10 42/16 49/10 49/21
56/2 76/5 76/22 76/23
July [4]  58/10 58/15 59/6 79/24
July 2nd [1]  79/24
July 8th [1]  59/6
June [3]  1/7 3/1 72/21
June 4th [1]  72/21
juror [12]  60/18 60/20 60/23 64/11
64/12 64/14 64/15 64/15 64/16 64/21
64/23 64/23
juror's [3]  60/8 60/9 60/10
jurors [18]
jurors' [1]  67/19
jury [33]

**K**

Kaiser [1]  22/5
kick [1]  60/7
kinds [2]  73/23 74/5
King [3]  2/5 3/14 30/16
knowledge [2]  16/13 16/14
Kristi [1]  52/13

**L**

labeled [1]  70/3
lack [2]  24/10 25/1
laid [1]  74/3
language [3]  7/18 17/16 18/21
laptop [1]  13/18
late [3]  29/21 57/13 57/16
LAUDERDALE [3]  1/3 1/6 2/11
Laughter [2]  36/4 36/7
laundering [1]  5/21
law [25]
lawyers [2]  11/24 64/1
leads [2]  36/23 45/23
leave [6]  69/24 71/14 71/14 72/12
72/17 73/16
lectern [1]  40/6

## L

**legal [4]** 27/7 28/14 47/20 53/19
**legitimately [1]** 61/22
**lengthy [1]** 69/14
**letter [1]** 14/18
**liability [1]** 35/6
**life [2]** 43/15 48/1
**light [1]** 49/7
**limb [1]** 53/17
**limine [7]** 3/21 29/16 35/4 35/6 48/7 50/14 54/2
**limit [3]** 7/8 8/5 72/6
**limited [5]** 4/1 10/8 16/13 49/19 49/20
**limits [1]** 7/12
**lines [3]** 31/12 31/19 36/21
**lines 1 [1]** 31/12
**lines 2 [1]** 31/19
**list [11]** 5/2 24/6 48/10 64/10 75/9 78/4 78/6 78/8 78/10 78/12 78/13
**Listen [1]** 14/13
**literally [5]** 47/16 49/22 51/8 74/17 78/5
**litigation [3]** 75/6 75/23 77/14
**LLP [1]** 2/6
**local [1]** 74/15
**locations [1]** 8/16
**lose [3]** 57/6 57/20 69/16
**loss [2]** 43/3 51/25
**lost [22]**
**lucrative [2]** 51/7 52/8
**lunch [1]** 66/3
**lying [1]** 61/16

## M

**M-O-N-E-S-S-E-N [1]** 37/6
**magistrate [1]** 72/14
**majority [1]** 23/4
**maker [2]** 31/18 33/2
**male [3]** 61/4 61/5 61/7
**males [2]** 61/6 61/6
**man [4]** 32/25 61/7 61/7 61/9
**manager [1]** 52/12
**manner [2]** 70/13 75/5
**market [6]** 37/8 37/16 38/3 39/20 39/21 39/24
**Marsh [3]** 2/4 3/13 30/15
**Maryland [1]** 2/3
**material [3]** 10/23 28/7 77/2
**matter [9]** 9/14 16/17 27/7 28/12 28/14 28/18 50/2 72/16 80/21
**Matthew [2]** 27/14 31/11
**mean [13]** 4/8 4/8 4/11 11/2 15/9 33/19 42/10 51/18 51/19 53/9 73/20 76/4 76/23
**meaning [2]** 18/24 20/17
**meaningless [3]** 26/15 26/16 28/3
**means [6]** 9/14 15/16 58/3 58/24 63/10 75/2
**meant [3]** 7/4 17/17 41/2
**measure [1]** 53/17
**measured [1]** 51/12
**mechanical [1]** 1/24
**medical [8]** 16/4 19/7 20/10 20/16

51/14 51/15 52/5 52/19
**MEDICINE [3]** 1/9 3/7 30/12
**meet [1]** 19/10
**meetings [1]** 22/4
**members [1]** 59/21
**mentions [1]** 54/13
**mere [1]** 32/19
**merely [2]** 32/8 32/12
**mess [1]** 73/2
**method [25]**
**methodology [4]** 42/7 42/9 42/10 42/11
**methods [2]** 36/25 39/23
**Miami [1]** 2/8
**Michael [3]** 2/4 3/13 30/15
**microphone [3]** 66/15 66/21 68/23
**microphones [1]** 66/22
**mine [1]** 25/16
**mines [1]** 73/12
**minute [1]** 72/13
**minutes [3]** 29/23 63/21 64/2
**Miramar [1]** 13/25
**misinterpreted [1]** 7/15
**misrepresentation [7]** 25/5 42/24 43/7 44/19 54/25 55/6 58/7
**missed [1]** 40/24
**missing [1]** 25/13
**mitigate [1]** 51/2
**mitigation [1]** 50/20
**mjsfcs [1]** 2/11
**moment [2]** 19/21 35/9
**Monessen [5]** 36/16 37/5 39/1 39/3 39/19
**money [14]** 5/21 42/4 47/6 48/5 51/19 51/20 51/22 51/22 52/1 52/4 52/17 52/23 57/2 79/16
**months [1]** 17/20
**monumentally [1]** 66/23
**Moore [3]** 41/13 76/24 77/19
**Moore's [1]** 41/5
**moot [1]** 35/18
**Morgan [2]** 48/10 49/19
**morning [1]** 56/2
**Morrison [1]** 18/2
**mostly [1]** 5/7
**motion [40]**
**motions [5]** 3/21 29/15 29/16 35/4 35/21
**movable [1]** 66/23
**move [5]** 53/5 54/24 66/13 66/21 66/25
**moved [4]** 34/20 48/13 58/24 79/16
**Mr. [31]**
**Mr. Awodiya [24]**
**Mr. Awodiya's [3]** 31/9 36/10 36/13
**Mr. Cuffy [1]** 16/1
**Mr. Fulton [1]** 32/6
**Mr. Hayse [1]** 33/1
**Mr. Stewart-Fulton [1]** 31/13
**Ms. [2]** 35/10 35/12
**Ms. Green [2]** 35/10 35/12
**multiple [4]** 5/6 10/6 33/8 33/9

## N

**Nabisco [11]** 5/9 5/10 5/12 5/13 5/17 5/25 6/9 6/10 6/13 17/25 18/1
**name [2]** 34/12 63/15
**named [2]** 63/3 63/4
**national [2]** 60/10 60/21
**nature [1]** 44/9
**NCL [1]** 40/9
**necessary [1]** 71/3
**necessity [1]** 46/11
**negligent [6]** 42/24 43/6 44/19 54/24 55/5 58/7
**neither [2]** 18/14 37/4
**neutral [2]** 61/11 61/14
**never-ending [1]** 69/3
**nine [2]** 50/20 53/7
**nitpicks [1]** 16/23
**Nobody [1]** 57/23
**Nodding [1]** 15/3
**nonrelevant [1]** 20/20
**note [4]** 19/12 20/1 54/7 54/16
**noted [1]** 21/4
**notes [1]** 63/22
**notice [5]** 29/4 29/9 55/25 56/18 72/24
**number [12]** 3/6 3/20 30/11 58/20 62/8 62/9 64/11 64/13 64/21 64/23 64/23 65/11
**Number 1 [5]** 62/9 64/11 64/13 64/21 64/23
**Number 18-60482-Civil [2]** 3/6 30/11
**Number 2 [1]** 64/23
**numbers [2]** 48/9 50/15
**numbers 4 [1]** 48/9
**numbers 9 [1]** 50/15
**nursing [1]** 19/7

## O

**object [1]** 75/7
**objection [4]** 55/7 55/9 75/8 75/25
**objections [3]** 73/6 73/10 73/11
**obligated [1]** 65/12
**obviate [1]** 41/9
**OCD [1]** 22/8
**Octavia [3]** 2/5 3/13 30/15
**offense [1]** 5/19
**offenses [2]** 5/19 5/20
**offer [4]** 53/2 70/4 70/6 70/8
**office [2]** 26/20 28/22
**Official [2]** 2/9 80/24
**offset [1]** 37/9
**Oh [5]** 11/15 30/5 35/12 69/8 71/9
**OLUWAMUYIWA [4]** 1/5 2/2 3/9 30/14
**omit [2]** 73/6 73/6
**omitted [2]** 10/23 10/24
**one-on-one [1]** 62/15
**open [1]** 15/17
**opening [1]** 66/3
**opinion [1]** 36/20
**opponent [1]** 75/21
**opportunities [1]** 52/21
**opportunity [8]** 40/24 43/12 48/16 51/11 52/20 52/22 52/25 67/11

**O**

**opposed [5]**  6/14 11/6 18/17 38/4 50/2
**opposing [2]**  56/1 56/11
**opposition [1]**  31/9
**option [13]**  43/16 43/18 43/25 44/8 44/8 44/24 44/25 45/11 47/15 47/16 47/17 47/24 65/6
**option 1 [2]**  44/8 44/24
**option 2 [3]**  43/25 44/8 44/25
**option A [1]**  43/16
**Option B [1]**  43/18
**options [1]**  64/14
**order [28]**
**ordered [8]**  12/15 12/15 12/20 12/23 12/25 13/4 13/7 77/16
**ordering [1]**  12/16
**orders [2]**  12/12 13/10
**origin [2]**  60/10 60/21
**original [1]**  46/22
**originally [1]**  25/4
**overrule [1]**  5/14
**oversaw [1]**  16/8
**overturn [2]**  18/1 18/2
**overwhelmingly [1]**  24/21

**P**

**P-E-R-E-M-P-T-O-R-Y [1]**  65/9
**p.m [5]**  1/7 3/1 30/3 30/3 80/6
**pace [1]**  69/15
**page [3]**  29/10 31/12 31/19
**page 10 [1]**  31/19
**page 32 [1]**  31/12
**panel [2]**  59/22 61/5
**papers [4]**  27/20 27/22 28/11 40/11
**paragraph [2]**  15/20 17/8
**paragraph 16 [1]**  15/20
**paragraph 23 [1]**  17/8
**paraphrasing [1]**  37/21
**part [9]**  9/10 10/20 23/5 37/19 37/20 44/12 46/17 48/1 61/1
**participation [2]**  7/22 8/2
**parties [1]**  56/3
**partner [1]**  36/6
**party [6]**  21/5 24/5 24/19 56/1 56/11 75/20
**pass [2]**  49/1 49/4
**passage [1]**  43/23
**passed [3]**  43/23 48/3 68/11
**passing [1]**  51/14
**Pause [2]**  19/23 55/16
**pay [2]**  69/21 69/24
**people [15]**  26/9 30/23 33/8 33/9 33/11 33/12 59/23 62/8 62/13 62/18 63/3 63/7 65/15 69/13 70/19
**percentage [1]**  41/25
**peremptorily [1]**  64/16
**peremptory [5]**  60/4 60/4 60/6 65/7 65/8
**Perfect [1]**  39/25
**Perfectly [1]**  72/3
**performed [2]**  16/5 37/7
**performer [2]**  51/16 51/23
**performing [2]**  51/20 53/10

**perhaps [1]**  70/16
**period [2]**  34/23 34/24
**Permanente [1]**  22/5
**permission [1]**  66/13
**permit [1]**  71/22
**permitted [2]**  25/6 51/1
**person [9]**  14/5 14/11 14/16 14/17 16/3 47/24 60/7 63/5 64/22
**personal [1]**  11/19
**pertains [1]**  55/25
**phonetic [1]**  53/18
**physician [1]**  51/11
**pick [5]**  39/23 39/24 47/18 65/21 72/8
**picking [1]**  62/19
**piece [2]**  50/21 75/25
**pieces [2]**  51/3 75/4
**piled [1]**  47/13
**pipe [1]**  66/19
**place [12]**  11/6 12/6 18/6 21/2 21/10 21/16 22/16 22/23 24/2 24/10 24/22 75/1
**plainly [1]**  32/24
**plaintiff [33]**
**plaintiff's [9]**  17/7 18/15 19/16 19/17 21/9 22/17 26/7 51/4 51/12
**plan [1]**  70/6
**plane [1]**  79/14
**planning [1]**  48/25
**plays [1]**  28/20
**plea [1]**  59/5
**plead [1]**  58/25
**pleading [1]**  27/20
**pleadings [1]**  74/18
**plus [5]**  62/20 62/21 62/23 62/24 63/10
**podium [4]**  4/6 4/9 44/17 66/13
**point [19]**
**pointing [1]**  51/9
**points [1]**  62/6
**policies [3]**  31/21 32/11 33/7
**policy [6]**  9/2 9/3 26/21 26/24 30/24 34/11
**portion [1]**  70/16
**portions [1]**  22/22
**position [12]**  5/12 5/13 23/23 24/12 28/11 28/16 37/12 40/2 41/5 46/7 49/24 55/24
**positions [1]**  38/1
**possibilities [1]**  43/7
**post [2]**  8/11 20/13
**post-secondary [1]**  20/13
**potential [1]**  51/16
**potentially [4]**  43/4 48/12 48/13 50/4
**practicable [11]**  9/6 9/13 9/16 9/20 10/13 10/21 27/25 28/4 28/13 32/23 33/17
**practical [3]**  9/10 23/25 27/11
**practice [2]**  28/20 30/24
**practicing [1]**  51/11
**precedence [1]**  58/21
**precisely [2]**  26/9 76/18
**preclude [1]**  36/11
**precludes [1]**  41/8
**precluding [3]**  9/23 41/6 49/12

**predicate [4]**  5/19 5/19 5/23 6/1
**prejudice [11]**  55/8 55/11 55/13 55/21 56/6 57/13 57/15 57/17 58/3 58/6 74/17
**prejudices [2]**  63/17 78/3
**prejudicial [3]**  36/11 78/13 78/17
**preliminary [1]**  78/24
**premise [1]**  53/8
**prepared [3]**  3/25 54/5 54/22
**presence [1]**  78/19
**present [3]**  37/1 56/3 75/15
**presiding [1]**  69/11
**pressed [1]**  68/7
**presumption [1]**  71/15
**pretextual [1]**  61/15
**pretrial [4]**  35/21 74/9 74/23 74/23
**prevent [2]**  11/9 51/9
**prima [1]**  61/2
**prima facie [1]**  61/2
**principally [1]**  26/4
**private [6]**  8/21 22/5 51/21 52/12 64/6 64/8
**pro [5]**  2/3 3/9 29/21 30/14 61/25
**pro se [4]**  3/9 29/21 30/14 61/25
**probing [1]**  63/17
**problem [6]**  44/16 45/22 67/6 75/11 75/24 78/9
**problematic [2]**  26/17 26/19
**problems [1]**  45/6
**procedure [3]**  55/12 55/20 76/20
**Procedure 41 [1]**  55/20
**procedures [1]**  31/21
**proceedings [3]**  1/24 80/6 80/20
**process [9]**  12/16 13/23 16/9 31/15 33/10 61/18 63/23 65/25 69/3
**prodded [1]**  25/2
**produced [1]**  1/25
**professors [1]**  33/19
**profits [4]**  41/8 42/20 43/17 44/1
**program [8]**  7/22 8/1 8/17 8/18 8/18 8/22 8/23 48/4
**programs [1]**  8/20
**prohibits [2]**  20/8 38/9
**Prometric [2]**  21/6 24/5
**promise [1]**  45/1
**pronounce [1]**  59/17
**pronounced [2]**  5/14 59/19
**proper [1]**  36/24
**properly [1]**  46/8
**proposed [6]**  71/22 72/25 73/19 73/20 74/4 78/18
**prospective [1]**  10/22
**protections [1]**  27/10
**protective [4]**  70/2 70/7 70/10 70/12
**prove [7]**  15/15 43/21 45/12 46/8 61/15 75/18 77/25
**proven [3]**  74/20 75/14 75/19
**provide [7]**  12/9 12/19 15/8 15/10 15/17 16/3 31/14
**provided [1]**  56/9
**providing [2]**  26/24 41/6
**proving [1]**  41/15
**provision [3]**  20/12 20/15 54/12
**provisions [2]**  6/8 20/20

**P**

**proximate [1]** 43/2
**psychological [1]** 21/9
**psychologist [1]** 22/6
**psychotherapist [1]** 22/6
**public [6]** 5/2 8/21 20/13 52/14 53/9 70/20
**publish [1]** 68/6
**published [1]** 67/23
**pull [1]** 18/21
**purports [1]** 56/5
**pursuant [4]** 26/24 31/15 32/16 80/18
**pursue [1]** 52/21

**Q**

**qualifications [1]** 28/12
**question [36]**
**questionnaire [1]** 63/14
**questionnaires [2]** 63/19 63/25
**questions [22]**
**quick [1]** 54/7
**quickly [1]** 31/3
**quote [2]** 7/13 36/22

**R**

**RA [25]**
**race [2]** 60/9 60/20
**racketeering [2]** 5/18 5/19
**raise [5]** 25/5 60/21 60/25 64/8 65/13
**raised [4]** 9/10 25/20 35/14 35/21
**raises [1]** 60/13
**rare [1]** 57/16
**rate [6]** 37/7 38/3 38/6 38/11 39/18 39/20
**re [1]** 53/6
**reach [2]** 6/2 43/4
**reached [1]** 18/13
**reaches [1]** 17/22
**read [13]** 5/12 18/3 18/18 33/22 36/15 37/10 55/12 63/20 69/14 69/15 70/12 72/13 77/8
**reading [2]** 6/10 20/21
**readmission [2]** 52/19 52/20
**readmitted [1]** 52/25
**ready [1]** 70/22
**realtime [1]** 69/21
**reasons [3]** 3/18 3/19 57/9
**rebut [1]** 48/25
**rebuttal [2]** 40/20 41/10
**recall [1]** 29/24
**Recalling [1]** 30/11
**receipt [1]** 20/23
**receive [4]** 7/21 7/24 20/10 27/18
**received [4]** 26/22 26/25 27/1 49/11
**recent [1]** 37/5
**Recess [1]** 30/3
**recognizes [1]** 18/2
**recommend [1]** 70/22
**record [21]**
**recorded [1]** 1/24
**recoveries [1]** 37/3
**redact [3]** 70/15 71/3 71/4
**redactions [2]** 70/4 70/23

**redeposition [1]** 34/22
**refer [3]** 7/1 20/20 54/14
**reference [2]** 20/15 31/3
**referenced [1]** 27/21
**references [3]** 17/14 17/25 30/23
**referring [2]** 8/23 53/16
**refers [1]** 20/12
**refile [4]** 57/7 57/21 72/7 72/8
**reflect [1]** 28/18
**reflected [1]** 54/17
**regime [3]** 17/24 19/13 19/13
**regulations [1]** 49/14
**Rehabilitation [10]** 4/14 4/20 6/17 6/19 6/20 7/20 8/5 20/8 20/21 31/14 80/18
**reiterate [1]** 30/22
**reject [5]** 15/9 15/11 52/24 64/13 64/24
**rejected [2]** 15/6 77/10
**rejection [1]** 12/6
**relationship [3]** 47/21 53/19 53/19
**relatively [1]** 53/13
**released [1]** 21/20
**relevant [12]** 5/21 16/25 22/16 39/3 44/1 48/17 48/20 48/22 49/8 70/15 70/15 73/7
**reliance [1]** 45/9
**relied [2]** 10/25 45/9
**religion [1]** 60/21
**relying [1]** 20/19
**remain [1]** 44/18
**remains [1]** 18/12
**remedy [2]** 47/18 47/25
**remember [5]** 27/19 64/18 65/12 69/18 78/12
**removed [1]** 73/11
**reordered [1]** 13/25
**reordering [1]** 13/24
**reply [2]** 37/25 38/5
**Reporter [3]** 2/9 2/9 80/24
**representation [1]** 43/1
**request [23]**
**requested [7]** 21/19 21/21 23/1 23/2 73/12 76/21 77/10
**requests [4]** 13/10 23/6 27/3 39/10
**required [11]** 10/3 10/7 10/9 19/9 34/18 34/25 37/16 39/9 45/19 45/24 46/10
**requirement [2]** 10/19 10/20
**requirements [2]** 19/10 29/12
**research [1]** 4/15
**resembles [1]** 26/13
**reserve [2]** 57/5 57/20
**resolve [2]** 3/21 29/23
**respectfully [2]** 5/13 76/14
**respond [2]** 48/16 64/19
**responded [4]** 3/24 35/7 35/7 48/8
**response [10]** 9/12 11/10 13/2 26/7 32/3 50/7 50/8 50/13 54/1 63/24
**restart [1]** 57/22
**restitution [1]** 47/23
**result [2]** 52/3 56/15
**resulted [1]** 43/14
**retook [1]** 23/6
**review [3]** 13/9 39/7 71/2

**reviewed [2]** 33/21 62/14
**RICO [4]** 5/18 5/23 6/2 6/12
**rid [1]** 63/7
**rise [1]** 80/4
**RKA [1]** 1/4
**RMR [2]** 2/9 80/24
**RMR-CRR [1]** 80/24
**robbery [1]** 5/20
**Roman [3]** 2/4 3/13 30/15
**room [4]** 2/10 43/11 47/11 68/25
**ROSS [43]**
**Ross' [5]** 7/22 8/1 9/2 15/24 16/6
**row [2]** 62/11 62/11 62/12 63/11
**Roy [1]** 1/14
**rule [11]** 55/12 58/5 74/14 74/14 74/16 74/18 74/20 75/8 76/3 76/3 76/19
**Rule 36 [3]** 74/14 74/16 74/18
**Rule 56 [3]** 74/20 76/3 76/19
**Rule 8 [1]** 74/14
**ruled [1]** 76/19
**rules [7]** 32/10 34/10 55/19 57/3 61/25 74/15 76/20
**ruling [1]** 77/1
**Ryan [3]** 2/4 3/12 30/15

**S**

**salient [1]** 22/22
**Salopek [2]** 2/9 80/24
**sanctioned [1]** 4/18
**sanctions [5]** 72/12 72/15 72/17 73/16 73/17
**satisfy [1]** 15/13
**saw [5]** 22/6 39/14 46/18 46/18 69/12
**scary [1]** 26/14
**scenario [1]** 39/9
**scenarios [4]** 10/8 10/8 10/8 74/3
**schedule [1]** 59/4
**scheduling [2]** 62/14 74/8
**school [28]**
**schools [3]** 18/20 20/10 20/16
**scope [1]** 7/12
**scores [1]** 50/4
**screens [3]** 67/16 67/19 67/23
**se [5]** 2/2 3/9 29/21 30/14 61/25
**seal [1]** 70/17
**seat [1]** 29/19
**second [13]** 3/20 9/22 11/7 11/12 13/6 13/8 13/24 14/4 45/13 55/14 57/7 62/11 65/24
**secondary [1]** 20/13
**Secretary [1]** 8/3
**section [26]**
**Section 1001 [2]** 7/3 19/10
**Section 1002 [3]** 7/1 18/24 19/3
**Section 3 [2]** 5/3 6/12
**Section 504 [2]** 6/17 8/7
**Section 705 [3]** 6/24 17/8 18/16
**Section 794 [2]** 7/12 20/18
**seek [3]** 42/25 72/12 72/16
**seeking [4]** 44/7 50/25 50/25 52/15
**selected [1]** 59/16
**selection [1]** 60/1
**self [1]** 34/3

**S**

**self-conflicting [1]** 34/3
**semester [3]** 23/6 23/6 26/23
**semesters [1]** 51/15
**send [1]** 8/1
**sense [6]** 37/25 39/14 58/19 62/6 65/1 68/8 68/9 75/17
**sensitive [2]** 66/18 70/14
**served [1]** 56/11
**serves [1]** 56/1
**service [2]** 52/14 53/9
**sessions [1]** 21/11
**setting [1]** 67/25
**settle [1]** 30/6
**seven [3]** 62/10 62/11 62/12
**Seventh [1]** 2/7
**shall [1]** 19/9
**Sharma [3]** 16/1 22/4 22/12
**she'll [1]** 67/9
**Sherick [1]** 53/18
**shift [1]** 61/10
**short [2]** 63/13 66/7
**sic [5]** 32/13 49/10 59/18 73/12 74/16
**sick [1]** 62/25
**side [2]** 60/13 71/23
**sidebar [2]** 68/21 68/22
**sidebars [2]** 68/18 68/21
**sides [1]** 59/4
**sides' [1]** 60/1
**signed [1]** 56/2
**silly [1]** 53/13
**simple [5]** 4/8 15/16 48/4 60/13 73/23
**sister [2]** 4/12 17/21
**situated [1]** 61/8
**situation [2]** 52/2 56/5
**Sixth [1]** 70/19
**skills [1]** 51/13
**slowly [2]** 11/13 11/17
**sly [1]** 27/7
**smart [3]** 52/6 57/18 57/25
**sneaky [1]** 10/17
**society [1]** 53/10
**solely [1]** 7/2
**sometime [1]** 79/21
**soon [2]** 59/8 79/20
**sophisticated [1]** 25/12
**sound [1]** 71/17
**sounds [3]** 45/13 47/10 50/24
**Southeast [1]** 2/7
**SOUTHERN [2]** 1/2 40/10
**spacing [1]** 79/13
**special [4]** 29/21 38/19 39/10 39/11
**specific [11]** 23/1 23/8 24/14 25/22 29/10 30/23 38/25 54/12 63/24 71/19 73/22
**specify [1]** 34/24
**speculation [1]** 44/4
**speculative [2]** 41/14 44/9
**speedy [1]** 58/22
**spent [1]** 47/12
**spirit [3]** 27/9 28/10 31/13
**stand [1]** 60/25
**standard [5]** 6/19 15/13 36/24 71/16

78/25
**standards [2]** 6/17 6/18
**state [13]** 3/8 5/11 6/18 27/18 28/9 28/17 30/13 30/20 37/22 48/10 49/19 59/10 60/11
**stated [3]** 8/1 16/20 77/2
**statement [24]**
**statements [4]** 31/2 31/19 62/2 66/3
**states [53]**
**States' [1]** 7/24
**statute [7]** 5/11 5/15 5/23 6/6 7/12 16/16 18/6
**statutes [3]** 4/16 5/18 25/14
**statutory [4]** 17/13 17/23 19/13 19/13
**stay [2]** 61/8 63/3
**stays [1]** 59/7
**stenography [1]** 1/24
**step [3]** 24/17 24/18 61/18
**Step 1 [2]** 24/17 24/18
**Stewart [3]** 27/15 31/11 31/13
**Stewart-Fulton [2]** 27/15 31/11
**stipulate [1]** 70/9
**stipulated [2]** 39/10 74/11
**stipulating [1]** 56/12
**stipulation [2]** 35/21 56/2
**stipulations [8]** 74/9 74/12 74/23 74/23 75/1 75/2 75/12 77/11
**straight [1]** 10/7
**straightforward [1]** 4/11
**strategic [1]** 58/1
**stray [1]** 66/15
**Street [1]** 2/7
**stringent [1]** 15/9
**struck [1]** 60/20 60/24 61/4 61/7
**student [7]** 12/17 16/6 26/22 31/15 32/15 32/16 33/7
**students [7]** 10/19 10/22 10/24 24/6 27/10 27/18 28/21
**study [1]** 24/22
**stuff [2]** 69/17 79/17
**subject [3]** 44/4 50/2 77/3
**subjected [1]** 22/18
**submissions [2]** 73/2 76/5
**submit [2]** 71/22 78/11
**submitted [9]** 11/10 13/21 40/21 72/20 72/21 72/22 72/23 73/4 78/6
**subsequent [1]** 36/20
**substantially [2]** 49/19 49/20
**success [1]** 49/16
**suffered [2]** 45/14 52/2
**sufficient [1]** 20/24
**suggested [1]** 37/15
**suggesting [2]** 38/24 42/7
**suitable [1]** 51/16
**Suite [1]** 2/7
**summarize [1]** 17/13
**summary [11]** 25/1 25/20 28/18 28/24 29/2 31/10 49/10 56/2 76/5 76/21 76/23
**superior [1]** 51/16
**supervisor [1]** 31/16
**support [2]** 24/17 24/18
**supports [1]** 33/17

**Supreme [8]** 5/7 5/24 36/15 37/4 38/9 39/1 39/4 53/22
**suspect [3]** 27/17 59/13 60/19
**system [4]** 20/13 28/21 63/23 66/24

**T**

**take [11]** 19/22 36/8 42/17 54/2 58/21 59/11 59/13 63/2 63/21 68/22 68/24
**taken [2]** 24/21 30/3
**talk [6]** 4/25 8/24 21/1 23/17 25/24 30/23
**talked [1]** 64/19
**talking [5]** 34/14 34/23 39/3 46/2 76/1
**talks [1]** 47/19
**technical [1]** 41/7
**technically [1]** 70/8
**technician [1]** 67/4
**tell [9]** 15/11 16/1 35/20 38/17 57/15 58/18 64/18 65/12 77/17
**telling [3]** 9/18 39/19 39/22
**tells [1]** 17/24
**tend [1]** 36/16
**term [3]** 18/23 18/24 29/22
**territory [1]** 56/10
**test [3]** 24/14 50/3 61/1
**testified [3]** 27/8 32/9 32/14
**testify [1]** 32/13
**testimony [9]** 10/2 34/3 34/4 34/5 34/15 40/12 40/22 41/7 70/17
**testing [9]** 15/22 16/2 23/3 23/7 24/7 24/13 24/21 49/5 49/11
**tests [4]** 23/3 23/4 24/10 49/4
**tethered [1]** 66/23
**Thank [28]**
**theirs [1]** 72/21
**theoretically [1]** 42/15
**theories [2]** 35/6 35/14
**theory [1]** 40/25
**think [59]**
**thinking [1]** 31/2
**third-amended [1]** 51/4
**third-party [2]** 21/5 24/5
**third-to-last [1]** 71/6
**thought [4]** 3/25 25/4 38/1 63/24
**thousand [1]** 42/14
**three years [1]** 43/12
**three-part [1]** 61/1
**three-step [1]** 61/18
**Thursday [3]** 50/11 50/14 54/2
**thus [2]** 41/9 43/11
**tickets [1]** 79/14
**tied [3]** 19/20 42/11 67/16
**till [1]** 78/3
**time [36]**
**times [2]** 13/22 50/5
**timing [1]** 50/5
**tire [1]** 30/6
**title [18]**
**Title 20 [2]** 18/25 19/4
**Title I [2]** 17/14 18/16
**Title III [6]** 6/16 17/17 18/17 18/19 19/20 19/21
**Title IV [3]** 8/18 8/19 8/22

## T

**Title VII [2]** 17/15 18/17
**ToniAnn [1]** 30/5
**top [1]** 73/10
**total [2]** 37/9 60/3
**touch [1]** 59/3
**transcript [4]** 1/13 1/24 27/17 80/20
**transcripts [2]** 48/11 48/25
**treated [2]** 74/20 75/14
**trial [19]**
**trouble [1]** 4/15
**true [16]** 10/14 16/11 16/18 19/16
  22/2 22/3 25/23 43/21 45/15 45/19
  62/2 62/3 65/13 74/22 77/17 80/19
**truly [1]** 42/23
**truth [2]** 9/19 45/16
**TUESDAY [2]** 3/1 50/10
**tuition [4]** 41/20 43/4 43/12 47/12
**two days [2]** 59/11 59/14
**typically [3]** 11/10 68/13 68/18

## U

**U.S [2]** 46/19 54/11
**U.S. [4]** 18/20 18/20 24/14 54/10
**U.S. definition [1]** 54/10
**U.S. schools [1]** 18/20
**U.S.-based [2]** 18/20 24/14
**U.S.C [5]** 6/24 7/1 7/11 17/8 18/16
**uhm [1]** 13/22
**ultimately [3]** 20/1 23/12 34/21
**Um [1]** 14/9
**Um-hum [1]** 14/9
**unconstitutional [4]** 60/20 60/24
  61/9 61/23
**uncontested [1]** 74/15
**undercut [1]** 53/13
**undergraduate [1]** 48/10
**understand [21]**
**understanding [2]** 19/25 35/13
**understood [3]** 14/2 18/7 49/6
**underwent [1]** 22/2
**unduly [1]** 41/14
**unfair [1]** 63/18
**Unfortunately [1]** 29/16
**UNITED [44]**
**universities [1]** 20/12
**university [18]**
**University's [1]** 4/12
**unless [3]** 60/13 70/8 79/10
**unnecessary [1]** 55/1
**unplugging [1]** 67/1
**unstated [1]** 65/18
**unsuccessful [1]** 56/7
**untimely [1]** 25/7
**us [8]** 17/24 25/7 27/4 29/2 36/23
  58/16 64/8 72/7
**USMLE [2]** 24/17 24/18

## V

**V-E-N-I-R-E [1]** 59/22
**value [1]** 37/1
**vendor [2]** 21/5 24/5
**venire [5]** 59/21 59/22 60/7 62/13
  64/3

**verbally [1]** 16/1
**verdict [2]** 45/5 46/2
**version [4]** 72/24 73/1 73/3 74/10
**versus [1]** 38/7
**veterinary [2]** 17/22 19/8
**via [1]** 72/15
**victim [1]** 47/24
**view [3]** 33/17 76/7 76/8
**views [1]** 28/15
**VII [2]** 17/15 18/17
**violated [2]** 62/4 62/5
**violation [1]** 61/3
**voir [9]** 59/19 59/20 66/9 71/11 71/11
  71/12 71/13 71/23 72/5
**voir dire [4]** 66/9 71/11 71/23 72/5
**voluntarily [3]** 54/25 55/22 56/17
**voluntary [1]** 56/18
**volunteer [1]** 52/13
**voyeur [1]** 59/18
**vs. [4]** 3/7 30/12 36/21 40/9
**vs. Delta [1]** 36/21

## W

**wait [2]** 68/24 78/3
**warn [1]** 66/18
**wasted [3]** 47/6 47/6 48/1
**wealth [1]** 52/12
**website [6]** 9/19 10/20 26/9 28/1 43/1
  46/24
**week [2]** 50/9 79/15
**Westlaw [1]** 40/10
**whatsoever [1]** 70/7
**whenever [1]** 45/25
**wherever [1]** 12/14
**white [1]** 47/25
**who's [3]** 16/23 31/11 31/16
**wife [1]** 63/16
**wisely [1]** 65/10
**withdraw [3]** 54/25 56/23 57/4
**withdrawn [1]** 57/5
**witness [6]** 27/16 27/16 40/12 40/25
  68/1 68/4
**witnesses [4]** 27/8 27/14 28/10 28/19
**women [1]** 61/8
**word [3]** 45/6 76/9 76/9
**words [1]** 20/18
**work [9]** 51/7 52/8 53/9 58/18 63/15
  70/23 70/23 70/24 73/18
**working [1]** 59/5
**works [5]** 16/7 30/8 58/11 58/15
  67/12
**world [1]** 43/19
**writing [1]** 11/13
**written [1]** 16/12
**wrong [1]** 19/18

## Y

**yields [1]** 61/1
**you'd [2]** 31/24 39/23

## Z

**zero [1]** 16/14

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on October 16, 2019, true and correct copies of

the Supplemental Appendix to Answer Brief of Appellee Ross University School

of Medicine, School of Veterinary Medicine Limited, Volumes I and II, were

served via ECF and email on:

> Oluwamuyiwa Awodiya
> 15005 Dahlia Drive
> Bowie, Maryland 20721
> Telephone: (240) 602-1836
> E-mail: drmuyiwa.a@gmail.com

> */s/Michael C. Marsh*_____
> Michael C. Marsh